## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 21-31333 |
| **JAMES D. BULGER,** | Chapter 7 |
| Debtor. | |

### MOTION TO DISMISS BANKRUPTCY CASE WITH PREJUDICE PURSUANT TO 11 U.S.C. § 349(a) AND MODIFICATION OF REQUEST FOR INJUNCTION AGAINST REFILING BANKRUPTCY

COME NOW Pike Road Investments, LLC ("Pike Road") and John William Kitchens ("Kitchens") (collectively, the "Movants"), by and through counsel, and move to dismiss this bankruptcy case with prejudice pursuant to 11 U.S.C. § 349(a) so that James D. Bulger ("Bulger") may not discharge any existing debts in a future bankruptcy case. In addition, the Movants modify their request for an injunction against refiling to one of at least two years. In support thereof, the Movants state as follows:

### FACTS & PROCEDURAL HISTORY

1.      The Movants (and other plaintiffs) sued Bulger for fraud and other counts in the Circuit Court of Autauga County ("the State Court") in April 2021. *See Pike Road Investments, LLC v. Bulger*, CV-2021-900069 (Autauga Cnty. Cir. Ct.).

2.      On July 29, 2021, the Movants filed a motion to hold Bulger in civil and criminal contempt and sought sanctions against Bulger due to his violations of the State Court's July 6, 2021 preliminary injunction. The State Court scheduled a hearing on the motion for August 5, 2021 at 9:00 a.m. After off-the-record arguments in front of the State Court and minutes before the contempt hearing, Bulger filed this bankruptcy case. The State Court nevertheless

proceeded with the hearing on criminal contempt, found Bulger committed eight violations, held him in contempt, sentenced him to forty days in jail, and sanctioned him $5,000.

3.        After conducting the contempt hearing on August 5, 2021, the State Court found that Bulger had committed eight separate violations of the State Court's orders, held Bulger in criminal contempt, ordered that Bulger be jailed for forty days (i.e., five days for each violation consecutively), and ordered that Bulger pay $5,000.00 in sanctions. Bulger was incarcerated that day.

### The Bankruptcy

4.        Bulger filed his schedules and Statement of Financial Affairs on September 17, 2021. (Doc. 13). The Bankruptcy Administrator moved to dismiss this bankruptcy case on September 22, 2021, citing Bulger's failure to obtain pre-petition credit counseling. (Doc. 22). Bulger and two of his co-defendants in the State Court, Ricky Adams ("Adams") and Greg Schmitt ("Schmitt"), nevertheless removed the Movants' lawsuit to this Court on October 11, 2021. (Doc. 25; *see also* Adv. Pro. 21-03023).

5.        On October 21, 2021, Bulger filed an objection to the Bankruptcy Administrator's motion to dismiss. (Doc. 29) On October 25, 2021, the Movants filed a joinder to the Bankruptcy Administrator's motion and requested an injunction against Bulger re-filing bankruptcy, alleging that he filed bankruptcy in bad faith, concealed assets, and engaged in post-petition transfers through Adams and Schmitt.[1] (Doc. 30). On September 17, 2021, Bulger amended his Schedule F to disclose an additional creditor owed $214,000 and his

---

[1] The Movants also raised Bulger's lack of pre-petition credit counseling as grounds for dismissal. The Movants do not waive that issue, but it has been amply discussed (Doc. 30) and need not be focused on here.

Statement of Financial Affairs to disclose additional former business interests. (Doc. 59). An evidentiary hearing is currently scheduled for November 30, 2021.

6.        The Movants have obtained more than one-hundred recordings of phone conversations Bulger had with Adams and Schmitt while he was in jail and after filing bankruptcy, which they have worked diligently to review and get transcribed. In addition, the Movants deposed Bulger, Adams, and Schmitt on November 18, 2021, transcripts of which they received today. However, the Movants believe that the combination of the jail call transcripts and the deposition transcripts will establish the allegations set out below.

**Bad Faith Purpose in Filing Bankruptcy**

7.        The Movants have previously asserted that Bulger filed bankruptcy to try to stop the State Court's contempt hearing and to engage in forum shopping. As noted, Bulger filed bankruptcy mere minutes before a contempt hearing in front of the State Court, and he was apparently unable to obtain pre-petition credit counseling because he did not decide to file bankruptcy until after he had arrived for that hearing. However, Bulger also hoped to either weaponize the Trustee against the Movants or to use that threat as leverage against the Movants to force a settlement. Bulger's jail call transcripts bear this out.

8.        For instance, on August 13, 2021, Bulger had the following conversation with Schmitt:

> BULGER: All right. He was impressed with my offer. He said, "That's a hell of an offer. That's a strong offer," and I said, "Well – so talk to him. I told him that, you know, that – told him how it was, you know, that I was going to list every single one of them promissory notes from him to me for all them millions. And let the trustee with unlimited funds, he could deal with him. Wouldn't be dealing with me no more, or I can pull it out. Huh?
>
> SCHMITT: Oh, okay. I didn't know.

BULGER: Yeah. See, I'm in bankruptcy, and I got to list all my assets. So my assets are those loans that I made to Billy. So I'm going to list them, and he can either take my offer or I'm going to list them. And then he won't be dealing with me no more. I will be out of it, and he will be dealing with the trustee. And the trustee has unlimited funds. They can do anything they want. So that will fuck him up.

SCHMITT: Damn. That's good. I'm glad.

BULGER: Yeah.

SCHMITT: I'm glad. I wasn't sure if Bill came through or not. I'm glad.

BULGER: Yeah. I feel confident with it.

SCHMITT: Great. So we won't have to put up with that damn judge anymore?

BULGER: Right, uh-huh. That's over with.

(Phone Call Transcript, Aug. 13, 2021, starting at 1:29 p.m.; 2:4 – 4:1).[2] (**Exhibit A**).[3]

9.        Bulger was also not fully committed to seeking a fresh financial start if he could settle his lawsuit against the Movants. For instance, on August 22, 2021, Bulger had the following conversation with Schmitt:

SCHMITT: I know. That's just – if he is gone, it's just [inaudible] – you know, with the bankruptcy court, like you said.

BULGER: Yeah.

SCHMITT: [Inaudible.]

BULGER: Yeah. But I hate to have to go through it because Bill can write me a letter that says it was like a clerical error or, you know, word it some kind of legal way. I don't know how the hell to word it, but he can word it some kind of way. And I can give it to that lady, and she can get that taken right back off. And then I

---

[2] The pinpoint citations to the Phone Call Transcripts and Deposition Transcripts are formatted as "page:line – page:line."

[3] See page 36 of this Motion for an Index of Exhibits.

will get the house signed back over to me, and I will go to the
bank and borrow against it. I will try to get a million or so and –
because I will qualify for it. . . .

(Phone Call Transcript, Aug. 22, 2021, starting at 10:35 a.m.; 3:8 – 3:22). (**Exhibit B**).

10.       There are other jail call transcripts where Bulger makes similar statements to

Adams and Schmitt that indicate a bad faith purpose in filing bankruptcy. The Movants are

prepared to introduce them as evidence at trial.

**Concealment of Assets**

<u>The House</u>

11.       Bulger, Adams, and Schmitt all live at 2211 U.S. Highway 31 North, Deatsville,

Alabama 36022 (the "House"). At his deposition, Bulger testified that he purchased the House

and transferred it to Jimmy James D. Bulger, LLC, which, according to Bulger's deposition

testimony, has always been owned by Adams, Schmitt, and Jeremy Richards. (Bulger

Deposition Transcript, Nov. 18, 2021; 15:5 – 15:17, 64:6 – 64:20). (**Exhibit C**). However,

records from the Secretary of State reveal that Jimmy James D. Bulger, LLC was formed by

Bulger on June 4, 2020 and was dissolved by Bulger on July 22, 2021; on both the formation

and dissolution documents, Bulger identified himself as the owner of Jimmy James D. Bulger,

LLC. (**Exhibit D**). Bulger did not disclose the House as an asset on Schedule A and he did not

disclose his prior interest in Jimmy James D. Bulger, LLC on either his initial or his amended

Statement of Financial Affairs.[4] (Doc. 13, pp. 10-16, 45-46; Doc. 59, pp. 12-13).

12.       Though Bulger denied this in his deposition, Bulger's jail calls strongly suggest

that Adams, Schmitt, and Jeremy Richards are holding the House in trust for Bulger to conceal

it from his creditors. Bulger's conversation with Schmitt on August 22, 2021 suggests that

---

[4] Bulger's Schedule A discloses real estate on Highway 31, which apparently is undeveloped land located
behind the House, but not the House itself. (Doc. 13, p. 13).

Bulger believes he can regain ownership of the House upon request. (¶ 9). In addition, Bulger

had the following conversation with Adams on August 21, 2021:

> BULGER: Yeah. I think that's the only thing I have left that we
> need to do, but I asked for that back lot behind the house. What
> I'm going to do is I'm going to build like two – well, it will be
> four like little bungalows. And me and Greg can move into them,
> into one of them. You know, it would be two buildings, but each
> building would have –
>
> ADAMS: Right.
>
> BULGER: Yeah, be like a duplex. So me and Greg can move into
> one of them, and then that way we can free his side up and –
>
> ADAMS: Get that rolling.
>
> BULGER: Yeah, get that rolling. And then I will get everybody
> to sign the house back over to me, and I will go to the bank and
> borrow the money against it. And I will probably buy another
> cabin in the mountains but buy one a little nicer, a little more
> upscale.

(Phone Call Transcript, Aug. 21, 2021, starting at 12:59 p.m.; 7:2 – 7:19). (**Exhibit E**). When

asked about that conversation in his deposition, Adams agreed that that was the arrangement:

> Q: Okay. In that – look at page 7. Page 7 says, "I will get
> everybody to sign the house back over to me and then I will go to
> the bank and borrow money against it. And I will probably buy
> another cabin. . . ." So his idea was to take the – for you guys to
> give him back the property?
>
> A: Yes.
>
> Q: Okay. And when was he going to – you were going – when
> were you going to deed it back to him?
>
> A: I don't know.
>
> Q: Whenever he asked you to; is that correct?
>
> A: I don't know when that would be.

Q: But whenever he asked you to, that was his plan, and you were going to do that?

A: Yes.

(Adams Deposition Transcript, Nov. 18, 2021; 103:3 – 103:21). (**Exhibit F**). And so did Schmitt:

Q: What property are you holding for him?

A: Just the Jimmy James Bulger, LLC, the house.

Q: Okay. That's the only property you're holding?

A: And that – all that land that's up there. It's all in that.

(Schmitt Deposition Transcript, Nov. 18, 2021; 44:5 – 44:12). (**Exhibit G**).

<u>Business Interests</u>

13.     Bulger appears to have transferred businesses to his associates after the State Court entered its preliminary injunction, but still appears to retain overall control of them.

14.     On January 19, 2021, Bulger formed Renaissance Builders LLC and subsequently transferred his interest in the entity to Adams, who dissolved the entity on July 22, 2021 and formed Renaissance Builders II LLC on the same day. (**Exhibit H**). At deposition, Bulger testified that he never had an interest in Renaissance Builders LLC and that it was always Adams's entity, while Adams testified that he never owned Renaissance Builders LLC. However, they are the only two individuals who ever signed paperwork for Renaissance Builders LLC that was filed with the Secretary of State. (Exhibit H).

15.     Bulger and Adams testified at deposition that Renaissance Builders II LLC was owned by Adams, Jeremy Richards, and Ginger McLeod and that Bulger merely acted as a consultant. However, the nature of Bulger's compensation and the jail calls undermines this

- 7 -

claim. Bulger testified at deposition that he has no set consulting rate and basically just gets paid whatever he asks for when he makes a consultation.

16.     In numerous calls, Bulger provided specific instructions to Adams and Schmitt about signing on closing documents to purchase property, laying out property, accepting cash draws and distributing funds, putting up fencing, and ordering lumber. For example:

> BULGER:  You have to talk real loud because I can't hear.  Hey, y'all were supposed to close on that 3.5 acres today with Monica.
>
> ADAMS:  I didn't know nothing about it.
>
> * * *
>
> BULGER:  Try to do it today, if you can.  Just go ahead and leave there and handle the business.
>
> ADAMS:  Right.
>
> BULGER:  And then call Monica's office and find out – if you will look in my phone, it says 3.5 acres or whatever.  You know, let that man know, see if they have the paperwork straight.  See it Monica got it straight and then –
>
> ADAMS:  Okay.
>
> BULGER:  And call Monica or ask him did everything get signed on the six acres.
>
> ADAMS:  Right.

(Phone Call Transcript, Aug. 9, 2021, starting at 2:02 p.m.; 2:5 – 2:9, 8:13 – 9:2).  (**Exhibit I**).

Or this conversation with Jeremy Richards:

> BULGER:  All right.  We are sitting a lot better than it was before.  I can't wait to tell you about it.
>
> RICHARDS:  Listen, we need you out.
>
> BULGER:  Yeah, I know.  I swear to God.  Crazy motherfucker.  But in that opening back there, just position that house where if

that – down at the end of that driveway, when it turns to the
right, that little opening that's down there?

RICHARDS:  In the bottom?  Yeah.

BULGER:  Uh-huh.  That driveway will be split.  You know, that
right side will go with that opening, and the left side will go down
in those woods.  Just position that house on that right – on the
right side, that opening, where it kind of faces that driveway at an
angle, you know, so when you drive in, you will just be driving
straight up to the house.

RICHARDS:  Okay.  The first house you are going to do –
position to the right-hand side?

BULGER:  That's right, in the opening, in that – where it's
already cleared out.

RICHARDS:  Okay.

BULGER:  Just find the levelest spot.  What I will do is when I
get a paper and pen, I will sketch out everything for you, and I
will send it to you.

RICHARDS:  Yeah.

(Phone Call Transcript, Aug. 11, 2021, starting at 1:17 p.m.; 2:11 – 3:14).  (**Exhibit J**).  Or this

conversation later in the same phone call, after Jeremy Richards had given the phone to Adams:

BULGER:  Okay.  Did you get – on the first, the draws and all
that, you got that?

ADAMS:  Yeah.  We've got that.

BULGER:  All right.  On the – okay.  It ain't no – don't talk a lot
about Jeremy.  We are going to get everything divided up.  So
then on the six acres, did you get the draws to those?

ADAMS:  Six acres?  We only got one draw.

BULGER:  Okay.  All right.  Call – call – call Stephanie and tell
her that you are ready for the other two houses down there on the
six acres.

ADAMS:  Okay.

- 9 -

BULGER:  We are ready to start them.

ADAMS:  That we closed yesterday?

BULGER:  Yes, you closed yesterday.  Not the three and a half acres.  Listen to me now.  Okay.  You have to listen to me.  Stop talking and listen to me now.  The six acres is going to be divided in half, and it's going to be two three-acre lots.  And it's already approved and everything so get your draws.  Get your first draw on each one of those.  Have you got it?

ADAMS:  Yeah, two and a half acres.

BULGER:  Do what?

ADAMS:  The first draw is on the two and a half acres?

BULGER:  No, on the six acres.  Six acres is going to be divided in half, and that will be two three-acre lots.

ADAMS:  Okay.  Get the draws on them?

BULGER:  Yes.  Get the draws on the next two houses, your first draw on your next two houses.  I need to get paid well for this consultation.  Then the three and a half acres has nothing to do with anything.

ADAMS:  Oh, okay.

BULGER:  Yeah. Just forget about it for right now.  All we have to do is make the payment.

ADAMS:  Okay.  So what – so to get – I need to send her paperwork on those two.

BULGER:  She should already have it.  She should have it from Monica, and then you and I put that paperwork together ourselves.  Do you remember when we were sitting on the front porch and we did it?

ADAMS:  Uh-huh.

BULGER:  Okay.  So you want to get the first draw for each one of those houses, but don't spend it.  Just let me walk us through it.

And I'm going to call you back later, and we will talk about everything.

ADAMS: Okay. So I'm fixing to call her and get the first draw [inaudible].

BULGER: Yes. And that way you can start them before the rain gets here because that hurricane is coming.

ADAMS: So what I do with that, they are going to start clearing the lot?

BULGER: Yeah. But just leave it in there – just leave it in there for right now. And what I'm going to do is get Kenny and Lonnie to start putting up the fence. They can start putting up the fence around it.

(Phone Call Transcript, Aug. 11, 2021, starting at 1:17 p.m.; 4:8 – 7:2). (Exhibit J).

17.     At his deposition, Bulger characterized all these conversations as merely

"advising" Renaissance Builders II LLC, and not controlling it. However, it soon became

evident that he had an exceedingly broad interpretation of that term:

Q: Have you been – have you had – what other businesses since you got out of jail have you been working at that you've made any income?

A: Just with Renaissance II.

Q: Okay. How much money did you make while you were in jail working for Renaissance?

A: I didn't make any while I was in jail. They just fronted me some.

Q: They fronted you some. How much did they know how to front you?

A: Whatever I needed.

Q: So it's not – it's whatever you needed, it's not based on what you earned?

A:  And then I turned around, and I did whatever they needed me to do.  I was giving advice while I was in there, so, I mean, that was part of it.

Q:  What would you tell them in jail to do with regards to the draws that they received?

A:  Pay whatever they had to pay and give me whatever I was needing.

Q:  Just give you whatever you needed?

A:  Yeah.

Q:  And you sort of controlled that – that money flow, didn't you?

A:  No, I don't control anything.  I just tell them how I would do it.  It may sound like I control it, but I don't control it.

Q:  Do you know that you had over 140 conversations with them while you were in jail?  Would that surprise you?

A:  No.

Q:  Okay.  Do you know in each one of them you told them exactly what to do with the money and how to spend it and what to do with it, each and every time?

A:  Sure.  I'm the advisor to it.  Yes, absolutely.

Q:  You didn't just advise them, you told them where the money was going to go?

A:  That's advising.

Q:  In fact, you told them out of the first draw to pay your attorney fee?

A:  That's advising.

Q:  Is that correct?

A:  Yeah.  That's advising.

Q:  You told them to pay $5000 out the first draw of their property to your lawyer to file this bankruptcy?

- 12 -

A:  Yes.  And then I also told them —

MR. BENSINGER:  Object to the form.

A:  -- how to pay the bills and whatever they had to do.

Q:  Did you tell them to pay $5000 —

A:  Yes.

Q:  -- out of the first draws —

A:  Yes.

Q:  -- to your attorney?

A:  Yes.

MR. BENSINGER:  Object to the form.

(Bulger Deposition Transcript, Nov. 18, 2021; 117:10 — 120:6).  (Exhibit C).

18.     Although he does not have a homebuilder's license, Bulger characterized his occupation on his Schedule I as a homebuilder.  (Doc. 13, p. 34).  Meanwhile, though Adams took a carpentry class in high school, he was unable to provide any specificity in deposition about his job duties with Renaissance Builders II LLC.  (Adams Deposition Transcript, Nov. 18, 2021; 25:11 — 27:15, 30:13 — 31:14).  (Exhibit F).

19.     Similarly, Bulger formed The Venue at the Fortuitous LLC on December 21, 2020, dissolved the entity on July 22, 2021, and Adams, Jeremy Richards, and Ginger McLeod formed The Fortuitous LLC on July 6, 2021.  (**Exhibit K**).  Schmitt acknowledged in his deposition that Bulger had transferred the business them:

Q:  Okay.  What businesses do you know that Mr. Bulger owns presently or has an interest in right now?

A:  None that I know of, not one that I know of.

- 13 -

Q: Do you know any of them he's transferred to anybody in the last 12 months?

A: Transferred?

Q: Yeah.

A: Yeah, the Fortuitous.

Q: Okay. He transferred that one to you guys?

A: Right, and deeded us those apartments, yes.

(Schmitt Deposition Transcript, Nov. 18, 2021; 43:10 – 44:1).[5] (Exhibit G).

20.     The deponents testified that The Fortuitous LLC was an event-hosting business that operated out of the House, as well as an Airbnb. Bulger testified at deposition that he does not own an Airbnb, and that Adams, Schmitt, and Jeremy Richards operate an Airbnb there. (Bulger Deposition Transcript, Nov. 18, 2021; 61:12 – 61:18). (Exhibit C). However, Bulger provided instructions to Adams and Schmitt about this business while he was in jail. *E.g.*, (Phone Call Transcript, Aug. 18, 2021, starting at 10:01 a.m.; 8:8 – 8:13). (**Exhibit L**). Bulger also intended to leverage the House, after it is signed back to him, to finance additional Airbnbs, as he explained to Schmitt on August 22, 2021:

> BULGER: I'm going to get as many of these Airbnb's going as I can. And then I'm going to buy the -- try to buy another – if I can get that loan against the house, I will buy another cabin in the mountains and just get like a closet, like I got at the house, you know, and just lock our stuff up in it. And then when we want to go, just mark off those dates and then that way keep it where it's making money too.
>
> SCHMITT: Oh, yeah.
>
> BULGER: And then – it will be like an Airbnb. You know, it would just be the same thing.

---

[5] The deponents all testified that the "apartments" Schmitt referred to are located at the House.

SCHMITT: Yes. That sound good. Okay.

BULGER: Yeah. I got – I got a lot of plans. I just – you know, I know these phones are recording my conversations so I don't want to say too much.

SCHMITT: Right.

(Phone Call Transcript, Aug. 22, 2021, starting at 10:35 a.m.; 5:8 – 6:2). (Exhibit B).

21.     Bulger formed Magnolia Real Estate Services LLC on March 11, 2021 at 2211 U.S. Highway 31 North and dissolved it on July 21, 2021; five days later, Ginger McLeod formed Magnolia Real Estate Services II LLC. (**Exhibit M**).

22.     Each of the businesses discussed above listed the House as their principal place of business. Bulger failed to disclose these prior interests in his initial Statement of Financial Affairs, notwithstanding that these interests fell within the ambit of Question 27 of that document, and notwithstanding that he had been held in contempt for these businesses' activities.[6] (Doc. 13, pp. 45–46). Yet, Bulger appears to control each of these businesses. As he stated in a conversation with Schmitt on August 22, 2021:

BULGER: All right. And we have to learn that – learn that app because I don't want nobody to be able to get nothing over on us anymore. That's over with.

SCHMITT: Okay. I don't know nothing about an app. I don't know nothing about an app.

BULGER: I don't really know what it is, but there has to be a way to track it because we are 50/50 on it. You know, he gets half, and I get half. I just don't want nobody to be able to blind side us anymore. Nobody else has control of us.

SCHMITT: Right. [Inaudible.]

---

[6] On November 17, 2021, the night before his deposition, Bulger amended his Statement of Financial Affairs to disclose his prior interests in Magnolia Real Estate Services LLC and The Venue at the Fortuitous LLC. He did not disclose a prior interest in Renaissance Builders LLC in this amendment. Doc. 59, pp. 12–13). Nevertheless, the Movants had already raised the initial omissions as an issue in their joinder to the motion to dismiss. (Doc. 30, ¶ 24).

- 15 -

BULGER: Because if I can do what I do and make everything come together and Ricky has my back on the houses and all that, if Jeremy – you know, they are going to split the – you know, split it. And then the only loose cannon we would have – and you would have the office stuff. The only loose cannon we would have would be Ginger, but I'm pretty good at that real estate so I might can – I might can watch her, you know what I mean?

SCHMITT: Okay.

BULGER: Because everything has to go in trust. And, see, when I get out, I can put everything back in my name because that restraining order is off of me.

(Phone Call Transcript, Aug. 22, 2021, starting at 9:51 a.m.; 7:14 – 8:16). (**Exhibit N**).

23. In addition, Bulger's jail calls indicate that he had an undisclosed ATV company in Mexico. On August 13, 2021, Bulger had the following conversation with Adams:

ADAMS: I think that's it. What you call it, somebody offered Jim. They wanted to buy you out of the ATV company for like something. He sent the contract over that the guy offered him about it.

BULGER: Okay. The guy in Mexico?

ADAMS: Yeah.

BULGER: How much would I get?

ADAMS: It was like 50,000.

BULGER: Yeah. Tell him to sell it.

ADAMS: Something else.

BULGER: Text him back and say yes.

ADAMS: Okay.

BULGER: But put USA money behind it or USN, whatever it is.

ADAMS: Yeah.

- 16 -

(Phone Call Transcript, Aug. 13, 2021, starting at 1:01 p.m.; 7:14 − 8:5).  (**Exhibit O**).  Bulger

disclosed four scooters in Mexico, but not an ATV business that might be worth $50,000.

(Doc. 13, p. 16).

<u>Unnegotiated Checks</u>

24.        For months, Bulger has been receiving checks from what is likely his most

profitable business, C-Squared Performance Automotive, LLC, which he owns 50% of.  Rather

than negotiate these checks, Bulger has been storing them and, per his deposition, intends to

present them at a later date:

> Q:  Does Ricky get a check every week?
>
> A:  I don't know.  I used to get one.
>
> Q:  You're still getting written checks every week, but they're just
> not being cashed; is that correct?  They're staying in the drawer,
> right?
>
> A:  Yes.
>
> Q:  You didn't disclose that you had checks that you were owed
> from C-Squared Performance Automotive on your schedules, did
> you?
>
> A:  Because it didn't have the money to pay me.
>
> Q:  You had checks that − that was a debt that was owed to you
> by C-Squared Performance Automotive, and you did not list that
> on your schedules, did you?
>
> MR. BENSINGER:  Object to the form.
>
> A:  I didn't know I had to because they're no good.  You know, it's
> not −
>
> Q:  Didn't you tell Ricky that you were going to use that to
> negotiate buying that business, 100 percent of that business?
>
> A:  I wish I could.

Q: Didn't you tell him that when you were in jail, that you were going to use that as leverage to buy the business back?

A: No. It would be a great idea.

* * *

Q: How many checks – they have been writing you a check every week and putting it in the cash drawer. Tell me how much they're writing you every week and putting it in the cash drawer.

A: It's supposed to be 1300.

Q: Thirteen hundred a week?

A: Yes. And I have no idea how many there is.

Q: It's been for months, hasn't it?

A: Yes.

(Bulger Deposition Transcript, Nov. 18, 2021; 73:23 – 75:5, 76:16 – 77:3) (Exhibit C); *see also*

(Adams Deposition Transcript, Nov. 18, 2021; 49:10 – 50:8) (Exhibit F) (similar testimony).

25.    Bulger did not disclose any unnegotiated checks from C-Squared Performance

Automotive, LLC in response to Question 20 on Schedule B. (Doc. 13, p. 19).

### <u>Real Estate Trusts</u>

26.    Bulger did not disclose his interest in twelve self-settled real estate trusts that he

created in February 2021 and which, pursuant to the trust documents, he is the beneficiary of.[7]

Elliot Ramos is the trustee of each real estate trust, and the trust and transfer documents are

substantially identical, differing only in the specific real estate being transferred to the trust.

Each trust agreement contains the following language:

---

[7] The trust paperwork also includes documents that Bulger signed on behalf of Pinehurst, LLC, a Florida limited liability company. The Movants are still investigating Bulger's relationship to Pinehurst, LLC.

> Whereas, the Beneficiaries are about to convey or cause to be
> conveyed in the near future certain real property to the Trustee,
> and the Trustee has agreed to accept such conveyance and hold
> the real property as a fiduciary in trust for the Beneficiaries under
> the terms and conditions set forth below[.]

For each real estate trust, Bulger was the only party who transferred real estate to the trust.

(**Exhibit P**).[8]

27.     Pursuant to the above-referenced language in the trust documents, Bulger is the beneficiary of the following real estate trusts containing the following real properties:

a.      <u>409 Chisolm Street Land Trust</u>, to which Bulger transferred real property located at 409 Chisolm Street, Montgomery, AL 36110 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5539, Page 0126;

b.      <u>229 West Woodland Drive Land Trust</u>, to which Bulger transferred real property located at 229 West Woodland Drive, Montgomery AL 36105 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5539, Page 0143;

c.      <u>3763 Whiting Avenue Land Trust</u>, to which Bulger transferred real property located at 3763 Whiting Avenue, Montgomery, AL 36105 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5538, Page 0983;

d.      <u>612 Planters Court Land Trust</u>, to which Bulger transferred real property located at 612 Planters Court, Montgomery, AL 36109 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5539, Page 0159;

---

[8] The Movants are only attaching paperwork for one of the real estate trusts because attaching all twelve would be voluminous.  However, the paperwork for the remaining eleven trusts is substantively identical.  All trust paperwork has been produced to Bulger's counsel and will be produced at the hearing.

e. 212 East Park Avenue Land Trust, to which Bulger transferred real property located at 212 East Park Avenue, Montgomery, AL 36110 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5539, Page 0176;

f. 6153 Cherry Hill Land Trust, to which Bulger transferred real property located at 6153 Cherry Hill Road, Montgomery, AL 36116 (Montgomery County) on February 4, 2021, per deed recorded in Real Property Book 5545, Page 0947;

g. 39 Davis Drive Land Trust, to which Bulger transferred real property located at 39 Davis Drive, Montgomery, AL 36105 (Montgomery County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0608;

h. 116 Hobbie Drive Land Trust, to which Bulger transferred real property located at 116 Hobbie Drive, Montgomery, AL 36105 (Montgomery County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0767;

i. 4599 Dover Road Land Trust, to which Bulger transferred real property located at 4599 Dover Drive, Montgomery, AL 36116 (Montgomery County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0750;

j. 6000 Oakleigh Road Land Trust, to which Bulger transferred real property located at 6000 Oakleigh Road, Montgomery, AL 36116 (Montgomery County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0700;

k. 3256 Upchurch Circle Land Trust, to which Bulger transferred real property located at 3256 Upchurch Circle, Montgomery, AL 36105 (Montgomery

County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0624; and

l.  319 East Park Avenue Land Trust, to which Bulger transferred real property located at 319 East Park Avenue, Montgomery, AL 36110 (Montgomery County) on February 16, 2021, per deed recorded in Real Property Book 5546, Page 0806.

28.     Bulger did not list an interest in these self-settled trusts on Question 25 of his Schedule B (Doc. 13, p. 20) and did not disclose the transfers on Question 19 of both his initial and amended Statements of Financial Affairs.  (Doc. 13, p. 44; Doc. 59, p. 11).  At his deposition, Bulger claimed that he had sold these properties to HIS Capital.  The trust agreements say otherwise.

Seven Million Dollars

29.     Finally, Bulger testified at deposition that seven million dollars in cash had been stolen from him in the past several months.  He did not give specifics about precisely when the theft occurred or when he noticed it, and he did not contact the police about the theft.  (Bulger Deposition Transcript, Nov. 18, 2021; 44:15 – 46:23).  (Exhibit C).  He did not disclose the theft on either his initial or amended Statement of Financial Affairs or on Schedule B.  (Doc. 13, pp. 20-21, 42; Doc. 59, p. 9).  However, deposition testimony suggests that Bulger did not carefully monitor his cash assets:

Q:  How much money did you have in cash at the beginning of this year, approximately?

A:  I wouldn't even know.

Q:  Would you have more than $100,000?

- 21 -

A:  I wouldn't even know.

Q:  Could you have?

A:  I don't know.

Q:  Would have had more than ten?

A:  I don't know.

Q:  Could you have – so you could have had more than $100,000

in cash at the beginning of this year?

A:  I don't know what I had.

Q:  Could you have had a million?

A:  I don't know.

Q:  So you're not saying you didn't, you just don't know?

A:  I just don't know.

Q:  Okay.  Could you have had three million?

A:  I don't know.

(Bulger Deposition Transcript, Nov. 18, 2021; 203:19 – 204:17).  (Exhibit C).

30.     To summarize, Bulger failed to disclose prior or current interests in four businesses, three of which now have successor entities under the ownership of Bulger's associates.  Bulger's jail calls indicate that his associates received Bulger's residence without paying adequate consideration and that they will transfer the property back to Bulger upon his request.  Bulger failed to disclose unnegotiated checks that he has been accumulating from one of his businesses.  Furthermore, Bulger failed to disclose his beneficiary interest in twelve self-settled real estate trusts, each of which contains valuable real estate.  Finally, Bulger possibly

failed to disclose an interest in two parcels that, per his instructions, were transferred post-petition.

## Post-Petition Transfers

31.     Bulger's jail calls also indicate that multiple post-petition transfers took place at his behest while he was in jail.  For instance, it appears that he transferred real estate while he was in jail.  On August 9, 2021, Bulger had the following conversation with Schmitt:

> BULGER:  Okay.  And the houses is coming along?
>
> SCHMITT:  Yes.  He is going along with the houses.  I just talked to Bill, Bill attorney.
>
> BULGER:  Okay.
>
> SCHMITT:  Let him know the conditions, and he said also he [inaudible].
>
> BULGER:  He said what?
>
> SCHMITT:  You have two houses with permits, two small ones.
>
> BULGER:  Okay.
>
> SCHMITT:  Two small ones.
>
> BULGER:  Just transfer them.  Just get them moved.
>
> SCHMITT:  Yes, that's what I told him.  We'll do that.

(Phone Call Transcript, Aug. 9, 2021, starting at 1:53 p.m.; 4:2 − 4:17).  (**Exhibit Q**).

32.     Bulger disclosed several interests in real estate that are subject to installment land sale agreements.  (Doc. 13, pp. 10-16)  However, he transferred payments received on some of these properties while he was in jail.  In his deposition, Bulger testified that the purchaser's name was Cash:

> Q:  Who is Cash?

A:  That's the one that – I thought you were talking about – you were talking about money one second, then you asked me about Cash.  That's the – that's his nickname – I don't know what his real name is – that's purchasing those properties.

Q:  How much does he pay you a month?

A:  He pays 3000 a month, and I've got it put up for whatever I'm supposed to do with it.

Q:  He puts it in your mailbox every month, right?

A:  Uh-huh.

Q:  For cash?

A:  Uh-huh.

Q:  And you didn't list any of the cash, but you remembered when you were in jail to tell Ricky and Greg to get the money out of the mailbox, correct?

A:  Yes.

Q:  So your testimony today is although you remembered it in jail, you didn't remember to tell the bankruptcy court that you were owed money in the form of cash that you received every month?

A:  I'm remembering as we go.  I'm going through everything.

(Bulger Deposition Transcript, Nov. 18, 2021; 120:12 – 121:17).  (Exhibit C).  Bulger's last response became a frequent refrain throughout his deposition.  In jail, Bulger had the following conversation with Schmitt on August 8, 2021 about receiving the payment from Cash:

BULGER:  Okay.  Now there is a guy, his name is Cash, that makes a $3,000 payment to me at the first of every month.  You know whenever you go down to the box and there is always $3,000 in cash down there?

SCHMITT:  Yes.

BULGER:  Tell Ricky to – he has my phone so make sure he is answering the text messages.

- 24 -

SCHMITT:  Okay.  I will be sure and tell him.  I will get him to do that.

BULGER:  Okay.  All right.  So he can – we can get that 3,000, and that will help.

SCHMITT:  Okay.  All right.

BULGER:  That guy normally just texts me and says it's in the box.  So it could be down there, just sitting there.

(Phone Call Transcript, Aug. 8, 2021, starting at 9:54 a.m.; 4:18 – 5:10).  (**Exhibit R**).  The following day, Bulger instructed Adams on what to do with the payment from Cash as set forth below:

BULGER:  All right.  You know on my phone, the name on the phone is Cash.  Did Greg explain it to you?

ADAMS:  Huh-uh.

BULGER:  Okay.  He pays me $3,000 a month in cash.

ADAMS:  Right.

BULGER:  So call him.  He should have already brought it to us.  So call him. . . .

\* \* \*

ADAMS:  Right.  And what are we going to do with the 3,000?  What do we do with that?

BULGER:  Okay.  Actually, you probably can give it to Jeremy, you know, to keep him happy.  How much do you have left?

ADAMS:  I probably have about $300 in my pocket.

BULGER:  Okay.  Well, give him two of it or something and hold on to the other or something.  But that other, when it hits, when it does, you will be all right.  Greg told you how to do that?

ADAMS:  Huh-uh.  But I'm going to sit down here and talk with him.

(Phone Call Transcript, Aug. 9, 2021, starting at 2:02 p.m.; 3:17 − 4:2, 5:5 − 5:17). (Exhibit I).

33.     In addition, Bulger attempted to transfer other assets after filing bankruptcy. For example, he attempted to transfer his ATV business in Mexico for $50,000. (¶ 23; Exhibit O). He also attempted to transfer an office, a camper, and a horse trailer (which were not listed in Schedule B), as set out in the following conversation with Schmitt on August 26, 2021:

> BULGER: I forgot what I was going to tell you a while ago. That lady came and looked at the camper, she is going to call you in a little while, and they want to go look at the horse trailer. And I told her three or $400. I wouldn't go no less than 300, but you can take Kenny out there with you, if you want to. But you need to be with them when they look at it because of coocoo. I can't think of his name. Lonnie.
>
> SCHMITT: Lonnie, yeah [inaudible].
>
> BULGER: Yeah.
>
> SCHMITT: Okay. The black horse trailer out there [inaudible]?
>
> BULGER: Yes, but − and Kenny will know how to blow the tires up and everything if they − you know, if they want to get it.

(Phone Call Transcript, Aug. 26, 2021, starting at 10:19 a.m..; 2:3 − 2:18). (**Exhibit S**).

34.     Bulger intended the $300 − $400 offer price for just the horse trailer. The camper is apparently worth far more, as set out in this conversation with Schmitt on August 20, 2021:

> BULGER: Oh, oh. There is a lady that's going to call you in a little bit − or I don't know what time she is going to call you. But she is going to look at the camper, and can you take her out there and show her the office?
>
> SCHMITT: Yeah. Okay. The office?
>
> BULGER: Huh?
>
> SCHMITT: Right there where we are talking?

BULGER:  The trucking company.

SCHMITT:  Oh, yeah.  If I know she is coming, yeah, I can change and do that.

BULGER:  Yeah.  She will call.  It won't be today though.  I think it will probably be over the weekend or something, but she will call you.  I was just letting you know.

SCHMITT:  She just wants to look at it?

BULGER:  Yeah.  But she might buy both of them so –

SCHMITT:  Oh, okay.

BULGER:  Yeah.

SCHMITT:  Okay.

BULGER:  That would be good.  Let me ask him.  What's your mama's name?  Riann, her name is Riann.  Hall, Riann Hall.

SCHMITT:  Did you give her a price?

BULGER:  I thought the camper would be around 10 to 12,000 and I haven't gave one on the – on the office yet.

SCHMITT:  Okay.

BULGER:  She might use Marissa Hall.  She has a lot of aliases.  All right.

SCHMITT:  That will be fine.

(Phone Call Transcript, Aug. 20, 2021, starting at 8:24 a.m.; 5:13 – 6:23).  (**Exhibit T**).

Incidentally, Bulger dissolved his trucking company, Jimmy and Darreus Transportation LLC, on July 23, 2021 (Doc. 13, p. 46), so the trucking company's assets became Bulger's assets.

35.  The Movants are continuing to review the jail call transcripts and deposition transcripts and anticipate producing additional evidence of Bulger's bad faith, concealments,

and post-petition transfers (or attempts at them) at the hearing.  The Movants reserve the

right to do so.


## ARGUMENT

36.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157(a), and the District Court's General Order of Reference dated April 25, 1985.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### Dismissal with Prejudice – 11 U.S.C. § 349(a)

37.        The Bankruptcy Code provides that dismissal of a bankruptcy case does not

prohibit the debtor from obtaining a discharge of his existing dischargeable debts in a

subsequent bankruptcy unless the court orders otherwise.  11 U.S.C. § 349(a).  When the court

orders otherwise it is known as "dismissal with prejudice."[9]  *Colonial Auto Ctr. v. Tomlin (In re*

*Tomlin)*, 105 F.3d 933, 936-37 (4th Cir. 1997).

38.        The Movants have already sought an injunction against refiling.  (Doc. 30).

However, now that Bulger's jail call recordings have been transcribed and Bulger, Adams, and

Schmitt have been deposed, and now that the Movants have had the opportunity to review the

transcripts, the Movants also believe that Bulger's conduct is serious enough that his existing

debts should not be dischargeable in a future bankruptcy filing.

39.        Bad faith can justify dismissal with prejudice, but that term "represents a

continuum of impropriety, which at one end may support the simple dismissal of a case and at

---

[9] The term "dismissal with prejudice" is also sometimes used to refer to an injunction against refiling
bankruptcy.  *In re Duran*, 630 B.R. 797, 809 (B.A.P. 9th Cir. 2021) (comparing "Weak Form" prejudice
against refiling to "Strong Form" prejudice against future discharge).  This Court has historically used
the term exclusively to mean barring the debtor from discharging his existing debts in a future
bankruptcy, i.e., "Strong Form" prejudice, *see, e.g.*, *In re Russell*, 2012 Bankr. LEXIS 5474 (Bankr. M.D.
Ala. Nov. 27, 2012), and the Movants will use the phrase "dismissal with prejudice" to refer to this
remedy going forward.

the other end justify dismissal with the most extreme sanctions imaginable." *In re Hall*, 258

B.R. 908, 911 (Bankr. N.D. Ind. 2001). "There is the bad faith which can be associated with a

lack of good faith or other misconduct to which we do not want to lend approbation, and then

there is the ***BAAAD FAAAITH*** which is synonymous with egregious misconduct,

contemptuousness, malfeasance, or systemic abuse." *Id.* (emphasis in original).

     40.     Dismissal with prejudice is known as the "capital punishment of bankruptcy" and

is therefore limited to "extreme situations" where the "debtor engages in egregious behavior

that demonstrates bad faith and prejudices creditors[.]" *Tomlin*, 105 F.3d at 937. For

example, "concealing information from the court, violating injunctions, or filing unauthorized

petitions" may be grounds for dismissal with prejudice. *Id.* Bad faith in the Ninth Circuit is

determined by a totality of circumstances guided by a four-factor test:

> (1) whether the debtor misrepresented facts in his petition or
>
>      plan, unfairly manipulated the Bankruptcy Code, or otherwise
>
>      filed his . . . petition or plan in an inequitable manner;
>
> (2) the debtor's history of filings and dismissals;
>
> (3) whether the debtor only intended to defeat state court
>
>      litigation; and
>
> (4) whether egregious behavior is present.

*In re Duran*, 630 B.R. 797 810 (B.A.P. 9th Cir. 2021) (citing *Leavitt v. Soto (In re Leavitt)*, 171

F.3d 1219, 1224 (9th Cir. 1999)) (noting that the factors "are not exclusive elements" and that

neither fraud nor malice were required, though they could be probative).

     41.     *Duran* is an instructive case. In *Duran*, the debtor filed Chapter 13 and initially

presented himself as a farmhand employee with modest wages, a fractional interest in his

residence subject to a mortgage, and approximately $105,000 in unsecured debt, and he proposed a plan to pay unsecured creditors 0.5%. *Id.* at 804–05. Under pressure from a litigation creditor, the debtor subsequently amended to reveal the litigation, additional assets, a judgment debt, that his employer was an insider, that he had previously owned a farm before transferring it to the insider, and that the farm's gross income exceed $1 million annually. *Id.* at 804–05. Finally, the IRS filed a $638,000 tax claim, rendering the debtor ineligible for Chapter 13, after which the debtor voluntarily moved to dismiss his case under 11 U.S.C. § 1307(b) and the litigation creditor filed a response requesting dismissal with prejudice. *Id.* at 805. The bankruptcy appellate panel affirmed the bankruptcy court's dismissal with prejudice, noting that "the § 1307(b) 'right' to dismiss is not a get-out-of-chapter-13-free card." *Id.* at 804.

42.  Although this case is under Chapter 7, it is similar to *Duran*. First, Bulger filed bankruptcy solely to thwart pending state court litigation against him. He filed just minutes before a contempt hearing, he removed the lawsuit to this Court to obtain a new judge, and he expressed his intention to weaponize the Trustee to pursue his litigation opponent. His purpose was to absquatulate from the state court, not to obtain a fresh start.[10]

43.  Second, Bulger transferred his residence and at least three businesses to insiders shortly before filing bankruptcy – and, in the case of the businesses, in violation of state court orders – and continued to direct their operations from jail but did not disclose them in his bankruptcy. Moreover, while in jail, Bulger expressed his intentions to reacquire his residence and businesses after he got out of jail.

44.  Third, Bulger failed to disclose twelve self-settled real estate trusts that he created this year and that he is the beneficiary of, and he failed to disclose an ATV business

---

[10] *See Duran*, 630 B.R. at 815 n.8, for a discussion of the origins and definition of the term "absquatulate."

worth purportedly $50,000 according to his jail phone transcripts. He also failed to disclose the theft of seven million dollars and to report that theft to the police, and he failed to disclose numerous unnegotiated checks he has been storing.

45.      Fourth, Bulger both attempted and made post-petition transfers. In addition to conducting ongoing business operations from jail, which included numerous cash transfers and payments, Bulger also appeared to transfer two parcels of real estate and installment payments for real estate he is selling. He also attempted to sell his ATV business and a camper and trailer that were not disclosed on Schedule B.

46.      Fifth, Bulger made less serious, but still notable, omissions and errors. He apparently forgot to include a creditor owed $214,000 – hardly an insignificant sum – for two months after initially filing schedules. (Doc. 59, p. 3). He also falsely answered on Question 15 of his Amended Petition that he had received pre-petition credit counseling when he had not. (Doc. 13, p. 5).

47.      Finally, this is Bulger's fourth personal bankruptcy. (See case nos. 00-01240, 95-01235, and 88-00412). Although he last filed bankruptcy more than twenty years ago, he "'has been to the rodeo before.' In other words a debtor who makes frequent use of the bankruptcy courts is expected to be more knowledgeable of his obligations than a naif who may truly be ignorant of the bankruptcy laws." *In re Smith*, 536 B.R. 478, 481-82 (Bankr. M.D. Ala. 2015). Two of Bulger's three prior bankruptcies were Chapter 7 cases, and he is certainly sophisticated enough to understand what his obligations in Chapter 7 are. His jail calls indicate as much.

48.      Given the foregoing circumstances, Bulger's conduct falls on the ***BAAAD FAAAITH*** end of the egregiousness spectrum. A short injunction, without more, is not sufficient to punish Bulger's conduct; instead, dismissal with prejudice is necessary.

### In the Alternative, or in Addition,
### an Injunction of at Least Two Years Is Warranted

49.     The Movants initially asked for an injunction against refiling bankruptcy of "at least 180 days," tracking 11 U.S.C. § 109(g), while they were still investigating the enormity of Bulger's conduct and when the details were murky. (Doc. 30). However, now that the enormity has become clearer, the Movants believe an injunction of 180 days is insufficient and that an injunction against Bulger should be at least two years.

50.     "It is well settled that a bankruptcy court may impose an injunction greater than the nonfiling period of 11 U.S.C. § 109(g)(1) where, as here, a debtor is abusing the protections of the Bankruptcy Code." *Smith*, 536 B.R. at 482. Although the Tenth Circuit has held that bankruptcy courts are limited by § 109(g)(1) to injunctions of no longer than 180 days, its holding has been rejected by three other circuit courts and most bankruptcy courts outside the Tenth Circuit. *Compare In re Frieouf*, 938 F.2d 1099, 1103-04 (10th Cir. 1991) (injunction limited by § 109(g)) *with, e.g., Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 339 (2d Cir. 1999) (rejecting *Frieouf*); *Tomlin*, 105 F.3d at 938 (same); *Dietrich v. Nob-Hill Stadium Props.*, 2007 U.S. App. LEXIS 3591, *15 (6th Cir. Feb. 15, 2007) (unpublished) (same); *Gonzalez-Ruiz v. Doral Fin. Corp. (In re Gonzalez-Ruiz)*, 341 B.R. 371, 386 (B.A.P. 1st Cir. 2006) (same).

51.     Moreover, on multiple occasions, this Court has imposed both dismissal with prejudice and a lengthy injunction at the same time. *E.g., Smith*, 536 B.R. at 484 (dismissal with prejudice and a five-year injunction); *In re Brown*, 319 B.R. 691, 694-95 (Bankr. M.D. Ala. 2005) (dismissal with prejudice and a two-year injunction); *In re Jones*, 289 B.R. 436, 442 (Bankr. M.D. Ala. 2003) (dismissal with prejudice and a five-year injunction).

- 32 -

52.    This case presents facts that warrant a lengthier injunction than 180 days. As discussed, one of the primary purposes for Bulger's bankruptcy was to torpedo the Movants' state court lawsuit, particularly an imminent contempt hearing, and to forum shop for a different judge. In addition, Bulger hoped to either leverage the threat of the Trustee to force the Movants to settle the case or to actively weaponize the Trustee against the Movants. This is evident by both the timing of Bulger's bankruptcy and the calls he made while in jail. When compounded with his concealment of business interests and assets, as well as his realized and attempted post-petition transfers, an injunction against refiling bankruptcy of at least two years is necessary to protect not only the Movants, but also the integrity of the bankruptcy process.

WHEREFORE, the movants, Pike Road Investments, LLC and John William Kitchens, request that this Honorable Court (1) dismiss this bankruptcy case with prejudice and (2) issue an injunction prohibiting James D. Bulger from filing bankruptcy again for at least two years, as well as order any other relief that may be just.


Respectfully submitted on November 22, 2021.

MEMORY MEMORY & CAUSBY, LLP


By: /s/ Wm. Wesley Causby

Von G. Memory
ASB-8137-O71V

Wm. Wesley Causby
ASB-9822-G93R

Attorneys for Pike Road
Investments, LLC and John William
Kitchens

- 33 -

MEMORY MEMORY & CAUSBY, LLP
P.O. Box 4054
Montgomery, Alabama 36103-4054
Tel (334) 834-8000
Fax (334) 834-8001
wcausby@memorylegal.com

By: /s/ Garrick L. Stotser

Garrick L. Stotser
ASB-4419-S72G

Attorney for Pike Road Investments, LLC
and John William Kitchens

MASSEY, STOTSER & NICHOLS, PC
1780 Gadsden Highway
Birmingham, Alabama 35235
(205) 838-9000
rstotser@msnattorneys.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing document on the following, by:

☐ placing same in the United States Mail, postage prepaid, and properly addressed

☑ E-mail or ECF (Pursuant to FED. R. BANKR. P. 9036)

☐ facsimile

☐ hand delivery

☐ delivered in open court

Danielle Greco, Esq.
U.S. Bankruptcy Administrator
One Court Street
Montgomery, Alabama 36104

Carly B. Wilkins, Esq.
Chapter 7 Trustee
560 South McDonough Street, Suite A
Montgomery, Alabama 36104

Bill D. Bensinger, Esq.
Christian & Small LLP
1800 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

on November 22, 2021.

/s/ Wm. Wesley Causby

## INDEX OF EXHIBITS

Exhibit A  Phone Call Transcript, Aug. 13, 2021, starting at 1:29 p.m.

Exhibit B  Phone Call Transcript, Aug. 22, 2021, starting at 10:35 a.m.

Exhibit C  Bulger Deposition Transcript

Exhibit D  SOS Documents for Jimmy James D. Bulger, LLC

Exhibit E  Phone Call Transcript, Aug. 21, 2021, starting at 12:59 p.m.

Exhibit F  Adams Deposition Transcript

Exhibit G  Schmitt Deposition Transcript

Exhibit H  SOS Documents for Renaissance Builders LLC et al.

Exhibit I  Phone Call Transcript, Aug. 9, 2021, starting at 2:02 p.m.

Exhibit J  Phone Call Transcript, Aug. 11, 2021, starting at 1:17 p.m.

Exhibit K  SOS Documents for The Venue at the Fortuitous LLC et al.

Exhibit L  Phone Call Transcript, Aug. 18, 2021, starting at 10:01 a.m.

Exhibit M  SOS Documents for Magnolia Real Estate Services LLC et al.

Exhibit N  Phone Call Transcript, Aug. 22, 2021, starting at 9:51 a.m.

Exhibit O  Phone Call Transcript, Aug. 13, 2021, starting at 1:01 p.m.

Exhibit P  Real Estate Trusts

Exhibit Q  Phone Call Transcript, Aug. 9, 2021, starting at 1:53 p.m.

Exhibit R  Phone Call Transcript, Aug. 8, 2021, starting at 9:54 a.m.

Exhibit S  Phone Call Transcript, Aug. 26, 2021, starting at 10:19 a.m.

Exhibit T  Phone Call Transcript, Aug. 20, 2021, starting at 8:24 a.m.