1    IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3             NORTHERN DIVISION

4

5   IN RE:                )

6   JAMES D. BULGER,      )   CASE NO. 21-31333

7        Debtor.          )       CHAPTER 7

8

9

10

          **DEPOSITION:  JAMES DEAN BULGER**

11

12        **DATE:  NOVEMBER 18, 2021**

13

14

15

16

17  BEFORE:

18  Sallie NeSmith Gunter

19  Certified Court Reporter

20  Alabama Board of Court Reporting

21  License #37

22

23

1    <u>S T I P U L A T I O N S</u>

2         IT IS STIPULATED AND AGREED by

3    and between the parties through their

4    respective counsel that the deposition of

5    <u>JAMES DEAN BULGER</u> may be taken on November

6    18, 2021, before Sallie NeSmith Gunter,

7    Certified Court Reporter of the State of

8    Alabama, Alabama Board of Court Reporting

9    (ABCR) License Number 37, Commissioner and

10   Notary Public, at the law offices of Memory,

11   Memory & Causby, LLP, 469 South McDonough

12   Street, Montgomery, Alabama.

13        IT IS FURTHER STIPULATED AND AGREED

14   that the signature to and the reading of the

15   deposition by the witness is waived, the

16   deposition to have the same force and effect

17   as if full compliance had been had with all

18   laws and rules of court relating to the

19   taking of depositions.

20        IT IS FURTHER STIPULATED AND AGREED

21   that it shall not be necessary for any

22   objections to be made by counsel to any

23   questions except as to form or leading

1  questions, and that counsel for the parties

2  may make objections and assign grounds at the

3  time of trial or at the time said deposition

4  is offered in evidence or prior thereto.

5      IT IS FURTHER STIPULATED AND AGREED

6  that the filing of the deposition by the

7  court reporter is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | **Appearing for the Creditors Pike Road** |
| 3 | **Investments and John William Kitchens:** |
| 4 | MASSEY STOTSER & NICHOLS, P.C. |
| 5 | By: Mr. Garrick L. Stotser, Esq. |
| 6 | By: Mr. Scott Patrick Hooker, Esq. |
| 7 | 1780 Gadsden Highway |
| 8 | Birmingham, Alabama 35235-3106 |
| 9 | rstotser@msnattorneys.com |
| 10 | shooker@msnattorneys.com |
| 11 | MEMORY MEMORY & CAUSBY, LLP |
| 12 | By: William Wesley Causby, Esq. |
| 13 | P.O. Box 4054 |
| 14 | Montgomery, Alabama 36103 |
| 15 | wcausby@memorylegal.com |
| 16 | **Appearing for the Debtor:** |
| 17 | CHRISTIAN & SMALL, LLP |
| 18 | By: Mr. Bill D. Bensinger, Esq. |
| 19 | 1800 Financial Center |
| 20 | 505 20th Street, North |
| 21 | Birmingham, Alabama 35203 |
| 22 | bdbensinger@csattorneys.com |
| 23 | Before: |

1   Sallie NeSmith Gunter,

2   Alabama Certified Court Reporter

3   ABCR License #37

4   Also Present:

5   Billy Kitchens

6   Brad Kitchens

7   Mark Kitchens

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

INDEX

WITNESS: JAMES DEAN BULGER

EXAMINATION

By Mr. Stotser 9

EXHIBITS

(For purposes of clarification, as used referring to exhibits marked herein, "Plaintiff" refers to Creditors Pike Road Investments and John William Kitchens)

Plaintiff's Exhibit 1 12
Notice of Deposition

Plaintiff's Exhibit 2 14
Valley Bank Records CJ & Jimmy Enterprises

Plaintiff's Exhibit 3 40
State of Alabama Certificate of Formation Renaissance Builders, LLC

Plaintiff's Exhibit 4 69
Bankruptcy Petition of James D. Bulger, Case Number 21-31333

Plaintiff's Exhibit 5 70
Schedule E/F to Bankruptcy Petition of James D. Bulger, Case Number 21-31333

Plaintiff's Exhibit 6 127
Property: 212 East Park Avenue
File #2021-5819

Plaintiff's Exhibit 7 132
Property: 612 Planters Court
File #2021-5809

Plaintiff's Exhibit 8 216
Telephone Conversation Transcript

```
1   August 8, 2021 9:54

2   Plaintiff's Exhibit 9                    223
    Telephone Conversation Transcript
3   August 9, 2021 13:53

4   Plaintiff's Exhibit 10                   227
    Telephone Conversation Transcript
5   August 9, 2021 14:02

6   Plaintiff's Exhibit 11                   235
    Telephone Conversation Transcript
7   August 12, 2021 8:48:54

8   Plaintiff's Exhibit 12                   237
    Telephone Conversation Transcript
9   August 13, 2021 13:01:29

10  Plaintiff's Exhibit 13                   240
    Telephone Conversation Transcript
11  August 13, 2021 13:29:31

12  Plaintiff's Exhibit 14                   242
    Telephone Conversation Transcript
13  August 13, 2021 14:34:03

14  Plaintiff's Exhibit 15                   244
    Telephone Conversation Transcript
15  August 14, 2021 8:58:12

16  Plaintiff's Exhibit 16                   245
    Telephone Conversation Transcript
17  August 15, 2021 13:08:28

18  Plaintiff's Exhibit 17                   247
    Telephone Conversation Transcript
19  August 16, 2021 9:42:41

20  Plaintiff's Exhibit 18                   249
    Telephone Conversation Transcript
21  August 17, 2021 13:57:56

22  Plaintiff's Exhibit 19                   251
    Telephone Conversation Transcript
23  August 19, 2021 10:01:26
```

1    Plaintiff's Exhibit 20                          253
     Telephone Conversation Transcript
2    August 19, 2021 13:18:36

3    Plaintiff's Exhibit 21                          256
     Telephone Conversation Transcript
4    August 19, 2021 14:00:38

5    Plaintiff's Exhibit 22                          257
     Telephone Conversation Transcript
6    August 20, 2021 8:24:32

7    Plaintiff's Exhibit 23                          259
     Telephone Conversation Transcript
8    August 21, 2021 12:59:51

9    Plaintiff's Exhibit 24                          262
     Telephone Conversation Transcript
10   August 22, 2021 09:51:35

11   Plaintiff's Exhibit 25                          265
     Telephone Conversation Transcript
12   August 22, 2021 10:35:41

13   Plaintiff's Exhibit 26                          267
     Telephone Conversation Transcript
14   August 25, 2021 13:32:48

15   Certificate of Court Reporter                   276

16

17

18

19

20

21

22

23

1          I, Sallie NeSmith Gunter, a Certified

2   Court Reporter of the State of Alabama,

3   Alabama Board of Court Reporting (ABCR)

4   License Number 37, acting as Commissioner,

5   certify that on this date there came before

6   me at the law offices of Memory, memory &

7   Causby, LLP, 269 South McDonough Street,

8   Montgomery, Alabama, on November 18, 2021,

9   beginning at or about 9:00 A.M.,

10  JAMES DEAN BULGER, witness in the above

11  cause, for oral examination, whereupon, the

12  following proceedings were had:

13          THE COURT REPORTER:  All right.

14  Would you gentlemen like the usual

15  stipulations?

16          MR. BENSINGER:  Yes, that's fine.

17          MR. STOTSER:  Yes.

18          THE COURT REPORTER:  All right.

19  Would you raise your right hand, please, sir,

20  to be sworn?

21

22

23

1            JAMES DEAN BULGER,

2   being first duly sworn, was examined and

3   testified as follows:

4                   EXAMINATION

5   BY MR. STOTSER:

6        Q.    Please state your name for the

7   record.

8        A.    James Dean Bulger.

9        Q.    And where do you live, Mr. Bulger?

10       A.    2211 U.S. Highway 31, North,

11  Deatsville, Alabama 36022.

12       Q.    Have you ever had your deposition

13  taken before?

14       A.    Yes.

15       Q.    Okay.  So just by way of review,

16  then you might know that we're going to ask

17  you a series of questions, and I'm going to

18  try to get your full response to those

19  questions.

20       A.    Okay.

21       Q.    You do have to answer out, which

22  you're doing right now, instead of nodding

23  your head, because the court reporter can't

1  get a nod of the head.

2        A.    Okay.

3        Q.    If you need a break, let me know.

4  If we're in between questions, I'm going to

5  ask you to answer the question.

6        A.    Okay.

7        Q.    If you answer my question, I'm

8  going to assume you understand it.

9        A.    Okay.

10        Q.    Sometimes I go quickly.  You can

11  slow me down.

12        A.    All right.

13        Q.    Okay.  I'm not trying to go

14  quicker than I need to.

15              MR. STOTSER:  Do you have a copy

16  of that deposition notice?  Did you make a

17  copy of that?

18              THE COURT REPORTER:  It's right

19  here.

20              MR. STOTSER:  Bill, there were

21  some documents that you had said you were

22  going to bring to the deposition.

23              (Off-the-record discussion.)

1            MR. STOTSER:  And for purposes of

2    today, just to make it easier on the court

3    reporter, instead of putting "debtor" or

4    "creditor" and these different things, we're

5    just going to refer the Kitchens and Pike

6    Road as Plaintiff, Mr. Bulger as Defendant,

7    just for ease of this.

8            MR. BENSINGER:  That's fine.

9            MR. STOTSER:  Is that all right?

10   Does that make it easier for you?

11           THE COURT REPORTER:  It does.

12           (Plaintiff's Exhibit 1 was marked

13            for identification.  A copy is

14            attached.)

15       Q.   (BY MR. STOTSER) I'm going to show

16   you what is marked as Plaintiff's Exhibit 1.

17   And this is a notice of deposition, and it

18   asked you to bring certain documents down

19   here.  Can you review that?

20       A.   Okay.

21       Q.   Did you bring the documents --

22       A.   My attorney did.

23       Q.   Okay.  You have to wait until I

1    finish the question so you'll know what I'm

2    asking.

3         A.    Okay.

4         Q.    The financial records of yours or

5    any of your other business entities on or

6    after August 5th to the present that you

7    intend to use in your defense?

8         A.    Okay.  Yes.

9         Q.    Can I look at those?

10              MR. BENSINGER:  This is

11   actually -- the stack is for all three of

12   them.

13              MR. STOTSER:  Okay.  Okay.

14              MR. BENSINGER:  But they've got

15   separate Bates for each one.  So Mr. Bulger's

16   are Bates JDB, and then Ricky Adams is RDA,

17   and James Schmitt, the Bates JGS.

18              (Off-the-record discussion.)

19         Q.    (BY MR. STOTSER) Okay.  So

20   basically, the documents that are being

21   produced pursuant to the notice of deposition

22   for Mr. Bulger are the CJ & Jimmy Enterprises

23   from Valley Bank; Jimmy and Darreus -- Jimmy

1    and Darreus Transportation bank records;

2    AmeriFirst bank records for Mr. Bulger

3    individually it looks like; Valley Bank

4    records from Jimmy James D. Bulger, LLC;

5    Jimmy James D. Bulger Investments, LLC; Jimmy

6    James D. Bulger Rental Properties, LLC; and

7    then looks like one page from Masterfoam

8    checking.  It looks like just a copy of

9    something maybe you got online from

10   Masterfoam, is that what that is?

11             THE WITNESS:  That's what that is?

12             MR. BENSINGER:  If you know, yeah.

13        A.    Okay.  Yes.

14             MR. STOTSER:  I think I'm going to

15   go ahead and mark that.  This all is

16   Plaintiff's Exhibit 2 collectively, and then

17   that way we'll make -- thank you for that.

18   And we'll get back to that.

19             (Plaintiff's Exhibit 2 was marked

20              for identification.  A copy is

21              attached.)

22        Q.    (BY MR. STOTSER) So is it your

23   testimony that these are all the documents

1   that are responsive to our request in

2   Plaintiff's Exhibit 1, those that are marked

3   as Plaintiff's Exhibit 2?

4        A.    Yes.

5        Q.    Okay.  And, Mr. Bulger, how long

6   have you lived at the Highway -- 2211 Highway

7   31, Deatsville, location?

8        A.    About three years.

9        Q.    And is that a property you're

10  renting or buying?

11       A.    Am I renting or buying?  No, it's

12  paid for.

13       Q.    It's paid for.  And whose name is

14  that in?

15       A.    Jimmy James Bulger, LLC.

16       Q.    Jimmy James Bulger, LLC?

17       A.    Yes.

18       Q.    Okay.

19       A.    And then Greg Schmitt's apartment

20  is in his name, and Ricky Adams' apartment is

21  in his name.

22       Q.    Okay.  So you have -- so there is

23  a deed in the name of Jimmy James Bulger,

1  LLC, where you own the property 2211 Highway

2  31, Deatsville, Alabama?

3       A.    That's --

4             MR. BENSINGER:  Object to the

5  form.

6             MR. STOTSER:  What's wrong with

7  that?

8             MR. BENSINGER:  Well, you said the

9  deed was in the name of the company, but he

10 owned it.  If the deed is in the name of the

11 company, the company owns it, that's why.

12      Q.    (BY MR. STOTSER) The deed -- there

13 is a deed in your name.  Did you buy it three

14 years ago?

15      A.    Yes.

16      Q.    Okay.

17      A.    I -- I purchased it.

18      Q.    You purchased it individually?

19      A.    Yes.

20      Q.    Or in the corporate name?

21      A.    Individually.

22      Q.    Okay.  And then you transferred it

23 to the corporate name?

1        A.    Yes.

2        Q.    When did you transfer it to the

3   corporate name?

4        A.    I don't remember.

5        Q.    Was it within the first year or

6   the last two years?

7        A.    I don't remember.

8        Q.    Somewhere within this three-year

9   period?

10       A.    Yes.

11       Q.    Okay.  And then you transferred it

12   to Jimmy James Bulger, LLC?

13       A.    Yes.

14       Q.    Okay.  And then you said that

15   Greg -- who is Greg, what is his last name?

16       A.    Schmitt.

17       Q.    S-C-H-M-I-T-T?

18       A.    Yes.

19       Q.    And you said Ricky Adams?

20       A.    Yes.

21       Q.    Correct?  They both own an

22   apartment there?

23       A.    Yes.

1    Q.    So did you deed property to them,

2    from James Jimmy Bulger, LLC, to Greg

3    Schmitt?

4    A.    Yes.

5    Q.    When did you do that?

6    A.    I don't remember.

7    Q.    But there is a deed there on part

8    of this, on an apartment?

9    A.    Yes.

10    Q.    You had a survey done?

11    A.    I think there's a survey, yes.

12    Q.    So you had a survey done where you

13    deeded property?

14    A.    No.  No.  No.  There's a survey

15    done of the land.

16    Q.    Of the land.  So --

17    A.    You're asking about the apartment?

18    Q.    Yes.

19    A.    No.  The attorney described it.

20    Q.    Which attorney?

21    A.    I can't think of her name.  She's

22    in --

23    Q.    Monica Mann?

1    A.    No.  She's in Florida.  Give me a
2 second, and it will come to me.  If I had my
3 phone, I could look it up.  I can't remember
4 her name right this minute.  It will come to
5 me in a minute.
6    Q.    Is your phone in your car?
7    A.    Yes.
8    Q.    Okay.  So at a break, we'll stop
9 and -- we'll stop and you can get her name,
10 okay?
11    A.    Okay.
12    Q.    Okay.  So your testimony before
13 the Court -- and you know you're under oath,
14 right?
15    A.    Letta Gorman, that's her name.
16    Q.    What's her name?
17    A.    Letta Gorman.
18    Q.    G-O-R-H-A-M?
19    A.    I don't know how to spell it.  But
20 it's -- Letta Gorman is how you say it.
21    Q.    How did you find her?
22    A.    I bought a house from her years
23 ago.

1    Q.    In Florida?

2    A.    No, in Montgomery.

3    Q.    Okay.  But this -- she's an

4    attorney in Florida now?

5    A.    And -- she's in Alabama and

6    Florida.

7    Q.    Okay.  She's licensed in both

8    places?

9    A.    Yes.

10   Q.    Okay.  And your testimony is that

11   you somehow deeded parts of this property to

12   Greg Schmitt and parts of this property to

13   Ricky Adams?

14   A.    Their -- their apartment got

15   deeded to them.

16   Q.    Their apartment got deeded.  What

17   did Greg pay for this apartment?

18   A.    I don't remember.  He gave me his

19   401(k) and his life insurance.

20   Q.    How much -- what's your best guess

21   as to how much that was?

22   A.    I don't remember.

23   Q.    What's your best guess?

1    A.    I'm not going to guess.  I can't

2  remember.

3    Q.    You don't have any idea if it was

4  one dollar or a million?

5    A.    No.

6    Q.    So it could have been a million

7  dollars?

8    A.    No.

9    Q.    Could it have been five dollars?

10    A.    No.  It was probably -- I don't

11  even remember.  I think the life insurance

12  was 200,000 -- I mean, not -- 25,000.

13    Q.    Okay.  And what was the 401(k)?

14    A.    I don't remember.  Probably -- I

15  just don't remember if it was 100,000 or

16  200,000.  I can't remember.

17    Q.    How did you arrive at the sales

18  price?

19    A.    Well, that was -- they invested a

20  long time ago, and then we -- I told them

21  when I was building the house that do it the

22  way they wanted it, that that's where their

23  investment would go.

1    Q.  Okay. And did you -- in your

2 bankruptcy schedules, did you say that those

3 three -- that they owned an interest in that

4 house? Did you list that in this bankruptcy

5 schedule?

6    A.  I don't know. I don't remember.

7    Q.  Okay. Now, let's go back for the

8 minute. You've filed bankruptcy more than

9 once, correct?

10    A.  Yes.

11    Q.  Okay.

12    A.  About 30 years ago, 20 years ago.

13    Q.  And you know you're supposed to

14 list all your assets?

15    A.  Yes.

16    Q.  And you're supposed to list all

17 your debts?

18    A.  Right.

19    Q.  Are you telling me right now you

20 have no idea whether or not you listed in

21 this bankruptcy petition the fact that Greg

22 Schmitt and Ricky Adams own part of 2211

23 Highway 31, Deatsville?

1      A.    I don't remember.

2      Q.    But you know that was one of your

3   obligations is to list all your assets and

4   all your debts?

5           MR. BENSINGER:  Object to the

6   form.

7      Q.    Did you know that was an

8   obligation?

9      A.    Yes.  On mine, yes.

10     Q.    Okay.  Would there have been any

11  reason why you didn't include that?

12     A.    On my obligations or my debts?

13     Q.    Yeah, your assets or your debts,

14  is there any reason you wouldn't --

15     A.    That's not my asset, and that's

16  not my debt.

17     Q.    Would you have listed that you

18  were the sole owner of this in this

19  bankruptcy petition?

20     A.    If I was the sole owner.

21     Q.    Okay.  We'll get to that in a

22  minute.  Okay.  Ricky Adams, how long ago did

23  he buy the apartment?

1       A.      The same time.  He got his out of

2    a 401(k).  It was 30,000.

3       Q.      So Ricky paid 30,000 for his

4    apartment, and Greg paid 25, plus you don't

5    know how much was in his 401(k)?

6       A.      No.

7       Q.      Okay.  Where did the 401(k) come

8    from?

9       A.      I don't know.  That was theirs.

10      Q.      Where di he -- well, you've known

11   him for a while.  Where did he work to be

12   able to get the 401 --

13      A.      Which one?

14      Q.      Ricky.

15      A.      Ricky worked at Fruit of the Loom.

16      Q.      Okay.  And so you cashed in the

17   Fruit of the Loom 401(k)?

18      A.      I didn't.

19      Q.      He did and gave the money to you?

20      A.      I don't know if he cashed it in or

21   what he did.  He just gave it to me.

22      Q.      Okay.  And then -- and Leta

23   handled -- Letta Gorman handled both of those

1    transactions?

2         A.    That's correct.

3         Q.    And did she handle them

4    simultaneously?

5         A.    Does that mean the same time?

6         Q.    The same time.

7         A.    Yes.

8         Q.    Okay.  And do you have paperwork

9    that shows these transfers?

10        A.    Yes.

11        Q.    Okay.  Where is the paperwork

12   located?

13        A.    I'm sure they have it.

14        Q.    Do you -- I'm asking if you have

15   paperwork, not if they have paperwork.

16        A.    No, not to my knowledge I don't.

17        Q.    You don't have the paperwork.

18              What is your marital status?

19        A.    Divorced.

20        Q.    How long ago was that?

21        A.    I don't even remember.

22        Q.    Years?

23        A.    Yes.

1      Q.     How long have you known Ricky
2  Adams?
3      A.     Eight years maybe.
4      Q.     When did you start doing
5  investments with Ricky Adams?
6      A.     When I met him.
7      Q.     Eight years ago?
8      A.     Yes.
9      Q.     What type of investment did you
10 first do with Ricky Adams?
11     A.     It was a rental house.
12     Q.     What happened, you both went into
13 a rental house and paid money for it?
14     A.     I can't even remember the
15 circumstances to it.  It had apartments in
16 it.
17     Q.     Okay.  How many different deals or
18 investments have you had with Ricky Adams in
19 the last eight years?
20     A.     Oh, a lot.  You're talking about
21 everything?
22     Q.     Yeah.
23     A.     A lot.  I don't -- I wouldn't even

1    have a number.

2          Q.    More than five?

3          A.    Oh, yes.

4          Q.    More than ten?

5          A.    Probably around ten.

6          Q.    Okay.  Were they in different

7    companies or individually in your names?  How

8    were they set up?

9          A.    Just different -- different

10   things.

11         Q.    When is -- let's go from now

12   backwards.  Do you have any now with Ricky

13   Adams?

14         A.    Are you talking about bank account

15   or --

16         Q.    We'll get into bank accounts.

17         A.    Okay.

18         Q.    Do you have any investments with

19   Mr. Adams right now?

20         A.    No, not --

21         Q.    Do you have any investments --

22   when is the last investment you had with

23   Mr. Adams?

1        A.      Well, it's just where he was doing

2    his apartment.

3        Q.      So the last one, the last

4    investment you had was on this -- your house

5    where the apartment is?

6        A.      Yes.

7        Q.      Okay.  Prior to that, when was the

8    last one?

9        A.      I can't even remember.

10       Q.      Have you had any investments with

11   him other than this apartment in the last two

12   years?

13       A.      I don't remember.

14       Q.      Well, we can -- is there something

15   that I can give you that can help get your

16   memory to where you can tell me what's going

17   on?  Because I'm the only one that can ask

18   you questions, and I can only find out what

19   you know.  You don't have any idea, of all

20   the multiple deals you've done with Ricky

21   Adams, whether you've done any other ones in

22   the last two years?

23       A.      You're talking about business

1    deals, right?

2         Q.    Correct.

3         A.    No.  They -- I mean, where they --

4    they've formed companies, but it had nothing

5    to do with me.

6         Q.    Okay.  What companies have they

7    formed in the last two years that don't have

8    anything to do with you?

9         A.    Construction.

10        Q.    What is the name of it?

11        A.    Renaissance II.

12        Q.    Renaissance Builders II?

13        A.    Yes.

14        Q.    Who formed that?

15        A.    Ricky, Greg -- I mean, Ricky,

16   Jeremy, and Ginger.

17        Q.    Ginger MacLeod?

18        A.    Yes.

19        Q.    Is it M-A-C-L-E-O-D?

20        A.    Oh, I don't know.

21        Q.    Is it Jeremy Richards?

22        A.    Yes.

23        Q.    And Ricky Adams all formed

1    Renaissance Builders II?

2         A.    Yes.

3         Q.    When did they form that, how long

4    ago?

5         A.    Maybe a year, six months, I

6    don't -- three months.  I don't know.

7         Q.    I'm going to hold that for a

8    minute.  Any other businesses that you know

9    of that Ricky was a part of that did or did

10   not have to do with you in the last two

11   years?

12        A.    Not to my knowledge.  I don't

13   remember.

14        Q.    What about Jeremy Richards, who is

15   Jeremy Richards?

16        A.    A friend.

17        Q.    Does he live with you?

18        A.    No.

19        Q.    Where does he live?

20        A.    Millbrook -- Montgomery.

21        Q.    Does he live in a house that you

22   have any interest in?

23        A.    No.

1      Q.    Or whatever you want to call it,

2   any residence that you have an interest in?

3      A.    No.

4      Q.    Okay.  What about Ginger MacLeod,

5   where does she live?

6      A.    Millbrook.

7      Q.    Do you have any working

8   relationship right now with Ginger, Jeremy,

9   or Ricky?

10     A.    Yes.

11     Q.    Tell me what that -- tell me about

12  that.

13     A.    I'm an advisor to them.

14     Q.    You're an advisor?

15     A.    Yes.

16     Q.    Okay.  Tell me about your --

17     A.    I'm an agent for them.

18     Q.    You're an agent.  Okay.  Tell me

19  about your duties and responsibilities as an

20  advisor for the three of them.

21     A.    Just teaching them how to do it.

22     Q.    Teaching them how to do what?

23     A.    You know, construction and

1    developing.

2          Q.    Okay.  Did they have a background

3    in construction and development, or are they

4    learning it all from you?

5          A.    No.  They had a little bit of a

6    background.

7          Q.    Okay.  Okay.  So you listed in

8    your bankruptcy petition that you're a home

9    builder.  Is that where you've gotten your

10   experience?

11         A.    Yes.

12         Q.    Okay.  And when did you first get

13   your license with the Alabama Home

14   Builders --

15         A.    I've never --

16         Q.    -- Licensure Board?

17         A.    I've never been licensed.

18         Q.    Have you built any homes in your

19   name or in your business names?

20         A.    Over the years?

21         Q.    Yeah.

22         A.    I've contracted with people.

23         Q.    That wasn't my question.  My

1  question was:  Have you built any homes where

2  you were the contractor?

3       A.    No.

4       Q.    You never have?

5       A.    No.

6       Q.    Okay.

7       A.    I've built it underneath someone

8  with them overseeing it.

9       Q.    So whoever would have been the

10  licensed home builder would have been

11  overseeing?

12       A.    Yes.

13       Q.    Okay.  Because you know you're not

14  allowed to be a builder and build residences

15  without a home builder's license?

16       A.    Right.

17       Q.    You know that's illegal?

18       A.    Uh-huh.

19       Q.    That's a yes?

20       A.    Yes.

21       Q.    Okay.  So tell me about your

22  financial arrangement as an advisor or as an

23  agent for the three of them.

1      A.     They pay me as I need it -- I

2  mean, as I -- you know, as I -- as they're

3  needing my advice on things.

4      Q.     Okay.  Tell me what they pay you.

5      A.     It just depends.  It can be 9000,

6  5000, 10,000.

7      Q.     Over what period of time?

8      A.     It will be whenever they're

9  needing me.

10      Q.     What's your rate?

11      A.     I don't have a rate.  I just give

12  a price for whatever I've done.

13      Q.     Have you received any money from

14  them in the last six months for your services

15  as an advisor or agent?

16      A.     Yes.

17      Q.     Okay.  How much have you received?

18      A.     Probably 15.

19      Q.     Fifteen thousand?

20      A.     Yes.

21      Q.     Who paid you?

22      A.     Ricky.

23      Q.     Ricky paid you 15,000.  Was that

1    individually or in the company name?

2         A.    I don't know where he got it.  He

3    just paid me.

4         Q.    What services do you provide for

5    the 15,000?

6         A.    Organizing the different things

7    that they requested.

8         Q.    What things did they request?

9         A.    Walking them through the different

10   stages of how to build, how to buy land, how

11   to develop it.

12        Q.    Is there any particular land in

13   the last six months that you have been

14   advising them on the building or development

15   of?

16        A.    Well, we was doing the four houses

17   that I'm in partners with Billy on.  I can't

18   think of the name of that street.

19   Pinetucket.

20        Q.    Okay.

21        A.    And then there's four houses on

22   County Road 40.

23        Q.    Okay.  How long have you been --

1  how long did you receive -- how long did you

2  give advice to them on these Pinetucket

3  houses?

4      A.    Well, we had gotten Jeremy to

5  oversee it.

6      Q.    Is Jeremy a builder?

7      A.    No.  We just hired him to oversee

8  it when I seen things weren't being paid.

9      Q.    Okay.  Tell me about the County

10 Road -- the County Road 40.  What is that?

11     A.    It's just four houses.

12     Q.    Four houses?

13     A.    Uh-huh.

14     Q.    When were they purchased?

15     A.    I don't know.

16     Q.    Well, give me your best estimate

17 as to when they were purchased.

18     A.    I'd say within six months.

19     Q.    And who purchased them?

20     A.    I don't know who purchased them.

21 They didn't purchase them.  I don't remember

22 who purchased them.  They're just building

23 them.

1    Q.    Who are they building them for if

2    they didn't purchase them?

3    A.    I don't know.  You'd have to ask

4    them.  I can't -- I don't know who it is.

5    Q.    Do you have any idea who they got

6    financed through?

7    A.    HIS Capital, but it's not them

8    that financed it.  It's the purchaser that

9    financed it.

10    Q.    Who is the purchaser?

11    A.    I don't know.

12    Q.    You don't know?

13    A.    No.

14    Q.    Are there four different

15    purchasers or one purchaser?

16    A.    One purchaser.

17    Q.    Of all four places?

18    A.    Yes, building all four houses.

19    Q.    So who is building the houses?

20    A.    Renaissance Builders II.

21    Q.    So that's the builder is

22    Renaissance Builders II?

23    A.    Yes.

1    Q.    And how much money have you
2  received for the services you've provided on
3  these four houses?
4    A.    Probably 15,000.
5    Q.    That's the 15,000 you were talking
6  about?
7    A.    Yes.
8    Q.    Okay.  Who did the closing on that
9  property?
10    A.    Monica Mann.
11    Q.    Did that closing occur when you
12  were in jail or before or after?
13    A.    I think before.
14    Q.    Did you go there?
15    A.    Yes.
16    Q.    Did you sign anything?
17    A.    Yes.
18    Q.    What did you sign?
19    A.    I forget what it's called.  It was
20  an agreement to build it.
21    Q.    Who drafted that, was it Monica?
22    A.    I don't know who drafted it.
23    Q.    In whose name did you build it in?

1  because you have several different entities.

2  Was it yours individually?

3       A.   No, I wasn't agreeing to build it.

4  It was Renaissance Builders that was going to

5  build it.

6       Q.   Renaissance Builders I or II?

7       A.   It was I, and I don't remember the

8  circumstances behind it all.  But what I

9  signed was worthless because it didn't go

10  through.

11       Q.   So you signed -- so your testimony

12  is that as Renaissance Builders I, that was

13  your entity, correct?

14       A.   No, it was not.

15       Q.   Okay.  Do you remember when I

16  asked you these same questions in the

17  contempt hearing in Autauga County?

18       A.   Yes.

19       Q.   Do you remember when you testified

20  under oath that Renaissance Builders I was

21  your entity?

22       A.   No, I did not.  I told you, I said

23  none of those are mine.

1          Q.    Okay.  So if you said that, would

2     you have been mistaken, or would you have

3     been lying to that Court?

4          A.    If I said that, I'd be --

5               MR. BENSINGER:  Object to the

6     form.

7          A.    I told you at the end that it was

8     all -- none of those were mine.

9               (Plaintiff's Exhibit 3 was marked

10                for identification.  A copy is

11                attached.)

12          Q.    (BY MR. STOTSER) This is

13     Renaissance Builders.  It says this document

14     was prepared by James Bulger.  Do you see

15     that?

16          A.    Yes.

17          Q.    What does the back page say there?

18          A.    Where -- where it's been

19     electronically signed by me.

20          Q.    What does it say?  Who does it say

21     the owner is?

22          A.    Me.

23          Q.    Okay.  There was something filed

1  with the Secretary of State with Alabama with

2  your name as the owner of Renaissance

3  Builders; is that correct?

4      A.    Yes.

5      Q.    Okay.  Do you remember telling me

6  that?  Does that refresh your memory as to

7  whether or not you told me that on --

8      A.    Yes.  I didn't own it, never did

9  own it.

10     Q.    So you signed a false document

11  with the State of Alabama suggesting you

12  owned it?

13     A.    No.  They corrected it.

14     Q.    Who is "they"?

15     A.    Debbie.

16     Q.    Who is Debbie?

17     A.    The one -- the secretary you were

18  talking to.

19     Q.    So it's corrected saying that you

20  didn't own Renaissance Builders?

21     A.    Right.

22     Q.    Who owns it?

23     A.    Jeremy, Ricky, and Ginger.

1    Q.    Okay.  So your testimony now --

2    you know you're under oath today?

3    A.    Yes.

4    Q.    Okay.  You know that there's

5    penalties for perjury?

6    A.    Yes.

7    Q.    Okay.  You're saying you never had

8    an ownership interest in Renaissance

9    Builders, LLC?

10    A.    That's right.

11    Q.    Okay.  And are you saying this

12    document was not signed saying you were the

13    owner?

14    A.    I'm saying it was incorrect, and

15    they corrected it.

16    Q.    And who -- those three corrected

17    it?

18    A.    Debbie corrected it.

19    Q.    So at that time, Renaissance

20    Builders, LLC, at some point between the time

21    this was filed in your name as the owner and

22    the time this corporation was dissolved that

23    you were not the owner?

1        A.      Whenever they realized it, they

2    corrected it.

3        Q.      Okay.  Well, let me ask you this

4    question:  Why the need for Renaissance

5    Builders II if they owned Renaissance

6    Builders I?

7        A.      That's -- I mean, I don't know

8    what they did.

9        Q.      Why would you have to have a

10   second Renaissance Builders opened if they

11   were the owner of the first Renaissance

12   Builders?  Why would they --

13       A.      You'd have to ask them.

14       Q.      -- dissolve that and then open up

15   another one?

16       A.      You'd have to ask them.

17       Q.      Well, let me ask you this.  So --

18   we'll get back to that in a minute.  Tell me

19   about your -- in the last 12 months, tell me

20   about the sources of your income.  How have

21   you made money?

22       A.      In the last 12 months.  Let's see.

23   I can't even remember.

1     Q.    Well, you've told the bankruptcy

2 court what money you made in the last 12

3 months --

4     A.    Yeah.

5     Q.    -- so you can't tell me now what

6 money you've made?

7     A.    I can't even remember.

8     Q.    How did you make -- what money did

9 you make?

10     A.    I've been in the hospital most of

11 the time.

12     Q.    Okay.  So you weren't making money

13 or you were?

14     A.    Some.

15     Q.    Well, what money did you make?

16     A.    Most of it had been stolen from

17 me.

18     Q.    What money did you make -- well,

19 let me ask you that.  Let's go to that for a

20 second.  Who stole money from you?

21     A.    I don't know.

22     Q.    Well, then what money was stolen

23 from you?

1    A.    The cash that I had.

2    Q.    How much cash did you have?

3    A.    Close to seven million.

4    Q.    You had seven million dollars in

5    cash that was stolen by somebody?

6    A.    Yes.

7    Q.    Okay.  Where was this cash kept?

8    A.    I had it put up.

9    Q.    Where?

10   A.    I had it put up in various places.

11   Q.    Well, tell me all the places you

12   had all this cash.

13   A.    Mainly at my house at 1324.

14   Q.    1324 what?

15   A.    South Perry Street.

16   Q.    So you had seven million dollars

17   in cash at 1324 South Perry Street?

18   A.    I had some in the mountains.

19   Q.    And some in the mountains.  Where

20   did you have that?  Where was that located?

21   A.    I don't remember the name of the

22   street.

23   Q.    Is that Bogart or something like

1    that?

2         A.    Yeah, uh-huh.  Yeah.

3         Q.    Okay.  How much did you have

4    there?

5         A.    I don't remember.  It was -- had

6    it between all of it.

7         Q.    And you're telling me that seven

8    million dollars was stolen?

9         A.    Yes.

10        Q.    What did the police say when you

11   went to them about the stolen money?

12        A.    I haven't gone.

13        Q.    Why?

14        A.    Because we're trying to work it

15   out.

16        Q.    Who is "we"?

17        A.    Me and Billy were trying to work

18   it out.

19        Q.    Okay.  So seven million -- was

20   that Billy's money?

21        A.    No.

22        Q.    Whose money was it?

23        A.    That was mine.

1      Q.    Okay.  So you had seven million

2   dollars -- none of it came from the

3   remodeling thing --

4      A.    No.

5      Q.    -- of the 22 million?

6      A.    No.

7      Q.    How much money did you get from

8   Mr. Kitchens and Pike Road?

9      A.    I have no idea.  I have no idea

10  what has transpired.

11     Q.    Would it be surprising if I told

12  you that you got over 22 million dollars from

13  these men in the last -- since 2018?

14     A.    I don't have it.

15     Q.    Would you be surprised that 22

16  million dollars went through your bank

17  accounts from checks that were written from

18  Mr. Bulger -- I mean Mr. Kitchens and Pike

19  Road?

20     A.    I don't know how much it was.

21     Q.    That's part of the seven million,

22  isn't it?

23            MR. BENSINGER:  Object to the

1    form.

2         A.    Part of my seven million?

3         Q.    Part of the seven million that was

4    taken?

5         A.    No.  No.

6         Q.    You had seven million in cash?

7         A.    Yes.

8         Q.    Okay.  Where did you get that

9    money from?

10        A.    I've had it.  I've been putting it

11   up, been saving it.

12        Q.    For how long?

13        A.    Quite a while.

14        Q.    So you've been saving seven

15   million dollars for quite a while?

16        A.    Yes.

17        Q.    Tell me about your -- your tax

18   returns you've filed.  When is the last time

19   you filed a tax return individually?

20        A.    I just corrected all of them and

21   filed them a few months ago.

22        Q.    Okay.  Who was your CPA that filed

23   them?

1      A.      Otis James.

2      Q.      Where does Otis James live?

3      A.      Deatsville, Alabama.

4      Q.      And you -- and you filed all

5  individual ones in the last few months?

6      A.      Yes.

7      Q.      Which -- what years did you file

8  for?

9      A.      The last four years.

10     Q.      Last four years.  Individually?

11     A.      Yes.

12     Q.      Did you file on behalf of all the

13  entities that you owned or had an interest in

14  in the last four years?

15     A.      No.

16     Q.      Did you include all the entities

17  in your bankruptcy filings from your

18  schedule?

19     A.      I'm not sure.

20     Q.      Where did he get the information

21  to file these tax returns?

22     A.      He had it.  He's been doing it the

23  whole time.

1      Q.    When's the last time you filed a

2  tax return prior to the last couple of

3  months?

4      A.    I never -- whenever I was supposed

5  to, I guess.

6      Q.    You filed it on time every year?

7      A.    I don't know.

8      Q.    Okay.  You said you filed one in

9  the last few months for four years.

10     A.    He corrected them.

11     Q.    He corrected them?

12     A.    I hadn't claimed all the cash, and

13  I went ahead and claimed it.

14     Q.    So how much cash did you claim?

15     A.    What I had.

16     Q.    Which was how much?

17     A.    The seven million.

18     Q.    How much of the seven million did

19  you have when the litigation began in Autauga

20  County this year?

21     A.    How much did I have left?

22     Q.    Yeah, how much was left of the

23  seven million?

1    A.    Oh, it all -- it all -- it was all
2  gone.
3    Q.    All seven million was taken?
4    A.    Yes.
5    Q.    And you didn't notify the
6  authorities?
7    A.    I did not.
8    Q.    What efforts have you made to
9  recover the seven million dollars?
10   A.    Working with Billy.
11   Q.    To do what?  What was Billy --
12  what is Billy's part in recovering?
13   A.    I didn't think Billy took it.  I
14  didn't know.  I mean, I talked to him every
15  day.  I talked to him the morning he filed
16  that, told him that I had already been and
17  seen lawyers.  I never thought Billy -- I
18  just didn't know what had happened.
19   Q.    So somebody came in -- when did
20  you notice the seven million was missing?
21   A.    Because it just kept being more --
22  every week it was more and more and more.
23   Q.    I don't understand.  Every week --

1  you noticed some was missing one week, and

2  then more was missing the next week, and more

3  was missing the following week?

4      A.    No.  On our jobs, when we got the

5  jobs, I would give Jesse the cash.  Then I

6  would go see Billy, and Billy would write me

7  a check refunding, and it went so fast.

8  Then -- then Billy's cash ran slow, and then

9  that's when I -- whenever I carried it in

10  there, Ms. Margaret was -- they didn't want

11  me to bring the cash in no more.  I didn't

12  have a checking account.

13      Q.    You didn't have a checking account

14  when, while you were working for Mr.

15  Kitchens?

16      A.    I never worked for him.  When I

17  met him, I didn't have one.

18      Q.    When did you get one after you met

19  with him?

20      A.    When -- when Billy and Ms.

21  Margaret told me to.

22      Q.    Okay.  Did you have one during the

23  entire relationship?  When they would give

1    you a check, would you -- what would you do

2    with the check on those homes, those remodel

3    homes?

4         A.    That's when I put it in the bank.

5    That's what Billy was wanting me to do, and

6    then that way I could claim -- I could claim

7    the money and then be able to sign with him

8    on loans.

9         Q.    When did you notice the seven

10   million dollars was missing first?

11        A.    I told him, you know, I'm running

12   out of money.

13        Q.    I didn't ask you what you told

14   him.  I said, when did you first notice that

15   the seven million dollars was missing?

16        A.    I don't remember when it was.

17   When we were in the middle of trying to keep

18   it going, trying to raise money.

19        Q.    So it was sometime in the last --

20   you didn't start doing business with them

21   regarding these Alfa remodel jobs until

22   around August or September of 2018, so it was

23   sometime after that?

1       A.      Yes.

2       Q.      Okay.  And then when the money was

3  getting slow was sometime around 2020, during

4  the pandemic?

5       A.      No, that's when it stopped coming

6  in.  We stopped getting money back.

7       Q.      So you still had your seven

8  million then?

9       A.      No, I didn't have it.  No.

10       Q.      How much of it did you have?

11       A.      I had loaned -- made loans to him

12  so that he could get the interest, and it

13  would keep us going.

14       Q.      What was the source of the loans

15  to him, where did that come from?

16       A.      From the cash that I had.

17       Q.      Okay.  If I had your bank account

18  from Synovus and AmeriFirst, and it showed

19  that 98 percent of the money that went into

20  that account came from Mr. Kitchens or Pike

21  Road, and that everything that you put out,

22  that's where the loans came from?

23       A.      That's where -- that's what the --

1  whenever he wrote me a check.  But I had
2  already given the cash out.
3        Q.    To who?
4        A.    Jesse.  He knows that.  Billy will
5  tell you I did it.
6        Q.    How much cash did you give to
7  Jesse?
8        A.    My God, I don't know how much.  I
9  would give Jesse the cash, and then Billy
10  would write me a check.  And then when it got
11  tight, me and Billy together were trying to
12  raise the money, whatever we needed to do to
13  keep it going.  The pandemic is what screwed
14  us up.  When the money stopped coming in, you
15  know, we weren't getting anything back.
16  That's what messed us up.
17        Q.    How many jobs -- how many remodel
18  jobs were you aware of?
19        A.    It was a lot of them.  I don't
20  know.
21        Q.    Well, part of your
22  responsibilities under that agreement was to
23  be in charge of all the money?

1      A.    Right.

2      Q.    Right?  And you gave money back to

3 Mr. Bulger on some of these jobs, correct?

4      A.    To Billy.

5      Q.    Billy?

6      A.    Yes.

7      Q.    Excuse me, I'm sorry, Billy.

8      A.    You're all right.

9      Q.    On some of these jobs.  And the

10 money came out of your checking account?

11      A.    Right.  So that we had -- that's

12 what he was saying, so that we had a -- then

13 we could go in and we could borrow.

14      Q.    Do you realize that we've tracked

15 the money, and the same money that went into

16 the checking account from Pike Road went out

17 of your checking account to pay back on these

18 jobs --

19      A.    That would --

20      Q.    -- the exact same money?

21      A.    That would be right.  That's how

22 it would -- over here was the cash, though,

23 that I was operating with.  That's how he

1  wanted me to do it, it's how we did it.  Ms.

2  Margaret was helping me with it.  That's why

3  we -- they didn't want me bringing in that

4  cash no more.

5      Q.    Okay.  I'm going to get back to

6  that in a little bit.  I'm getting a little

7  bit off.

8            Tell me about the entities which

9  you've owned in the last four years.  What

10  entities have you owned?

11      A.    I don't remember.  I'd have to

12  look at the notes or something.

13      Q.    Tell me the ones you do remember.

14      A.    Jimmy James Bulger Enterprises.

15      Q.    What did Jimmy James Bulger

16  Enterprises do?  Jimmy James D. Bulger

17  Enterprises?

18      A.    Yes.

19      Q.    Okay.  What was the purpose of

20  that entity?

21      A.    Just whatever came along.

22      Q.    Well, give me an idea of what you

23  did in that.  What business did you do?

1      A.    I don't know if it was remodeling

2 or anything, some kind of business

3 opportunity.  Whatever came along, that's

4 what I did.

5      Q.    Okay.  How long did you -- give me

6 some ideas of any business that was conducted

7 in that since --

8      A.    I don't even remember.

9      Q.    Okay.  Did you file any tax

10 returns for that entity?

11      A.    I don't know.

12      Q.    Is there anybody that would know

13 better than you did?

14      A.    Debbie might would know.

15      Q.    Okay.  Tell me what roles Debbie

16 had.  What were Debbie's job roles?

17      A.    Everything was getting so crazy.

18 I couldn't keep up with it.  And Billy told

19 me that we needed get somebody to help, and

20 that's what I did.  So I hired Debbie, and

21 she started organizing things and helping get

22 things together.

23      Q.    What was the reason why you opened

1    up so many different entities?

2        A.    Just different projects.  I was

3    going to do different projects.

4        Q.    Okay.  Tell, tell me about --

5    let's do it this way.  This might make it

6    easier.  Tell me about The Venue at

7    Fortuitous.

8        A.    I was going to do a venue, but I

9    didn't do it, so we closed it.

10       Q.    Who is "We closed it," and "I was

11   going to do"?  Who owned it?

12       A.    Debbie closed it.  Me and Jeremy.

13   It never was even -- it never was even -- we

14   just discussed doing it.  We reserved the

15   name, but we never did it.

16       Q.    Well, you actually filed

17   incorporation papers, so you incorporated

18   that business.

19       A.    We were going to.

20       Q.    No, you did.

21       A.    Okay.  We closed it too, though.

22       Q.    Okay.  Who is "we"?

23       A.    Debbie.

1    Q.    Debbie closed it.  When you opened

2    it, where did you open up a bank account?

3        A.    I don't know.  I mean, if there

4    was one, it would be at Valley, I guess.  I

5    have no idea.  There wasn't one ever I don't

6    think, to my knowledge.  I don't know.

7        Q.    And what project was supposed to

8    be done, were you supposed to do with The

9    Venue?

10       A.    Doing venues in the front yard.

11       Q.    Like what kind of venues, weddings

12   and things like that?

13       A.    Right, or family reunions or --

14       Q.    And what property was that

15   supposed to be located on?

16       A.    2211 U.S. Highway 31, Deatsville.

17       Q.    And who owned that venue, The

18   Venue at Fortuitous?

19       A.    Jimmy James Bulger, LLC.

20       Q.    And what business was conducted in

21   that entity?

22       A.    Nothing.

23       Q.    You never had any weddings at the

1    2211?

2        A.    No.

3        Q.    Have you had any weddings in the

4    last year there?  You have, haven't you?

5        A.    At the house.

6        Q.    Yeah.

7        A.    Yes.

8        Q.    What name was that -- what name

9    was the wedding done under at the house?

10       A.    Fortuitous II or something.  I

11   don't -- I don't know what the name of it is.

12       Q.    Is that your Airbnb?

13       A.    No.  I don't have an Airbnb.

14       Q.    Is there an Airbnb business now at

15   Fortuitous, LLC?

16       A.    Yes, they have one there.

17       Q.    Who is "they"?

18       A.    It's Ricky, Greg, and Jeremy.

19       Q.    So Fortuitous -- The Venue at

20   Fortuitous I, I guess, was your business that

21   you were going to have venues such as

22   weddings, you closed it in late July of this

23   year, correct?

```
 1        A.     Yes.

 2        Q.     Okay.  And then immediately

 3   Fortuitous, LLC, was opened by Ricky, Greg,

 4   and Jeremy, and weddings were conducted; is

 5   that correct?

 6        A.     Yes.

 7        Q.     Okay.

 8        A.     Me and Jeremy were going to do the

 9   Fortuitous, The Venue at Fortuitous, but I

10   didn't -- I didn't want to do it.

11        Q.     And so this -- this venue, your

12   house is being used to have wedding venues

13   for Fortuitous, LLC, the one owned by Ricky,

14   Greg, and Jeremy now?

15        A.     That's their -- their property,

16   uh-huh.

17        Q.     They own the property?  I thought

18   you owned the property and they owned an

19   apartment?

20        A.     They have an apartment.

21        Q.     Who owns the property?

22        A.     The land goes -- part of the land

23   I guess goes -- all -- all of them own it,
```

1    Jimmy James Bulger, LLC, owns it.

2         Q.    Jimmy James Bulger, LLC, owns the

3    property?

4         A.    Yes.

5         Q.    Correct?

6         A.    Yes.

7         Q.    You were to have -- you were

8    opening up The Venue at Fortuitous to do,

9    among other things, weddings, correct?

10        A.    The Venue at Fortuitous, yes.

11        Q.    Correct.  You closed it in the

12   middle of July, correct?

13        A.    Yes.

14        Q.    You closed at the time of when

15   there was an injunction issued against you in

16   Autauga County from doing any business,

17   correct?

18        A.    That's what the judge said.

19        Q.    Have you seen the injunction?

20        A.    Yes.

21        Q.    Around that same time,

22   Fortuitous -- the new Fortuitous company was

23   opened by Ricky and Jeremy and Ginger [sic],

 1  correct?

 2       A.    Yes.

 3       Q.    And they started doing wedding

 4  venues, correct?

 5       A.    I think they've done one.

 6       Q.    Okay.  And that was done on the

 7  property that is owned by you; is that

 8  correct?

 9       A.    No, Jimmy James Bulger, LLC.

10       Q.    Okay.  Your entity owns it; is

11  that correct?

12       A.    No, it's not my entity.

13       Q.    Who owns Jimmy James Bulger, LLC?

14       A.    Greg, Jeremy, and Ricky.

15       Q.    When was that transferred to them?

16       A.    They've always owned it.  I've

17  never owned it.

18       Q.    You've never owned Jimmy James

19  Bulger, LLC?

20       A.    No.

21       Q.    Have you ever had a conversation

22  with them where you told them words to the

23  effect of when this bankruptcy is over or

1  when this injunction is lifted that you can

2  transfer this property back into my name?

3          A.    No, absolutely not.

4          Q.    So if I've got a tape recording of

5  your voice saying that --

6          A.    Uh-huh.

7          Q.    -- you're telling me under oath

8  that that is not correct?

9          A.    Right.

10         Q.    Okay.  Have you ever had any

11 conversations with anyone where you said as

12 soon as this bankruptcy or this injunction is

13 lifted off of me, then I will put properties

14 back into my name?

15         A.    I'll start back -- going back into

16 business and putting stuff in my name, yes.

17         Q.    That I will take the properties

18 from you and put it in my name?

19         A.    No.

20         Q.    Have you ever told Ricky or Greg

21 that this property here, that you would put

22 that property back into your name and then

23 you would go get a loan on it?

1     A.    I may have because I can qualify

2 for it.

3     Q.    And as soon as --

4     A.    Or add me to it.

5     Q.    Do you remember telling them as

6 soon as this injunction is lifted off of me

7 that I can put this property back into my

8 name and go get a loan for it?

9     A.    I don't remember.  But if -- if --

10 whenever it's lifted off of me, if they want

11 to add me on there, then I can get go get a

12 loan for it.

13     Q.    Isn't the only reason why you're

14 not on there now is because of the

15 injunction?

16     A.    Absolutely not.

17     Q.    No, you don't remember saying

18 that --

19     A.    No.

20     Q.    -- in a conversation to them?

21     A.    No.

22     Q.    Are you telling this Court under

23 oath, under penalty of perjury, that you

1  never said words to that effect?

2      A.    I don't remember saying it.  And

3  it is -- I can explain what I said or what I

4  was meaning by it.

5      Q.    Okay.  Renaissance Builders I,

6  what -- tell me about the business of

7  Renaissance Builders I.

8      A.    It's a construction company.

9      Q.    Who owned -- who owns that

10 construction company?

11     A.    Jeremy, Ricky, and Ginger.

12     Q.    What part did you play in

13 Renaissance Builders I?

14     A.    Just advising them how to do it.

15     Q.    What projects were there in

16 Renaissance Builders I?

17     A.    The four houses on County Road 40.

18     Q.    Tell me about C-Squared

19 Performance Automotive.

20     A.    I'm partners with Chris Bowers.

21     Q.    50/50 partner?

22     A.    Yes.

23     Q.    Tell me what kind of business it

1  is.

2      A.    Mechanic shop.

3      Q.    Where is it located?

4      A.    Downtown Montgomery.

5      Q.    What address?

6      A.    It's on Madison.  I don't know the

7  address.  I can't remember.

8      Q.    715 Madison?

9      A.    Okay.

10     Q.    Are you leasing that property?

11     A.    No.  I purchased it.

12     Q.    You purchased that property?

13     A.    Yes.

14     Q.    Where are your purchase documents?

15     A.    Debbie has them.

16     Q.    Is there any reason why you didn't

17  list that asset on your bankruptcy petition?

18     A.    I mean, it -- I don't know.

19     Q.    Well, we've gone over this a few

20  times.  I guess I'm going to have to keep

21  reminding you.  You know you were obligated

22  to list all your assets --

23     A.    Right.

1      Q.    -- in the bankruptcy petition?

2      A.    Yes.

3      Q.    In fact, you've told Ricky and

4 Greg numerous times that you have to list

5 everything, correct?

6      A.    Yes.

7      Q.    You're telling me today you have

8 an interest in 715 Madison Avenue?

9      A.    Yes.

10      Q.    And that you purchased it,

11 correct?

12      A.    Yes.

13      Q.    And yet you did not put this in

14 your -- can you show me in what I'm going to

15 mark as Plaintiff's 4 where you listed that

16 asset?

17          (Plaintiff's Exhibit 4 was marked

18           for identification.  A copy is

19           attached.)

20         THE WITNESS:  Where would it be?

21         MR. BENSINGER:  It should be -- I

22 don't think that's listed but --

23         THE WITNESS:  It's not?

1          MR. BENSINGER:  I don't believe it

2    is.

3          A.    It's not listed.

4          Q.    (BY MR. STOTSER) It's not listed.

5    So since August the 5th, you've had the

6    opportunity to look over these schedules,

7    look over these petitions, and give this

8    bankruptcy court all of your assets and all

9    of your debts; is that correct?

10         A.    Yes.

11               (Plaintiff's Exhibit 5 was marked

12                 for identification.  A copy is

13                 attached.)

14         Q.    (BY MR. STOTSER) You even filed

15    last night what I'm going to mark as

16    Plaintiff's Exhibit 5, you even supplemented

17    your record last night in Plaintiff's Exhibit

18    5, didn't you?

19         A.    Yes.

20         Q.    Okay.  And yet you still have not

21    listed a building and a business -- a

22    building at 1715 -- 715 Madison Avenue that

23    you own or have an interest in?

```
 1          A.     Yes.

 2          Q.     Why?

 3          A.     I'll have to see the paperwork, if

 4    I have it, who owns it.

 5          Q.     You just told me you own it, sir.

 6          A.     Well, I've got to see what the

 7    paperwork says.

 8          Q.     Do you own it or do you not own

 9    it?

10          A.     I've got to see what the paperwork

11    says.

12          Q.     Were you lying to me just a minute

13    ago or were you telling me the truth when you

14    said you had an ownership interest in that?

15                 MR. BENSINGER:  Object to the

16    form.

17          A.     I've got to see what -- who owns

18    it.  I've got to look it up.

19          Q.     So now you don't know?

20          A.     I told you I didn't know.

21          Q.     You know that this case is about a

22    bad faith and about bad faith with not

23    listing all your assets, correct?  You know
```

1  that's part of this case that we're going to

2  court on?

3       A.    I'm listing everything as we

4  remember it.

5       Q.    Everything as you remember it?

6       A.    Yes.

7       Q.    Okay.  Tell me what else is not

8  listed in these schedules in 4 and 5 that you

9  don't remember.  And I'll give you all day,

10 if you need to, to go over 4 and 5.  What

11 other assets have you not listed?

12           MR. BENSINGER:  Object to the

13 form.

14      A.    To my knowledge, nothing.

15      Q.    So the only way you're going to

16 list them is if I happen to find them and

17 come up with them?

18      A.    No.  It's as I remember them.

19      Q.    C-Squared Performance Automotive,

20 is it doing business right now?

21      A.    Yes.

22      Q.    Who are the employees?

23      A.    I don't know.

1          Q.     Name any employees of C-Squared

2   Performance Automotive.

3          A.     Chris and Ricky.

4          Q.     When you just said you don't know,

5   that wasn't truthful either, was it, sir?

6   You did know?

7          A.     I knew Chris and Ricky works

8   there.

9          Q.     Why did you not answer that when I

10  said that?

11         A.     You wanted to know the name of the

12  employees.  I don't know them.

13         Q.     How much is that business worth?

14         A.     Probably nothing.

15         Q.     Probably nothing.  How much money

16  does Rick -- Chris get out of that business a

17  year?

18         A.     I don't know.

19         Q.     You don't have any idea?

20         A.     No.

21         Q.     Does he get a check every week?

22         A.     I don't know.

23         Q.     Does Ricky get a check every week?

1      A.    I don't know.  I used to get one.

2      Q.    You're still getting written

3  checks every week, but they're just not being

4  cashed; is that correct?  They're staying in

5  the drawer, right?

6      A.    Yes.

7      Q.    You didn't disclose that you had

8  checks that you were owed from C-Squared

9  Performance Automotive on your schedules, did

10 you?

11     A.    Because it didn't have the money

12 to pay me.

13     Q.    You had checks that -- that was a

14 debt that was owed to you by C-Squared

15 Performance Automotive, and you did not list

16 that on your schedules, did you?

17          MR. BENSINGER:  Object to the

18 form.

19     A.    I didn't know I had to because

20 they're no good.  You know, it's not --

21     Q.    Didn't you tell Ricky that you

22 were going to use that to negotiate buying

23 that business, 100 percent of that business?

1        A.    I wish I could.

2        Q.    Didn't you tell him that when you

3   were in jail, that you were going to use that

4   as leverage to buy the business back?

5        A.    No.  It would be a great idea.

6        Q.    Did you say that?

7        A.    Yeah, if -- if I did say that,

8   that would be great.

9        Q.    Okay.  Did you say that? is what

10  I'm asking.

11       A.    I don't remember.

12       Q.    You don't remember saying that.

13  Do you remember telling Ricky that it was a

14  cash cow?

15       A.    It could be.

16       Q.    Do you remember telling Ricky that

17  it was a cash cow?

18       A.    It could be.

19       Q.    That's not what I asked you, sir.

20       A.    It's not right now.

21       Q.    Do you remember telling him it

22  could be?

23       A.    No, I don't remember.  But I can

1  tell you it would be.

2       Q.    Do you remember telling Ricky to

3  cash his checks every week first?

4       A.    Yes.

5       Q.    Okay.

6       A.    Because he works there.

7       Q.    I thought you said you didn't know

8  if Ricky was cashing his checks.

9       A.    I don't know if he's cashing them.

10 I keep telling him to cash them.

11      Q.    Are you making it up as you go

12 along, sir?

13            MR. BENSINGER:  Object to the

14 form.

15      A.    No.

16      Q.    How many checks -- they have been

17 writing you a check every week and putting it

18 in the cash drawer.  Tell me how much they're

19 writing you every week and putting it in the

20 cash drawer.

21      A.    It's supposed to be 1300.

22      Q.    Thirteen hundred a week?

23      A.    Yes.  And I have no idea how many

1  there is.

2      Q.    It's been for months, hasn't it?

3      A.    Yes.

4      Q.    Okay.  And do you have any reason

5  why you didn't list that as a debt that was

6  owed to you on your schedules?

7      A.    I didn't feel like it was a debt

8  owed to me.

9      Q.    Okay.

10     A.    I think it was based off of how

11  much we have come in, if it can cover it.

12  But I don't know.

13     Q.    Okay.  Jimmy and Darreus

14  Transportation, tell me about that company.

15     A.    It was a transportation company.

16     Q.    Okay.  What assets are in that

17  transportation company?

18     A.    None.

19     Q.    None.  Were there ever any assets?

20     A.    Just old trucks and trailers.

21     Q.    Did you file a tax return for

22  Jimmy and Darreus Transportation?

23     A.    I don't know.

1      Q.    Let me ask you this.  This is will

2   be easier.  You have about a dozen or -- 12

3   to 15 different entities that you either

4   owned or own now.  Have you ever filed tax

5   returns on any of those entities?

6      A.    I don't know.  I don't think so.

7   I don't know.

8      Q.    So there would be really no way

9   for a Court to determine what assets were

10  actually put in this entity or taken out of

11  this entity; is that correct?

12          MR. BENSINGER:  Object to the

13  form.

14      A.    I don't know.

15      Q.    Last week in Montgomery there was

16  a Jimmy and Darreus Transportation truck

17  driving around.  Who -- who was driving that

18  truck around last week?

19      A.    A Jimmy and Darreus Transportation

20  truck?

21      Q.    Yeah.  It had it on the -- it had

22  it on the truck.  Whose truck is that, and

23  why were they driving that around?

1    A.    I don't know.  I don't even know

2  of a sticker that says that.

3    Q.    There was a Jimmy and Darreus

4  truck that was driving around.  Who owned

5  that truck?

6         MR. BENSINGER:  Object to the

7  form.

8    A.    I don't know.

9    Q.    Where did the old trucks that were

10 Jimmy and Darreus Transportation go?

11   A.    They were sold.

12   Q.    To who?

13   A.    Just individuals that stopped and

14 purchased them.  Debbie would have the

15 record.

16   Q.    Were they sold about the time the

17 corporation went out of business 7/23/2021?

18   A.    Probably.

19   Q.    Okay.  And that was when the

20 injunction was under --

21   A.    No.

22   Q.    Was in Autauga County?

23   A.    No.

1        Q.    You just said yes.

2        A.    No, they were sold before that.

3   Well, I'm telling you no.  I said it was sold

4   before that.  Whenever we closed it down out

5   there, we sold them.  They were junk.  The

6   motors were blowed and everything else.

7   That's what was left.

8             Then Billy wanted his.  I thought

9   I had the company sold, so we took it over

10  there, I took all the trucks to his house and

11  trailers for him.

12       Q.    And you sold the rest of them

13  around the time it was closed?

14       A.    Just whatever was -- whatever was

15  there.

16       Q.    Whenever was left around the time

17  it closed, you sold?

18       A.    Yes -- no, before that, before.

19  Debbie and Greg closed those things.  I don't

20  know anything about it.

21       Q.    What entities do you own right now

22  that are open and operational or that you

23  have an interest in?

1      A.    None that I know of.

2      Q.    Your testimony before the Court is

3 you do not own an entity or have an interest

4 in an entity now?

5      A.    I can't remember what -- I can't

6 remember.  Not that I know of.  I don't

7 remember.

8          I know Jimmy Enterprises closed.

9 They were trying to organize everything and

10 get it together, so I don't know.

11      Q.    Who is "they"?

12      A.    Debbie.

13      Q.    Was trying to organize and get --

14      A.    Close out, she was the one that

15 closed out the -- like the names that I

16 had -- we had reserved and we didn't use, or

17 had closed the company or whatever.

18      Q.    C-Squared Performance Automotive

19 is still open, correct?

20      A.    Yes.

21      Q.    Money, LLC, is still open; is that

22 correct?

23      A.    I don't know.  I don't know if

1  they closed it or not.  There's nothing ever

2  been done with it.

3       Q.    Who owned Money, LLC?

4       A.    I did, but nothing was ever done

5  with it.

6       Q.    What was the purpose for opening

7  up Money, LLC?

8       A.    It had a cologne brand it was

9  going to do.

10      Q.    And what -- what assets were put

11  into it?

12      A.    Nothing.

13      Q.    What money was put into an

14  account?

15      A.    Nothing.

16      Q.    What account did any -- what

17  account was opened at what bank?

18      A.    There wasn't one that I know of

19  that I remember unless it was a Valley.  And

20  it would be $250 if Debbie opened it or had

21  me to open it.

22      Q.    Did you list Valley National Bank

23  in any of your schedules?  I want you to look

1    at Plaintiff's Exhibit 4 and 5 and ask if you

2    even listed Valley Bank as someone that owned

3    any interest in any businesses.

4         A.    No, it's not listed.

5         Q.    How many entities were opened

6    using Valley Bank?

7         A.    I don't know.  Debbie put it

8    together.  I don't know how many it was.

9         Q.    You signed them all?

10        A.    Okay.

11        Q.    I'm not asking you "okay."  You

12   signed them, correct, you went --

13        A.    Yes, whatever --

14        Q.    Okay.  You went to the bank and

15   signed them?

16        A.    Uh-huh.

17        Q.    Did you ever tell your attorney

18   that Valley National Bank, that all of these

19   entities were in there, and you should have

20   told bankruptcy judge that all of those

21   accounts were open?

22              MR. BENSINGER:  Object to the

23   form.

1      A.    Debbie -- Debbie and Greg got him

2  the information that he requested, or you

3  requested, or whoever requested.

4      Q.    Did you ever tell anyone -- did

5  you ever -- let me ask you this:  Did you

6  list or review any of these bankruptcy

7  schedules to determine if you had listed

8  Valley Bank?

9      A.    Did I look at them?

10     Q.    Or review, yes.

11     A.    I signed it.

12     Q.    You signed it?

13     A.    Yes.

14     Q.    And you signed it stating that you

15 knew that it was a crime, punishable by

16 imprisonment and fine, if you didn't answer

17 correctly?

18     A.    Yes.

19     Q.    You knew at the time you signed

20 these that Valley Bank was not listed on

21 these petitions?

22     A.    I knew at the time I signed

23 that -- I asked him, I said if anything comes

```
 1   up --
 2              MR. BENSINGER:  Stop.  You can't
 3   talk about what we've talked about.
 4              THE WITNESS:  Okay.
 5              MR. BENSINGER:  I'm instructing
 6   you right now.
 7              THE WITNESS:  Okay.
 8              MR. STOTSER:  And I'm not asking
 9   about what you told him.
10              MR. BENSINGER:  I know you -- I
11   know you didn't, Rick.  I'm just --
12              THE WITNESS:  Okay.
13              MR. BENSINGER:  I know what you're
14   doing.
15        A.    Okay.  Ask me again.
16        Q.    (BY MR. STOTSER) Did you at the
17   time you filed these -- this bankruptcy
18   petition know that Valley Bank was not listed
19   as a creditor?
20        A.    No.  I listed everything --
21        Q.    I mean as a bank account that
22   you --
23        A.    I listed everything that I could
```

1    remember at the time.

2         Q.    And you just happened to forget a

3    dozen accounts that were opened at Valley

4    Bank for all your entities?

5              MR. BENSINGER:   Object to the

6    form.

7         A.    I've forgotten several things.   I

8    couldn't remember them.   I'm having to

9    remember them as I go.

10        Q.    So I guess the -- as you continue

11   to remember things, you're going to continue

12   to amend your schedules and then let the

13   bankruptcy court know what?   What are they

14   going to know?   When are they going to have

15   all your assets and debts, as you remember

16   them?

17        A.    As I go through everything, I can

18   remember them.

19        Q.    Okay.   So we could not even have

20   all your assets and debts now, because you

21   may not have remembered them all, correct?

22        A.    If Valley is not listed, it's $250

23   in them accounts.

1          Q.     Per account?

2          A.     I think so.  I'm not sure.  I'd

3     have to ask Debbie.

4          Q.     Well, C-Squared Performance goes

5     through Valley, doesn't it?

6          A.     I don't know anything about it,

7     though.

8          Q.     You've signed checks in those

9     businesses?

10         A.     Okay.

11         Q.     I'm not asking "okay."  You have,

12    haven't you?

13         A.     Yes.

14         Q.     Okay.  So then you have some

15    knowledge.

16         A.     Of whatever I signed, I have

17    knowledge of it.

18         Q.     And you're also an owner or part-

19    owner in those businesses, correct?

20         A.     Of C-Squared?

21         Q.     Yeah.

22         A.     Yes.

23         Q.     Okay.  There was a Gods U Doc

1    [phonetically] or something?

2         A.    Godsduc.   That's years ago.   I

3    don't even know what it is.   I don't think

4    there's anything in it.

5         Q.    It's still open, right?

6         A.    I guess she didn't close it.

7         Q.    She didn't -- according to your

8    testimony a little while ago, she didn't

9    start working for you until after Billy said

10   you needed somebody to handle this, correct?

11        A.    Right.

12        Q.    So some of these entities you were

13   responsible for prior to the time she became

14   involved, right?

15        A.    Right.

16        Q.    And that was one --

17        A.    She's closing them out as she

18   goes.

19        Q.    You're a 100 percent owner in

20   that, right?

21        A.    Yes.

22        Q.    Okay.   Bulger Enterprises, Inc.,

23   you're a 100 percent owner in that?

1    A.    Yes.

2    Q.    What does that do?

3    A.    It closed.

4    Q.    No, it's open according to your

5    schedules.

6    A.    Oh, I don't know.

7    Q.    Is it closed or open?

8    A.    Well, if you said it's open, it's

9    open.

10    Q.    Well, I'm not -- I don't know

11    whether it's open or not, sir.  Your

12    bankruptcy petition says it is an open

13    entity.

14    A.    Okay.

15    Q.    Is it open or is it closed?

16    A.    I'll have to check and see.

17    Q.    You don't know whether it's open

18    or closed?

19    A.    No.  I'll have to check and see.

20    Q.    Okay.  Are you going to amend your

21    schedules again if you find out that that's

22    not correct, what you put in the schedules?

23    A.    If I need to make it right, I'll

1    make it right.

2         Q.    Okay.  All About Construction, is

3    that entity opened?

4         A.    No.

5         Q.    What's your interest -- what was

6    your interest in All About Construction I?

7         A.    Fifty percent.

8         Q.    Who was your partner?

9         A.    Jesse Love.

10        Q.    What was that business to do?

11        A.    Construction.

12        Q.    Was that supposed to be these Alfa

13   remodel jobs that you were working on with

14   Mr. Kitchens?

15        A.    Yes, and any jobs that I was

16   doing.

17        Q.    What other jobs were you doing

18   through All About Construction at the same

19   time these Alfa jobs were going on?

20        A.    As I was -- any kind of job I was

21   doing.

22        Q.    Just --

23        A.    If I was remodeling something or

1   if I was building a house or something,

2   whatever I was doing.

3       Q.    All About Construction, your

4   involvement didn't include the fall of 2018.

5   Tell me since the fall of 2018 what other

6   jobs you and Jesse did in All About

7   Construction I that did not include Mr.

8   Kitchens?

9       A.    Houses.

10      Q.    Name where those houses are.

11  Where were those houses?

12      A.    In Deatsville, Alabama.

13      Q.    What -- how many were there?  Were

14  there four or more?  I thought I remembered

15  four before.

16      A.    I think it is four.

17      Q.    Four houses.  Okay.  And they were

18  built and sold --

19          (Cell phone rings.)

20          MR. STOTSER:  I am so sorry.

21      Q.    So there were four houses that

22  were built in All About Construction with you

23  and Jesse at the time in which the -- the

1 agreement was underway with these Alfa

2 remodel jobs, those were side jobs?

3        A.    Yes.

4        Q.    Okay.  Where did you get the money

5 for those?

6        A.    I had a business partner with

7 that.

8        Q.    Who was your business partner?

9        A.    Robbie -- what -- what was that

10 lawyer's name that was there with you that

11 day, the fat one -- well, I mean the heavyset

12 one?

13        Q.    I'm not going to answer that.

14        A.    Yeah.

15        Q.    I had a co-counsel, Trey Norman,

16 that was --

17        A.    That was him, Robbie Norman.

18        Q.    Robbie Norman?

19        A.    Uh-huh.

20        Q.    Okay.  So Robbie Norman was a

21 partner with you on these four houses in

22 Deatsville, and you were a partner with

23 Jesse?

1          A.     Yes.

2          Q.     Okay.  Now, some of the money for

3   that came out of your Synovus or your

4   AmeriFirst bank account, correct?

5          A.     No.  Whenever I had -- whenever I

6   paid, we -- Billy had me to do everything,

7   that was the way we was going to do it, do

8   everything through Synovus.  That way, it

9   gave me a track record, and we could borrow

10  at the bank and do whatever we needed to do.

11         Q.     Okay.  What I was asking you is

12  that some of the proceeds on these four

13  houses came out of the Synovus and AmeriFirst

14  bank accounts that you had?  I saw checks,

15  and some of them went out from that, correct?

16         A.     It came out of the cash, where I

17  had paid cash.  And then the way we had

18  worked it, that was my profits and things.

19  The whole thing, we rolled it like that.

20         Q.     What I'm asking you is that --

21         A.     Were any checks written?  Yes.

22         Q.     Checks were written out of the

23  Synovus and AmeriFirst account to build those

1  four houses?

2       A.    No.  They were written out of

3  there, but it was already -- it was -- it was

4  put in there.

5       Q.    Okay.  It was put in there, but it

6  was -- the money -- there was money put into

7  that account, and then from that account

8  there were checks written out of Synovus and

9  AmeriFirst for these four houses?

10      A.    Yes.

11      Q.    Okay.

12      A.    But it wasn't Billy's money.

13      Q.    Okay.  What other houses did you

14 guys do on the side in All About Construction

15 I?

16      A.    I don't remember any more.  I

17 don't remember.

18      Q.    And then all of a sudden All About

19 Construction I is closed, and All About

20 Construction II is opened.  Why close All

21 About Construction I and then open up another

22 entity All About Construction II?

23      A.    It -- it wasn't.  Tommy did that,

1  and I don't know why he did All About

2  Construction II.  And he did it the same

3  time.

4      Q.    Tommy who?

5      A.    Gallion.

6      Q.    Tommy Gallion opened up All About

7  Construction II?

8      A.    All About Construction and All

9  About Construction II.  Jesse already had All

10 About Construction.  But when I bought into

11 that, Tommy did All About Construction and

12 All About Construction II.  I don't know why

13 he did the II.

14     Q.    Okay.  Well --

15     A.    Him and Jesse was talking.

16     Q.    All About Construction II was an

17 entity that you and Jesse owned 50/50?

18     A.    Yes.

19     Q.    Okay.  Your signature -- your

20 signature on that, you wrote checks out of

21 All About Construction II?

22     A.    I didn't even know it had an

23 account.  So, yes, I did.  If I did it, I did

1    it.

2         Q.    You didn't know you had an

3    account, but you wrote --

4         A.    I don't remember.

5         Q.    -- tens of thousands of dollars of

6    checks out of that bank account?

7         A.    I don't remember.

8         Q.    What was -- tell me what business

9    was transacted out of All About Construction

10   II.

11        A.    I don't remember.  It was

12   whatever -- whatever -- whatever -- ever how

13   Jesse had that organizes.

14        Q.    Okay.  But you were a 50/50 owner?

15        A.    Yes.

16        Q.    Okay.  You wrote a bunch of checks

17   out of that to you.

18        A.    Okay.

19        Q.    What were all the tens of

20   thousands of dollars you checks you wrote out

21   to you from?

22        A.    I would have to see it.

23        Q.    Okay.

1          A.     See the checks.

2          Q.     What about Homes4You, LLC?  That's

3    still open.  What business is there

4    transacted in Homes4You, LLC?

5          A.     I don't even remember it,

6    Homes4You.

7          Q.     You don't remember that one.  You

8    list it on your schedule as being open.  To

9    your knowledge, is that open?

10         A.     Oh, that's the one that me and

11   Billy had together.

12         Q.     Okay.  Is that open?

13         A.     I thought she closed it, but I

14   don't -- I don't know.  If it's listed as

15   open, it's open.

16         Q.     Let me ask you a -- that -- let me

17   go back to something for a minute.

18         A.     Yes, it was.  Yeah, because we

19   were supposed to go to the bank to get the --

20   we were approved at the bank for the note.

21         Q.     To do what?

22         A.     To build four houses.

23         Q.     Which four, was that the

1    Pinetucket houses or not?

2         A.    No.  I had put the money in

3    Pinetucket.  Billy -- me and Billy went to

4    the bank in Tallassee and met with that

5    banker.

6         Q.    Billy signed the notes on those,

7    either individually or corporately, correct?

8         A.    Yes.  And then I had to add money

9    to it to get it where we could do all four of

10   them.  I paid down whatever we had to pay.

11   Whatever it was, I don't remember.

12        Q.    Okay.  On page 13 here, it's

13   talking about 701 Pinetucket, 713 Pinetucket,

14   715 Pinetucket, 514 Whispering Wind Way.

15   Those were the four houses?

16        A.    Yes, we're 50/50 on them.

17        Q.    Okay.  Down here it says one

18   debtor only on all these.

19        A.    Debtor means the person that owes

20   the money.

21        Q.    Yeah.  Who --

22        A.    So Billy owed the money, and then

23   I had to sign -- I mean, I had to pay

1  whatever it was they were requiring down.

2       Q.   It says, "Who has an interest in

3  the property?" and you said "Debtor 1 only,"

4  being you, on these.  Does Billy have an

5  interest in those properties?

6       A.   We're 50/50 in them.

7       Q.   Okay.  Do you remember ever

8  telling Greg or Ricky while you were in jail

9  that you're glad you didn't have any

10  ownership interest in them because the EPA

11  was coming after them and was --

12       A.   Yeah.

13       Q.   -- going to --

14       A.   Whenever I got that -- they said

15  it came in the mail.  I said, well, I'm glad

16  I don't have it then.

17       Q.   Right.  You told both of them that

18  you were glad you didn't own an interest in

19  them because the EPA would go after them?

20       A.   Somebody had called the EPA on me.

21       Q.   Correct.  And --

22       A.   And then whenever whatever

23  happened, I don't know what happened.

1      Q.    Yeah.

2      A.    Whatever that was called, then it

3 got the EP -- whoever had called it, got it

4 off of me.

5      Q.    Right.  And you were -- you told

6 both Ricky and Greg while you were in jail

7 that you were glad you didn't own these

8 properties?

9      A.    I'm glad it wasn't on me, yeah.

10      Q.    Right.  You were glad it wasn't

11 on --

12      A.    I don't remember -- I don't

13 remember how I worded it.

14      Q.    Okay.

15      A.    That's what I meant by it.

16      Q.    That you're glad it's on him,

17 because he was the owner of the property?

18      A.    I'm glad it wasn't on me, yeah.

19 So ever how I worded it, I can tell you what

20 I meant by it.

21      Q.    If you're a 50 percent owner, it's

22 50 percent on you, isn't it?

23      A.    Yes.

1      Q.    Okay.  So if you don't own it,

2  then it's not on you, right?

3      A.    You got to clean it up.

4      Q.    Okay.  But you don't have to clean

5  it up because you're not an owner?

6      A.    I would clean it up.  I tried to

7  clean it up, tried to finish them up.

8      Q.    But after -- when you went in

9  jail, you were telling them that you were

10  glad you didn't own it?

11      A.    I might have been aggravated and

12  said something.

13      Q.    Okay.  What did Masterfoam, LLC,

14  what did that do?

15      A.    Spray foam in -- in walls, you

16  know, the construction walls.

17      Q.    What kind of assets do you have in

18  that entity?

19      A.    There's none.

20      Q.    You had to have something in that

21  entity to do business with.  It was open for

22  two years.  What did you -- what kind of work

23  did you do in Masterfoam, you sprayed walls?

1    A.    Yes.

2    Q.    Did you have spray guns?

3    A.    No, not anymore.

4    Q.    What do you have?  What did you

5  have?

6    A.    It was some kind of machine that

7  sprayed it.

8    Q.    Okay.  And who bought the

9  machines, you did?  You were the owner?

10    A.    No.  No, I wasn't the owner.  Me

11  and Jesse was the owner together, we were

12  50/50.

13    Q.    Okay.  50/50 Masterfoam.  And when

14  that closed down this year, where did the

15  assets go?

16    A.    There wasn't any -- oh, there was

17  a trailer that some man bought.  I don't

18  know.  I don't even know what happened to it.

19    Q.    Is it the same trailer that's at

20  your home address now?

21    A.    No.  I don't have a trailer at my

22  home address.

23    Q.    Do you have a trailer at any

1  address?

2      A.    No.

3      Q.    There's no trailer that you know

4  of that's either -- at either one of the --

5  that's at the Coosada Road property or at the

6  Deatsville property?

7      A.    You're talking about my -- the

8  little utility trailer I got?

9      Q.    Yeah.  That's in your name?

10     A.    The little utility trailer?

11     Q.    Uh-huh.

12     A.    Okay.

13     Q.    Did you list that on your

14  schedules?

15     A.    I don't know.  I don't know if it

16  was listed or not.  It's $300, I mean,

17  what --

18     Q.    Three hundred dollars.  Who did

19  you have --

20     A.    You're talking about the little

21  utility trailer I've got?

22     Q.    I'm talking about the trailer that

23  you had someone go out while you were in jail

1  and try to buy.  Do you remember that?  Do

2  you remember making a transaction --

3       A.    Oh, that's the camper trailer.

4       Q.    Camper trailer.  Okay.

5       A.    Oh.

6       Q.    There's a camper trailer?

7       A.    Yeah.

8       Q.    Okay.  How much is the camper

9  trailer worth?

10      A.    I don't know, six or 8000 maybe.

11      Q.    Okay.  You didn't list that on

12 your schedule.  Why not?

13      A.    I don't know.

14      Q.    Is it one of those things you

15 haven't thought about?

16      A.    Yeah.

17      Q.    But you had somebody in jail's mom

18 actually -- you let somebody in jail actually

19 tell their mom to go out --

20      A.    And look at it.

21      Q.    -- and look at it to buy it,

22 right?

23      A.    Yes.

1    Q.    And there was a horse trailer too,
2  right?
3    A.    Yes.
4    Q.    And did she buy the horse trailer
5  and the camper?
6    A.    No.  I didn't sell anything.
7    Q.    You didn't sell it, but you tried
8  to?
9    A.    I was going to.  And then whenever
10 I realized we couldn't, then it was
11 different.  When everything calmed down.
12   Q.    What do you mean "when everything
13 calmed down"?
14   A.    Well, everything went in turmoil
15 just for -- for a while.
16   Q.    When did it go into turmoil?
17   A.    At that hearing.
18   Q.    But it was after the hearing that
19 you made a deal or tried to make a deal?
20   A.    I was still in jail.  It was still
21 in turmoil.
22   Q.    But you admit to calling Ricky and
23 Greg and asking them to show this girl the

1 camper and the trailer, the camper and the

2 horse trailer in order to try to purchase --

3 for her to purchase it?

4     A.     To let them look at it, yes.

5     Q.     And you were going to sell it to

6 them?

7     A.     No.  I was just letting them look

8 at it.  If they want to buy it, you know, if

9 the trustee said we could after we got out.

10 I didn't know about all that, so we --

11 everything just in turmoil, that's all it

12 was.  But nothing's gone, everything is right

13 there.

14     Q.     Okay.  Is all the personal

15 property in the garage still there?

16     A.     Yes, it sure is.

17     Q.     You said there's a lot of property

18 in the garage.  What kind of personal

19 property is in the garage?

20     A.     A lot in the garage.

21     Q.     Like what kind of stuff?

22     A.     Junk.

23     Q.     You said very expensive stuff.

1     A.    Yeah.

2     Q.    You didn't say "junk" in the jail.

3     A.    Yeah, it's expensive.

4     Q.    You said it was expensive.

5     A.    Yeah.  If you can find an antique

6 dealer to buy it from you, it's expensive.

7     Q.    What kind of expensive antiques

8 are in your garage?

9     A.    Stuff like that chair, things like

10 that (indicating).

11     Q.    Candlesticks?

12     A.    Yes.

13     Q.    What other?  There's a lot of --

14 tell me what else.  I've not been in your

15 garage.  What else is in your garage?

16     A.    I don't know.  It's all piled up

17 in there.

18     Q.    Well, tell me what else.

19     A.    Tanning bed, a desk, various other

20 things.  I was going to sell that, but I

21 don't know -- just waited until I got out

22 until everything calmed down.  And everything

23 is still right there.

1     Q.    What was Signature Event, LLC?

2  What was that supposed to do, that entity

3  supposed to do?

4     A.    It was supposed to be a club

5  that -- or venue or something.  I don't know.

6  That was Jesse's thing.  And I didn't even

7  remember that until you just said it.

8     Q.    What changes did you make to your

9  schedules that you filed last night about

10  10:30, the night before your deposition

11  today?

12     A.    Putting Harold Spiers on there.

13     Q.    Who is Harold Spiers?

14     A.    He's the one that holds the

15  mortgage on my land.

16     Q.    What land is that?

17     A.    In Selma.  The land behind the

18  house.

19     Q.    What's the address of that?

20     A.    I don't know.  I don't guess I

21  ever called and got one.

22     Q.    So you have land in Selma?

23     A.    No.  I'm saying he's in Selma.

1      Q.     Okay.  I'm sorry, I misunderstood.
2  He owns a mortgage on what property?
3      A.     The land behind the house.
4      Q.     The Deatsville house?
5      A.     Yes.
6      Q.     Okay.  And how much is this
7  mortgage?
8      A.     Well, it's 214,000 still owed on
9  it.
10      Q.     And you just forgot about that,
11  listing that until last night?
12      A.     As I'm remembering it, I'm putting
13  it on there.
14      Q.     So we may be here for a long time
15  as you remember more assets and debt that --
16      A.     And going through everything.
17      Q.     Is there any reason since you've
18  got out of jail you couldn't have reviewed it
19  all and made sure you had it all?
20              MR. BENSINGER:  Object to the
21  form.
22      A.     I've been reviewing it all.
23  There's so much of it.

1     Q.    So you reviewed it all, and it
2  wasn't until --
3     A.    I'm going through each thing --
4     Q.    Let me finish my question.  You
5  reviewed it all, and it took you until last
6  night to add in Magnolia Real Estate and The
7  Venue at Fortuitous, even though those were
8  the entities which you were put in jail for
9  in August?
10     A.    That's when I wrote down the list,
11  and that's when I turned it in to be -- to
12  add it.
13     Q.    So you didn't turn it in to be
14  added until yesterday?
15     A.    Right.
16     Q.    And yet you do realize that
17  those -- that was part of the reason you were
18  held in criminal contempt?
19     A.    That's what the judge said.
20     Q.    Okay.  And yet you didn't bother
21  to tell your attorney about it until
22  yesterday?
23     A.    We got -- we were --

1          MR. BENSINGER:  Don't discuss

2    anything that we --

3          Q.    I don't want to know what he said.

4          MR. BENSINGER:  -- that we've

5    discussed.

6          Q.    You didn't tell your attorney

7    about it until yesterday?

8          A.    No.  Debbie is making a list of

9    everything and then giving it to me, and then

10   I turn it in.

11         Q.    Is Debbie still employed there?

12         A.    Yes.

13         Q.    Who works there?  Who works for

14   you?

15         A.    Well, nobody actually works for

16   me.

17         Q.    You don't have any employees?

18         A.    Kenny works for me, that's it.

19         Q.    Kenny who, Kenny Richards?

20         A.    No.  I don't know his last name.

21   It starts with an S.

22         Q.    How long has Kenny worked for you?

23         A.    Probably three or four years.

1          Q.     What about Lonnie, does he work

2     for you?

3          A.     Not anymore.

4          Q.     When is the last time Lonnie

5     worked for you?

6          A.     A few weeks ago.

7          Q.     What happened?  Why doesn't he

8     work for you anymore?

9          A.     I don't have anything for him to

10    do.

11         Q.     What did he do in the -- since you

12    were in jail, what did he do for you?

13         A.     He was collecting rent.

14         Q.     Rent on what entities?

15         A.     I had already sold it.

16         Q.     Well, three or four weeks ago you

17    hadn't sold it.  There's property that -- you

18    have rental properties right now, don't you?

19         A.     No.

20         Q.     You don't have any rental

21    properties?

22         A.     No.

23         Q.     Is anybody in the Plum Street

1    address right now?

2         A.    No.  I don't own it.

3         Q.    You list it on your schedule you

4    do.

5         A.    It's got a -- it's got a mortgage

6    against it where whenever he pays it, it --

7         Q.    2501 Plum Street.

8         A.    And 2500.

9         Q.    And 2500, single-family homes.

10        A.    And Pocahontas.

11        Q.    Yeah, single family.  Legal title

12   is held subject to a sales agreement?

13        A.    Yes.

14        Q.    So when did you enter into an

15   agreement to sell these properties?

16        A.    It's been a while.  I don't know.

17   I'll have to --

18        Q.    Give me -- give me your best

19   estimate.

20        A.    I don't know.

21        Q.    Two months ago?

22        A.    No.

23        Q.    Three?

1          A.     I don't know.

2          Q.     Where is that contract?

3          A.     Debbie would have it.

4          Q.     So you own it, and you're selling

5   it to somebody?

6          A.     No, I owner-financed it.

7          Q.     He already bought it?

8          A.     He's paying it.

9          Q.     He's paying it.  You didn't list

10  these payments on the schedule.  Why didn't

11  you list these payments on any schedule for

12  how much money these people are paying you?

13         A.     As we come up on it, we're --

14  we're adding whatever we --

15         Q.     So I'm assuming that is yet

16  something else you're going to add, right?

17         A.     If we need -- as we've come up on

18  it.  We haven't come up on that yet, to my

19  knowledge.

20         Q.     Yeah.  They --

21         A.     She hasn't asked me about it yet.

22         Q.     The judge has asked you about it,

23  I promise.  You're supposed to list all your

1 assets and all your debts, the money you're

2 getting off of --

3     A.    Debbie hasn't asked me about it.

4     Q.    Okay.  You know your obligation is

5 not to Debbie; your obligation is to the

6 bankruptcy court?

7     A.    Yes.

8     Q.    Okay.  You did not list any money

9 you were getting.  What other money are you

10 getting for what properties that are owner-

11 financed besides these two?

12     A.    It's called Heustess Street.  I

13 don't know how to spell it.

14     Q.    H-O-U-S --

15     A.    No, that don't look right.

16     Q.    Hu --

17     A.    It look like -- the sign looks

18 like H-U-E-G-H or something like that.  I

19 don't know.

20     Q.    Okay.

21     A.    That's what's on the -- I mean, I

22 don't know what -- I just know you say

23 Heustess.

1     Q.    Okay.  There's nothing on your

2  bankruptcy petition about getting any money

3  or owning any interest in Heustess Street.

4  Do you know why that wasn't listed?

5     A.    I don't know.  We haven't come on

6  it yet.  We're going through everything.

7     Q.    So you and Debbie are going

8  through everything, and then you're going to

9  tell your lawyer, and then your lawyer is

10 planning on adding different assets?

11    A.    As I -- as they come up.

12    Q.    As they come up?

13    A.    Yes.

14    Q.    Okay.  So you would agree with me

15 that right now your schedules are not

16 complete, you don't have all the assets

17 listed in here?

18    A.    Right.

19    Q.    Okay.  You would agree with me

20 that you filed this in August, and up until

21 today, you still don't have all the assets

22 listed?

23    A.    There's -- there's some --

1    Q.    Some that aren't listed.

2    A.    -- that I'm going to go through.

3    Q.    You're still going through them?

4    A.    Yes.

5    Q.    What has prevented you to go

6    through it from the time that you got out of

7    jail until today?

8    A.    Nothing prevented me.  I'm going

9    through it.  It's just so much of it.

10   Q.    Have you been -- have you had --

11   what other businesses since you got out of

12   jail have you been working at that you've

13   made any income?

14   A.    Just with Renaissance II.

15   Q.    Okay.  How much money did you make

16   while you were in jail working for

17   Renaissance?

18   A.    I didn't make any while I was in

19   jail.  They just fronted me some.

20   Q.    They fronted you some.  How much

21   did they know how to front you?

22   A.    Whatever I needed.

23   Q.    So it's not -- it's whatever you

1   needed, it's not based on what you earned?

2       A.    And then I turned around, and I

3   did whatever they needed me to do.  I was

4   giving advice while I was in there, so, I

5   mean, that was part of it.

6       Q.    What would you tell them in jail

7   to do with regards to the draws that they

8   received?

9       A.    Pay whatever they had to pay and

10  give me whatever I was needing.

11      Q.    Just give you whatever you needed?

12      A.    Yeah.

13      Q.    And you sort of controlled that --

14  that money flow, didn't you?

15      A.    No, I don't control anything.  I

16  just tell them how I would do it.  It may

17  sound like I control it, but I don't control

18  it.

19      Q.    Do you know you had over 140

20  conversations with them while you were in

21  jail?  Would that surprise you?

22      A.    No.

23      Q.    Okay.  Do you know in each one of

1  them you told them exactly what to do with

2  the money and how to spend it and what to do

3  with it, each and every time?

4      A.    Sure.  I'm the advisor to it.

5  Yes, absolutely.

6      Q.    You didn't just advise them, you

7  told them where the money was going to go?

8      A.    That's advising.

9      Q.    In fact, you told them out of the

10  first draw to pay your attorney fee?

11      A.    That's advising.

12      Q.    Is that correct?

13      A.    Yeah.  That's advising.

14      Q.    You told them to pay $5000 out the

15  first draw of their property to your lawyer

16  to file this bankruptcy?

17      A.    Yes.  And then also I told them --

18          MR. BENSINGER:  Object to the

19  form.

20      A.    -- how to pay the bills and

21  whatever they had to do.

22      Q.    Did you tell them to pay $5000 --

23      A.    Yes.

1     Q.     -- out of the first draws --

2     A.     Yes.

3     Q.     -- to your attorney?

4     A.     Yes.

5            MR. BENSINGER:  Object to the

6  form.

7     Q.     Who's Cash?

8     A.     I don't know.

9     Q.     You know who Cash is, Mr. Bulger.

10    A.     Oh, Cash, that's the one that --

11  you're saying Cash.

12    Q.     Who is Cash?

13    A.     That's the one that -- I thought

14  you were talking about -- you were talking

15  about money one second, then you asked me

16  about Cash.  That's the -- that's his

17  nickname -- I don't know what his real name

18  is -- that's purchasing those properties.

19    Q.     How much money does he pay you a

20  month?

21    A.     He pays 3000 a month, and I've got

22  it put up for whatever I'm supposed to do

23  with it.

1    Q.    He puts it in your mailbox every

2    month, right?

3        A.    Uh-huh.

4        Q.    For cash?

5        A.    Uh-huh.

6        Q.    And you didn't list any of the

7    cash, but you remembered when you were in

8    jail to tell Ricky and Greg to get the money

9    out of the mailbox, correct?

10       A.    Yes.

11       Q.    So your testimony today is

12   although you remembered it in jail, you

13   didn't remember to tell the bankruptcy court

14   that you were owed money in the form of cash

15   that you received every month?

16       A.    I'm remembering as we go.  I'm

17   going through everything.

18       Q.    Okay.  How much money is owed on

19   all those houses?

20       A.    I don't know.

21       Q.    You listed three.  Were there

22   other houses?

23       A.    I don't know.  I'll have to look

1  at it.  Am I to look at cash?

2      Q.    There's 4 and 5.

3      A.    I know Plum Street, both Plum

4  Streets are on it.

5      Q.    Right, you listed two Plum --

6      A.    And Pocahontas is on it.

7      Q.    Pocahontas.  And then something

8  called Heu -- I don't remember --

9      A.    Heustess.  It's not on there.

10      Q.    No, it's not on there.  But that's

11  one of them also.  That's another -- that's

12  another one that he's buying for which he's

13  paying?

14      A.    No.  He's not buying Heustess.

15      Q.    Who's buying Heustess?

16      A.    No one is buying Heustess.  I

17  think it's already paid out.  I'm not sure.

18  I'd have to look.  We haven't gotten to that

19  yet.

20      Q.    You and -- you and --

21      A.    Debbie.

22      Q.    -- Debbie have not gotten to that

23  to determine your ownership interest so that

1    you can let the Court know?

2              THE WITNESS:  Is that Japonica, is

3    that what this is (indicating)?

4              MR. BENSINGER:  Yes.

5         A.    Japonica is the other one.

6         Q.    (BY MR. STOTSER) Okay.  And what

7    was the purchase price of all of those?

8         A.    I don't know.  I'd have to look it

9    up.

10        Q.    What's your best estimate of the

11   purchase price?

12        A.    I don't remember.

13        Q.    When did he buy them?

14        A.    I don't remember that either.

15        Q.    He bought them at the time when

16   this -- when the Autauga County case was

17   going on, didn't he?

18        A.    I don't know.  I'll have to look

19   it up.

20        Q.    Let me ask you, he -- do you

21   remember at the beginning of the year that

22   you sold a bunch of properties to trust?

23        A.    I sold them to HIS Capital.

1      Q.    Okay.  They were listed and sold

2  to a Ramos Elliott in trust?

3      A.    I don't know anything about it.  I

4  sold it to HIS Capital.

5      Q.    Okay.

6      A.    And whoever did the -- I went in

7  there to sign it at Monica's office.  I

8  signed whatever she told me to sign.

9          MR. STOTSER:  Let's take a break

10  for five minutes.

11          (Recess.)

12      Q.    (BY MR. STOTSER) Those four -- you

13  were talking before the break about the four

14  houses and All About Construction that were

15  being built by you and Jesse at the time that

16  Mr. Kitchens was working with you with regard

17  to these Alfa remodel jobs, and you said you

18  had a partner?

19      A.    Yes.

20      Q.    What was his name again, Norman?

21      A.    Yeah, Robbie.

22      Q.    Okay.  What was -- who is Robbie

23  Norman?

1        A.    A friend of mine, and me -- and he

2   and I were 50/50 in them.

3        Q.    You were 50/50 on those houses?

4        A.    Yes.

5        Q.    Okay.  And how -- did he pay for

6   any of those houses, or was it just your

7   payment that went to the houses?

8        A.    No.  He put the money up.

9        Q.    He put all the money up or some of

10  it?

11       A.    I can't remember.  I can't

12  remember.

13       Q.    Did you have any kind of agreement

14  or document that evidenced your --

15       A.    No.

16       Q.    The payment?

17       A.    Just our word.

18       Q.    When those four houses were sold,

19  who did the closings?

20       A.    I think Monica did them.

21       Q.    Monica did all the closings?

22       A.    I think.

23       Q.    Okay.

1      A.    She usually does, because she

2  reads for me.

3      Q.    She did the close -- Monica did

4  the closings.  And Monica would have

5  disbursed the funds 50/50, according to the

6  profits that were made, half to each one of

7  you?

8      A.    Yes.

9      Q.    About when would they have closed?

10  Would they have closed in the last 12 months?

11      A.    I don't remember.

12      Q.    You didn't start them until when,

13  sometime in '19 or '20?

14      A.    I don't remember.

15      Q.    Well, give me an estimate.

16      A.    I mean, I don't even remember to

17  even give you an estimate.

18      Q.    Was it in the last four months?

19      A.    I don't know.

20      Q.    So it could have been, could have

21  been in the last four months?

22      A.    It wasn't last the four months,

23  but I don't know when it was.

1          Q.     Was it in the last eight months?

2          A.     I don't know.

3          Q.     So it could have been between four

4     and eight months?

5          A.     It -- I don't know.

6          Q.     Okay.

7          A.     I'll have to look it up.

8          Q.     How do you look -- how are you

9     going to go back and look it up?

10         A.     As Debbie brings the stuff to me,

11    we go through it, and she asks me everything,

12    and we -- she organizes it.  And we go

13    through it, and then we make a list of what

14    needs to be done.

15               (Off-the-record discussion.)

16                (Plaintiff's Exhibit 6 was marked

17                 for identification.  A copy is

18                 attached.)

19         Q.     (BY MR. STOTSER) I'm going to show

20    you what I've marked as Plaintiff's Exhibit 6

21    and ask you if you can identify those

22    documents as property which you sold this

23    year at 212 East Park Avenue?

1          THE WITNESS:  What is --

2          MR. BENSINGER:  It says 212 East

3  Park Avenue Land Trust as the buyer.

4          THE WITNESS:  Okay.

5          MR. BENSINGER:  The property

6  location, it says 212 East Park Avenue,

7  Montgomery, Alabama 36110.

8     A.    Yes.  What did you want me to --

9     Q.    (BY MR. STOTSER) I just want you

10  to identify them first.  Now, in Plaintiff's

11  Exhibit 6, that document contains a closing

12  statement dated 2/4/2021, an addendum to a

13  closing statement, a purchase agreement, a

14  trust agreement.  You signed this contract

15  1/15, James Bulger, this real estate

16  contract, to sell that property, correct?

17     A.    With HIS fund -- or HIS whatever

18  it is.

19     Q.    Okay.  You signed with Florida

20  Home Buy, LLC, buying this property?

21     A.    Okay.

22     Q.    Okay?

23     A.    Okay.

1    Q.    Okay.   You signed it on behalf of

2   Pinehurst, LLC?

3    A.    I don't know who that is.

4    Q.    Well, I don't either, sir.  It

5   says, "James D. Bulger on Behalf of

6   Pinehurst, LLC (Seller)."  So Pinehurst, LLC,

7   was the seller of this property, and you

8   signed on behalf in your corporate capacity

9   for Pinehurst, LLC, correct?

10    A.    No, I'm here.   I don't know who

11   this is (indicating).

12    Q.    Well, no, it says "On behalf of

13   Pinehurst, LLC."  Who is Pinehurst, LLC?

14    A.    I don't know.   I don't know.

15         MR. HOOKER:  It should be in

16   there.

17         MR. STOTSER:  Okay.  Let's go off

18   the record for a minute.

19         (Off-the-record discussion.)

20    Q.    (BY MR. STOTSER) So tell me who

21   Pinehurst is.

22    A.    I don't know.

23    Q.    Did you list Pinehurst as being an

1    entity in which you had an interest?

2          A.    No.

3          Q.    Did you list Pinehurst as being an

4    entity in which you were an officer or

5    director?

6          A.    No.

7          Q.    Then why did you sign a document

8    on behalf of an entity which you don't know

9    who exists?

10         A.    I don't know.  I signed my name to

11   it.  I don't know.

12         Q.    Do you know Mark Fuller?

13         A.    Mark Fuller.

14         Q.    Do you know a guy named Mark

15   Fuller?

16         A.    Ben Fuller.

17         Q.    You know Ben Fuller.  Who is Ben

18   Fuller?

19         A.    That judge.

20         Q.    Okay.  How do you know him?

21         A.    The -- the hearing thing.

22         Q.    Oh, okay.  Do you know anybody who

23   is -- do you know anybody who is associated

1  with Pinehurst, LLC?

2      A.    No.

3      Q.    How did the buyer get -- how did

4  the buyer get the name Pinehurst, LLC, if not

5  from you?

6      A.    I don't know.  I sold it to HIS

7  Capital.

8      Q.    The borrower is Elliott Ramos, as

9  trustee of 212 East Park Land Trust, a

10  Florida trust, dated January 1st, 2021.

11      A.    The people are in Florida.

12      Q.    Okay.  The lender is HIS.

13      A.    That's who -- that's who bought it

14  from me.

15      Q.    Then there's a trust agreement

16  that's attached, and the trust agreement says

17  that the beneficiaries are about to convey

18  property to the trustee, and the trustee has

19  agreed to accept the conveyance as a

20  fiduciary in trust for the beneficiaries.

21  The beneficiaries -- who sold this property,

22  sir?

23      A.    I sold the property to HIS.

1       Q.    Okay.  And it's listed down here

2   that you are -- you are the trustee of

3   this -- that you are the beneficiary of this

4   trust?

5       A.    No.  No.

6       Q.    That's what this document says,

7   that --

8       A.    I don't know anything about it.

9       Q.    You signed -- these documents were

10  closing documents that the closing attorney

11  gave me pursuant to a subpoena.

12      A.    I don't know anything about it.  I

13  sold it to HIS, and I got my check, and I was

14  done with it.  I don't know anything about

15  all of that.  I signed whatever she told me

16  to sign.

17              (Plaintiff's Exhibit 7 was marked

18               for identification.  A copy is

19               attached.)

20      Q.    (BY MR. STOTSER) This is a copy of

21  Plaintiff's Exhibit 7, and it's the same

22  documents basically on 612 Planters Court

23  Road, and you sold property on Planters Court

1    Road on or about February 4th; is that

2    correct?

3        A.    Yes.

4        Q.    Okay.  And this residential

5    purchase agreement was made between James

6    Bulger, on behalf of Pinehurst, LLC, and

7    Florida Home Buy, LLC.  That's your

8    signature, 1/15, correct?

9        A.    Yes.  The electronic thing, yes.

10       Q.    Okay.

11       A.    I don't know anything about that.

12    I sold it to HIS.

13       Q.    Well, let me ask you this:  Then

14    you had an addendum on this contract, January

15    7th, 2021, and it shows that Pinehurst is

16    selling it to HIS.  Do you see that?

17    Pinehurst, LLC, is selling this property in a

18    contract addendum to HIS Capital Group,

19    January 7th, 2021?

20       A.    I don't know.  There's a contract

21    that I signed that said to HIS for the amount

22    of the houses.

23       Q.    Is that your signature

1   (indicating)?

2           A.      The electronic thing, yes.

3           Q.      Who is Sam Sewell?

4           A.      Sam Sewell?

5           Q.      You know Sam Sewell, you've sold

6   him property.

7           A.      Yeah.  Okay.  He bought 1324 South

8   Perry.  I just had to think who he was.

9           Q.      Why is he somebody that bought

10  1324 --

11          A.      Oh, he was the one that -- he -- I

12  don't know what you call him, but like a real

13  estate.  He's the one that asked me about --

14  he's the one that called me about the houses,

15  like a real estate agent or something.

16          Q.      Okay.

17          A.      That's who he is.

18          Q.      Okay.  And he witnessed your

19  signature?

20          A.      I wasn't there, I mean --

21          Q.      It says:  "Witness:  Sam Sewell"

22  to your signature.  That is your -- that's

23  your signature (indicating)?

1      A.      Yes.

2      Q.      Okay.  And you signed on behalf of

3   what does that say, Pinehurst, LLC?

4      A.      Okay.

5      Q.      Yes, that's what it says?

6      A.      All right.

7      Q.      Now, let me ask you this:  Exhibit

8   1 shows purchase price and rehab holdbacks of

9   13 pieces of property, okay.  I think 12 of

10   them closed.  I don't know if the Pocahontas

11   one closed or not.  I don't think it did.

12          It showed original purchase price

13   and then it shows new purchase price.  Why is

14   the new purchase price different from the

15   original purchase price?

16      A.      Because they were in such bad

17   shape.

18      Q.      Okay.  So what's the rehab

19   holdback for?

20      A.      That was to redo them, to remodel

21   them for them.

22      Q.      So you're re --

23      A.      No, we only did a few of them.

1    Q.    Okay.  And then once you did it,

2  you got -- you still owned those properties,

3  right?

4    A.    No, I don't own those properties.

5    Q.    You did the rehab?

6    A.    That's what they paid me for.

7    Q.    So they paid you to do the rehab

8  on these properties?

9    A.    But I didn't do it all.  I only

10  did a couple of them.

11    Q.    Which ones did you do the rehab

12  on?

13    A.    I don't even remember.  I'll have

14  to get -- go through it.

15    Q.    Tell me -- look through the

16  properties and tell me which ones you did the

17  rehab on.

18    A.    Okay.  I'll have to look at it and

19  whenever I remember it.

20    Q.    Well --

21    A.    I'm going to have to go through

22  my --

23    Q.    Go through right now.

1          A.    I don't have anything to go

2     through with.

3          Q.    Well, use your mind.  Tell me what

4     you've got.

5          A.    I don't remember.  I'll be glad to

6     look it up.

7          Q.    Rehab holdback, did you do Dover

8     Drive?

9          A.    I don't know.  I don't remember.

10         Q.    Could you have?

11         A.    I don't know.

12         Q.    What entity did you do these rehab

13    work through?

14         A.    HIS.

15         Q.    No.  What entity did you do them

16    for?  Were you doing it individually, or were

17    you doing it in one of your corporations?

18         A.    HIS.

19         Q.    You were doing it in the entity as

20    HIS?

21         A.    You're talking about who was

22    paying me for doing it?

23         Q.    No, I'm saying --

1       A.      What are you asking then?

2       Q.      The work that was being done was

3  being done by whom?

4       A.      Me, I did it.

5       Q.      You individually?

6       A.      Yes.

7       Q.      Or you as one of your

8  corporations?

9       A.      Individually.

10      Q.      And then would they pay you for

11 those when you finished them?

12      A.      Yes.

13      Q.      And when was the first one you

14 started working on?

15      A.      I don't know.  I'll have to look

16 all that up.

17      Q.      When was the second one?

18      A.      I don't know.

19      Q.      How many did you do?

20      A.      I don't know.  I can get with you.

21      Q.      It's becoming a convenient answer,

22 sir.  You don't have any idea if you did one

23 or -- you're telling this judge --

1     A.    I don't know how many I did.

2     Q.    You're telling this judge under

3  oath you don't know if you did one or you did

4  12?

5     A.    Right.

6     Q.    You could have done 12?

7     A.    I know I didn't do all of them.

8     Q.    You could have done six?

9     A.    I think it was four or five.

10    Q.    You did four or five?

11    A.    No, I said I think it was four or

12  five.

13    Q.    Tell me, to the best of your

14  knowledge --

15    A.    I don't remember.

16    Q.    -- which four or five you did.

17    A.    I don't remember.

18    Q.    How long did they take you to do?

19    A.    A little while.

20    Q.    A month, a few months?

21    A.    No.

22    Q.    How long?

23    A.    A couple of weeks.

1    Q.    Each one?

2    A.    No.  It was like -- I don't even

3    remember.  I think we just did a little on

4    each one and then had to keep coming back for

5    something.

6    Q.    You said, "We just did a little."

7    Who is "we"?

8    A.    Me and Lonnie and Kenny.

9    Q.    So you and Lonnie and Kenny?

10    A.    Uh-huh.

11    Q.    Okay.  Now, I've got 11 -- ten

12    more just like this, that are in these names

13    of these properties, including 3763 Whiting

14    Avenue.

15    A.    No, I don't own that.

16    Q.    Did you sell it?

17    A.    Say it again to me.

18    Q.    Did you -- let me do it this way.

19    Did you sell --

20    A.    Are you saying Whiting?

21    Q.    I'm sorry, I may not have --

22    A.    I know it.  You're all right.

23    That's all right.

1    Q.    3763 Whiting Avenue?

2    A.    Yes.

3    Q.    229 West Woodland Drive?

4    A.    Yes.

5    Q.    6153 Cherry Road?

6    A.    Yes.

7    Q.    409 Chisholm Street?

8    A.    Yes.

9    Q.    319 East Park Avenue?

10   A.    Yes.

11   Q.    3256 Upchurch Circle?

12   A.    Yes.

13   Q.    6000 Oakleigh Road?

14   A.    Yes.

15   Q.    4599 Dover Drive?

16   A.    Yes.

17   Q.    116 Hobby Drive?

18   A.    Yes.

19   Q.    39 Davis Drive?

20   A.    Yes.

21   Q.    Okay.  All of those were sold

22  around February of this year; is that

23  correct?

1      A.     To HIS, yes.

2      Q.     And all of those had -- do you

3  have any evidence that would show that those

4  were -- that the contracts were not entered

5  into, any of them, between you on behalf of

6  Pinehurst, LLC, as the seller?  Do you have

7  any evidence that would show -- I could go

8  through 12 of them, if you want me to.  Do

9  you have any evidence to show me that you

10 didn't enter each one of those contracts

11 under that name?

12     A.     I sold it under -- I sold it to

13 HIS.

14     Q.     I'm asking you on the contract

15 documents -- I've shown you two, and I could

16 go through 12 more if I need to.  Do you have

17 any reason to -- do you have any evidence to

18 show that those contracts did not say that

19 you were signing them on behalf of Pinehurst,

20 LLC?

21     A.     If I understand what you're asking

22 me, I have a contract for HIS where I sold

23 them to them.

1      Q.    Correct.

2      A.    Is that what you're asking?

3      Q.    Just like this contract, just like

4 these contracts?

5      A.    Is that HI -- no, it's a -- it's

6 a -- I'll get it to you.  It's a contract.

7      Q.    Are you saying there's another

8 contract other than what you gave to the

9 closing attorneys?

10      A.    It's HIS that did it.  Sam Sewell

11 and HIS did that.

12      Q.    Do you have --

13      A.    And then Monica got it and read it

14 for me, and I signed it.

15      Q.    Okay.  Do you have any evidence to

16 show that each trust document does not say

17 that the purchaser is the beneficiary of each

18 property?

19      A.    I'm not the ben --

20      MR. BENSINGER:  Object to the

21 form.

22      A.    I don't know what that means, but

23 I'm not bene -- I don't even know anything

1    about it.

2        Q.    Okay.  But you don't have any

3    evidence to show me that this document and

4    the other ten like it -- are there any

5    other --

6            Let me ask you this:  Are there

7    any amendments or changes to this trust

8    document that was signed, the 12 trust

9    documents that were signed during these

10   closings that said the beneficiaries are

11   about to convey property?

12       A.    I don't know.  I don't know

13   anything about that.  I'm not -- I don't have

14   no trust or beneficiary or nothing.

15       Q.    When you -- what deeds or

16   mortgages -- when Debbie -- Debbie is in

17   charge of handling all your deeds and

18   mortgages, right?

19       A.    Yes.

20       Q.    Okay.  How many deeds or mortgages

21   right now do you have that she's handling for

22   you?

23       A.    I don't know.  I mean, like we

1  sold these.

2       Q.    Yeah.  But when you were in jail,

3  you told Greg that you wanted Greg to sit

4  down with her and learn everything about all

5  of the deeds and all of the mortgages that

6  she was handling now?

7       A.    Yes.

8       Q.    You said that on many occasions?

9       A.    Yes.

10      Q.    Okay.  What deeds and mortgages as

11  of August 5th existed for which she was

12  handling on your behalf?

13      A.    That -- that I don't know about.

14  That's what I'm trying to find out.

15      Q.    You still --

16      A.    That's why we're going through

17  everything.

18      Q.    Okay.  You still don't know all

19  the deeds and mortgages that she's handling?

20      A.    No.

21      Q.    Let me go back for a minute.  When

22  you entered into the relationship with

23  Jimmy -- I mean with Billy on these -- to do

1  those Alfa remodel jobs in August or

2  September of 2018 and then worked until let's

3  say the end of 2020 on those jobs, at some

4  point during that time your testimony was you

5  lost seven million dollars in cash?

6      A.    Uh-huh.

7      Q.    Correct?

8      A.    Right.

9      Q.    And your testimony before was that

10  that was spread out in different locations?

11      A.    Right, well, two.

12      Q.    Two locations?

13      A.    Yes.

14      Q.    1324 South Perry?

15      A.    Yes.

16      Q.    And the Bogart residence --

17      A.    Yes.

18      Q.    -- up in Tennessee, right?

19      A.    Yes.

20      Q.    And you actually had a safe up in

21  Tennessee where you had money, didn't you, or

22  a vault up there?

23      A.    No.

1      Q.    You didn't have any secure place
2  where you held it?
3      A.    I had a basement.
4      Q.    You had a basement.  But it had a
5  vault or some secure place where you held it,
6  didn't it?
7      A.    No.
8      Q.    It didn't?
9      A.    No.
10     Q.    Where in the basement did you have
11 it?
12     A.    In the basement.  Well, it wasn't
13 really a basement.  It's a -- what do they
14 call them, cellar thing.  They call them
15 cellars there or something.  You can't stand
16 up in it.
17     Q.    And how much did you have at each
18 location?
19     A.    I don't know.
20     Q.    Give me your best estimate.
21     A.    I don't know.  I don't even know
22 how much was -- we -- when I started going
23 into it, we went into it.  I mean, it just --

1    Q.    When is the first time you noticed

2  that that money was missing?

3    A.    Well, I kept telling Billy, I

4  said, I'm getting low too.  You know, I mean,

5  I kept telling him.

6    Q.    Okay.

7    A.    And he was telling me.

8    Q.    So Billy was telling you he was

9  getting low around --

10    A.    I was telling him I was getting

11  low, and he was telling me he was getting

12  low, and we were trying to work together to

13  come up with whatever we needed to come up

14  with.

15    Q.    You told him -- when is the first

16  time you told him you were getting low?

17    A.    Whenever I was getting low.  I

18  don't know.

19    Q.    Was that during the pandemic when

20  he started complaining because there weren't

21  properties moving?

22    A.    No.  We were both complaining.

23    Q.    Okay.  So your money was getting

1   low because you noticed that your seven

2   millions dollars was getting less and less?

3       A.   What now?

4       Q.   You started getting lower on your

5   money --

6       A.   I told him my cash is getting down

7   low, it's not -- and it's not coming back.

8       Q.   Okay.  And your cash was supposed

9   to be coming back from where?

10      A.   Jesse would bring it to me.

11      Q.   Jesse would bring you the cash?

12      A.   And then he'd get whatever he

13  needed on Monday and Friday.  On Fridays I

14  usually wrote him a check for whatever else

15  he needed.

16      Q.   And --

17      A.   Billy would cover it.

18      Q.   But out of the seven -- how much

19  did you have in cash that you gave Jesse that

20  wasn't this seven million dollars?

21      A.   That's what I'm saying.  I don't

22  even know.  It all got mixed in together, I

23  mean, it was -- and then mine was gone.  I

1   told Billy the minute it -- I said mine's

2   gone, because they wanted me to stop bringing

3   all that cash and -- well, he didn't.  He

4   didn't mind.  But she -- Ms. Margaret didn't

5   like all that cash in there.

6       Q.    When did you first notice that any

7   of the seven million dollars was missing or

8   stolen?

9       A.    The whole time I kept -- whenever

10  we got -- whenever it was going down, I told

11  Billy, I said, my money is -- my money is

12  going down now.

13      Q.    You told Billy somebody is

14  stealing my money?

15      A.    No.  I told Billy my money is

16  going down.

17      Q.    So it was going -- so

18  incrementally over --

19      A.    I'm saying that I can't help --

20  I'm wanting him to know that I'm not going to

21  help as much, you know, I'm not going to be

22  able to do it.

23      Q.    So incrementally over time, over

1  some period of time, the seven million

2  dollars got stolen, not all that once, it got

3  stolen over time, so your money started going

4  down over time?

5       A.   I'm not even sure it's stolen.

6  I'm not sure that the jobs aren't real.  I

7  don't know.  We went by and looked at them.

8  I don't know.  I don't know.  All this was

9  his idea.  I told him that whenever I bought

10  the thing and Billy put it together.  I mean,

11  he understood it.  I know houses, that's what

12  I know.

13       Q.   Part of your job -- part of your

14  job description under those contracts were

15  for you to be on those jobs and run crews on

16  those job sites.  How many of those jobs did

17  you actually run crews yourself?

18       A.   None, never had to.  Jesse --

19  Jesse had it, he handled it.

20       Q.   How many different jobs did you

21  ever go to, job sites did you go to out of

22  the 400-plus jobs that were there?

23       A.   I don't remember.  We checked

1  on -- we checked on it a few times, not no

2  whole bunch.  We checked on it a few times.

3      Q.    How many job would -- how many job

4  sites would you have ever been a part of or

5  gone to to look at during the entire

6  relationship with Mr. Kitchens?

7      A.    Five, six.

8      Q.    So out of 408 checks that you got

9  from Mr. Kitchens and Pike Road, you laid

10  eyes on five to six jobs?

11      A.    We laid eyes on them, me and him

12  together.

13      Q.    I'm asking you how many jobs out

14  of those 408 Alfa jobs did you ever lay your

15  eyes on or see anything going on with regard

16  to those?

17      A.    Probably five or six.

18      Q.    Five or six jobs.  The other 402

19  jobs, you have no idea if they were real or

20  not?

21      A.    No.

22      Q.    But you got checks every month?

23      A.    Got money back every -- every

1    week.

2         Q.    Every week you took money from

3    Mr. Kitchens?

4         A.    Every week money came in.

5         Q.    There was not money, sir, that

6    came in --

7         A.    And I paid it out.

8         Q.    -- over 200 jobs, there was no

9    money that came in.

10        A.    Yes, it did.

11        Q.    Where is that money?

12        A.    That's what the cash was.  And we

13   kept -- I kept moving it back and forth, and

14   then Billy would pay me back.  I'd put the

15   money out, and Billy would give it back to

16   me.

17        Q.    And you're telling this Court that

18   you have filed tax returns to indicate that

19   you have all this cash --

20        A.    Yes.

21        Q.    -- that was missing or stolen?

22   Did you indicate on the tax returns it was

23   all stolen?

1    A.    No.  I'm not saying it's stolen.
2  I'm saying I don't know.  I don't know what
3  happened.
4    Q.    So it still could be somewhere?
5    A.    Yeah.
6    Q.    Could it still be --
7    A.    I feel like the jobs are still
8  real.  I don't know.  I have no idea, no
9  idea.
10    Q.    You were in charge of the
11  accounting for these jobs.  According to your
12  contract, you were in charge of the
13  accounting.
14    A.    And every Monday I come in here,
15  and we'd do the same thing.  Whatever come
16  in --
17    Q.    Did you get checks --
18    A.    -- I gave it to him.
19    Q.    Did you get bills --
20    A.    No.
21    Q.    -- from anybody?
22    A.    No.  It all came in in cash.
23  Jesse handled all of it.

1      Q.    Did you get any bills or any

2   evidence that these jobs were real from

3   anybody?

4      A.    I got from Alfa whatever --

5   whatever Jesse got from Alfa, he sent it to

6   me.  Got the letters from Alfa.  Then Ms.

7   Margaret wanted me to do it a certain way, so

8   I did it the way she wanted it, and I carried

9   it in there.

10     Q.    How many letters --

11     A.    And -- and Jesse would sign --

12  Jesse sent it to me, and then I would do the

13  way Ms. Margaret wanted it.  And then I'd

14  meet Jesse, and he would sign it, or either

15  he'd send Ms. Margaret or me or something or

16  another, a letter saying I had permission to

17  sign it.

18     Q.    How many letters from Alfa did you

19  get?

20     A.    I don't remember.

21     Q.    More than five or six?

22     A.    I mean, I really don't remember.

23     Q.    Were there more than five or six?

1 There were 408 -- you got 408 checks from my

2 client.

3   A. I'm talking about letters

4 stating --

5   Q. How many letters did you get from

6 Alfa state --

7   A. -- that he was working with him.

8   Q. Okay.  How many letters did you

9 get from Alfa about he was working with them?

10   A. I think three or four.  I don't

11 know.

12   Q. Three or four?

13   A. I don't know.  Two.

14   Q. Do you have any evidence at all to

15 show that any of the jobs were real, more

16 than five or six jobs, out of the 408 checks

17 that you got from my client?

18   A. He would -- now ask me again.

19   Q. Do you have any evidence that

20 these jobs were real other than five or six

21 out of the 408 jobs?

22   A. I have the bill that was -- the --

23 the thing that was sent to Jesse from Alfa

1   that he sent to me.

2        Q.    You have four.  You just told me

3   you have three to four of those.

4        A.    No.  No.  That's the -- you -- the

5   letter is saying that Jesse has -- Jesse

6   works with them or whatever.  It was from

7   Alfa.

8        Q.    Okay.  What information do you

9   have from any source to show that the jobs

10  were real?

11       A.    The things that I gave to Billy,

12  the things that Jesse would send to me, and

13  then I would do Ms. Margaret the way she

14  wanted it, I have those.  I gave them to

15  Billy.

16       Q.    A job estimate, and you would sign

17  each job estimate, and then you would get a

18  check?

19       A.    Yes.  And I would have already

20  given Jesse the money.  Then whenever we

21  got -- when I got in there -- and Billy

22  already knew it.

23       Q.    So you have a -- each one, you

1   have a job, an address listed, and an amount

2   that it's supposed to cost, a percentage of

3   the property, you signed your name, Jesse

4   somehow signed his name, and then you got a

5   check, that's how it worked?

6       A.   Yes.  I had already covered it.

7       Q.   Okay.  And you paid back part of

8   the money to Mr. Kitchens or Pike Road from

9   time to time on certain jobs?

10      A.   Whatever came in, I gave it to

11  him.

12      Q.   How did you know what came in from

13  what job?

14      A.   Jesse would have it banded

15  together.

16      Q.   Who kept up with all that?

17      A.   Jesse did.

18      Q.   Where are all those documents

19  bounded together that shows all of that

20  information?

21      A.   I don't know.  I have what --

22      Q.   You looked at all of that

23  information before you just wrote out checks

1  to them, didn't you?

2      A.    I never wrote out a check to him.

3  I gave him cash.

4      Q.    You gave who cash?

5      A.    Jesse.

6      Q.    When you were giving back money to

7  Mr. Kitchens, where did that money -- how did

8  you --

9      A.    Jesse had given it to me.

10      Q.    How did you verify there was any

11  work done?

12      A.    He -- he had -- Jesse told me what

13  goes to what, and that's how it was.  And

14  when I walked in there, I had -- I wrote --

15  sat right there and wrote the checks out.

16      Q.    How did Jesse give you that

17  information, by paper?

18      A.    No.  He just -- he told me what

19  was what.

20      Q.    So your testimony under oath --

21  and again, you realize you're under oath

22  today?

23      A.    Yes.

1    Q.    Your testimony under oath is each

2    time Jesse would just say give a certain

3    amount of money back to Billy on each one of

4    those jobs?

5    A.    No.  He would tell me what -- what

6    we were -- where we were at and what was

7    going on.

8    Q.    How would you know how much to

9    give him back?

10    A.    Whatever -- whatever he told me

11    had come in.

12    Q.    Isn't it a fact that really what

13    happened is you just gave them part of the

14    money back that he had already -- that Mr.

15    Kitchens --

16              (Simultaneous cross-talk.)

17    A.    Absolutely not.

18    Q.    If the -- if the documents show

19    that almost the same amount that went into

20    Mr. Kitchens' account went out back to Mr.

21    Kitchens, and there was no other money put in

22    that account --

23    A.    I did the -- I did the account the

1    way Billy told me to set it up.  I did the

2    account the way Billy told me to do it.

3    The -- the cash part of it I understood.

4    Well, Billy and Ms. Margaret, they're the

5    ones together that told me how to do it.

6    Probably not as much -- Billy was the one

7    that -- you know, the idea of how to do this,

8    and then Ms. Margaret was the one that kept

9    up with the books.  She kept up with my

10   books.

11       Q.    So you can't tell me right now

12   with regard to this seven million dollars

13   when it was lost, where it was lost, or if

14   it's all gone even now?  You don't know right

15   now?

16       A.    No.

17       Q.    Okay.

18       A.    That's what we were talking about.

19       Q.    Okay.  WoodForest National Bank,

20   what business -- what account was that?

21       A.    I don't know.  I think it's just

22   my personal.

23       Q.    Is that a personal account?

1          A.     I think.  I don't know.

2                 MR. STOTSER:  Let me see his

3    discovery that he gave us.

4          Q.     (BY MR. STOTSER) Okay.  On

5    Plaintiff's Exhibit 2, you show a Wells Fargo

6    bank account in Jimmy and Darreus

7    Transportation, right?

8          A.     Okay.

9          Q.     Do you see that?

10         A.     Yes.

11         Q.     Okay.  Did you even mention Wells

12   Fargo in your bank -- in your schedules, that

13   that was an entity, a bank account that you

14   had money in?

15         A.     I don't know.  I don't remember --

16                MR. BENSINGER:  Object to the

17   form.

18         A.     I don't remember us coming up on

19   this.  I don't have money in it.

20         Q.     Well, Jimmy, the company does.

21         A.     Okay.

22         Q.     That's -- I mean, that's what it

23   shows.

1      A.      Okay.

2      Q.      Let me see that back again.  It

3  shows a deposit on 8/2 of $300.

4      A.      Okay.

5      Q.      The company was dissolved prior to

6  8/2.  Why was there money put in there after

7  the company was dissolved if it wasn't

8  active?

9      A.      I don't know.

10     Q.      Who put the money in there?

11     A.      I don't know.  I can find out.

12     Q.      Is that money still -- is this

13  business still active?

14     A.      No.

15     Q.      Then why was there money

16  deposited?

17     A.      I don't know.

18     Q.      Did you deposit the money?

19     A.      I wouldn't think I did it.

20     Q.      Well, would you know?

21     A.      Well, I'd be willing to bet I

22  didn't do it.  I don't know.

23     Q.      And then there's an AmeriFirst

1   account.  You've given me the bank statements

2   from -- ending September 26th to October

3   24th, but I don't have one for what I asked

4   for, which was from August.  Why is there --

5   why didn't you include the August bank

6   account statement?

7        A.    I don't know.  I can get you one

8   if there is one.  That's closed, isn't it?

9   That's AmeriFirst?

10       Q.    Well, did you close it?  Did you

11  take $7322.79 out of it?

12       A.    No.  It's still in there.

13       Q.    Do you know how much money was in

14  there as of the date you filed your

15  bankruptcy petition?

16       A.    Probably that same amount.

17       Q.    James D. Bulger Rental Properties,

18  what properties are in James D. Bulger Rental

19  Properties?

20       A.    Nothing.

21       Q.    When was the last time you had any

22  property in that entity?

23       A.    If I ever did, it would be

1  whenever -- if it ever had anything, I don't

2  know.  We haven't gotten to that yet.

3      Q.    Did you ever do any business in

4  Masterfoam?

5      A.    Yes.

6      Q.    What business did you do?

7      A.    They had a couple of jobs where

8  they sprayed foam.

9      Q.    Who is "they"?

10     A.    Masterfoam.

11     Q.    That's you then?

12     A.    Well, Jesse's the one that

13  actually handled it.  I didn't handle it.

14     Q.    Do you have any employees?

15     A.    Now?

16     Q.    Since the time of your bankruptcy

17  petition, do you have any employees that are

18  working for you in any capacity?

19     A.    Just Kenny.

20     Q.    Okay.  And what is Kenny being

21  paid by you?

22     A.    Three hundred a week.

23     Q.    Okay.  So Debbie doesn't work for

1  you?

2      A.    No.  She just helps me.

3      Q.    She doesn't get any income from

4  you?

5      A.    No.  She gets it from the other

6  ones.

7      Q.    Who pays for the utilities at your

8  residence?

9      A.    I don't know.  Greg handles all

10  that.

11      Q.    You don't know who pays for

12  your --

13      A.    No.

14      Q.    -- your bills?

15      A.    Greg handles all that.

16      Q.    Do you pay for them?

17      A.    Do I for what?

18      Q.    Do you pay for them?  What bills

19  do you pay for anybody other than yourself?

20      A.    I don't pay any bills for nobody

21  but myself.

22      Q.    In your bankruptcy petition, you

23  listed that you do pay for other people other

1    than yourself.  So which one is it, do you

2    pay for other people or do you not?

3        A.    What is it speaking about?

4        Q.    It says is there anyone you're

5    paying for other than yourself, that you pay

6    anything for other than yourself.

7        A.    Just the -- Kenny, I guess.

8    You're talking about -- you're talking about

9    electric bill or something or another?

10       Q.    I'm just talking about do you pay

11   any bills for anyone other than yourself, or

12   have you in the last six months?

13       A.    I've helped people out.

14       Q.    Who have you helped out?

15       A.    I don't know, whoever, just

16   various people.  Whenever somebody needs

17   help, I try to help.

18       Q.    Do you loan them money or you give

19   them money?

20       A.    Actually, I don't, I try not to

21   loan anything.  I try to just --

22       Q.    Just gifts?

23       A.    I mean, if they give it back,

1    that's great.

2         Q.    Okay.  Who -- who have you given

3    gifts to in the last year?

4         A.    I -- I don't know.

5         Q.    Give me a list.  You said there

6    are various people.  Give me some of the

7    names.

8         A.    I wouldn't even know.

9         Q.    Well, you know some of the people.

10   Who have you given gifts to?

11        A.    Let's see.  There was a guy named

12   Zach, I helped him out.

13        Q.    How much did you give him?

14        A.    I don't even remember.

15        Q.    Give me an estimate.

16        A.    I don't know.  And then --

17        Q.    I need to know -- wait, we're not

18   done with Zach.

19        A.    Okay.

20        Q.    What is Zach's last name?

21        A.    I don't know.

22        Q.    How much did you give him?

23        A.    I don't know.  I don't remember.

1    Q.    More than $10,000?

2    A.    Oh, hell, no.

3    Q.    Well, how much?

4    A.    I don't have that kind of money.

5  I don't know.

6          Then one named Bham.

7    Q.    Bham?

8    A.    Yes.

9    Q.    Okay.  How much did you give him?

10   A.    I don't even know, 30, $40 or

11 something or another.  I don't know.  Stuff

12 like that.

13   Q.    Okay.  In this Schedule J of your

14 expenses, it says, "Do your expenses include

15 expenses of people other than yourself and

16 your dependents?" and you put "Yes."

17   A.    Okay.

18   Q.    That's what I was asking you

19 about.  Who else do you pay expenses for

20 other than yourself?

21   A.    I don't know.  I'd have to find

22 out.

23   Q.    You don't know who you pay --

1  where your money goes?  You don't know who

2  you're paying for?

3       A.    Greg handles that all, paying

4  stuff.

5       Q.    So your testimony before this

6  Federal bankruptcy court is that you've

7  listed yes, but you can't give me any

8  details, correct?

9       A.    Right.

10      Q.    Okay.

11      A.    At the moment.

12      Q.    Did you -- do you have any bank

13  accounts with Ricky Adams or Greg Schmitt

14  individually?

15      A.    I have one with Ricky.

16      Q.    Where is that?

17      A.    Guardian.

18      Q.    Okay.  How much is in that

19  account?

20      A.    I don't know.  I haven't --

21      Q.    Why was that account opened

22  individually with you and Ricky?

23      A.    That was years ago.

1          Q.    What money is in there?

2          A.    I don't know.  I don't know if

3    there's any in it.

4          Q.    Why did you open up that account

5    joint tenants with right of survivorship,

6    meaning if you died, he gets all the money?

7    It's normally something you don't do unless

8    you have a spouse.

9          A.    I don't know.

10         Q.    You don't know why you checked the

11   box for that?

12         A.    I guess if I died where he could

13   get it.

14         Q.    Okay.

15         A.    Ain't nobody else to get it.

16         Q.    It said on your schedules that

17   you're a home builder?

18         A.    Uh-huh.

19         Q.    Are you a home builder?

20         A.    Yes.

21         Q.    Okay.

22         A.    Developer.

23         Q.    How big -- what's the biggest

1    house you've built as a home builder?

2          A.     Twenty-five hundred square feet.

3          Q.     There's property called South

4    Hull Street.

5          A.     South Hull?

6          Q.     Street in Montgomery that you say

7    you own.

8          A.     Oh, no, I did own it.  That was

9    with Tommy.

10         Q.     Okay.  This says you own it on

11   your schedules.  Is this --

12         A.     I signed him a quitclaim deed, so

13   I don't know.

14         Q.     Is this -- well, what's your

15   understanding of a quitclaim deed, giving up

16   your interest?

17         A.     Yes.

18         Q.     Then why did you list on your

19   petition that you owned it?

20         A.     Because I may still own it.  I

21   don't know.

22         Q.     That's just one of those things

23   you're not sure of?

1    A.    Right.  We haven't got to that

2  yet.

3    Q.    You and Debbie?

4    A.    Right.

5    Q.    Coosada Road, 5040 Coosada Ferry

6  Road, tell me about that property.  Who owns

7  that?

8    A.    That's the farm.

9    Q.    That's the farm.  Whose farm is

10  that?

11    A.    That's what I loaned Billy to

12  borrow against.

13    Q.    It says you have a mortgage

14  interest.

15    A.    There's another mortgage -- I have

16  a mortgage against it.  I have a second

17  mortgage against it for 100,000.

18    Q.    Who is that mortgage with?  Who

19  owes on that mortgage?

20    A.    Billy.

21    Q.    Billy owes the mortgage.  But it

22  says your ownership interest is a mortgage.

23  It says your interest is a mortgage.  Do you

1  have a mortgage on that property?

2      A.    Yes.

3      Q.    Are you -- are you the one

4  receiving the money on the mortgage?

5      A.    He hasn't paid me anything on it.

6      Q.    But you're saying that he owes you

7  money on it?

8      A.    A hundred thousand if we sell it.

9  He's not supposed to pay me anything on it.

10     Q.    If you sell it, he's supposed to

11  pay you $100,000, that's your testimony?

12     A.    Yes.

13     Q.    Okay.  Why didn't you list that he

14  was -- that he had an interest in the

15  property here?

16     A.    Because it's mine.

17     Q.    He doesn't have an interest in it?

18     A.    Uh-uh.  He wrapped it back to me.

19     Q.    Tell me what about what a wrap is.

20     A.    Do you know what a VA no-qualify

21  loan is?

22     Q.    I know what it is.  I'm asking you

23  what it is.

1          A.     Oh, it's -- well, where you --
2     it's just subject to that loan.
3          Q.     So who has -- you are the title
4     owner on that property?
5          A.     Yes, or either -- I don't know who
6     the exact title owner is but --
7          Q.     Who is supposed to have title to
8     it?
9          A.     I guess it's me.
10          Q.     Does Billy have a bank loan on it?
11          A.     Yes.
12          Q.     Do you have a loan that's
13     recorded?
14          A.     I guess.  Monica did it.
15          Q.     Do you know if there's a loan
16     that's recorded on there at all?
17          A.     I don't know.  I mean, Monica did
18     everything, so I don't know.
19          Q.     Why did you put unknown on the
20     portion of the property that you own or have
21     an interest in?  Why did you put unknown when
22     you just told me it was $100,000?
23          A.     Because I don't know.

1       Q.      You don't know what it is?

2       A.      Uh-uh.

3       Q.      Tell me about this Highway --

4       A.      You're talking about the balance

5  that -- that's owed on it?

6       Q.      Yeah.

7       A.      I don't know.

8       Q.      That's not what I'm asking you.

9  It says your ownership interest you don't

10 know.

11      A.      I don't know how much of it is

12 owed.

13      Q.      What's the value of the property?

14      A.      I don't know.  Probably 250, 300.

15      Q.      Why didn't you say -- tell the

16 bankruptcy court what it was when they asked

17 you on this schedule what it was?

18      A.      Asked me -- asked me what?

19      Q.      When they asked you what the value

20 of the property was.  It says current value

21 of the entire property, and you put unknown.

22 Why didn't you put 250?

23      A.      Because I didn't know.  I'm just

1    guessing now.

2         Q.    Tell me about this Highway 31

3    property.

4         A.    What about it?

5         Q.    Whose property is that?

6         A.    Jimmy James Bulger, LLC.

7         Q.    Jimmy James Bulger owns the entire

8    interest in that property?

9         A.    Yes.

10        Q.    Is it subject to any liens or

11   encumbrances?

12        A.    Yes.

13        Q.    What liens?

14        A.    With Harold Spiers.

15        Q.    Harold Spiers owns -- is that the

16   200-and-something thousand --

17        A.    Yes.

18        Q.    -- that you just listed?

19        A.    Yes.

20        Q.    Does Mr. Kitchens or Pike Road

21   have any interest in that property?

22        A.    Not right now.

23        Q.    What do you mean "not right now"?

1    A.    We're in the middle of all this.

2  I don't know.

3    Q.    What did they own before you were

4  in the middle of all this, what --

5    A.    That's what we're going through.

6  That's what me and Debbie was going through

7  just yesterday, getting it all straight,

8  because I've got mortgages where it wasn't

9  paid, we had six months to pay it.  Then we

10  had gone to the bank to try to borrow the

11  money, and the bank said they couldn't do it.

12  I mean, I'm having to -- I'm having to go

13  back over everything and let her read it to

14  me, and we're putting it together.

15    Q.    Does Mr. Bulger have some sort of

16  interest in this property?

17    A.    No.

18    Q.    You're saying he doesn't have any

19  interest in this property at all?

20    A.    You said Mr. Bulger.

21    Q.    I'm sorry, I apologize.

22    A.    You're okay.

23    Q.    Mr. Kitchens --

1     A.    Okay.

2     Q.    -- does he have any interest in

3 this property?

4     A.    Not at the moment.  I'm having to

5 go through it.

6     Q.    Did he have any interest in this

7 property before --

8     A.    We were going to do it 50/50.

9     Q.    Prior to this bankruptcy filing,

10 your agreement was to do this deal 50/50?

11     A.    Yes, absolutely.

12     Q.    And he borrowed money on it,

13 didn't he, on this property?

14     A.    No.

15     Q.    He doesn't have any loans on this?

16     A.    He borrowed money from -- he has

17 mortgages to me on it.

18     Q.    Okay.  And what --

19     A.    Of where he was buying the lot.

20     Q.    This land is in Deatsville?

21     A.    Yes.

22     Q.    Highway 31?

23     A.    Yes.

1      Q.    It's worth a million eight right

2  now?

3      A.    That's what they said.

4      Q.    Who told you that?

5      A.    The -- I guess the tax office.  I

6  don't know who did.

7      Q.    How much did you pay for the

8  property when you bought it?

9      A.    I don't know.  Maybe 300,000,

10  something like that.

11      Q.    Mr. Kitchens gave you the 300,000

12  to pay for it?

13      A.    No, absolutely not.

14      Q.    He did not?

15      A.    No.  I had it.

16      Q.    Okay.

17      A.    No.

18      Q.    He didn't get a loan for this?

19      A.    No.

20      Q.    You had it.  When did you buy it?

21      A.    I bought -- Harold Spiers is the

22  one that did it.

23      Q.    When did you buy it?

1      A.    I don't remember when I bought it.
2  But Harold Spiers is the one that --
3      Q.    Sold it to you?
4      A.    Yes, and he financed it.
5      Q.    It shows you have four scooters in
6  Mexico?
7      A.    Yeah.  They're raggedy.
8      Q.    Why are they in Mexico?
9      A.    I was just down there, and the
10 taxi driver was talking to me, and I just --
11 I don't even remember how much they were.
12 They wasn't nothing hardly.
13     Q.    What did you pay for each one of
14 them?
15     A.    That's what I was trying to
16 remember.  It wasn't much.
17     Q.    Like give me --
18     A.    Three or $400.  They were in
19 Mexico.
20     Q.    Why are they still there?
21     A.    I mean, they're worthless, I mean,
22 they --
23     Q.    They're worthless.  Do you have a

1  business in Mexico, sir?

2      A.    No.   I was going to do it with

3  him.

4      Q.    Do you have a business in Mexico

5  that you're making money off of with someone

6  else right now?

7      A.    Whenever -- whenever we --

8  whenever I first started, we were going to be

9  in business together.   And the -- the

10  four-wheelers kept getting stolen and

11  everything else, and he was going to send me

12  the money to do it.   I sent him money down

13  there to get it started, and it just hasn't

14  panned out.   It was up until just -- I mean,

15  it just didn't --

16      Q.    Who --

17      A.    It just didn't pan out.

18      Q.    Who was it that -- who was it that

19  you were in business with down there?

20      A.    His name is Emmanuel.

21      Q.    Manuel what?

22      A.    Oh, I don't know the last name.

23      Q.    So you met Manuel in Mexico, gave

1   him three or $400 to buy three or four --

2        A.    No, I sent him 5000.

3        Q.    You sent him $5000?

4        A.    Yeah.

5        Q.    To start a company, right?

6        A.    Yes.

7        Q.    Okay.  Why is that company not

8   listed in your bankruptcy petition, sir?

9        A.    I haven't gotten to it yet.

10       Q.    Were you lying to the Court when

11  you did it?

12       A.    No.

13             MR. BENSINGER:  Object to the

14  form.

15       A.    No.  I haven't gotten to it yet.

16  I'm going through every single thing.  Just

17  like what the recording said, I'm going to

18  tell every single thing, and I'm going

19  through every single thing.

20       Q.    Let me ask you this.

21       A.    But I'm having to do it.

22       Q.    Did you ever get offered money to

23  sell an ATV company in Mexico while you were

1  in jail?

2      A.    He said that, but it never -- it

3  wasn't true.

4      Q.    What did you say in response to

5  him saying that he could sell it?

6      A.    I said yes.

7      Q.    And how much was it for that you

8  were supposed to sell it?

9      A.    I think he was telling 50,000.

10      Q.    Fifty thousand dollars, huh?

11      A.    Yeah.  I wish it could sell for

12  that.

13      Q.    And you -- and on the next

14  schedule, when it asked about ATVs, you put

15  none?

16      A.    Yeah.

17      Q.    You had ATVs?

18      A.    No, I didn't.

19      Q.    You had a business down there?

20      A.    It never -- it never -- it never

21  developed into one.

22      Q.    Why did you ask him to find out

23  the daily balance in the company that day?

1     A.    To find out what we had coming in.

2     Q.    And you asked him that, to

3 continually find out, that he tells you when

4 you call him how much they're making each day

5 off of those ATVs?

6     A.    Right.  And it never -- never came

7 in, never manifested.

8     Q.    Well, it was manifesting while you

9 were in jail, the business was going on while

10 you were jail, because were asking Ricky and

11 Jesse --

12     A.    And then the AT -- the little

13 four-wheelers got stole and everything else.

14     Q.    Uh-huh.

15     A.    He had reasons for everything.

16     Q.    And Number 30, you can find it

17 right there.  It's page 20.

18     MR. BENSINGER:  Okay.

19     Q.    Number 30 on page 20, it says,

20 "Other amounts someone owes you."  Is there

21 any amounts anybody else owes you other than

22 what you've told me now?

23     A.    I don't -- I mean, we're going

1  through everything.  As far as I know at this

2  moment, on my knowledge, but I know there's a

3  lot more I've got to go through.

4       Q.    Where are -- what else do you have

5  to go through?

6       A.    Whatever Debbie has got lined up

7  for me every day.

8       Q.    Okay.

9       A.    Where we can make it as accurate

10 as possible.

11      Q.    Tell me about this Airbnb at your

12 house.  Do you have an Airbnb business?

13      A.    I don't have one, no, and I don't

14 know anything about it.  You'd have to talk

15 to Ricky and Greg.

16      Q.    You do know about it, sir.  You

17 talked about it in the jail recordings about

18 how --

19      A.    Yeah.  Well, I talked about it,

20 and then I got out of it.  I'm not in it.

21      Q.    You were in it when you were in

22 jail?

23      A.    No.

1    Q.  You asked how much money was being

2 made each day off of it, didn't you?

3    A.  Yes.

4    Q.  You asked how much money it was

5 being rented for, correct?

6    A.  Yes.

7    Q.  You asked -- you told them where

8 to put the property and where to put --

9    A.  I'm the advisor on it, yes.

10    Q.  -- certain personal property on

11 it, correct?

12    A.  Uh-huh.

13    Q.  It's your house?

14    A.  What do you mean "personal

15 property"?

16    Q.  You said where to put property, go

17 move this over here, go put this over there,

18 right?

19    A.  To make it look right, to decorate

20 it, yes.

21    Q.  You told -- asked about the daily

22 amount, every day asked about how much was

23 being made on that company?

1         A.      Excited about it, yeah.

2         Q.      Whose -- what's the business that

3   operates the Airbnb out of your home?

4         A.      Fortuitous.

5         Q.      The one that's owned by Ricky

6   Adams?

7         A.      Jeremy and Greg.

8         Q.      You say you owed $100,000 in

9   taxes.  How did you come up with that?

10        A.      I just guessed.  It's way more

11  than that now.

12        Q.      For what years do you owe that

13  money?

14        A.      I don't even know.  I owe for the

15  last four years.  I don't know how much it

16  is, though.

17        Q.      When you said you amended your

18  schedule -- you bankruptcy petition a little

19  while ago, that -- I mean, your tax returns,

20  excuse me, that would mean that you actually

21  filed them in the first place.  So your

22  testimony is that you filed tax returns and

23  then recently have amended them?

1          A.      Yes.

2          Q.      Okay.  And you have copies of your

3     filed tax returns for the last four years?

4          A.      Yes.  Debbie has them.

5          Q.      So that would be for '21, '20,

6     '19, and '18?

7          A.      Okay.  Uh-huh, yes.

8               MR. BENSINGER:  Object to the

9     form.  Rick, I think we haven't had to file

10    '21 yet if you meant tax year '21.

11         Q.      Okay.  I'm sorry.  So let's go

12    back.  For the tax years of --

13              MR. BENSINGER:  '20, '19, '18,

14    '17.

15         Q.      Have you filed for 2021?

16         A.      I don't know.

17         Q.      Do you do any kind of withdrawals

18    or do you pay in anything each quarter --

19         A.      I don't know.  Debbie --

20         Q.      -- for quarterly estimated tacks?

21         A.      Debbie does all of that.

22         Q.      Where does she get the money to

23    pay these?

```
 1        A.    At the time, whatever I was doing.

 2        Q.    Where does she get the money now

 3   to pay any of your bills?

 4        A.    She hasn't paid anything I don't

 5   think.

 6        Q.    How does Greg or Debbie get the

 7   money to pay your bills right now?

 8        A.    Whatever I make off of whatever

 9   I'm doing.

10        Q.    What are you doing?

11        A.    The consultant stuff, the -- you

12   know --

13        Q.    And what was the name of the

14   person that you said was Cash that you got

15   $3000 a month?

16        A.    I don't know his name.  And that's

17   put up for them.

18        Q.    Put up for who?

19        A.    The trustee, I guess, whoever I'm

20   supposed to give it to.

21        Q.    The $3000 a month that you get is

22   put up for the trustee?

23        A.    Or whoever I'm supposed to give it
```

1  to.

2        Q.    You've used that money to pay your

3  bills, and you gave it to different people

4  that lived in your house?

5        A.    No.  That's what I was going to

6  do.  But then Greg sold his truck, and he did

7  all that.  I was going to.

8        Q.    You --

9        A.    I just didn't even realize all of

10  it.  It took -- that's why I said it was all

11  chaos.  That's why I didn't sell anything, I

12  didn't move anything, didn't do nothing,

13  because I was just waiting.  I had all kind

14  of thoughts, crazy thoughts, everything else.

15  It was just chaos.

16              Once I got out, and it all settled

17  down, we started going through every single

18  thing so --

19        Q.    And the results of you going

20  through every single thing was the one

21  amendment you filed last night?

22        A.    As far as we've gone through.

23  There's a bunch more to go.

1        Q.    On page 35 of 54 on 8a, it says,

2  "Attach a statement for each property and

3  business showing gross receipts, ordinary

4  necessary business expenses, and the total

5  net monthly income."  Why have you not

6  attached anything to your schedules?

7              MR. BENSINGER:  What page?

8              MR. STOTSER:  Page 35 of 54, on

9  the bottom, at least that's the way it's

10  written.

11        A.    I don't guess Debbie has it ready

12  yet.

13        Q.    (BY MR. STOTSER) Do you know it's

14  overdue to be turned in to the Court now?

15        A.    Uh-uh.

16        Q.    Do you know you should have -- you

17  were supposed to have already given it to --

18  do you have any reason why you have not

19  attached that statement as was required by

20  the bankruptcy court?

21        A.    I guess it's not ready yet.

22        Q.    Okay.  And then again on the next

23  page -- again, I don't know if I got a good

1    answer.  "Do your expenses include expenses

2    of people other than yourself and your

3    dependents?" and you said "Yes."  Who -- what

4    other expenses do you have that include

5    people other than yourself?

6         A.    And I don't know.  I'm going to

7    have to find that out.

8         Q.    You don't know whether you're

9    paying any money on anybody else's behalf or

10   not?

11        A.    Uh-huh.

12        Q.    That's your testimony?

13        A.    Yes.

14        Q.    Then why did you put it?

15        A.    Why did I put what?

16        Q.    Why did you put yes?

17        A.    I don't know.

18        Q.    You signed it, right?

19        A.    Yes.

20        Q.    You're paying -- you've paid

21   payments on other vehicles other than the

22   vehicles listed in this bankruptcy petition,

23   haven't you?

1     A.    I've paid payments?

2     Q.    Payments on other vehicles?

3     A.    Like what do you mean?

4     Q.    How many vehicles have you made

5 payments on in the last 60 days?

6     A.    I don't know.  Greg handles that.

7 I don't know.  Greg and Debbie.

8     Q.    You tell Greg what to do?  You

9 tell Greg what to do?

10     A.    Whenever he's asking me, yes.

11     Q.    Well, on those jail tapes, you

12 told him every payment to make and when to

13 make it, didn't you?

14     A.    Yes, if I was aware of it at the

15 time, absolutely.

16     Q.    It said this year you've made

17 money off of interest and dividends.  How

18 much money have you made?

19     A.    I don't know.

20     Q.    7/31 you paid Guardian Credit

21 Union 29,766.05 for a car.  What was that?

22     A.    I borrowed on the car, and then I

23 re-borrowed again, and they paid -- out of

1  the re-borrowed thing, they paid that back.

2      Q.    You paid that, but then the source

3  of that income came from where?

4      A.    You know, I go in, and I borrowed

5  on the car.  And then -- then I borrowed

6  again on the car, but part of that paid that

7  back off.

8      Q.    Like you refinanced the car?

9      A.    Yes, I guess.

10     Q.    So none of the money came from

11 you?  You listed on here that you paid almost

12 $30,000 on page 41.

13     A.    Out of that -- out of the money

14 that was borrowed, it paid it back.

15     Q.    Okay.  On Number 7 on page 41, it

16 says that you paid money to an insider within

17 one year on a debt that you owed, and it said

18 you paid John Kitchens $40,000 twice?

19     A.    Yes.

20     Q.    Okay.  Tell me what debt you owe

21 Mr. Kitchens.

22     A.    He and I had settled all this, and

23 I was going to buy it all.  And my payment on

1  it was 40,000 a month, and I made the
2  payments.
3      Q.    So you owed a debt of $40,000 a
4  month for how long to Mr. Kitchens?
5      A.    Ever how long it was paid out.  I
6  don't -- ever how long it took to pay it out.
7      Q.    To what, pay ten million out?
8      A.    Whatever I was buying it for.
9      Q.    What were you buying it for?
10     A.    I don't know.  All that paperwork
11 is at the house.  Debbie's got it all.
12     Q.    So you do acknowledge that you
13 have a debt to Mr. Kitchens?
14     A.    I was buying -- buying all this
15 out, taking -- it was mine.
16     Q.    What was yours?
17     A.    The whole -- the whole deal, the
18 whole company, the whole shebang.  We
19 had already -- we'd already settled it.  I
20 was buying it.
21     Q.    All the Alfa?
22     A.    Yes.
23     Q.    And all that?

1    A.    All the construction.

2    Q.    You were buying all that from him?

3    A.    Yeah.

4    Q.    Okay.

5    A.    All the construction.

6    Q.    How much money have you paid to

7  Lonnie each month in the last year?  You pay

8  him money, don't you?

9    A.    Yeah.  I pay him his checks.

10  Probably 2400.

11    Q.    A month?

12    A.    Yeah.

13    Q.    For how long?

14    A.    I don't know.

15    Q.    What does he do -- what did he do

16  for you?

17    A.    Collected rent.

18    Q.    And you were paying him while you

19  were in jail also?

20    A.    Right.

21    Q.    Okay.  So what rent was he

22  collecting for you when you were in jail?

23    A.    None.

Q.    Then why were you paying him?

A.    Because I had told him I -- I had
it all set up where we would -- you know, we
would be able to basically retire.  That was
my retirement.

Q.    The rental income?

A.    No, the -- what I had put up.  You
know, the business was doing great.  I
thought we would be able to retire.

Q.    What business was doing great?

A.    The -- me and Billy.

Q.    Okay.

A.    The houses and the -- and the Alfa
and the -- the things that I was doing, you
know, we were doing great.

Q.    Okay.  Lonnie you paid $600 a week
even while you were in jail?

A.    Uh-huh.

Q.    What did Lonnie do for you?  You
say he collected rent.  I just want to know
where the rent was he collected and what
addresses he collected it from.

A.    That's off of those 12 properties

1  that was sold.

2      Q.    So the 12 properties that were

3  sold, he would collect rent off of each one

4  of those properties after they were sold?

5      A.    No.  I just kept paying him.  He's

6  my friend, yeah.

7      Q.    Okay.  So it was like a gift?

8      A.    No.  He worked, did whatever I

9  needed him to do.

10      Q.    You said he just collected rent.

11  I asked you what you did -- he did for you,

12  and you said collected rent?

13      A.    What he needed -- he collected

14  rent and whatever he needed to do.

15      Q.    So you're changing your testimony?

16      A.    No, I'm --

17      Q.    Yeah, you are.

18      A.    -- clearing it up for you because

19  you didn't understand it.

20      Q.    Sir, I asked you these questions,

21  and --

22      A.    And I answer them.

23      Q.    -- I'm asking for your full

1    answer.

2          A.    And I answer them.

3          Q.    Do you understand?

4          A.    And I answer them fully,

5    completely.

6          Q.    Well, answer them correctly.

7          A.    And I'm answering them correctly.

8    And I'll be more than happy to, and I'll be

9    more than happy to be thorough with it.

10          Q.    What else has he done for you

11    since you went in jail --

12          A.    Whatever --

13          Q.    -- to pay [sic] rent?

14          A.    -- I needed to have done.

15          Q.    Name one thing.

16                THE COURT REPORTER:  Excuse me.  I

17    can only take one at a time, so if you will

18    wait for his question, please.

19                THE WITNESS:  I got you.

20          Q.    (BY MR. STOTSER) What else did he

21    do for you other than collect rent?  That was

22    the question asked four questions ago.

23          A.    He's repaired electrical problems,

1    he's kept the farm up, maintenance.

2         Q.    Did you give him any property?

3         A.    Yes, uh-huh.

4         Q.    What property?

5         A.    I didn't give it to him.  He did

6    all the work on the farm, the repairs,

7    everything.  I bought the stuff that went in

8    it.  And I gave him that old trailer that I

9    paid a hundred dollars for and the lot for

10   doing the -- what you call it, bartering,

11   whatever it's called.  I don't know what it's

12   called.  Instead of giving him money, I gave

13   him that.

14        Q.    And when did you transfer that to

15   him?

16        A.    I don't remember.  It ain't been

17   that long ago.

18        Q.    In the last six months?

19        A.    Maybe.

20        Q.    What about Ricky Adams, the

21   Bentley?

22        A.    No, he paid me for that.

23        Q.    Twenty-five thousand dollars?

```
 1        A.     That sounds right.  I don't know.

 2        Q.     Well, that's what you put on your

 3   schedule.

 4        A.     Okay.  Then that's what he paid me

 5   for it.

 6        Q.     Where did that money go in, what

 7   account did that money go into?

 8        A.     It didn't.

 9        Q.     It was just cash?

10        A.     Yes.

11        Q.     When did he pay you that money?

12        A.     Well, he made payments to start

13   with.

14        Q.     When did he start making the

15   payments?

16        A.     Whenever I sold it to him.

17        Q.     When did you sell it him?

18        A.     I don't know.  I'll have to look

19   that up.

20        Q.     Give me your best estimate.

21        A.     I don't remember.

22        Q.     In the last two years?

23        A.     So then he got in a wreck, and he
```

1  got the insurance, and he gave me the

2  insurance money, and that paid it out.

3      Q.    When did he give you the last

4  payment?

5      A.    I don't know.  I'd have to look it

6  up.

7      Q.    Was it less than a year or two

8  ago?

9      A.    I don't know.

10     Q.    You said it was less than two

11 years ago in this petition, so I'm just

12 trying to find out whether --

13     A.    So it was less than two years.

14     Q.    Well, you just said you don't

15 know.

16     A.    Okay.

17     Q.    Do you know or you don't know?

18     A.    Less than two years.

19     Q.    How much money did you have in

20 cash at the beginning of this year,

21 approximately?

22     A.    I wouldn't even know.

23     Q.    Would you have more than $100,000?

1       A.      I wouldn't even know.

2       Q.      Could you have?

3       A.      I don't know.

4       Q.      Would you have had more than ten?

5       A.      I don't know.

6       Q.      Could you have -- so you could

7   have had more than $100,000 in cash at the

8   beginning of this year?

9       A.      I don't know what I had.

10      Q.      Could you have had a million?

11      A.      I don't know.

12      Q.      So you're not saying you didn't,

13  you just don't know?

14      A.      I just don't know.

15      Q.      Okay.  Could you have had three

16  million?

17      A.      I don't know.

18      Q.      You're saying you could have, you

19  just don't remember?

20              MR. BENSINGER:  Object to the

21  form.

22      Q.      Are you saying you could have, you

23  just don't remember?

1      A.    I'm saying that I don't -- I don't

2  know what I had.  You're saying all that.

3  I'm saying I don't know what I had.

4      Q.    Well, how did you pay your

5  attorney fees for the circuit court case, out

6  of what account?

7      A.    I didn't pay it out of an account.

8      Q.    Where did you pay -- how, did you

9  pay it, in cash?

10     A.    Yes.

11     Q.    How much did you pay?

12     A.    Fifteen thousand.

13     Q.    You said in the tapes you paid

14  100,000.

15     A.    You asked me how much I paid.

16     Q.    How much have you paid to these

17  attorneys?

18     A.    Fifteen thousand.

19     Q.    That's all that you paid at the

20  beginning of the circuit court lawsuit?

21     A.    Yes.

22     Q.    And you haven't paid any more?

23     A.    I paid Chip 7000.

1    Q.    Who is Chip?

2    A.    That other lawyer that was there.

3    Q.    Oh, I'm sorry.  Yeah, I'm sorry.

4  Okay.  So you've paid a total of $7,000 to

5  Chip and $15,000 to Mr. Bensinger's firm?

6    A.    Yes.

7    Q.    And that's the entire amount of

8  money you've paid?

9    A.    Yes.

10    Q.    Okay.  So when you said you

11  paid over -- when -- you said you paid, on

12  the tapes, $100,000 --

13    A.    I'm saying it's costing $100,000.

14    Q.    No, you said you paid $100,000.

15    A.    Well, I mean, you -- I mean, if

16  you want me to break down and tell you

17  exactly what I meant by how I said it, I'll

18  be glad to.  I may not have worded it the way

19  you word things or the way other people word

20  things.

21    Q.    I'm just using it the way you

22  worded it.

23    A.    I understand.  And I'll be glad to

1    explain my definition.

2        Q.    Okay.  We'll get into that.  Who

3    is Grady Hicks?

4        A.    Grady Hicks?  Oh, that's who I

5    bought the farm from.

6        Q.    Okay.  What about Kenneth Shimek,

7    S-H-I-M-E-K?

8        A.    That's Kenny.

9        Q.    That's Kenny?

10       A.    Yeah.  I don't know the last name.

11       Q.    What does Kenny do for you?

12       A.    Just whatever I need.

13       Q.    What did he do in 2020 for you?

14       A.    Just whatever I need.

15       Q.    How much money did you pay him a

16   month?

17       A.    Three hundred -- well, it'd be

18   three, six, nine -- be $1200.

19       Q.    Twelve hundred a month?

20       A.    Yes.

21       Q.    Would that have been for like the

22   last two or three years, if he needed -- you

23   needed him to do something, he'd pay you 1200

1    a month?

2          A.    I paid him 1200.

3          Q.    That's what I meant, excuse me.

4          A.    Yeah.

5          Q.    What about Raymond Smith?

6          A.    Raymond Smith?  Oh, that's the guy

7    that I was supposed to be going into business

8    with with the trucks, that came out there

9    and --

10         Q.    What business was that?

11         A.    I think it was called Mixed

12   Motion.  It was transportation.  And Tommy

13   Gallion had to sue him.

14         Q.    Is there a lawsuit pending?

15         A.    No.

16         Q.    What happened with regard to the

17   lawsuit?

18         A.    His fiancée was at Guardian Bank,

19   and she was the one accessing my account.

20   And he returned all the -- settled, whatever

21   you want to say.  He returned all the trucks

22   and stuff, so it was settled.

23         Q.    What business was that?

1          A.     Mixed Motion.

2          Q.     Mixed Motion.  And what was your

3    interest in Mixed motion?

4          A.     We were supposed to be 50/50.

5          Q.     Then why didn't you list that in

6    your petition?

7          A.     We haven't gotten to it yet.

8          Q.     Wendell Silas, who is that?

9          A.     A friend of mine.

10         Q.     What do you -- what business do

11   you have with Mr. Silas?

12         A.     He does excavating work.

13         Q.     In 2020, what kind of excavation

14   work did he do, on what properties?

15         A.     I don't know what all properties.

16   I know he cleared the land behind my house.

17         Q.     On your Deatsville house?

18         A.     Yes.  And I still owe him $10,000.

19         Q.     You didn't list that as a debt.

20         A.     Okay.  I will when we get to it.

21               MR. STOTSER:  Do you see it?

22               MR. BENSINGER:  I thought that we

23   had.

1          MR. STOTSER:  Maybe you have.  I

2   just didn't see it.

3          Q.    (BY MR. STOTSER) Okay.  You gave

4   Monica Mann $150,000 in the last couple of

5   years.  What did you give Monica money for?

6          A.    For closings.

7          Q.    What about Greg, what does Greg do

8   for you?

9          A.    Pays my bill, you know, handles

10  all my bills and doctors and all that stuff.

11         Q.    How much money do you pay Bill?

12         A.    Greg.

13         Q.    Greg, excuse me.

14         A.    I don't know.  That I don't know.

15         Q.    Give me an estimate of what you

16  pay him.

17         A.    I don't actually really pay him.

18  He just -- if he needs something, he can get

19  it.

20         Q.    Where does he get it from?

21         A.    Whatever he tells me he needs, and

22  I get it and give it to him.

23         Q.    Where does he give you the money

1  from?

2      A.    Where does he give -- he doesn't

3  give me any money.

4      Q.    Where does he get the money from?

5      A.    From me.

6      Q.    And where do you get it?

7      A.    Whenever he tells me he needs

8  something, then so whatever I'm doing, then

9  I'll -- I'll give it to him out of whatever I

10 have.

11     Q.    How do you pay him, cash?

12     A.    Yes.

13     Q.    Checks?

14     A.    I think there was some checks.

15 But the checks wasn't from me, but the cash

16 is from me.

17     Q.    How much money do you pay him in

18 cash?

19     A.    Just whatever he needs, whatever

20 he's asking me for.

21     Q.    Jimmy and Darreus Transportation,

22 who is Darreus?

23     A.    A friend of mine.

1    Q.    What's his name?

2    A.    Darreus Zanders.

3    Q.    Zanders.  Was he notified when the

4  business was closing?

5    A.    Yes.

6    Q.    Who told him?

7    A.    I guess we told each other.

8    Q.    Why did the business close?

9    A.    The pandemic thing slammed us,

10  couldn't get drivers, couldn't do nothing.

11         MR. STOTSER:  Let's take a break

12  and use the restroom for just a minute.

13         (Off-the-record discussion.)

14         (Recess.)

15    Q.    (BY MR. STOTSER) Okay.  When

16  you -- we were at Autauga County, I think it

17  was August the 5th, in a hearing in Circuit

18  Court regarding those Pinetucket properties

19  and the motion for contempt.  Do you remember

20  that?

21    A.    Yes.

22    Q.    Okay.  On that date, you filed a

23  bankruptcy petition approximately two hours

1  into that hearing?

2      A.    Yes.

3      Q.    Do you remember that?

4      A.    Yes.

5      Q.    Okay.  I've gotten a lot of your

6  jail tapes as to why you filed the petition,

7  and we'll go into those.  But could you tell

8  me why you filed the bankruptcy petition?

9      A.    Because other debtors wasn't going

10 to get satisfied.  I got to get a fresh

11 start.  Anything I said in there was complete

12 chaos because all that was just crazy.

13     Q.    You were ready to get it out of

14 that court?

15     A.    Huh?

16     Q.    You were ready to get it out of

17 Circuit Court?

18     A.    I wanted it fair, I wanted to be

19 treated fair.

20     Q.    And this --

21     A.    For all the debtors.

22     Q.    And that Circuit Court -- well, at

23 that point in time, you're not dealing with

1  any other -- anybody else but Mr. Kitchens

2  and Pike Road, right?

3      A.    No, I'm dealing with all of them.

4      Q.    During that hearing -- not during

5  the hearing you weren't?

6      A.    Oh, yeah.

7      Q.    You hadn't filed bankruptcy before

8  the hearing, had you?

9      A.    The judge is trying to force me to

10 sell -- he has no judgment or anything, and

11 he's trying to force me to sell my property.

12     Q.    The judge wasn't -- I mean, it's

13 basically what comes through these recordings

14 is this judge wasn't being fair?

15     A.    Uh-huh.

16     Q.    Right?

17     A.    Right.

18     Q.    And you thought you'd get more

19 fair going to a different judge?

20     A.    I think all the debtors, it will

21 be fair all the way around.

22     Q.    That's not what I'm asking you

23 about, debtors.  I'm saying you felt it would

1  be more fair going -- getting it out of

2  there?

3      A.    Uh-huh.

4      Q.    Correct?

5      A.    Yes.

6      Q.    You thought that that judge wasn't

7  being fair to you, right?

8      A.    Right.

9      Q.    You said the trustee will F -- F

10  them up so we won't have to put up with the

11  damn judge anymore?

12      A.    Uh-huh.

13      Q.    Right?

14      A.    Uh-huh.

15      Q.    You have to say yes.

16      A.    Yes.  Yes.

17      Q.    Okay.  So you were happy to get it

18  out of that court so you could get to a more

19  fair judge?

20      A.    Right, where the creditors will

21  all be treated equal.

22      Q.    You mean where you would be

23  treated equal?

1      A.    No, where all my creditors would

2  be, where all my creditors would be.

3      Q.    All your creditors.  Okay.

4            (Off-the-record discussion.)

5            (Plaintiff's Exhibit 8 was marked

6             for identification.  A copy is

7             attached.)

8      Q.    (BY MR. STOTSER) I'm going to --

9  let me ask you this:  You testified earlier

10  that you were making -- that you made calls

11  while you were in Autauga County Jail for

12  those 40 days?

13      A.    Yes.

14      Q.    And almost an overwhelming

15  majority were to either Greg Schmitt or to

16  Ricky Adams?

17      A.    Yes.

18      Q.    Okay.  And you made those probably

19  consistently on almost a daily basis while

20  you were in there?

21      A.    Yes.

22      Q.    Except for a few days?

23      A.    Yes.

1      Q.    And how do you make those, like

2   you -- you have your -- how do you do that?

3   There's a book or something.  How does that

4   work?

5      A.    A book?

6      Q.    Like a book, like you have to put

7   money on your book or put money or something?

8      A.    Oh, somebody puts money on your

9   book, and you just make -- put in a code, and

10  it --

11     Q.    And did you -- do you have like a

12  code that you -- do you have a code that

13  you --

14     A.    Put in?

15     Q.    Your code that you put in, like

16  there was a certain code put in on every one?

17     A.    Yes.

18     Q.    Is that right?

19     A.    Yes.

20     Q.    Okay.  What was your code?

21     A.    Oh, I can't remember that.

22     Q.    Okay.  What I'm going to do now

23  for the purposes of trying to make it a

1   little bit easier, because I've transcribed

2   some of these -- or a court reporter has

3   transcribed some of these conversations you

4   had.  And I'm going to go briefly and try to

5   go quickly through some of these, okay?

6        A.   Okay.

7        Q.   The first one I'm marking is

8   Plaintiff's Exhibit 8.  And it's -- I'll

9   identify that as a conversation between you

10  and Greg Schmitt, which took place August

11  8th, 2021, around 9:54 A.M.

12       A.   Okay.

13       Q.   Okay.  And do you remember talking

14  to him about various matters contained in

15  this --

16       A.   Yes.

17       Q.   -- in this recording?

18       A.   Yes.

19       Q.   At the first page, it says,

20  "Whenever that money hits on the account,

21  tell Ricky to pull out nine cash and give

22  Bill five," correct?

23       A.   Yes.

1      Q.    And that was what we were talking

2  about before about --

3      A.    Yes.

4      Q.    -- out of the first draw --

5      A.    Yes.

6      Q.    -- for that three and a half acres

7  of property, was that from --

8      A.    No.

9      Q.    What draw was that from?

10     A.    That's on the -- on the -- the

11  County Road 40.

12     Q.    Okay.  Out of the County Road 40

13  property, you said if that money hits, tell

14  Ricky to give -- to pull out nine cash and

15  give five to Bill, right?

16     A.    Right.

17     Q.    Then on the second page -- go to

18  the bottom of the second page.  It says --

19  you said that a lot during those tapes, that

20  we'll be in a better position, and you've got

21  a great plan?

22     A.    Yes.

23     Q.    What was your plan?  You said you

1  had this great plan, and we're in a better

2  position than when we were in the other

3  court.  Tell me what -- what you meant by

4  those statements.  You said those in a lot of

5  places.

6      A.    Yeah, I do have a plan.

7      Q.    What's your plan?

8      A.    Prove all this stuff that I'm

9  telling you.

10     Q.    That was what your plan was?

11     A.    Yes.

12     Q.    Prove what?

13     A.    All the stuff that I'm -- that I

14  kept -- me and Billy kept going over for

15  weeks and months.

16     Q.    Why were you in a better position

17  while you were in bankruptcy than you were

18  when --

19     A.    Because somebody will listen.

20     Q.    Because that circuit judge didn't

21  listen to you?

22     A.    I never talked to him that I know

23  of.

1      Q.   Okay.  And then down at the bottom

2 of the page 4, it talks about Cash and the

3 guy that made the $3000 payment to you?

4      A.   Uh-huh, yes.

5      Q.   Is that right?  And then on page

6 5, it says -- you say to make sure you tell

7 him to get cash out, 9000, and pay all the

8 bills.  What bills was he supposed to pay

9 with 9000?

10     A.   Whatever he needed.

11     Q.   Including your --

12     A.   Whatever --

13     Q.   Including your car payment?

14     A.   Whatever he had, yeah.

15     Q.   So he was supposed to pay your

16 lawyer fee, your car payment, and your other

17 bills out of his draw related to those lots?

18          MR. BENSINGER:  Object to the

19 form.

20     Q.   Is that correct?

21     A.   Out of -- out of whatever -- out

22 of the nine.

23     Q.   Out of the nine, he was supposed

1 to pay your car payment?

2     A.    Uh-huh.

3     Q.    Your lawyer fee?

4     A.    Whatever -- whatever bills he had

5 coming in.

6     Q.    And it was his business, correct?

7     A.    No, not Greg's.

8     Q.    It was Ricky's business?

9     A.    Uh-huh.

10     Q.    Okay. Then on the next page, it

11 says you give Ricky five. So what were you

12 giving Ricky 5000 -- on page 6, why were you

13 giving Ricky 5000?

14     A.    To pay whatever he had to pay.

15     Q.    Okay.

16     A.    Whatever he said he needed.

17     Q.    And that's all I'll go over. I'm

18 going to try to go over them quickly.

19     You always said you loved them.

20 You guys have a personal -- do you guys --

21     A.    Give this back to you?

22     Q.    No, we'll just leave it there.

23     Okay. Let's go to August 9th.

1          MR. HOOKER:  There may have been

2    more than one conversation that day.

3               (Plaintiff's Exhibit 9 was marked

4               for identification.  A copy is

5               attached.)

6          Q.    August 9th -- and there's a lot of

7    copies -- August 9th, Plaintiff's Exhibit 9,

8    I'm going to show you that.  That was a

9    conversation -- if you can identify that,

10   this is a conversation between you and Greg

11   Schmitt, which happened on the 9th, from the

12   Autauga County Jail at 13:53.

13         A.    Okay.

14         Q.    Well, and that's military time.

15         A.    Okay.

16         Q.    1:53.

17         A.    Okay.

18         Q.    Right?

19         A.    All right.

20         Q.    Do you recognize that?

21         A.    Okay.

22         Q.    Okay.  Down at the bottom, you're

23   talking about Ricky using one of your credit

1  cards.  What credit card do you have?

2       A.    I don't know.  Whatever --

3  whatever -- Greg handles the credit cards.

4       Q.    He handles yours?

5       A.    Uh-huh.

6       Q.    You don't even know what -- you

7  have to say yes.

8       A.    Yes.  I'm sorry.

9       Q.    You don't even know which credit

10 cards?

11      A.    Uh-uh.  No, I do not.

12      Q.    But he was just supposed to use

13 your credit card, right?

14      A.    Yes.  For whatever he was doing, I

15 guess.

16      Q.    Different money was being put in

17 your -- on your books, right?

18      A.    You're talking about from

19 different people?

20      Q.    Yes.

21      A.    Yes.

22      Q.    Okay.  Where did they get the

23 money to put the money on your books, from

1    what source?

2        A.    I don't know.

3        Q.    What -- you just told them to do

4    it; they had to come up with where they would

5    get it?

6        A.    Oh, with them, yes.  Yes.

7        Q.    Okay.

8        A.    But, I mean, other people did too,

9    I think.

10       Q.    Page 5, you said did you sign the

11   papers with Monica?

12       A.    Wait a minute.

13       Q.    I'm sorry.

14       A.    5 is here.  Okay.

15       Q.    Did you sign the papers with

16   Monica.  What papers was that from, what

17   paper were they signing?

18       A.    I don't know.  I don't remember.

19       Q.    Well, it's one the --

20       A.    Does it say here?

21       Q.    It says -- down below, it says,

22   the three and a half acres, y'all are

23   supposed to sign on it today, the six acres.

1          A.    Oh, they were buying three and a

2     half acres.

3          Q.    Okay.  And they didn't even know

4     they were supposed to sign on it?

5          A.    No.  We didn't -- we didn't know

6     what was going on.

7          Q.    You had to tell them to go sign on

8     it, right?

9          A.    Yeah.  I advise them on

10    everything.

11         Q.    You advise them when to go down

12    and sign on property?

13         A.    Yes.  They had met with the man.

14    They bought it.  I just put the deal together

15    for them.

16         Q.    Who did they buy it from?

17         A.    I don't know that man's name.  I

18    think his last name was Wallace.  I'm just

19    guessing.

20         Q.    What?

21         A.    Wallace, I think.

22         Q.    Wallace?

23         A.    I think.

1      Q.   And it says you're supposed to

2  sign on that, but nobody had contacted you.

3          And then on page 6 you said you

4  and Ricky are buying it, so you guys need to

5  call.  And look at my phone, it says 6.5

6  acres, and you need to call Monica to see if

7  it's ready.  So they were supposed to buy a

8  three-acre piece and a six-and-a-half-acre

9  piece too?

10      A.   No.  They were buying the three-

11  acre piece, and HIS is buying the six acres.

12      Q.   Okay.  But you said in these

13  recordings that they were supposed to buy it.

14  When did that change, that Ricky was supposed

15  to buy it to HIS buying it?  When did that

16  change?

17      A.   I don't think Ricky was ever

18  supposed to buy it.  I don't know.

19          (Plaintiff's Exhibit 10 was marked

20           for identification.  A copy is

21           attached.)

22      Q.   (BY MR. STOTSER) Let me show you

23  the same thing --

1          A.      Put this up?

2          Q.      Yeah.   Yeah.   Sorry.   Plaintiff's

3    Exhibit 10, August 9th, is a conversation

4    that took place between you and Ricky Adams

5    at 2:02.  Do you recognize that?

6          A.      Okay.  All right.

7          Q.      Do you see that?

8          A.      Okay.

9          Q.      On page 2, it says -- you go, "You

10   have you to talk real loud because I can't

11   hear."  That's because you were in the jail,

12   right?

13         A.      Yes.

14         Q.      It says, "Hey, y'all were supposed

15   to close on the three and a half acres today

16   with Monica."  And what was Ricky's -- what

17   did Ricky say, "I didn't know nothing about

18   it"?

19         A.      Meaning he didn't know anything

20   about the closing, what time or anything.

21         Q.      Oh, okay.  And then it said you're

22   waiting -- down below it said you're waiting

23   for the money to drop.  What money are you

1  waiting to drop?

2      A.    I don't know, whatever was

3  supposed to come in.

4      Q.    Okay, on page 5, you said, "What

5  are we going to do with the 3000?" which is

6  the cash money.  You said, "Probably give it

7  to Jeremy to keep him happy."

8              And then you said -- Ricky said

9  that I have $300 in my pocket, and you said,

10  "Well, give him two of it or something and

11  hold on the other or something"?

12      A.    Yes.  But we didn't have to do any

13  of that.

14      Q.    But you were telling him to take

15  the $3000 from the cash and give it to Jeremy

16  to keep him happy?

17      A.    Right, because Jeremy had --

18  Jeremy had helped with different things, I

19  think.

20      Q.    And then it said -- when Ricky

21  said he had only 300, you were basically

22  telling Ricky, well, you get a thousand and

23  give -- it looks like what it says is you get

1    a thousand and give Jeremy 2000?

2         A.    But we didn't have to do any of

3    that.

4         Q.    And later on page 7 it says your

5    number is 3659.  Does that -- I guess that

6    was the jail number, 3659, the middle of page

7    7, toward the bottom?

8         A.    I see it, but I don't --

9         Q.    "That's your number, 3659."  I

10   guess that's the way you put money on the

11   books?

12        A.    I guess.

13        Q.    Okay.  On page 8, you talk at the

14   bottom, you say, "And then call Monica's

15   office."  It says 3.5 acres.  Let the man

16   know they have to get the paperwork straight.

17   See if Monica got it straight.

18             What was wrong with the three and

19   a half acres, or what did they have to get

20   straight?

21        A.    I don't know.  I guess the -- I

22   guess that man had a problem or something.  I

23   don't know.

1      Q.    Okay.  Then it said call Monica
2  and ask them did he get everything signed on
3  the six acres?
4      A.    Right.
5      Q.    Who is that?
6      A.    Did they get everything signed on
7  the six -- HIS.
8      Q.    Did they all call you "Boss Man"?
9      A.    Yeah, a lot of them do.
10      Q.    Do they?  A lot of these
11  conversations, including this one on August
12  the 11th at 1:17, you say, "We are sitting a
13  lot better than it was before.  I can't wait
14  to tell you about it."  Is that what you
15  testified to before?
16      A.    Yeah.
17      Q.    Is that we're out of the Circuit
18  Court, we're sitting with the Northern --
19      A.    I meant that it would be a
20  balance, I mean, it will be a fair thing.
21      Q.    Okay.  Who is Stephanie?
22      A.    Oh, that's the lady at -- at HIS.
23      Q.    Okay.  What was -- what's her

1  function or her role in this?

2       A.    She's the one you have to turn the

3  pictures in to.

4       Q.    For what purpose?

5       A.    You know, like when you get to a

6  certain stage.

7       Q.    To get the draw?

8       A.    Yes.

9       Q.    How did those loans work?  What

10  money was put down on those properties for

11  the three and a half or the six acres?

12       A.    I don't know about that.  But I

13  know that -- they didn't put nothing down.

14  They're not -- they're not -- they're not

15  Ricky's -- you know, they're not Renaissance

16  property.  They're building for them.

17       Q.    So the three and a half acres that

18  Ricky signed on was not --

19       A.    No, that's not --

20       Q.    Is not in his name?

21       A.    That's not -- that has nothing to

22  do with -- with Stephanie, what you was

23  asking me about.  You're asking about the six

1    acres.

2         Q.    Who did the loan go through for

3    the three and a half acres?

4         A.    The man that sold the property.

5         Q.    He owner-financed it?

6         A.    Yes.

7         Q.    Okay.  Did he get any collateral

8    for it?  I mean, did he take back a mortgage?

9         A.    The land.

10        Q.    Okay.  And how did they get

11   draws -- how did they get the draws to be

12   able to build the properties?  Did they get

13   draws or did they just pay it out of their

14   cash flow?

15        A.    You're talking about on the -- on

16   the six acres where they're building?

17        Q.    On the three acres, the three and

18   a half acres.

19        A.    There's nothing being done to it.

20        Q.    There's no houses being built?

21        A.    No.  It's just sitting there.

22        Q.    So on the six acres, how many --

23        A.    Have to make payments on it, once

1    every quarter.

2         Q.    So there's no construction going

3    on with that at all?

4         A.    No.  Wait a minute, on the three

5    acres?

6         Q.    Correct.

7         A.    No.

8         Q.    On the six acres or six and a half

9    acres --

10        A.    They're building two houses.

11        Q.    -- they're building two houses.

12   Okay.  A lot of your -- a lot of the tapes

13   talk about four houses.

14        A.    That's on County Road 40.

15        Q.    Okay.  So those are four different

16   houses?

17        A.    Yes.

18        Q.    Okay.  I'm trying to go through

19   these quicker.  Okay.  On August 11th, you

20   were talking at 3:11:19, you were talking to

21   Ricky Adams, and he was talking about the

22   money, and you told him that he could go to

23   the bank by himself and get it, he could make

1   a withdrawal, you don't have to have a check.

2          How was he able to make

3   withdrawals?  From what account can Ricky

4   make withdrawals?

5      A.   From his own account.  He don't

6   have to have a check.

7      Q.   So you're talking about his own

8   accounts?

9      A.   Yeah, I guess.

10      Q.   Okay.  Is Ronnie still living at

11   your Coosada Road property?

12      A.   Yes.

13      Q.   Because you were trying to get him

14   out at one point, weren't you, to turn that

15   into an Airbnb?

16      A.   I thought about it.

17      Q.   Okay.  And you were going to fix

18   up the trailer so you'd have a place to stay,

19   right?

20      A.   Well, it was actually fixed, yeah.

21          (Plaintiff's Exhibit 11 was marked

22           for identification.  A copy is

23           attached.)

1          Q.     (BY MR. STOTSER) I've just got a

2     couple of things on this.  This is

3     Plaintiff's 11, a conversation on August the

4     12th, 8:48 A.M. between you and Mr. Adams.

5     Go to page 11.

6          A.     Okay.

7          Q.     Down at the bottom, it says --

8     you're talking about this -- the automotive

9     dealership and it says, "Because he is

10    pulling $100,000 a year off of it."  You were

11    referring to Chris, right?

12         A.     Yeah.  That's what he was supposed

13    to be getting.  I don't know if he is or not.

14         Q.     Okay.  You said -- you didn't say

15    he's supposed to be.  You said, "Because he

16    is pulling 100,000 a year off of it," right?

17         A.     Okay.

18         Q.     That's where I got -- I was trying

19    to show you where I got the 40,000 -- I mean,

20    you said that to Ricky about that?

21         A.     Uh-huh.

22         Q.     Correct?

23         A.     Okay.

1          Are you through with this one?

2     Q.     Yeah, I'm through with that.

3          (Plaintiff's Exhibit 12 was marked

4           for identification.  A copy is

5           attached.)

6     Q.     (BY MR. STOTSER) I've marked

7  conversation August 13th, 2021, at 1:01 P.M.

8  as Plaintiff's 12 between you and Ricky

9  Adams.

10     A.     Okay.

11     Q.     Okay.  Do you see down at the

12  bottom of page 7 and the top of page 8, it

13  says -- where Ricky said, "They wanted to buy

14  you out of the ATV company for...something"?

15     A.     Yeah, that was --

16     Q.     "He sent the contract over that

17  the guy offered."  And your answer -- do you

18  see that? -- was, "The guy in Mexico"?

19     A.     Uh-huh.

20     Q.     Do you see that?

21     A.     Uh-huh.

22     Q.     And then Ricky said, "Yeah."  And

23  you said, "How much would I get?"  And he

1   said, "It was like 50,000."  And then you

2   said, "Tell him to sell it."  Right?

3       A.   Yes.

4       Q.   And then a little bit later, you

5   said, "Put the USA money behind it or USN,

6   whatever that is."  What does that mean?

7       A.   I don't know.  Whenever you --

8   when you look at something or another, it

9   says -- it don't say USA, it says USD or

10   some -- or US something.

11       Q.   Oh, okay.

12       A.   I don't what -- I didn't know what

13   that meant.

14       Q.   So this was the ATV company that

15   we were talking about?

16       A.   Yeah.  But it wasn't -- it wasn't

17   real, the offer wasn't real.

18       Q.   Okay.  The offer wasn't real, but

19   the ATV company was real that he was trying

20   to buy you out of for -- you though when you

21   made this -- when you had this conversation

22   with Ricky, you thought that there was a

23   $50,000 offer to buy you out of the ATV

1  company?

2      A.    Yeah.

3      Q.    And you said sell it if you can,

4  right?

5      A.    Yes.

6      Q.    Okay.

7      A.    I mean, if you're going to get

8  something like that for that, yeah.

9      Q.    Now, you talk about buying another

10  piece of property by the Church of Christ

11  where Billy was buried is what you say?

12      A.    Yeah.

13      Q.    You talked about buying one with

14  Greg Schmitt, a house that was shaped by

15  [sic] a barn?

16      A.    It was shaped like a barn.  But

17  it -- no, that didn't -- it wasn't -- it

18  wasn't real.  I mean, the house is there, but

19  it had already sold.

20      Q.    Okay.  Well, you were talking

21  about buying it?

22      A.    Right.

23      Q.    How did you find out about it

1    while you were in jail?

2        A.    Somebody was in there talking

3    about it.

4        Q.    Okay.  You were talking about

5    wanting to do it?

6        A.    Well, I was just interested in it

7    the way it was -- the way it was described.

8            (Plaintiff's Exhibit 13 was marked

9             for identification.  A copy is

10            attached.)

11        Q.    (BY MR. STOTSER) I show you

12    Plaintiff's 13.  This was Friday, August

13    13th, 2021, 1:29, between you and Greg

14    Schmitt.  Do you see that?

15        A.    Okay.  It was actually talking

16    about renting it to start with, wasn't it,

17    trying to rent it or something?

18        Q.    Right.  On page 4 when -- you were

19    talking about being confident with the

20    trustee and they can F him up, you're talking

21    about F'ing my client up, right?

22        A.    I'm talking about -- yeah.

23        Q.    Right?

1      A.    On the -- on all that crap that
2  took place.
3      Q.    Right.  And then on page 4 you
4  said --
5      A.    If that's how we're going to
6  handle business.
7      Q.    -- Greg said, "Great.  We won't
8  have to put up with this damn judge anymore?"
9  And you said, "Yeah," right?
10      A.    Right.
11      Q.    Okay.  And page 5 is where you
12  were talking about the house that you were
13  looking at buying, right?
14      A.    Right.
15           MR. BENSINGER:  What page was that
16  on?
17           MR. STOTSER:  Which one?
18           MR. BENSINGER:  That you were just
19  talking about, the conversation concerning
20  the judge.
21           MR. STOTSER:  Page 5 and -- 4 and
22  5, I think.
23           MR. BENSINGER:  Okay.  I'm sorry.

1  You had said 4, and I just couldn't see what

2  you were talking about.  Thank you.

3        Q.    (BY MR. STOTSER) okay.  When you

4  were talking to Greg Schmitt in one of these

5  conversations --

6        A.    Are you through with this one?

7        Q.    Yeah.

8        A.    Okay.

9              (Plaintiff's Exhibit 14 was marked

10                for identification.  A copy is

11                attached.)

12        Q.    (BY MR. STOTSER) Friday, the 13th,

13  14:34, Plaintiff's 14.  On page 7, you were

14  trying to make sure that your car note was

15  paid, the truck was paid, the Dodge was paid,

16  the Ram was paid.  What -- you're telling

17  Greg to pay all those bills, right?

18        A.    Uh-huh.

19        Q.    Who owned the truck and the Dodge

20  and the car, who owned those?

21        A.    Well, indirectly, I guess I had

22  possession of them.  That was that Ray Smith

23  guy.  But the trucking company.

1      Q.   Okay.  I don't know if I know what

2 you're talking about.

3      A.   It's where his fiancée worked at

4 Guardian and went into my account.

5      Q.   Oh, okay.  So you got those trucks

6 out of that settlement, or those -- you got

7 these vehicles out of the settlement where

8 she was taking money out of Guardian?

9      A.   Yes.

10      Q.   Okay.  And those were the bills

11 you were talking about paying?

12      A.   Yes.

13      Q.   Okay.  Then on page 8, you were

14 talking about making sure Ricky learns all

15 about the job sites, and Jeremy didn't know

16 anything about the Airbnb's, right?

17      A.   Uh-huh.  That's what Jeremy does.

18      Q.   Oh, he's the Airbnb guy?

19      A.   (Nodding.)

20      Are you through with this one?

21      Q.   Yeah -- well, let's see.  You

22 talked about -- you talked while you were in

23 jail about Jeremy getting on the Airbnb's so

1  you get Lonnie out of the farm and you could

2  turn that into an Airbnb too?

3      A.    That's what we was wanting to do.

4      Q.    Is that what you're planning on

5  doing with that?

6      A.    No.  That's what I was wanting to

7  do.

8      Q.    Why did you not decide to?

9      A.    I'm not doing anything.  I'm

10  tired.

11          (Plaintiff's Exhibit 15 was marked

12            for identification.  A copy is

13            attached.)

14      Q.    (BY MR. STOTSER) Plaintiff's 15 is

15  a conversation August 14th, 2021, at 8:58

16  between you and Mr. Adams.

17      A.    Okay.

18      Q.    On page 12 and 13, you said -- at

19  the bottom of page 12, it says "If everything

20  settles out like I think it will, then I'm

21  going to try to sell as much stuff as I can,

22  and I will tell you about it."  What kind of

23  stuff were you going to sell?

1          A.     Whatever I had left.

2          Q.     Was it some of these assets that

3   you're still trying to find for the

4   bankruptcy court that you may be selling?

5          A.     No.   Whatever I have -- whatever I

6   have left, whatever -- whatever I have,

7   whatever -- I don't -- I don't -- whatever I

8   had.

9                 (Plaintiff's Exhibit 16 was marked

10                 for identification.   A copy is

11                 attached.)

12         Q.     (BY MR. STOTSER) Plaintiff's 16 is

13   an August 15th conversation at 1:08 between

14   you and Ricky.

15         A.     And all them conversations is when

16   I'm stressed out and everything else.

17   Changed the whole thought when I got out.

18   That's why I never did nothing with anything.

19         Q.     You're -- on page 6, you're

20   telling Ricky, hey, hold tight on the money,

21   that's got to make us through this journey.

22   So you were telling Ricky to hold onto the

23   money.   What journey were you guys getting

1  through?  Because you talk about this many

2  times, the thing -- you make sure that Ricky

3  makes sure that nobody else gets any money,

4  and they have -- have a tight rein on it

5  because it's got to get you through the

6  journey.  Get you through this whole

7  bankruptcy and everything?

8      A.    No.  Get us through the job,

9  the -- whatever job we're doing.  Whatever --

10 whatever I was referring to that we were

11 talking about, you can't pay people

12 ridiculous amounts of money and everything

13 else.  You've got to hold tight to it.

14     Q.    Because if not, you're not going

15 to --

16     A.    We wouldn't be able to finish it.

17     Q.    Okay.

18     A.    We wouldn't be able to make it

19 through it.

20     Q.    And on page 7, then there you're

21 talking about for him to make sure he tells

22 you how many -- what checks are cleared, how

23 much money is in there, because Debbie

1  doesn't give you the right balances a lot,

2  right?

3       A.    Debbie goes by something else, I

4  don't know.

5       Q.    And then on page 9 and 10, you're

6  talking about 15 to $20,000 of lumber that

7  was stolen, right?

8       A.    Yes.

9       Q.    When was that stolen?

10      A.    I don't know.  We've got the

11 police report on it, though.

12      Q.    What property was it stolen from?

13      A.    County Road 40.

14           (Plaintiff's Exhibit 17 was marked

15            for identification.  A copy is

16            attached.)

17      Q.    (BY MR. STOTSER) Plaintiff's 17 is

18 August 16th, 2021, 9:42, between you and Greg

19 Schmitt.  Go to page 6.  See there in the

20 middle of it, you said, "...I'm out on the

21 15th anyway.  The worst case is I'm out on

22 the 15th, you know, and I can bring in a

23 couple of hundred thousand."

1           Where were you going to get a

2    couple of hundred thousand dollars?

3           A.    Do some jobs, do some -- get out

4    there and hustle like I used to.

5           Q.    So you --

6           A.    Get to work.

7           Q.    But it said you could bring in --

8    what it says is you could bring in that money

9    on the 15th, you could bring in a couple of

10   hundred thousand.

11          A.    That ain't what it's saying.

12          Q.    Is that part of the cash?

13          A.    That ain't what it's saying.

14          Q.    Read what it says then.

15          A.    It's saying that -- I'm telling

16   you what you -- I'm telling you how I meant

17   it.

18          Q.    That's not what it says.

19          A.    Okay.  I'm telling you.

20          Q.    "I can bring in a couple of

21   hundred thousand," I can bring a --

22          A.    I can --

23          Q.    -- couple of hundred thousand

1   dollars?

2         A.    I can make it.

3         Q.    Did it say that, "I can make it"?

4         A.    That's what I'm meaning by it.

5         Q.    Oh, okay.  Did you find out

6   whether or not you believed Jeremy or Debbie

7   are on your team?  Do you feel like they're

8   on your team?

9         A.    Absolutely.

10        Q.    Okay.  Because in jail you weren't

11  sure about that?

12        A.    Yeah.  And I talked to each one of

13  them.

14              (Plaintiff's Exhibit 18 was marked

15               for identification.  A copy is

16               attached.)

17        Q.    (BY MR. STOTSER) Plaintiff's 18,

18  August 17th at 1:57 between you and Mr.

19  Schmitt.

20        A.    Okay.

21        Q.    At the bottom it says are you on

22  that account at Hancock?

23              MR. BENSINGER:  What page?

1          Q.     The bottom of page 2?

2          A.     Okay.

3          Q.     What account is at Hancock?

4          A.     I don't even remember what that

5     Hancock -- it would be one of their accounts.

6          Q.     And Greg said, "No, I'm not on the

7     Hancock account."  Then you asked which one

8     the account [sic] went into, and it's a BBVA

9     account, right?

10         A.     Yeah.  Yes.

11         Q.     Okay.  So what did -- do you know

12    anything about the Hancock account you were

13    asking him about?

14         A.     No.  I mean, I remember there

15    being a Hancock account, but I can't remember

16    what it was about.

17         Q.     You don't remember whose name is

18    on it?

19         A.     No.

20         Q.     What about the BBVA account?

21         A.     I know Ricky's on there and

22    Jeremy.

23         Q.     Are you on there too?

1      A.    No.  I'm not on any of it.  It's

2  not mine.

3            (Plaintiff's Exhibit 19 was marked

4             for identification.  A copy is

5             attached.)

6      Q.    (BY MR. STOTSER) August 18th,

7  2021, 10:01, between you and Mr. Schmitt.  On

8  page 6, is that one of -- is that the lawsuit

9  you were talking about where Mark Pierce is

10  suing you?

11      A.    I mean, what's it saying?

12      Q.    It said that Mark Smith served you

13  or you thought he served you with a

14  commission for selling South Perry Street.

15      A.    Oh, yes, because it -- yes, that's

16  what it's referring to.

17      Q.    Okay.  Is that suit still

18  underway?

19      A.    It's in this.

20      Q.    It's in the bankruptcy?

21      A.    Yes.

22      Q.    Okay.  And on page 9 at the

23  bottom, you were talking about some stupid

1  shit being popped up, and then you said

2  "They're protecting me, and it puts me in a

3  federal court instead of this stupid shit

4  here."  Were you talking about the stupid

5  shit being the Circuit Court stuff?

6       A.    Yeah.

7       Q.    Okay.  That's all I've got on that

8  one.

9             Do you remember ever telling Greg

10 that you had plenty of money to pay the bills

11 with, "We've got plenty to pay everything

12 with, there's no need to worry, we have

13 plenty"?

14      A.    Yeah.  What he sold the truck,

15 ever how much it was, quit worrying.  I've

16 got enough, you know, don't nobody be

17 extravagant.

18      Q.    Why didn't you want Jeremy

19 collaborating with Debbie about everything?

20      A.    About everything that was going

21 through, because I didn't know what -- I

22 didn't know where Debbie stood or where --

23 Debbie is my -- handles everything, and I

1  didn't know.  I just didn't know.

2              (Plaintiff's Exhibit 20 was marked

3                  for identification.  A copy is

4                  attached.)

5      Q.    (BY MR. STOTSER) Let me show you

6  what I've marked as Plaintiff's 20, which is

7  August 19th, 1:18, between you and Ricky

8  Adams.  On page 4, you talk about payroll.

9  What is payroll for?  It says 3000 -- Ricky

10  talks about he's got 3000, and you said

11  "Payroll is 2000."  What -- what's payroll?

12      A.    I don't know.  Whatever they owed

13  that week, I guess.  I guess it totaled 2000.

14      Q.    How do you know that?  You're in

15  jail.

16      A.    I don't know.  I guess -- I don't

17  know.

18      Q.    Okay.  On the next page, you said,

19  "Every Thursday just know that you have to

20  get two.  But every week you write 15 to old

21  boy."  Who is that?

22      A.    Jeremy gets 1500 a week.

23      Q.    "And he brings you -- you know, he

1  brings you some.  Then every week just give

2  him that"?

3       A.    Right.

4       Q.    "You keep what you need, and then,

5  you know, the six, and then give Greg the

6  rest"?

7       A.    Uh-huh.

8       Q.    Then it says, "Old boy" -- Ricky

9  said, "Old boy bring the funds?  Jeremy

10 brings the 15?"  And then Billy -- then you

11 say, "I wasn't going to call any names.

12 But...Jeremy brings 15."  It doesn't say,

13 "Jeremy gets 15," it says "Jeremy brings 15."

14 What 15 -- what does he bring?

15      A.    Whatever he has that he's

16 collected for the week or whatever he's done,

17 whatever he has left over.

18      Q.    From the -- from the rental

19 houses?

20      A.    No.  There's no rental houses.

21      Q.    Well, how is Jeremy collecting

22 15 -- where is Jeremy getting --

23      A.    Whatever he has left over.  Jeremy

1    was overseeing the jobs.

2         Q.    Jeremy is supposed to bring 15

3    from what jobs?

4         A.    Usually it's about 15.

5         Q.    From what jobs?  Why does it say

6    every week, like -- like this is an ongoing

7    thing?

8         A.    Every week we settle up.

9         Q.    Every week he's supposed to bring

10   15?

11        A.    Uh-huh, every week we settle up.

12        Q.    Fifteen, 15 from where?

13        A.    Wherever he's got it from,

14   whatever he's got.

15        Q.    Fifteen thousand?

16        A.    No, 1500.

17        Q.    A week?

18        A.    Uh-huh.

19        Q.    Okay.  So it's not Jeremy getting

20   paid 1500, it's Jeremy bringing 1500; that's

21   what it says, right?

22        A.    Okay.

23        Q.    Okay.  Now, on page 10 -- 9 and

1  10, you're talking about -- you say when

2  you're talking with Ricky about maybe the

3  automotive shop.  You said, "Bitch,

4  understand this.  I own that company, and let

5  me explain something to you."

6          Is that -- what company are you

7  talking about you own?

8      A.    I don't know.  I guess it would be

9  on the automotive thing.

10     Q.    Did you own any other company?

11     A.    No.  I don't even know what I'm

12 talking about.

13          (Plaintiff's Exhibit 21 was marked

14           for identification.  A copy is

15           attached.)

16     Q.    (BY MR. STOTSER) Plaintiff's

17 Exhibit 21 is August 19th, 2021, at 2:00, a

18 conversation between you and Mr. Schmitt.

19     A.    Okay.

20     Q.    On page 4, you say, "There

21 is...$100,000 in there, so we are all right."

22 Where is there $100,000?

23     A.    In the -- to build the house with.

1      Q.    You said "in there."  In where?

2      A.    In their account, I mean, in

3 their -- when they get their account.

4      Q.    How did you know there was

5 $100,000 in there?

6      A.    I'm just guessing at the numbers.

7 At that time I would have known them

8 probably.

9      Q.    While you were in jail?

10     A.    It was before I -- I mean, it

11 happened before.

12         (Plaintiff's Exhibit 22 was marked

13          for identification.  A copy is

14          attached.)

15      Q.   (BY MR. STOTSER) Plaintiff's 22 is

16 Friday, August 20th, 8:24, between you and

17 Mr. Schmitt.  Page 5 and 6, this is the one

18 where you're talking about somebody coming

19 and looking at the camper and to show the

20 office, right there (indicating)?

21     A.    Yes.

22      Q.    You're saying she might buy both

23 of them?

1     A.    No.  She was just looking at them.

2  She wasn't going to buy nothing.

3     Q.    Well, that's what you said.

4     A.    Yeah.

5     Q.    "She might buy both of them"?

6     A.    Yeah.

7     Q.    So is that not what you meant?

8     A.    I'm saying it -- she was going to

9  look at them.  They were leading on like

10  that.  They wasn't going to buy nothing.

11     Q.    You thought they were going to buy

12  something when you said that?

13     A.    Then I couldn't sell it anyway.  I

14  just --

15     Q.    You didn't say I couldn't sell it,

16  you just said she might buy it?

17     A.    I stopped every single thing.  I

18  told you in the very beginning when we

19  started talking about all this that all this

20  was just stress, just chaos.

21     Q.    "I thought the camper would

22  be...10 to 12,000," right?

23     A.    Yes.

1      Q.    Okay.  Did you -- you didn't list

2   that on your bankruptcy petition?

3      A.    I don't know that we've gotten to

4   it yet.

5      Q.    Okay.  But you knew it on -- you

6   knew the estimated value on the date that you

7   wrote that, right?

8      A.    That's about twice as much.

9      Q.    Okay.

10     A.    Are you through with this one?

11     Q.    Yeah, I'm done with that one.

12           (Plaintiff's Exhibit 23 was marked

13            for identification.  A copy is

14            attached.)

15     Q.    (BY MR. STOTSER) Let me show you

16  what's marked Plaintiff's Exhibit 23,

17  8/21/2021 at 12:59 between you and Ricky

18  Adams.  Okay.  Look on page 7, page 7 and 8.

19  You said, "Yeah, get that rolling.  And then

20  I will get everyone to sign the house back

21  over to me, and I will go to the bank and

22  borrow money against it.  "And then I

23  will...buy other cabin in the mountains, buy

1    one a little nicer, a little bit more

2    upscale."  Do you see that?

3         A.    Yes.

4         Q.    Now, that what was what we were

5    talking about before --

6         A.    Uh-huh.

7         Q.    -- when I asked you about signing

8    the property back to you.  That's what you

9    said, "I will get everyone to sign the house

10   back to me," right?

11        A.    Yes.

12        Q.    That's your plan, right?

13        A.    No.  My plan is them add me on

14   there, and I'll go to the bank because I can

15   qualify for the loan.

16        Q.    Is that what that says?

17        A.    That's what I'm saying.

18        Q.    That's what you're saying now?

19        A.    No, that's what I was saying then.

20        Q.    No, what you said right there,

21   sir, was, "I will get everyone to sign the

22   house back over to me."  You didn't say, "I

23   will get my name put on it," did you?

1          A.     I'm telling you what I meant by

2     it.

3          Q.     Okay.  So you didn't mean what you

4     said?

5          A.     Yeah, I meant what I said.

6          Q.     You're going to buy another cabin

7     in the woods, right?

8          A.     Yes.

9          Q.     Did you own a cabin in the woods?

10         A.     Yes.

11         Q.     When did you sell that?

12         A.     I don't even remember.

13         Q.     Was it -- why was it not listed in

14    your bankruptcy petition that you sold it?

15         A.     They hadn't gotten to it yet.

16         Q.     So when you and Debbie get to it,

17    you're going to tell your lawyer, and then

18    he'll add it to it?

19         A.     Absolutely.

20         Q.     Okay.  Did everybody call you

21    "Champagne" in jail?  Was that your nickname?

22         A.     No.

23         Q.     It's not?

1        A.    Tried to do that.  Then they tried

2    to call me --

3        Q.    "My new nickname is Champagne"?

4        A.    That's what they tried to call me

5    because of my color.

6        Q.    And you said, "Because I'm rich,"

7    right?

8        A.    Because of my color they think I'm

9    rich or whatever.  Then they called me

10   Boogotti, and I said no.

11       Q.    But it said, "Because I'm rich" is

12   what you answered?

13       A.    That's what they said.

14       Q.    Okay.  Did you get good reviews

15   off the wedding that you had?

16       A.    I don't know.

17       Q.    You had a wedding, and you were

18   looking for reviews.

19       A.    I didn't have one.  I don't know

20   what they got.  I asked about it.  I don't

21   know what they got.  That'd be Jeremy you'd

22   have to talk to about that.

23                (Plaintiff's Exhibit 24 was marked

1            for identification.  A copy is

2            attached.)

3       Q.    (BY MR. STOTSER) Plaintiff's 24 is

4  August 22nd, 9:51, Sunday, between you and

5  Mr. Schmitt.  At the bottom of the first page

6  2, it says that the wedding needs to get a

7  good review.  Did you ever find out about

8  that --

9       A.    No.

10       Q.    -- whether they reviewed it well?

11       A.    No.  Furthest thing from my mind.

12       Q.    But you asked about it.

13       A.    Well, at the time.

14       Q.    Okay.

15       A.    Just making conversation.

16       Q.    Then on page 7, it talks about the

17  app, you have to learn the app, right?  We

18  have to learn that app because we don't want

19  any -- what app are you talking about?

20       A.    I don't know.  I guess -- I don't

21  know what I'm talking about.  I guess the --

22       Q.    The app for the Airbnb?

23       A.    I guess, whatever it -- yeah, I

1  guess.

2      Q.    What does it say at the bottom?

3  "I don't really know what it is, but there

4  has got to be a way to track it because we

5  are 50/50 on it.  You know, he gets half and

6  I get half."

7      A.    Well, I don't get nothing.

8      Q.    That's not what you said, sir, is

9  it?

10     A.    Okay.  Well, you can take it out

11 of -- I mean --

12     Q.    No, I'm not taking it out of

13 context, sir.

14     A.    You can say whatever you want to

15 say.

16     Q.    "You know, he gets half, and I get

17 half," what does that mean to you?

18     A.    I don't own half of it.

19     Q.    That means I don't own half, I'm

20 lying about the half now that I'm in trouble

21 with --

22     A.    I don't own any of it.

23     Q.    -- the bankruptcy court?

```
 1         A.     I don't own any of it.

 2                (Off-the-record discussion.)

 3                (Plaintiff's Exhibit 25 was marked

 4                 for identification.  A copy is

 5                 attached.)

 6         Q.     (BY MR. STOTSER) I show you

 7    Plaintiff's 25, which is a conversation from

 8    the Autauga County Jail on August 22nd,

 9    10:35, between you and Mr. Schmitt.  On page

10    6, it says that I know these phones are

11    recording my conversation so you don't want

12    to tell -- say too much.  You knew that,

13    right?

14         A.     Uh-huh, yes.

15         Q.     All right.

16         A.     Are you through with this?

17         Q.     We're getting close.

18                And from time to time during the

19    day, you would actually get them to put money

20    on different people's books; is that right?

21         A.     Yes.

22         Q.     To help them out?

23         A.     Yes.
```

1       Q.    Where did they get the money from

2  to do that?

3       A.    Whatever they had.

4       Q.    Did they ever tell you no, like

5  I'm not going to do it?

6       A.    Not if they had it.  If he didn't

7  have it, he would have, but if he had it --

8             MR. HOOKER:  Page 3.

9       A.    Oh, this?

10      Q.    Oh, okay.  On page 3, you were

11 talking about the fact that what you planned

12 on doing if you settled was getting your

13 lawyer to say that there was a clerical error

14 in the bankruptcy?  You said that a couple of

15 times, right?

16      A.    Yes, uh-huh.

17      Q.    So your lawyer would write a

18 letter saying there was a clerical error in

19 filing it so you wouldn't mess up

20 your credit?

21      A.    Clerical error as in --

22      Q.    Like you shouldn't have --

23      A.    Like we shouldn't have done it.

1    It was a -- it was --

2         Q.    Like filing it was --

3         A.    It was a business instead of a --

4    instead of -- it was a business deal instead

5    of my personal deal.

6         Q.    Okay.  So you should have never

7    filed it, and that would be -- that was what

8    you were going to get your lawyer to do to

9    save your credit if you settled?  That was

10   during the settlement, right?

11        A.    It was just an idea.

12        Q.    Okay.  You said it more than once.

13   That's why I was --

14        A.    It was an idea.

15        Q.    Okay.

16        A.    To see if he could do it, to see

17   if that was a possibility.

18              (Plaintiff's Exhibit 26 was marked

19               for identification.  A copy is

20               attached.)

21        Q.    (BY MR. STOTSER) Plaintiff's

22   Exhibit 26, August 25th, 2021, a conversation

23   at 1:32 between Mr. Bulger and Mr. Adams.  On

1    page 6, you're talking about that -- this is

2    what we talked about earlier.  You talked

3    about the automotive shop, and you say, "I

4    have been saying it the whole time...that

5    thing is a moneymaker.  That place is a

6    moneymaker"?

7         A.    It could be.

8         Q.    That's not what it says.  It

9    doesn't say "could be."  It says it is,

10   right?

11        A.    Uh-huh.

12        Q.    That's correct, right?

13        A.    Yes.  It could be, absolutely.

14        Q.    So when you said "it is," that's

15   not correct, is that --

16        A.    (No response.)

17        Q.    What business do you have in

18   Orlando?

19        A.    I don't have anything in Orlando.

20        Q.    You don't have any business

21   interest?

22        A.    No.

23        Q.    Do you have any in Georgia?

1      A.     No.

2      Q.     Do you have any interest in any

3 other state other than Alabama?

4      A.     No.

5      Q.     You don't have any business

6 interest or don't have any real estate?

7      A.     I don't have anything.

8      Q.     Is that your testimony?

9      A.     Yes.

10            (Off-the-record discussion.)

11     Q.     (BY MR. STOTSER) How many

12 expensive clocks do you have in that armoire?

13     A.     It's like that (indicating), them

14 things.  I don't know.

15     Q.     One of those (indicating)?

16     A.     Yeah.

17     Q.     How many of those do you have in

18 there?

19     A.     I think there's two.  Yeah, two.

20     Q.     Tell me about you had $17,000 in

21 taxes that went to Jimmy and Darreus

22 Automotive, for payment of taxes that Debbie

23 paid?

1    A.    Yeah.  And we did go over that.

2    Q.    Tell me about that.

3    A.    That was Jimmy and Darreus

4  Transportation.

5    Q.    When did you give her the 17,000

6  to pay those taxes, right before you went to

7  jail?

8    A.    No, uh-uh.  It was way before.  I

9  didn't know where it went, so she looked it

10 up and showed me where everything went.

11   Q.    Okay.  Did she pay taxes with it?

12   A.    No.  She paid bills with it.

13   Q.    Oh, so was it supposed to pay

14 taxes, is that what was supposed to happen

15 with it?

16   A.    Yes.

17   Q.    And that's what you thought was

18 going to happen?  What kind of taxes were

19 supposed to be paid?

20   A.    I don't know, whatever it was that

21 was owed.  I don't know.  I don't know the

22 kind of tax.

23        MR. STOTSER:  Let me do this.

1  Let's take about five minutes.  I'm going

2  to -- I've got one or two things, and then

3  we'll be done.

4           THE WITNESS:  Okay.

5           (Recess.)

6       Q.    (BY MR. STOTSER) One -- one

7  business I did not ask you about was Magnolia

8  Real Estate Services, LLC.  Tell me about

9  that business.

10      A.    I was going to do that, and I

11 didn't do it.

12      Q.    Well, you opened up the LLC?

13      A.    Right.

14      Q.    What business was supposed to be

15 conducted in that?

16      A.    Real estate company.

17      Q.    Real estate company.  Did you ever

18 own any property in that company?

19      A.    No.

20      Q.    Okay.  Why did you dissolve it

21 7/21/2021?

22      A.    I didn't want to do it.

23      Q.    And then who is Jennifer MacLeod?

1      A.     Ginger MacLeod.

2      Q.     Ginger, excuse me.  Who is Ginger

3  MacLeod?

4      A.     She -- she was going to be my

5  partner.  She's doing it on her own now.

6      Q.     And then she opened up Magnolia

7  Real Estate Services II, LLC?

8      A.     Yes.

9      Q.     So she was your partner in I and

10  then --

11     A.     Never did anything with it.

12     Q.     And then she opened up II?

13     A.     Uh-huh.

14     Q.     And she opened it within three or

15  four days after you closed the first one?

16     A.     Right.

17     Q.     And she used as the address

18  your -- your address, the Deatsville address?

19     A.     Yes.

20     Q.     And Ricky -- when Ricky opened up

21  Fortuitous, LLC, he used the Deatsville

22  address?

23     A.     Yes.  Debbie handles all that

1   stuff for them.

2       Q.    And when he opened Renaissance, he

3   opened it up at the Deatsville address,

4   correct?

5       A.    When he opened Renaissance?  Yes,

6   I think so.

7       Q.    Okay.

8       A.    Debbie handles all of it for them.

9       Q.    Okay.  On page 8, let's see, it

10  says -- and I'll show you this again.  But it

11  says -- you're talking about this, and you

12  say "Everything has to go in trust, and when

13  I get out, I can put everything back in my

14  name because the restraining order is off of

15  me."  Do you see that?

16      A.    Uh-huh.

17      Q.    What do you mean by that?

18      A.    Anything -- anything -- anything

19  that I do, I can put it in my name after

20  that.  Any business deals I do, I can put it

21  in my name.

22      Q.    What it says, sir, is everything

23  is in trust and has to stay in trust until

1  the restraining order gets out from under

2  you, and then you can put everything back in

3  your name.  What else can be put --

4      A.    I can go --

5      Q.    -- back in your name?

6      A.    I can go back to using my name.

7      Q.    Right.  So everything that's in

8  somebody else's name can be put back in your

9  name after the trust --

10      A.    I don't own anything, and no one's

11  holding anything for me.

12      Q.    That's not what that says, does

13  it?  What does it say?

14      A.    It says exactly what I'm telling

15  you.

16      Q.    No, it doesn't.  What does it say?

17      A.    Yes, it does.

18      Q.    It says --

19      A.    That's your determination.

20      Q.    -- everything is going to be in

21  trust.  Doesn't it say --

22      A.    Uh-huh.

23      Q.    -- everything has to stay in

1 trust?

2     A.    Yes.

3     Q.    And that everything can be put

4 back in my name when the restraining order is

5 off, right?

6     A.    Yes.

7     Q.    "Put back in my name" implies that

8 it was in your name, and it's going to be put

9 back in your name, correct?

10     A.    That's how you're taking it.

11         MR. STOTSER:  I think that's how

12 most people are.  That's all I've got.

13         THE WITNESS:  Great.

14     THUS CONCLUDED THE DEPOSITION OF

15         JAMES DEAN BULGER AT 1:20 P.M.

16

17

18

19

20

21

22

23

1                     C E R T I F I C A T E

2

3    STATE OF ALABAMA    )

4    JEFFERSON COUNTY    )

5         I hereby certify that the above and

6    foregoing proceeding was taken down by me by

7    stenographic means, and that the questions

8    and answers therein were produced in

9    transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a true

12   and correct transcript of the proceedings

13   occurring on said date at said time.

14        I further certify that I am neither of

15   counsel nor of kin to the parties to the

16   action; nor am I in anywise interested in the

17   result of said cause.

18

19        _____

20             SALLIE NESMITH GUNTER

21          CERTIFIED COURT REPORTER

22             ABCR LICENSE #37

23             EXPIRES 9/30/2022