1   IN THE UNITED STATES BANKRUPTCY COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5   IN RE:                )

6   JAMES D. BULGER,      )    CASE NO. 21-31333

7        Debtor.          )        CHAPTER 7

8

9

10
          DEPOSITION:  RICKY DARRELL ADAMS
11

12        DATE:  NOVEMBER 18, 2021

13

14

15

16

17  BEFORE:

18  Sallie NeSmith Gunter

19  Certified Court Reporter

20  Alabama Board of Court Reporting

21  License #37

22

23

1          <u>S T I P U L A T I O N S</u>

2        IT IS STIPULATED AND AGREED by

3 and between the parties through their

4 respective counsel that the deposition of

5 <u>RICKY DARRELL ADAMS</u> may be taken on November

6 18, 2021, before Sallie NeSmith Gunter,

7 Certified Court Reporter of the State of

8 Alabama, Alabama Board of Court Reporting

9 (ABCR) License Number 37, Commissioner and

10 Notary Public, at the law offices of Memory,

11 Memory & Causby, LLP, 469 South McDonough

12 Street, Montgomery, Alabama.

13        IT IS FURTHER STIPULATED AND AGREED

14 that the signature to and the reading of the

15 deposition by the witness is waived, the

16 deposition to have the same force and effect

17 as if full compliance had been had with all

18 laws and rules of court relating to the

19 taking of depositions.

20        IT IS FURTHER STIPULATED AND AGREED

21 that it shall not be necessary for any

22 objections to be made by counsel to any

23 questions except as to form or leading

1  questions, and that counsel for the parties

2  may make objections and assign grounds at the

3  time of trial or at the time said deposition

4  is offered in evidence or prior thereto.

5        IT IS FURTHER STIPULATED AND AGREED

6  that the filing of the deposition by the

7  court reporter is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

| | |
|---|---|
| 1 | <u>**APPEARANCES**</u> |
| 2 | <u>Appearing for the Creditors Pike Road</u> |
| 3 | <u>Investments and John William Kitchens</u>: |
| 4 | MASSEY STOTSER & NICHOLS, P.C. |
| 5 | By: Mr. Garrick L. Stotser, Esq. |
| 6 | By: Mr. Scott Patrick Hooker, Esq. |
| 7 | 1780 Gadsden Highway |
| 8 | Birmingham, Alabama 35235-3106 |
| 9 | rstotser@msnattorneys.com |
| 10 | shooker@msnattorneys.com |
| 11 | MEMORY MEMORY & CAUSBY, LLP |
| 12 | By: William Wesley Causby, Esq. |
| 13 | P.O. Box 4054 |
| 14 | Montgomery, Alabama 36103 |
| 15 | wcausby@memorylegal.com |
| 16 | <u>Appearing for the Debtor</u>: |
| 17 | CHRISTIAN & SMALL, LLP |
| 18 | By: Mr. Bill D. Bensinger, Esq. |
| 19 | 1800 Financial Center |
| 20 | 505 20th Street, North |
| 21 | Birmingham, Alabama 35203 |
| 22 | bdbensinger@csattorneys.com |
| 23 | Before: |

1  Sallie NeSmith Gunter,

2  Alabama Certified Court Reporter

3  ABCR License #37

4  Also Present:

5  Billy Kitchens

6  Greg Schmitt

7  (Mr. Schmitt was present, as noted herein,
   only for the proceedings beginning on page
8  103)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    I N D E X

2

3  WITNESS:  RICKY DARRELL ADAMS

4  EXAMINATION

5  By Mr. Stotser                            8

6  EXHIBITS

7  (For purposes of clarification, as used
   referring to exhibits marked herein,
8  "Plaintiff" refers to Creditors Pike Road
   Investments and John William Kitchens)

9

10  Plaintiff's Exhibit 27                    17

11     Notice of Deposition

12  Certificate of Court Reporter          105

13

14

15

16

17

18

19

20

21

22

23

1          I, Sallie NeSmith Gunter, a Certified

2    Court Reporter of the State of Alabama,

3    Alabama Board of Court Reporting (ABCR)

4    License Number 37, acting as Commissioner,

5    certify that on this date there came before

6    me at the law offices of Memory, Memory &

7    Causby, LLP, 269 South McDonough Street,

8    Montgomery, Alabama, on November 18, 2021,

9    beginning at or about 2:11 P.M.,

10   RICKY DARRELL ADAMS, witness in the above

11   cause, for oral examination, whereupon, the

12   following proceedings were had:

13              THE COURT REPORTER:  Would you

14   gentlemen like the usual stipulations again?

15              MR. BENSINGER:  Yes, that's fine.

16              MR. STOTSER:  That's perfectly

17   fine.

18              THE COURT REPORTER:  Would you

19   raise your right hand, please, sir, to be

20   sworn?

21

22

23

<u>**RICKY DARRELL ADAMS**</u>,

being first duly sworn, was examined and

testified as follows:

<u>**EXAMINATION**</u>

<u>BY MR. STOTSER:</u>

Q.   Have you ever had your deposition

taken before?

A.   No.  This is my first time.

Q.   Okay.  Let me sort of tell you how

it's going to go, and we'll try to get

through it just as quickly as we can.  I'm

just going to ask you a series of questions.

Some of it is going to be background, some of

it is going to be questions about what's

going on with Mr. Bulger's assets and just

going to try to get your best answer to the

questions.

A.   Right.

Q.   If you don't understand a

question, just ask me and tell me you don't

understand it.  I get going pretty quick, so

feel free to slow me down.  She had to do

that the last time.  So if you answer my

1  question, I'm going to assume you understand
2  it, okay?
3        A.    All right.
4        Q.    And we're going to -- you'll have
5  to answer out.  You're doing good, but you'll
6  have to answer.  You can't say uh-huh or
7  whatever, you have to answer yes or no,
8  because she can't get down those inflections,
9  and she wants to make sure.  Is that fair?
10       A.    Okay.  Yes.
11       Q.    If you need to take a break, let
12 me -- let me know.  Hopefully, we're going
13 to -- the plan is to try to get through a lot
14 quicker than the one this morning, that's the
15 goal.  So if we can just get this going,
16 we'll do it so --
17             And you know you're under oath
18 with your ques -- your answers, correct?
19       A.    Yes.
20       Q.    Okay.  So state your full name for
21 the record, please.
22       A.    Ricky Darrell Adams.
23       Q.    Is Darrell, is it spelled -- is

1   it --

2       A.    D-A-R-R-E-L-L.

3       Q.    Okay.  And where do you live,

4   Mr. Adams?

5       A.    Pine Level, Deatsville.

6       Q.    Pine Level?

7       A.    Yes.

8       Q.    What's your address?

9       A.    2211 U.S. Highway 31, North.

10      Q.    In Deatsville?

11      A.    Yes, 36022.

12      Q.    Okay.  How long have you lived at

13  that address?

14      A.    Three years.

15      Q.    Okay.  And who else lives there

16  with you?

17      A.    James Bulger and Greg Schmitt and

18  Kenny Shimek.

19      Q.    What is Kenny's last name?

20      A.    Shimek.

21      Q.    Do you know how you spell that?

22      A.    S-H-I-M-E-K, I think.

23      Q.    S-H-I-M-E-K?

```
 1          A.    M-E-K, yeah.
 2          Q.    Kenny Shimek.  Okay.  And Greg?
 3          A.    James Greg Schmitt.
 4          Q.    Schmitt, S-C-H-M-I-T-T?
 5          A.    Yes.
 6          Q.    Okay.  And then Jimmy Bulger?
 7          A.    Yes.
 8          Q.    Okay.  And who owns that
 9    residence?
10          A.    Me, Jeremy Richards.
11          Q.    You and Jeremy own the residence
12    at --
13          A.    2211 U.S. Highway 31.
14          Q.    When did you purchase that
15    property?
16          A.    Let's see.
17                (Off-the-record discussion.)
18          Q.    (BY MR. STOTSER) Are you still
19    thinking?
20          A.    Yeah.  I'm trying to remember.
21          Q.    I'm not trying to get you going
22    any faster than you're wanting to.  Any idea?
23          A.    I don't remember.  I really don't
```

1    recall.

2         Q.    Okay.  What did you pay for the

3    residence?

4         A.    I don't recall that.

5         Q.    Can you give me your best estimate

6    about what you paid?

7         A.    I don't know a number.

8         Q.    More than 10,000?

9         A.    I don't know a number.

10        Q.    Did you actually pay for it, or

11   was it just transferred -- given to you?

12        A.    I paid for it.

13        Q.    Who did the closing?

14        A.    I don't recall.  Maybe -- I'm not

15   going to say maybe.

16        Q.    What's your best guess?  I know

17   it's not perfect.

18        A.    Monica Mann.

19        Q.    Monica Mann.  When you bought it,

20   did anybody else purchase it with you?

21        A.    Not that I recall.

22        Q.    Was it purchased in your

23   individual name?

1          A.    My apartment that I -- that I --

2     the place where I stay?

3          Q.    Yeah.

4          A.    Yes.

5          Q.    Okay.  So you own your apartment

6     individually?

7          A.    Yes.

8          Q.    Do you know the source of any of

9     the funds that you paid?  Were they from any

10    particular source?

11         A.    I work.  I used to work at Fruit

12    of the Loom.

13         Q.    Okay.  So you just saved money?

14         A.    Yes.  I had a 401(k).

15         Q.    How much did you have in your

16    401(k)?

17         A.    I don't remember.

18         Q.    When did you work for Fruit of the

19    Loom, what were your employment dates?

20         A.    When did I?

21         Q.    Yeah, from when to when?

22         A.    2007.

23         Q.    Okay.  Through about when?

1    A.    2018.

2    Q.    Okay.  Did you have any other jobs

3 during that time, or was that your sole

4 income?

5    A.    Yeah, that was my sole income.

6    Q.    And after 2018, where did you go

7 work?  What was your next job?

8    A.    C-Squared Performance.

9    Q.    What's your -- what are your

10 duties and responsibilities of C-Squared?

11    A.    Manager.

12    Q.    What's your income that you make

13 from there?

14    A.    Forty-five a year.

15    Q.    Forty-five thousand?

16    A.    Yes.

17    Q.    Is it salary?

18    A.    Yes.

19    Q.    Okay.  And you get paid what,

20 weekly?

21    A.    Yes.

22    Q.    Okay.  So however that works out,

23 45,000 gets paid a certain amount per week.

1    Okay.  And you've been working there since

2    2018 to the present?

3         A.    Yes.

4         Q.    Okay.  Has that been your sole

5    source of income?

6         A.    Yes.

7         Q.    Okay.  And what's your birth date?

8         A.    11/28/1988.

9         Q.    When did you graduate from high

10   school?

11        A.    2007.

12        Q.    From around here?

13        A.    Yes.

14        Q.    Where?

15        A.    Westside Montgomery.

16        Q.    Westside.  Okay.  Did you go to

17   school after that or just go straight to

18   work?

19        A.    I went to college about two weeks.

20        Q.    Okay.  About as long as I wanted

21   to go.  Okay.  And then you went to work for

22   Fruit of the Loom?

23        A.    Yes.

1      Q.    Okay.  And then from there, you

2  went to work for C-Squared as a manager, and

3  you've worked as a manager for C-Squared from

4  that, so that gives your -- from 2007 to

5  2021, so that gives your employment history?

6      A.    No.

7      Q.    Okay.  It didn't.  Where else did

8  you work?

9      A.    No.  I worked CVS in 2007 when I

10  was in high school.

11      Q.    Okay.  Let's don't worry about --

12  I won't worry about your high school.

13          After -- when you started working

14  for Fruit of the Loom, after that did you

15  work anywhere else except for Fruit of the

16  Loom and C-Squared?

17      A.    Yes.

18      Q.    Where else?

19      A.    Fortuitous.

20      Q.    What is Fortuitous?

21      A.    The place we stay at, VRBO,

22  Airbnb.

23      Q.    This is your Airbnb?

1       A.    Yes.

2       Q.    Okay.  And the address of the

3  Airbnb is what?

4       A.    2011 [sic] U.S. Highway 31, North,

5  Deatsville.

6       Q.    When did you start the Airbnb?

7       A.    This year.  I don't know exact

8  date.

9       Q.    About how many months ago?

10      A.    I don't know exact date.

11      Q.    I'm not asking you exact, just

12  your best memory of when you started it.

13      A.    Probably -- what is this,

14  November?

15      Q.    Like this month?

16      A.    No, I'm saying this is November.

17      Q.    Oh, I'm sorry.  I'm sorry.

18      A.    I don't know.

19           (Plaintiff's Exhibit 27 was marked

20            for identification.  A copy is

21            attached.)

22      Q.    (BY MR. STOTSER) Let me show you

23  what's been marked as Plaintiff's 27.  And

1    this is where I've asked you to bring all the

2    financial records of any business entities

3    which you're involved in.  Do you -- do you

4    have any business entities in which you're

5    involved in other than Fortuitous?

6         A.    Yes, Renaissance Builders.

7         Q.    Okay.  Where do you bank with

8    Fortuitous?

9         A.    BBVA.

10        Q.    And who are the owners of that

11   entity?

12        A.    Me, Ricky Adams, Jeremy Richards,

13   and Gregory Schmitt.

14        Q.    What's your ownership interest?

15        A.    Thirty-three percent.

16        Q.    And do you have paperwork that

17   shows that you each have 33 percent of that

18   entity?

19        A.    Yes.

20        Q.    And who -- where is that lo --

21   who --

22        A.    I don't have it on me.

23        Q.    Who did that paperwork?

1      A.     Debbie Hudson.

2      Q.     Debbie Hudson?

3      A.     Yeah.

4      Q.     Does Mr. Bulger have any

5  involvement at all in Fortuitous?

6      A.     No.

7      Q.     No interest in it?

8      A.     No.

9      Q.     Okay.  When did you first get

10  your -- how long ago -- do you have people

11  staying in there this week?

12     A.     No.

13     Q.     When's the last time you had

14  people staying in there?

15     A.     A month ago.

16     Q.     How much do you charge them a

17  night?

18     A.     VRBO charges.  I don't know the

19  price.

20     Q.     High threes, low fours?

21     A.     I think that's -- well, yeah.

22     Q.     Okay.

23     A.     It's around on that -- on VRBO,

1   they set the price for the first bookings, I

2   think, on that situation.

3        Q.    Okay.  They set the price?

4        A.    They set the price.

5        Q.    How many rooms do they get for

6   that price?  Do they get the whole location?

7        A.    No.

8        Q.    What do they get?

9        A.    Master bedroom, bathroom, full

10  bath, full kitchen, full den, living room.

11       Q.    Who normally lives in the master

12  bedroom?

13       A.    No one.

14       Q.    No one is in there?

15       A.    No one.

16       Q.    How many bedrooms are in that

17  house?

18       A.    What do you consider as a bedroom?

19       Q.    Where there's a bed and somebody

20  sleeps.

21       A.    Okay.  Well, one -- 11.

22       Q.    And you own one of those bedrooms?

23       A.    Yes, as far as my apartment, as

1  far as Fortuitous.

2      Q.    So "as far as my apartment, as far

3  as Fortuitous," what does that mean?

4      A.    Fortuitous as the VRBO, that has

5  seven bedrooms.

6      Q.    Fortuitous has seven bedrooms?

7      A.    Yes.

8      Q.    And then you have a separate

9  apartment?

10     A.    Yes.

11     Q.    And you purchased that apartment?

12     A.    Yes.

13     Q.    You didn't purchase the other

14  seven bedrooms, did you?

15     A.    What you mean?

16     Q.    You bought your apartment you told

17  me?

18     A.    Okay.

19     Q.    You didn't buy the other seven

20  bedrooms, did you, you didn't purchase that?

21     A.    Me?

22     Q.    Yeah.

23     A.    No.

1      Q.    Okay.  But yet you're using that

2  for Fortuitous?

3      A.    Yes.

4      Q.    Okay.  When was the first time --

5  how many weddings have you had there?  Have

6  you had any?

7      A.    One wedding that I know of.

8      Q.    That was back in the summer?

9      A.    Yes, I think it was.

10     Q.    How much did they pay?

11     A.    I don't know.

12     Q.    You're one of the owners.  Who

13 would know?

14     A.    Jeremy Richards, if that's the

15 case.

16     Q.    How do you know what you're going

17 to get paid out of it?

18     A.    Jeremy Richards will inform me.

19     Q.    How much money have you put into

20 this Fortuitous, this entity?

21     A.    I don't know.

22     Q.    Whose furniture is being used for

23 the entity?

1          A.     I don't know whose furniture that

2    is.

3          Q.     Mr. Bulger owns that furniture,

4    doesn't he?

5          A.     I don't know.

6          Q.     You don't know?

7          A.     No.

8          Q.     It's not yours, right?

9          A.     It's not mine, right.

10         Q.     Okay.  So you don't know who owns

11   the furniture that is used as an asset in a

12   business which you own one-third of, that's

13   your testimony under oath?

14         A.     Yes.

15         Q.     Okay.  What other entities do you

16   have -- do you own or have an interest in?

17         A.     Renaissance Builders.

18         Q.     Tell me what kind of assets are in

19   Renaissance Builders.

20         A.     Houses, land.

21         Q.     How many houses?

22         A.     That I'm building or is owned

23   by --

1    Q.    Owned.

2    A.    None that I know.

3    Q.    You don't own any building in that

4    business?

5    A.    No.

6    Q.    Okay.  You're building houses?

7    A.    Correct.

8    Q.    Okay.  Where are you building the

9    houses?

10    A.    These houses are being built on

11    County Road 40.

12    Q.    County Road 40.  How many houses?

13    A.    Four there.

14    Q.    Four houses.  Where's the bank

15    account for those houses?

16    A.    At BBVA.

17    Q.    Whose name is on the bank account?

18    A.    Mine, Jeremy, and Ginger.

19    Q.    Who is Ginger?

20    A.    MacLeod.  She's a business

21    partner.

22    Q.    Is she a business partner in

23    Renaissance?

1        A.      Yes.

2        Q.      Who's the builder of those homes?

3        A.      What you mean?

4        Q.      What?

5        A.      What you mean?

6        Q.      Who's building the houses, you?

7        A.      Like who's --

8        Q.      Yeah.

9        A.      -- like doing the labor, like

10   actually out there?

11       Q.      Who's the home builder, is it

12   Renaissance.

13       A.      Renaissance Builders.

14       Q.      Okay.  They're the home builder?

15       A.      Yes.

16       Q.      Who is out there -- who has

17   completed any work or done anything in

18   furtherance of those houses?

19       A.      I don't know.

20       Q.      Well, have you gone out there and

21   worked on them?

22       A.      No.

23       Q.      You don't do --

1   A.  They subcontract out.

2   Q.  Do you do home construction?

3   A.  No.

4   Q.  Okay.  Does Jeremy do home

5 construction?

6   A.  I don't know.

7   Q.  You don't know what Jeremy does?

8 He lives with you, doesn't he?

9   A.  No, he doesn't.

10   Q.  Where does he live?

11   A.  I don't know his address.

12   Q.  Where does he live?  How do you

13 get --

14   A.  Montgomery.

15   Q.  Okay.  Does Billy -- Jimmy work on

16 the houses?

17   A.  No.

18   Q.  Okay.  He doesn't have anything to

19 do with them, does he?

20   A.  No.

21   Q.  Okay.

22   A.  He's an advisor.  He helps us,

23 tells us how to go about doing it.

1        Q.    What does he get paid?

2        A.    I don't know.

3        Q.    You own a business that you pay

4   somebody, and you don't have any idea what

5   you pay them?

6        A.    No, I don't.

7        Q.    Do you pay them more than a

8   dollar?

9        A.    I don't pay them.

10       Q.    Who pays them?

11       A.    That's not my job to pay.

12       Q.    What's your job in the business?

13       A.    I'm usually the inspector.  I

14   check on them, making sure things get

15   delivered, I get estimates.

16       Q.    Do you get paid out of this

17   entity?

18       A.    Yes.

19       Q.    How much money do you get paid?

20       A.    I haven't got paid yet but --

21       Q.    So you don't get paid?

22       A.    Eventually.

23       Q.    Hopefully?

1       A.      Yeah, eventually.

2       Q.      You hope to get paid, but you're

3  not getting paid?

4       A.      Right.

5       Q.      Does Jimmy get paid?

6       A.      Not that I know of.

7       Q.      Okay.  Were you a part of

8  Renaissance Build -- Builders I?

9       A.      No, I wasn't part of that.

10      Q.      So you had no business in

11 Renaissance Builders I, and the only business

12 you had was in Renaissance Builders II?

13      A.      II.

14      Q.      Okay.  You were not an officer,

15 director, owner, or agent of Renaissance

16 Builders I, correct, just of II?

17      A.      Yes.

18      Q.      Okay.

19      A.      II.

20      Q.      What other business entities do

21 you own or have an ownership interest in now?

22      A.      I think that's it.

23      Q.      Do you file tax returns?

1      A.    Yes.

2      Q.    Are you current in filing your tax

3   returns?

4      A.    No.

5      Q.    When's the last time you filed tax

6   returns?

7      A.    Last year.

8      Q.    2020?

9      A.    Yes.

10      Q.    Did you --

11      A.    No.  I filed this year.  I filed

12   this year.  I take that back.

13      Q.    You filed this year.  How much

14   money did you claim this year that you made?

15      A.    I don't remember.

16      Q.    Did you claim the money, any money

17   you made from Jimmy Bulger?

18      A.    I haven't made no money from him.

19      Q.    So if there's checks written to

20   you from Jimmy Bulger, you would deny that?

21      A.    Would I deny it?

22      Q.    Would you deny that you've got

23   checks from him?

1     A.    If it's checks, no, I -- if it's
2  checks, I won't deny it.
3     Q.    Okay.  But to your memory, you
4  haven't gotten paid anything from Mr. Bulger?
5     A.    No.
6     Q.    Okay.
7     A.    Unless it's C-Squared Performance.
8     Q.    No, not C-Squared.  I'm saying
9  individually, did you file -- did you claim
10 any tax money for any money that Mr. Bulger
11 paid you in 2020?
12    A.    I don't know about 2020.
13    Q.    Okay.  You don't have any
14 background in the building business, do you?
15    A.    Yeah.  I went to carpentry class,
16 I had carpentry class I went to, building.
17    Q.    In high school?
18    A.    Yeah.
19    Q.    Okay.  What else?
20    A.    That's about it.
21    Q.    Okay.  So tell me what you
22 inspect.  That's one of your job functions is
23 to inspect, right?

1      A.     Right.

2      Q.     Okay.  What do you do as an

3 inspector?

4      A.     Make sure the house is being

5 progressed.

6      Q.     How do you know if you have no --

7 if you don't have anything but a carpentry

8 class in high school, whether or not it is

9 proceeding the way it's supposed to and it's

10 proper?

11      A.     Because I can see a building going

12 up.

13      Q.     Anything else?

14      A.     What else, no.

15      Q.     Who prepared your tax returns?

16      A.     TurboTax.

17      Q.     Who pays for the utilities and

18 everything in your house -- in your

19 apartment?

20      A.     I don't know.

21      Q.     You don't know who pays for your

22 utilities?

23      A.     Greg Schmitt.

1    Q.    He pays for your utilities?

2    A.    Greg Schmitt.

3    Q.    Why is he paying for your bills?

4    A.    What you mean why?

5    Q.    I don't pay for Scott's bills.

6    A.    It would be good if he did.

7    Q.    It would be good.  So you're just

8  saying he out, of the goodness of his heart,

9  pays your utility and other bills?

10   A.    No, he just pays them.  I don't

11 pay them.

12   Q.    You don't pay them?

13   A.    No.

14   Q.    Okay.

15   A.    I don't go down to Alabama Power

16 and pay it, no.

17   Q.    Okay.  You don't pay water, gas,

18 anything, right?

19   A.    No.

20   Q.    You don't pay maintenance either,

21 do you?

22   A.    Maintenance?

23   Q.    On the house, on your apartment?

1    A.    No.

2    Q.    You don't pay taxes on the house?

3    A.    When they're due.

4    Q.    You pay taxes on your apartment?

5    A.    No.

6    Q.    You're telling me that you bought

7  an apartment there, and you own an apartment,

8  and that you got a deed on an apartment that

9  you bought that you paid for with money, but

10  you don't know how much?

11    A.    I don't remember.

12    Q.    That's your testimony, right?

13    A.    (Nodding.)

14    Q.    Where do you bank?

15    A.    Max, my personal account.

16    Q.    M-A-X?

17    A.    Yes.

18    Q.    Where is that, is that Montgomery?

19    A.    Yes.

20    Q.    Where -- what else?  Is that your

21  only bank account personally?

22    A.    I have a Guardian account.

23    Q.    Okay.  Is that in your individual

1   name?

2       A.      Shared.

3       Q.      With who?

4       A.      Jimmy, James Bulger.

5       Q.      Why would have an account with

6   him?

7       A.      We're friends.

8       Q.      Do you have bank accounts with any

9   other friends besides Mr. Bulger?

10      A.      As far as personal or business?

11      Q.      Well, personal first.

12      A.      No.

13      Q.      Okay.  So do you have -- how much

14  money is in that Guardian account with your

15  friend Mr. Bulger?

16      A.      Don't know.

17      Q.      Do you get bank statements?

18      A.      Probably so.  I don't see them.

19      Q.      Who does?

20      A.      I don't know.

21      Q.      Do you put the interest that you

22  make off the bank account on your tax

23  returns?

1    A.    I don't re -- I don't know about

2  that.

3    Q.    What bank accounts do you have

4  with your friends -- with your other friends

5  that are business related?

6    A.    Fortuitous, Renaissance Builders.

7    Q.    What other businesses or business

8  activities or investments have you ever had

9  with Mr. Bulger --

10    A.    I don't know any.

11    Q.    -- other than this Guardian

12  account?

13    A.    I don't know any.

14    Q.    You don't know any?

15    A.    No.

16    Q.    So he testified earlier that he's

17  had several with you over many years, over

18  the last eight years.  Was he lying?

19    A.    I don't know.  I can't speak for

20  him.

21    Q.    Well, speak for yourself.

22    A.    That's what I'm doing.

23    Q.    Are you telling the truth?

1      A.     About?

2      Q.     About the fact you haven't had any

3  business relationships with him.

4      A.     As far as what?

5      Q.     Business relationships on any

6  entity or anything else you've done,

7  investments or otherwise, other than this

8  Guardian account?

9      A.     That was personal.

10     Q.     That's your testimony under oath?

11     A.     You said that's personal.

12     Q.     Personal or business?

13     A.     Business, if we did, I don't

14 remember.

15     Q.     What would it take to jog your

16 memory as to whether or not you had any

17 accounts with him?

18     A.     Bank statements, I guess.

19     Q.     Okay.  Where would be bank

20 statements that you would have?

21     A.     That's what I'm asking [sic].  I

22 don't have them.

23     Q.     Do you know whether you've been in

1  any kind of business with Mr. Bulger other

2  than the Guardian account that you have with

3  him personally?

4       A.    As far as what type of business?

5       Q.    Any type of business, any type of

6  investment?

7             We may not need Greg until after

8  four.

9       A.    If so, I can't remember.

10      Q.    When's the last time you talked to

11  Mr. Bulger about this deposition, lunch?

12      A.    No.

13      Q.    Did you talk to him today about

14  his testimony?

15      A.    I just talked to him.

16      Q.    What did he say?

17      A.    They're going to ask you a lot of

18  questions.

19      Q.    What else did he say particularly?

20  He told you some particular information I

21  want you to know.

22      A.    That's all he told me.  That's all

23  I can remember.  I had a lot going on.

1      Q.    His statement was like less than

2  an hour ago.  You're being vague with me.

3  Are you telling the truth to this Court, you

4  don't have any memory other than he said he

5  asked a lot of questions?

6      A.    That's all I remember he told.  I

7  had a lot going on.  I was working.

8      Q.    You were working an hour before

9  you got here?

10     A.    Yes.

11     Q.    Okay.  And he called you up, and

12 he said -- your testimony is he said that

13 they're -- they have a lot of questions, and

14 that's all he said?

15     A.    They're going to ask you a lot of

16 questions.

17     Q.    He didn't ask -- tell you anything

18 else to look out for?

19     A.    Not that I remember.

20     Q.    How long was the conversation?

21     A.    Maybe like three minutes, I guess.

22     Q.    Look on your phone and see how

23 long it lasted.

1          A.     One minute.

2          Q.     One minute?

3          A.     Two minutes.

4          Q.     Two minutes.  Did you talk to

5     anybody else about your testimony today?

6          A.     No.

7          Q.     So you haven't even met with your

8     lawyer?

9          A.     I just met him.

10         Q.     That's it, you haven't talked to

11    him about it?

12         A.     Earlier about meeting here at two.

13         Q.     That's all?

14         A.     And how to come in the door.

15         Q.     What other businesses do you know

16    Mr. Bulger is in or has been in in the last

17    12 months?

18         A.     That's all I know.

19         Q.     You don't know --

20         A.     I don't know.

21         Q.     You don't know if Mr. Bulger has

22    any other business interests or any other

23    interest in any other businesses?

1      A.      No.

2      Q.      That's your testimony under oath?

3      A.      I don't know.

4      Q.      I'm asking you, do you know if he

5  has any other business interests at all in

6  the past year, do you know that?

7      A.      No, I don't.

8      Q.      You realize you're under oath?

9      A.      Yes.

10     Q.      You realize you could be put in

11  prison for contempt?

12     A.      Okay.

13     Q.      Do you realize that?

14     A.      Yes.

15     Q.      Have you gone to jail before?

16     A.      No.

17     Q.      Have you ever been arrested for

18  anything before?

19     A.      No.

20     Q.      Okay.  He's got a business in

21  Mexico, doesn't he?

22     A.      I don't know that.  That ain't got

23  nothing to do with me.

1    Q.   Did I ask you if it had anything

2  to do with you?

3    A.   No.  But --

4    Q.   What did I ask you?  I said, did

5  he have any business interests, and you said

6  no.

7    A.   And I said I don't know.

8    Q.   Okay.  You know he has a business

9  in Mexico, don't you?

10    A.   I don't know.

11    Q.   Do you remember talking to him

12  when he was in jail about a business in

13  Mexico?

14    A.   Oh, okay, I know what you're

15  talking about.  I know, you're talking about

16  the ATV place.

17    Q.   Right.  He owns an ATV company,

18  right?

19    A.   Not that I know of.  I know he

20  owns an ATV down there.

21    Q.   How many ATVs does he own?

22    A.   I don't know how many is down

23  there specifically.

1    Q.    You've been there.

2    A.    I don't know how many they've got

3 down there.  I don't know.

4    Q.    Tell me what you know about the

5 business, that business.

6    A.    It's an ATV rental.

7    Q.    ATV rental place?

8    A.    Yes.

9    Q.    Who is the guy that's working with

10 him in that?

11    A.    The guy I know is Emmanuel.  I

12 don't know his last name.

13    Q.    Okay.  You've talked to him on the

14 phone, right?

15    A.    Yeah, I've talked to Emmanuel.

16    Q.    You've talked to him about how

17 much money that business makes per day on

18 occasions, haven't you?

19    A.    He told me a figure before.

20    Q.    How much figure did he --

21    A.    I don't know what that figure was.

22    Q.    But he was making a certain amount

23 every day in that business, right?

1       A.      Yes.

2       Q.      And you've been down there?

3       A.      I have been down there.

4       Q.      More than once?

5       A.      Yes, I've been down there probably

6  twice.

7       Q.      You went down there after he got

8  out of jail, didn't you?

9       A.      Yes.

10      Q.      Okay.  Did you stay in the same

11  place you stayed before?

12      A.      What you mean?

13      Q.      Well, Mr. Bulger in jail told

14  you -- asked you where you stayed to make

15  sure you stayed at the same place you stayed

16  before.  Where did you stay?

17      A.      When I went down there?

18      Q.      Yeah.

19      A.      I stayed at a resort.

20      Q.      Where -- where is the location of

21  this ATV company?

22      A.      It's in Tulum.

23      Q.      Tulum, do you know how to spell

1    that?

2         A.    T-U-L-U-M.

3         Q.    T-U-L-U-M, Tulum, Mexico?

4         A.    Yes.

5         Q.    How many times have you been to be

6    Tulum, Mexico?

7         A.    I've probably been there like five

8    times.

9         Q.    Five times in the last how long?

10        A.    Probably three years.

11        Q.    Three years.  All for this

12   business?

13        A.    No.

14        Q.    How many for this business?

15        A.    I went down there to have fun.

16        Q.    How many times for this business

17   did you go?

18        A.    I didn't go for a business.  I go

19   to have fun.

20        Q.    How much time -- did Mr. Bulger go

21   with you in September or October of this

22   year?

23        A.    We only went once.  I only went

1  once with him this September, I think that's

2  when it was.

3       Q.    You talked about -- in jail about

4  going back after he got out of jail, that's

5  the trip you're talking about?

6       A.    Whenever he got out, yes, we went.

7       Q.    How many times in the past year

8  would it show on your passport that you

9  went -- that you went to Mexico?  If I got

10  your passport, how many times would it show

11  that you went to Mexico?

12       A.    This year?

13       Q.    This year?

14       A.    I went twice.

15       Q.    Okay.  And both of the times you

16  guys went by the ATV -- even if you didn't do

17  anything, you went by the ATV sales rental

18  place, right?

19       A.    No.

20       Q.    You didn't?

21       A.    I didn't.

22       Q.    You didn't even go by there?

23       A.    No.  Last time -- the second time,

1  yes.  But you said both times, no.

2       Q.    Okay.  The second time you did?

3       A.    Yes, the second time I did.

4       Q.    How many ATVs were sitting there

5  and how many were being used or not used that

6  time?

7       A.    I don't recall.

8       Q.    Well, give me your best estimate.

9       A.    About four.

10       Q.    Four were being used, or four were

11  not being used?

12       A.    Four I seen.

13       Q.    Four were there.  How many were --

14  how many were not --

15       A.    I don't know how many --

16       Q.    -- being used?

17       A.    I don't know how many were not

18  being used.

19       Q.    Let me ask you this:  Mr. Bulger

20  stated in one of the jail tapes that he owned

21  50 percent of the app for Fortuitous.  Is

22  that correct?

23       A.    No.

1        Q.    How much does he own?

2        A.    None.

3        Q.    So when he told you that on the

4  tape, he was lying to you?

5        A.    That just how he talks.

6        Q.    He just talks like I own this, and

7  I own this, even when he doesn't?

8        A.    Yeah, just how he talks.

9        Q.    Just.  You call -- do you refer to

10  him as "Boss Man" also?

11        A.    No.

12        Q.    Do others in the house?

13        A.    Not that I know of.

14        Q.    He even said in the deposition

15  before everybody referred him to "Boss Man."

16  That's not true?

17        A.    I don't call him that.  I can't

18  speak for nobody else.

19        Q.    Okay.  You've heard other -- you

20  can tell me if you've heard other people call

21  his "Boss Man."

22        A.    I can't tell you if I did.

23        Q.    Why can't you tell me?  I just

1    asked you.

2          A.    Because I don't know.  I don't be

3    around when somebody call him "Boss Man."

4          Q.    Okay.  You never heard that?

5          A.    No.  I just said that.

6          Q.    Okay.

7          A.    I don't know.

8          Q.    Okay.  And C-Spire, have you ever

9    had conversations with C-Spire about --

10   C-Squared, excuse me, about C-Squared, about

11   you and he buying that business away from is

12   it Chris?

13         A.    Chris Bowers.

14         Q.    Yeah.  You've had conversations

15   about buying that business away from Chris,

16   right?

17         A.    No.

18         Q.    So if I'm -- in a minute I'm going

19   to show you some jail tapes, and I'm going to

20   give you a chance to change your testimony

21   before I show them.

22         A.    I heard about giving Chris --

23   well, selling Chris his part.

1        Q.    And you two buying it and taking
2    it over?
3        A.    I heard, yeah, you're right.
4        Q.    Not heard, you're on the
5    conversation?
6        A.    Yeah, I heard about that.  Yeah.
7        Q.    You were a part of the
8    conversation?
9        A.    Yeah, I was.
10        Q.    Okay.  And on those tapes, you
11    said that you -- that he gets a check, that
12    Bulger gets a check every week that's put in
13    the -- is it put in a drawer or put in the
14    cash register?
15        A.    Put in a drawer.
16        Q.    Okay.  And that's been going on,
17    according to those tapes, for several months,
18    right?
19        A.    No, it hasn't been going on.
20        Q.    How long has that -- how long has
21    he been getting --
22        A.    It stopped for a while.  It
23    stopped, been stopped.

Q.   And then it -- but there were a
bunch of checks in there?

A.   He's got a lot of checks there.

Q.   Okay.  A lot of checks.  How much
are the checks for?

A.   His payroll was like 1300.

Q.   Thirteen hundred a week?

A.   Yes.

Q.   Okay.  And yours is whatever the
salary is per week, right?

A.   Yes.

Q.   Do you work there full time?

A.   Most of the time.

Q.   Okay.  Have you been to his
Gatlinburg cabin?

A.   His Gatlinburg cabin?

Q.   Yes.

A.   I've been to Gatlinburg.

Q.   To -- with him to a cabin owned by
him?

A.   I've been there.  I don't know if
he owned it.  I don't know.

Q.   Did he have a key and open up the

1   door when he got there?

2      A.    That don't mean he owns it but --

3      Q.    Is that what happened?

4      A.    No.

5      Q.    Does he own -- Cosby --

6      A.    Tom Crosby, okay.

7      Q.    Okay.  Does he own that cabin?

8      A.    I don't know.

9      Q.    Did he own the cabin?

10     A.    At one time I think he did.

11     Q.    Did you ever -- you went to the

12   cabin?

13     A.    Yes.

14     Q.    On more than one -- you've been

15   there several times?

16     A.    Yes.

17     Q.    Okay.  Does he have a safe in that

18   cabin?

19     A.    I don't know.

20     Q.    Has he ever told you that he's had

21   any kind of safe or any kind of safe where he

22   put money in that cabin?

23     A.    No.

1    Q.    Do you ever know of any cash that
2  he's had on hand?  Has he ever talked to you
3  about cash that he's had?

4    A.    Usually that's all he have.

5    Q.    That's what he normally has?

6    A.    Yeah.

7    Q.    Just cash?

8    A.    Yeah.

9    Q.    Has he ever talked to you about
10  how much money in cash he's had --

11    A.    No.

12    Q.    -- at any of his residences or up
13  at the cabin?

14    A.    No.

15    Q.    Have you ever known him to have
16  over $100,000 in cash?

17    A.    No.

18    Q.    Has he ever told you he's lost
19  $100,000 or more in cash?

20    A.    Yes.

21    Q.    How much has he told you he's
22  lost?

23    A.    It was over 100,000.

1    Q.    How much more?

2    A.    That's all I know.

3    Q.    What did he say, I've lost over

4    $100,000 in cash?

5    A.    Yeah, I've heard him say he lost a

6    lot of cash.

7    Q.    Did he say how much?

8    A.    No.

9    Q.    So you don't know if it was over

10   100 or less?

11   A.    It's got to be over 100.

12   Q.    Why?

13   A.    Because he was talking about that

14   lawsuit but --

15   Q.    Well, how much did he say he lost?

16   A.    It's been a lot.  He told me it

17   was a lot, like millions.

18   Q.    He's lost millions in cash?

19   A.    Yeah, that's what I -- as I

20   recall.

21   Q.    Where did the money go?

22   A.    I don't know.

23   Q.    You never had a conversation?

```
1        A.      No.

2        Q.      You don't know about --

3        A.      That wasn't my business.

4        Q.      I know that.  But on these jail

5   tapes, you talk a lot about being -- doing

6   things with him in business, and now you're

7   acting like you don't know nothing.

8        A.      No, about that I don't.

9        Q.      You don't know about any cash that

10  he's lost?

11       A.      No, only what he said.

12       Q.      What did he say?

13       A.      He lost cash.

14       Q.      When did he tell you that?  How

15  long ago did he tell you that?

16       A.      I don't know.

17       Q.      A week, two weeks, a month?  How

18  long ago did he tell you that?

19       A.      When this case started.

20       Q.      Okay.  When his case started in

21  circuit court or his case started in

22  bankruptcy court?

23       A.      The case with all of this going on
```

1    with him and Billy Kitchens, yeah.

2          Q.    Okay.  Do you know Billy Kitchens?

3          A.    I know of him.

4          Q.    Have you seen him?

5          A.    Yeah, I've seen him before.

6          Q.    Okay.  Okay.  So, I mean, he's not

7    a stranger to you, is he?

8          A.    No, he's not.

9          Q.    Okay.

10          A.    I haven't seen him in forever, but

11   I know of him.

12          Q.    Do you know what that lawsuit is

13   about?

14          A.    Not really.

15          Q.    Did you have anything to do with

16   all those remodel jobs with Alfa?

17          A.    No.

18          Q.    You didn't have anything to do

19   with them?

20          A.    No.

21          Q.    Did you know anything about them?

22          A.    I heard talk about it but --

23          Q.    What did you hear about it?

1      A.    Don't remember.

2      Q.    What talk did you hear about it?

3      A.    I don't remember.  I heard, but I

4 don't remember.  I don't recall.

5      Q.    Have you ever heard of Pinehurst,

6 LLC?

7      A.    No.

8      Q.    Mark Fuller, do you know Mark

9 Fuller?

10     A.    Not that I know of.

11     Q.    The property you're working on

12 with Renaissance Builders II, what is that,

13 what is that property?  Is that a house, two

14 houses, four houses?

15     A.    It's four houses on County Road

16 40.

17     Q.    When did you start building those?

18     A.    Probably like -- I don't remember

19 when they started.

20     Q.    Was it a year ago, two years ago?

21     A.    I don't remember.

22     Q.    Well, give me -- give me your

23 estimate.

```
 1          A.    I don't remember.

 2          Q.    I've got a check that we used in

 3    the other case that showed $20,000 of lumber

 4    in July of 2021.  Was it for that?

 5          A.    I don't know.

 6          Q.    Who is the builder of those

 7    houses, those four houses?

 8          A.    Renaissance Builders.

 9          Q.    Okay.  So Renaissance Builders is

10    the general contractor, and then it subs out

11    jobs to other people?

12          A.    Yes.

13          Q.    Okay.  Who owns the four houses?

14          A.    HIS Capital.

15          Q.    Who do you deal with at HIS

16    Capital?

17          A.    I deal with Stephanie.

18          Q.    And who's her boss?

19          A.    Ricky.

20          Q.    Did you meet Ricky down in Mexico

21    when you went the last time?

22          A.    I did.

23          Q.    Why did he show up in Mexico at
```

1  the ATV place?  What connection does he have

2  to the ATV place in Mexico?

3      A.  I don't know if he have a

4  connection.

5      Q.  Why would he just happen to be in

6  Mexico at the ATV place at the same time you

7  and -- you went with Mr. Bulger, didn't you?

8      A.  Where?

9      Q.  To Mexico the last time.

10     A.  Yes.

11     Q.  Okay.  Did you drive, fly?  How

12  did you get there?

13     A.  Fly.

14     Q.  Who paid for the tickets?

15     A.  I don't know what account paid for

16  them.

17     Q.  Do you know if it came from your

18  account or Mr. Bulger's?

19     A.  It came from -- I don't know which

20  account it came from.

21     Q.  So you just get tickets to go

22  places, and you don't know how they're paid

23  for?

1    A.    Yeah.

2    Q.    Do you know who pays for it?

3    A.    Best life.

4    Q.    It is a good life, it's a great

5    life.  What other things do you get paid from

6    somebody else that you don't know other than

7    your utilities and tickets on plane flights?

8    A.    That's all I know.

9    Q.    Who pays for your vehicle?

10   A.    What you mean?

11   Q.    Do you have a car?

12   A.    Yes.

13   Q.    What kind of car?

14   A.    A Bentley.

15   Q.    A Bentley.  Who pays for that?

16   A.    Nobody.

17   Q.    Is it paid for?

18   A.    Yes.

19   Q.    When did it get paid for?

20   A.    I've had this car -- when did I

21   get this?  I don't remember when I got it.

22   Q.    Who paid for it?

23   A.    Me.

1    Q.    Okay.  How much money did you pay

2  for it?

3    A.    I paid I think around about

4  50,000.

5    Q.    How did you get $50,000 to pay for

6  the vehicle?

7    A.    I saved money.

8    Q.    So you saved money from your Fruit

9  of the Loom job to pay for it?

10    A.    Yeah, 401(k).

11    Q.    401(k).  So you used 401(k) to pay

12  for the Bentley and to buy the apartment,

13  right?

14    A.    Yeah.

15    Q.    So when I go back and subpoena the

16  records for Fruit of the Loom, I'm going to

17  see enough money in there to pay for both of

18  those, is that your testimony?

19    A.    Yeah.  I save money.

20    Q.    I didn't say you didn't save

21  money.  I asked is that going to be your

22  testimony?

23    A.    No, that won't be the case then.

1          Q.     Well, are you telling me the

2     truth?

3          A.     I saved money.  I ain't just

4     saying that was Fruit of the Loom that paid

5     for it.

6          Q.     You said it came from your 401(k)

7     too?

8          A.     Yeah.

9          Q.     How much money was in your 401(k)

10    when you took it out?

11         A.     I don't remember when I did that.

12         Q.     What other things did somebody

13    else pay other than your utilities and your

14    tickets?  Who pays for your car insurance on

15    the Bentley?

16         A.     Myself.

17         Q.     You do, out of your checking

18    account?

19         A.     Yes.

20         Q.     Are you telling me the truth?

21         A.     Yes.

22         Q.     So it's coming out of your bank

23    account at where?

```
 1       A.    Max.

 2       Q.    Max.  So if I go to your bank

 3  account at Max, it's going to show a payment

 4  for your insurance out of that --

 5       A.    Yeah.

 6       Q.    -- for the Bentley?

 7       A.    Yeah.

 8       Q.    Didn't Mr. Bulger pay $25,000 to

 9  pay off that Bentley in July?

10       A.    I don't know.

11       Q.    You would know if he paid $25,000

12  for your vehicle, wouldn't you?

13       A.    How would I know that?

14       Q.    Are you kidding me?

15       A.    I don't know that.

16       Q.    You don't know?

17       A.    No, I don't know that.

18       Q.    Did Mr. Bulger tell you to

19  conveniently lose your memory about every

20  incident and every asset in this case?

21       A.    No.

22             MR. BENSINGER:  Object to the

23  form.
```

```
 1        Q.    What?

 2        A.    No.

 3        Q.    What did he tell you about -- did

 4   he tell you not to answer my questions

 5   truthfully?

 6        A.    No.

 7        Q.    Okay.

 8        A.    Why would anybody say that?

 9        Q.    So you're telling this judge, when

10   you stand before this bankruptcy judge in a

11   couple of weeks, you're going to tell her, I

12   have no idea he paid $25,000 for my Bentley

13   in July?

14        A.    I don't know.

15        Q.    Are you hiding assets for Mr.

16   Bulger?

17        A.    No.

18        Q.    You're not hiding any assets?

19        A.    No.

20        Q.    You know that's a crime.  Has he

21   given you any -- any property to hold?

22        A.    No.

23        Q.    You know you can go to jail if
```

1  you're lying about that?

2      A.    I don't have no property to hold.

3      Q.    He's not giving you any business

4  interests or any assets to hold during

5  these --

6      A.    No.

7      Q.    -- bankruptcy proceedings?

8      A.    No.

9      Q.    He's not?

10     A.    He haven't given me anything.

11     Q.    Has he told you to hold onto

12 anything?

13     A.    No, he haven't told me anything.

14     Q.    What kind of -- what kind of

15 personal property is in the garage there at

16 the Deatsville address?  Tell me what's of

17 any kind of value in the garage of all those

18 assets.

19     A.    Nothing I know of.

20     Q.    All the furniture, clocks,

21 chandeliers?

22     A.    I don't see all that in there.  I

23 don't know.  I haven't seen it.

1    Q.    You don't know about all that?

2    A.    I haven't seen it.

3    Q.    You don't remember Mr. Bulger

4  telling you about that in jail?

5    A.    It ain't at our property.

6    Q.    What?

7    A.    It's not at our property.  You

8  said at the house.  It's not in our garage.

9    Q.    Where is it?

10   A.    I know it was at Jeremy's house.

11   Q.    At Coosada Road?

12   A.    No, Jeremy's place.

13   Q.    Okay.

14   A.    He has a garage where some of his

15 furniture went.

16   Q.    So is some of Mr. Bulger's

17 property in Jeremy's house?

18   A.    That's what I know.

19   Q.    Okay.  What else is at Jeremy's

20 house that belongs to Mr. Bulger?

21   A.    That's all I know.

22   Q.    You went and signed on property in

23 Monica Mann's office, is that correct, just

1   within the last two to three months?

2        A.    Yes.

3        Q.    Okay.  What property did you sign

4   on?

5        A.    What's that, Airport Road?

6   Airport Road.

7        Q.    Tell me about that property.

8   Airport Road, what is that address?

9        A.    I don't know the address.

10       Q.    Okay.  How much acreage is it, or

11  what kind of property is it, a house?

12       A.    Six acres.

13       Q.    Six acres.  Okay.  And what did

14  you do put down for the purchase price for

15  the six acres?

16       A.    I don't know.  I don't remember.

17       Q.    Where did you get the money to buy

18  the property?

19       A.    HIS Capital.

20       Q.    They just came and gave you money

21  to buy six acres?

22       A.    Investment, building houses, the

23  same people that own County Road 40.

1        Q.    But you signed paperwork when you

2    went to Monica Mann's office.

3        A.    I remember that.

4        Q.    What did you sign?

5        A.    I don't remember.

6        Q.    Did you know you were signing the

7    paperwork, or did Mr. Bulger just tell you to

8    go down and sign paperwork and put it in your

9    name?

10       A.    No.

11       Q.    Tell me about the specifics of

12   this property, this six acres that you

13   bought.

14       A.    Went there to buy property for --

15   to build houses.

16       Q.    Okay.  Who, you individually?

17       A.    I went, Greg went, two people.

18       Q.    You and Greg individually bought

19   six acres?

20       A.    We both were there.

21       Q.    And you bought six acres at

22   Monica -- and you closed it at Monica Mann's

23   office?

1    A.    Yes.

2    Q.    Okay.  And how much money did you

3 pay down on that?

4    A.    I don't remember.

5    Q.    How much was the price of it?

6    A.    I don't remember.

7    Q.    Give me your best -- your best

8 estimate.

9    A.    I don't know.

10    Q.    You bought property within the

11 last three months, and you have no idea what

12 you paid for it?

13    A.    I don't remember.

14    Q.    Because it wasn't your property,

15 was it, it was Mr. Bulger's?

16         MR. BENSINGER:  Object to the

17 form.

18    A.    No.  We got advice.

19    Q.    What?

20    A.    We have an advisor.  He tells us

21 how to do things.

22    Q.    Your advisor tells you to go buy

23 property, buy property, and you just go sign

1    your name to it?

2         A.    Yes.

3         Q.    Okay.  Who set up the financing,

4    did you?

5         A.    Our advisor, me, I want to say HIS

6    Capital.

7         Q.    And what have you done with that

8    property since you bought it?

9         A.    I know bulldozed, I think a slab

10   there, fencing, a barn there.

11              MR. STOTSER:  Okay.  Let me take a

12   break.

13              (Recess.)

14        Q.    (BY MR. STOTSER) How did you get

15   here today?

16        A.    A vehicle.

17        Q.    Well, I figured that.  What kind

18   of vehicle?

19        A.    Smart Car.

20        Q.    Who owns that?

21        A.    I don't know his name.

22        Q.    You don't know the name of the

23   person that you drove his car?

1      A.     Last name Meeks.

2      Q.     Meeks?

3      A.     Yes.  I don't know his first name.

4      Q.     How did you come to have his car?

5      A.     He told me I could drive it.

6      Q.     Why did you drive his car when you

7  have your own car?

8      A.     Because he told me I could drive

9  his car.

10      Q.     There's a Cadillac Escalade.  Who

11  owns that car?  Is that Mr. Bulger's car?

12      A.     I don't know.  I think it's in his

13  name.  I don't know.

14      Q.     Okay.  And then the Bentley is in

15  your name?

16      A.     Yes.

17      Q.     Okay.  Is there a BMW?  Who owns

18  the BMW?

19      A.     I have a BMW.

20      Q.     Is that in your name too?

21      A.     Yes.

22      Q.     Okay.  What year is that BMW?

23      A.     2006.

1     Q.    And that's titled to you?

2     A.    Yes.

3     Q.    When did you -- when did you get

4  ownership of that?

5     A.    I don't know exactly what year I

6  bought that car.

7     Q.    Just your best guess.  Was it in

8  the last two years?

9     A.    (No response.)

10     Q.    I'm sorry, I didn't hear what you

11  said.

12          THE COURT REPORTER:  If he said

13  anything, I didn't hear it either.

14          MR. STOTSER:  Okay.

15     A.    2018.

16     Q.    (BY MR. STOTSER) 2018.  How much

17  did you pay for it?

18     A.    Fifty-five hundred.

19     Q.    Was that from the money you saved

20  or were earning too?

21     A.    Yes.

22     Q.    You paid for it, all of it?

23     A.    I was working.

```
 1        Q.    At Fruit of the Loom?

 2        A.    Yes.

 3        Q.    You paid for it out of your Max

 4   account?

 5        A.    I had cash.

 6        Q.    Did you get any of that cash from

 7   Mr. Bulger?

 8        A.    No.

 9        Q.    How much cash has Mr. Bulger given

10   you in the last 24 months?

11        A.    None.

12        Q.    None?

13        A.    That I know of.

14        Q.    He hasn't given you any money?

15        A.    Not that I know of.

16        Q.    Well, you would remember if

17   somebody gave you money, wouldn't you?

18        A.    Recently, yes.

19        Q.    Okay.  Has he given any money

20   recently?

21        A.    No.

22        Q.    Has he given any checks for

23   anything or any kind of -- money, checks, or
```

1  any kind of money whatsoever, has he given

2  you money for anything in the last four

3  months?

4        A.     No.

5        Q.     You haven't gotten any money from

6  him in the last four months?

7        A.     No.

8        Q.     Have you gotten money from anybody

9  except for C-Squared in the last four months?

10       A.     I got a check from Renaissance

11  Builders, I got a check from that account.

12       Q.     You told me you hadn't made any

13  money.  Just a minute ago I asked you if you

14  got any money out of Renaissance Builders,

15  and you said no, you have not, you hope to.

16  That was your testimony.  Are you changing it

17  now?

18       A.     I got a check -- I remember I

19  probably got a check from them in the last

20  four months.

21       Q.     Just a minute ago you said you

22  didn't get any money out of it.  Which one is

23  it?  Do you remember --

1          A.     Just a minute ago you said James

2    Bulger gave me money.  Renaissance Builders

3    is not James Bulger.

4          Q.     You told me a little while ago in

5    your testimony, I said have you got any money

6    out of Renaissance Builders, and you said no,

7    I hope to, but I have not.  Now you're

8    telling me you got money out of Renaissance

9    Builders.  You've been under oath both times,

10   you understand that?

11         A.     Yes.

12         Q.     Which time is truthful and which

13   time is not truthful?

14         A.     I got a check from there, yes, I

15   did.

16         Q.     So your former testimony was not

17   truthful?

18         A.     Yes.  I didn't get paid.  I got a

19   check from them to pay something.

20         Q.     Did you -- are you under any kind

21   of medication or have any kind of reason why

22   you cannot answer my questions truthfully

23   today?

```
 1              MR. BENSINGER:  Object to the
 2   form.
 3        A.    No.
 4        Q.    Is there any reason why you can't
 5   answer my questions truthfully?
 6              MR. BENSINGER:  Object to the
 7   form.
 8              MR. STOTSER:  What's wrong with
 9   that?
10              MR. BENSINGER:  Argumentative.
11        Q.    (BY MR. STOTSER) No, I'm just
12   asking him a question.  Is there any reason
13   why you cannot -- that you know that I should
14   know why you can't answer my questions
15   truthfully today?
16        A.    I've answered your questions the
17   best of my knowledge.
18        Q.    Okay.  So there is no reason?
19        A.    No reason.
20        Q.    Okay.  Where did you get the money
21   to open up Renaissance Builders?
22        A.    HIS Capital.
23        Q.    Where did you get the money for
```

1    the corporate formation of that entity?

2         A.    I don't know.

3         Q.    So you're opening up companies

4    that you don't know how you're paying for

5    them; is that your testimony?

6         A.    I was at the bank when we opened

7    it.

8         Q.    What bank is that?

9         A.    BBVA.

10        Q.    Okay.

11        A.    But at the time -- well, it was

12   BBVA.  It's PNC now.

13        Q.    Okay.  You were at the bank with

14   who?

15        A.    Me, Jeremy, and Ginger.

16        Q.    Does Ginger live at that location?

17        A.    No.

18        Q.    Okay.  You also opened -- there's

19   other entity that you've opened in the last

20   year you didn't tell me about, Magnolia Real

21   Estate Assistant, LLC.  Tell me about that

22   company.

23        A.    I don't know about that one.

1    Q.    It's in your name, it was in your
2    name.
3    A.    I don't recall that one.
4    Q.    How would a business be opened in
5    your name and you don't know anything about
6    it?
7    A.    I don't recall it.  Magnolia?
8    Q.    So to your knowledge, you did not
9    allow anybody to open up that entity in your
10   name; is that your testimony?
11   A.    Yes, I allowed.
12   Q.    Well, who did it?
13   A.    I want to say was it Debbie.
14   Q.    Do people just open up businesses
15   in your name without your knowledge a lot?
16   A.    No.  I know of them, but I don't
17   recall Magnolia.
18   Q.    Do you know of other businesses
19   that people opened up in your name without
20   your -- without your consent?
21   A.    No, I don't know.
22   Q.    Who paid the money to open up
23   Magnolia Real Estate Assistant, LLC?  You

1  have to pay money to the Secretary of State

2  when you open it.

3       A.    I don't recall that.  I don't

4  know.

5       Q.    Are people allowed to open up --

6  or create assets in your name without your

7  knowledge?

8       A.    No.

9       Q.    Is that okay?

10      A.    No.

11      Q.    Okay.  To your knowledge, does

12  Mr. Bulger pay any of your living expenses?

13      A.    No.

14      Q.    Who pays for your food, do you?

15      A.    Sometimes.

16      Q.    Okay.  Does he pay for it

17  sometimes too?

18      A.    No.

19      Q.    Who else pays for it?

20      A.    Dates.

21      Q.    Better man than me.  Do you know

22  of any properties that Jimmy Bulger has built

23  either in his name or any corporate names in

1  the past three years?

2       A.    I don't know.

3       Q.    How much money does Chris get out

4  of the automotive business?

5       A.    As far as his salary?

6       Q.    Uh-huh.

7       A.    A hundred thousand.

8       Q.    A hundred thousand a year?

9       A.    Yeah.

10      Q.    You remember when Mr. Bulger was

11  in jail, correct?

12      A.    Yes.

13      Q.    Okay.  And you and he had many

14  conversations while he was in jail; is that

15  correct?

16      A.    Yes.

17      Q.    And you knew when that tape

18  recording comes on, that tape recording says

19  that he's calling from Autauga County Jail

20  and that they're being recorded, correct?

21      A.    Yes.

22      Q.    So you knew you were being

23  recorded?

1    A.    Yes.

2    Q.    Okay.  And you remember making

3  phone calls from -- through August and

4  September, correct?

5    A.    Yes, if that's the time period.

6    Q.    Yeah, assuming it is.  I'll get

7  you to the times.  I'm going to show you what

8  we've previously marked as Plaintiff's

9  Exhibit 10, and it's a phone call between you

10  and Mr. Bulger, August 9th, 2:02.  Okay.  On

11  page 2, he asks you, he says, "Hey, y'all

12  were supposed to close on that 3.5 with

13  Monica," and you said, "I didn't know

14  [anything] about it."

15    A.    Uh-huh.

16    Q.    Do you see that?

17    A.    Uh-huh.

18    Q.    What -- how did you find out you

19  were supposed to close on property?  You

20  didn't know about it as of the date of

21  this -- the date of this recording.  When did

22  you find out that you were supposed to close

23  on property?

```
1        A.    I think it was that day.

2        Q.    So that day Mr. Bulger, who is

3   your advisor, told you to go down there and

4   close on property?

5        A.    Yes.

6        Q.    And you said, "I didn't know

7   [anything] about it," right?

8        A.    Yes.

9        Q.    And then later on, he said, I'm

10  waiting for "that money to drop," and you

11  said, "Money to drop."  What money was it

12  that was dropping?  It's at the bottom of

13  page 2.  Do you know what money that was

14  drop -- was supposed to drop?

15       A.    Yes.

16       Q.    What money is that?

17       A.    It was $3000.

18       Q.    What's the $3000?

19       A.    For Jimmy.

20       Q.    Three thousand dollars?

21       A.    Uh-huh.

22       Q.    That's what the money --

23             THE COURT REPORTER:  Is that yes?
```

1    A.    Yes, the 3000.

2    Q.    Tell me about what you know about
3  the $3000.

4    A.    I just know he gets it once a
5  month.

6    Q.    How long has he gotten it for?

7    A.    I don't know that.

8    Q.    He still getting it, right?

9    A.    I don't know.

10   Q.    How long did you know he got it?

11   A.    Those two months he was in jail is
12 all I know.

13   Q.    Who is Jake?

14   A.    I don't know Jake.

15   Q.    Page 4.

16   A.    I see it says Jake.

17   Q.    "He should have brought it to
18 [you].  So call him.  Did you talk to Jake?
19 Yeah, I talked to him."  I guess you know who
20 Jake is if you talked to him.

21   A.    I don't think that's his name,
22 though.

23   Q.    Okay.

1    A.    He's probably mistaken.

2    Q.    What do you think the guy's name

3  is?  You had -- you had Jimmy's cell phone,

4  didn't you?

5    A.    I did.

6    Q.    The whole time?

7    A.    Yes.

8    Q.    And there's somebody that's listed

9  under his cell phone as Cash?

10    A.    Yeah, but I don't think it's Jake.

11    Q.    Okay.  And you went and got money

12  out of the -- out of the mailbox, right?

13    A.    I didn't.

14    Q.    You didn't, you never got money

15  out of the mailbox?

16    A.    No, I didn't get it.

17    Q.    Who got it?

18    A.    Greg got it.

19    Q.    Greg got it.  And you asked him on

20  page 5, "What are we going to do with the

21  3000?  What do we do with it?"  See that on

22  page 5?

23    A.    Yes.

1    Q.    Okay.  And you said -- he said to

2    give it to Jeremy and keep him happy, right?

3    A.    Yes.

4    Q.    And then you said, I have 300 left

5    in my pocket?

6    A.    Yes.

7    Q.    And then he said, "Well, give him

8    two of it or something and then hold onto the

9    other..."  So you kept $1000 out of that

10    money?

11    A.    Yes.

12    Q.    Okay.  I thought you just told me

13    before you didn't get any money from Mr.

14    Bulger.

15    A.    I didn't get it from him.  He was

16    locked up.

17    Q.    Oh, okay, we're going to play that

18    game.

19    A.    No, I didn't.

20    Q.    So you got money -- you got money

21    that was his and put it in your -- you got

22    $1000 from that cash, you put -- you took it

23    and you gave the other 2000 to Jeremy,

1    correct?

2         A.    I did.

3         Q.    Okay.  So you have gotten money

4    from Mr. Bulger --

5         A.    Yes.

6         Q.    -- in the last four months?

7         A.    If this is the situation, yes.

8         Q.    You mean if I prove it to you?

9         A.    No.  I'm saying that I didn't get

10   it from him, but yeah.

11        Q.    Then on page 8, you said he told

12   you to call Monica's office and try to get

13   the paperwork straight.  Do you see that at

14   the bottom of page 8?

15        A.    Uh-huh.

16        Q.    Okay.  Did you call her?

17              THE COURT REPORTER:  Is that yes?

18        A.    Yes.

19        Q.    Did you call her?

20        A.    I don't think I did.

21        Q.    How did you get the paperwork

22   straight?

23        A.    I think Greg did that.

1      Q.    Okay.  What did you have to get

2   straight?

3      A.    I don't know.

4      Q.    And then I'm going to show you

5   what has been marked as Plaintiff's Exhibit

6   11.  That's the August 12, 2021,

7   conversation, that you had with Mr. Bulger.

8   On page 11, you're -- it's talking about that

9   automotive dealership, I think, on page 11

10  [sic]?

11     A.    Yes.

12     Q.    And you talk about part -- this is

13  what Jimmy says, "Part of the thing I want to

14  talk to him about.  Just give it to him, give

15  it to him, and that will help.  Maybe it will

16  boost it.  It will give him a place to go

17  because I can't keep paying all the damn

18  bills."  And you said, "I know."  And then he

19  said, "Out of my...money.  No paychecks."

20  He's talking about that business?

21     A.    Yes.

22     Q.    So he was paying those bills --

23     A.    Yes.

1       Q.    -- to your knowledge?

2       A.    At one point in time, yes.

3       Q.    And then it said he's pulling off

4  $100,000 a year.  That's where you got what

5  he was making a year, right?

6       A.    Yes.

7       Q.    I'm going to show you Plaintiff's

8  12, Friday the 13th conversation at 1:01.

9  Again, you knew these were being recorded,

10 right?

11      A.    Yes.

12      Q.    Okay.  And page Number 7 and 8,

13 we're talking about this Mexico property,

14 right?  "They wanted to buy" -- "They wanted

15 to buy you out of the ATV company," right?

16 Do you see that?

17      A.    Yes.

18      Q.    Okay.  "He sent the contract over

19 that the guy offered him about it"?

20      A.    Yes.

21      Q.    Okay.  So you told him about a

22 contract you saw where the guy offered

23 $50,000?

1   A.  Yes.

2   Q.  Okay.  So did the contract come to

3 the house?

4   A.  No.  It was email, I think.

5   Q.  It was emailed.  Okay.

6   A.  Or text.

7   Q.  Okay.  Did he go down there in

8 September to sell it?

9   A.  Not to my knowledge.

10   Q.  Well, what did he do after that?

11 You told him -- it says, "Tell him to sell

12 it."  Did you go back and text him back and

13 say yes?

14   A.  Yes.  I told him what he said,

15 Jimmy said sell it.

16   Q.  Okay.  And then you wrote the guy

17 back?

18   A.  Uh-huh.

19   Q.  And then what did he say, okay?

20   A.  He said no.

21   Q.  So your testimony under oath is he

22 emailed a contract?

23   A.  Uh-huh.

1    Q.    Offered to buy it for 50,000?

2    A.    Uh-huh.

3    Q.    Jimmy said yes?

4    A.    Uh-huh.

5    Q.    And then he said no?

6    A.    Right.

7    Q.    Does that make much sense to you?

8    A.    Uh-huh.

9    Q.    How does that make sense?

10   A.    Because the guy didn't --

11   Q.    He offered to buy it?

12   A.    He did.

13   Q.    He sent over a contract?

14   A.    He did.

15   Q.    He said it was 50,000?

16   A.    Yes.

17   Q.    Mr. Bulger said sell it?

18   A.    Yes.

19   Q.    You text back and said Mr. Bulger

20   is fine to sell it?

21   A.    Uh-huh.

22         THE COURT REPORTER:  You're going

23   to have to say yes or no.

1      A.    Yes.  Yes.

2      Q.    And then your testimony is the guy

3  wrote back and said --

4      A.    No.

5      Q.    -- no?

6      A.    He didn't want to sell it.

7      Q.    Okay.  And you knew this because

8  you had his phone?

9      A.    Yeah.

10     Q.    Do you remember one of those

11  projects that happened this summer where you

12  got $20,000 worth of lumber stolen off the

13  job site?

14     A.    No, I don't remember.

15     Q.    You don't?  Mr. Bulger testified

16  that there was money [sic] stolen off the job

17  site at one of those houses.  You don't

18  recall that?

19     A.    No.

20     Q.    So he's not the owner of it, you

21  are, and you don't know that there was money

22  stolen out of it?

23            MR. HOOKER:  Lumber.

1       Q.    Lumber stolen out of it?  Is that

2  your testimony?

3       A.    In what summer?

4       Q.    Yeah.

5       A.    This summer?

6       Q.    Yeah.  July, I'll say July-August

7  time period.

8       A.    This year?

9       Q.    Yes, sir.

10      A.    Yes, I do remember that now.

11      Q.    So --

12      A.    Jeremy told me about it.

13      Q.    Jeremy told you that there --

14      A.    There was lumber stolen.

15      Q.    Off of which job?

16      A.    One of those houses on County Road

17  40.

18      Q.    County Road.  It was Renaissance

19  Builders, right?

20      A.    Yes.

21      Q.    I show you Plaintiff's 15.  What

22  date does it have there at the --

23      A.    August 14th.

1          Q.     August 14th at 8:58?

2          A.     Yes.

3          Q.     Okay.  Was Mr. Bulger trying to

4    get Lonnie to move from the Coosada Road

5    property so he could turn that into an

6    Airbnb?

7          A.     Yes.

8          Q.     Did Lonnie move?

9          A.     No.

10         Q.     But he wanted him to, and you were

11   supposed to help him do that, right?

12         A.     Yes.

13         Q.     Okay.  Because he said he was

14   tired of paying those bills for Lonnie,

15   right?

16         A.     Yes.

17         Q.     Because Lonnie is sitting on his

18   ass making 600 a week, right?

19         A.     Yes.

20         Q.     So Lonnie wasn't working, but he

21   was getting it?  He was getting $600 a week

22   whether he was working or not, right?

23         A.     Yes, I guess.

1      Q.    And it said, "You ran Darreus
2 off."  What did you do to run Darreus off?
3      A.    I don't know.
4      Q.    Page 8, he said, "Well, you ran
5 Darreus off.  That shit was so funny.  You
6 ran that MF off."
7      A.    Probably one night we was at the
8 bar maybe.
9      Q.    What?
10      A.    I think when we was at the bar,
11 yeah.
12      Q.    How much business now is Jimmy and
13 Darreus Transportation doing?
14      A.    I don't know.
15      Q.    You've seen trucks still out
16 there?
17      A.    Out where?
18      Q.    Around your house.
19      A.    There's no truck there that I know
20 of.
21      Q.    Where did Jimmy and Darreus run
22 out of?
23      A.    It was out of Coosada Road.

1      Q.     Okay.  The Coosada Road?

2      A.     It was an office building out

3   there.

4      Q.     Is that where the property --

5   that's where the trucks were stored?

6      A.     Yeah.

7      Q.     Okay.

8      A.     At J&D Transport, I think that's

9   what it was called.

10     Q.     Okay.  J&B Transport?

11     A.     J&D.

12     Q.     D, I'm sorry.  Okay.  Did you ever

13  work for them?

14     A.     No.

15     Q.     Did you ever get any money from

16  that business?

17     A.     No.

18     Q.     Who is C.J.?

19     A.     A friend of Jimmy's.

20     Q.     What did C.J. want?

21     A.     I don't know.

22     Q.     You never talked to C.J. when he

23  was burning up the phone?

1      A.    No.

2      Q.    I show you what has been marked as

3  Plaintiff's Exhibit 16.  On page 6, Mr.

4  Bulger is always telling you to hold on tight

5  to the money to make it through the journey,

6  and he says that on page 6 again.  What does

7  he mean by that?  What journey are you guys

8  making it through?

9           MR. BENSINGER:  Hold on one

10  second.

11      A.    What money is he talking about?

12      Q.    What journey are you making?

13  You've got to make it through the journey.

14  You've got to hold on tight to the money to

15  make it through the journey.  "You know what

16  I'm saying?  You said, "Yeah."  You said,

17  "Yeah."  So what journey are you guys making

18  it through?

19      A.    The day he get out of jail.

20      Q.    Okay.  And you're supposed to hold

21  onto all the money, all that money.  Why does

22  he have any right to tell you what to do with

23  your money?

1        A.    He's the advisor.

2        Q.    He's the advisor.  How long had he

3  been the advisor?

4        A.    He's been my friend forever so --

5        Q.    That's not what I'm asking.

6        A.    I don't recall how long.  When he

7  opened Renaissance II.

8        Q.    About the time he was -- had the

9  injunction against him from doing any

10 business, he became an advisor of all of a

11 sudden?

12       A.    Yeah, about that time.  He

13 couldn't work, so advising was the next best

14 thing to do.

15       Q.    You see on page 10 [sic] where it

16 says that I've already had $20,000 worth of

17 lumber stolen because he won't listen?

18       A.    Yes.

19       Q.    We've already had that lumber

20 stolen.  What business was he in with you

21 when he said "we" already had that money

22 stolen?

23       A.    "We" was referring to Renaissance

1    Builders.

2         Q.    Why is it "we"?  What interest

3    does he have in Renaissance Builders?

4         A.    He's the advisor.

5         Q.    Oh, okay.  Let me show you

6    Plaintiff's Exhibit 20.  Who did -- who did

7    Jimmy pay payroll?  What kind of payroll did

8    Jimmy pay?

9         A.    Payroll?

10        Q.    Yeah.

11        A.    To?

12        Q.    Who did Jimmy pay payroll to?

13        A.    I know Debbie is on payroll.

14        Q.    Okay.  Whose payroll is Debbie on?

15        A.    I don't know.  I don't know.

16        Q.    You don't know who Debbie gets

17   paid by?  She provides services to you,

18   doesn't she?

19        A.    She does.

20        Q.    Okay.  You don't pay her?

21        A.    Jeremy probably goes in there and

22   pays her, sits down with her.  I don't be in

23   there.

1      Q.    You don't know who pays her or

2  what account it comes through, is that your

3  testimony?

4      A.    I don't know what account it comes

5  out of.  I know Jimmy has paid her before.

6      Q.    Who else did -- who else did she

7  do work for besides you?  She did work for

8  Mr. Bulger, didn't she?

9      A.    Yes.

10      Q.    Okay.  Did Mr. Bulger pay her?

11      A.    Yes.  I've seen her -- he pay her

12  before.

13      Q.    Okay.  And you -- she does work

14  for you, but do you pay her?

15      A.    No, I don't pay her.

16      Q.    Does she do work for Greg?

17      A.    Yes.

18      Q.    Does Greg pay her?

19      A.    I don't know.

20      Q.    Does Jeremy pay her?

21      A.    I don't know.

22      Q.    Do you know if anybody else pays

23  her?

1    A.    I don't know.

2    Q.    Do you see on page 3 where it said

3  I don't want Jeremy and Debbie collaborating

4  with each other, right?

5    A.    Uh-huh.

6    Q.    Was he worried about Jeremy?

7         THE COURT REPORTER:  Is that yes?

8    A.    Yes.

9    Q.    Was he worried about Jeremy

10  collaborating?  What was he worried about the

11  two of them talking about together?  That's

12  what he was saying, right?

13    A.    Yes.

14    Q.    Why was he worried about it?

15    A.    I don't think he -- that they

16  probably had some alliance going on.

17    Q.    And I said, well, Jimmy -- and

18  "Debbie was like, 'Well, Jimmy sold all those

19  trailers.  And he just put money back in the

20  business.  And we can go a few more months.'"

21  And then he said, "Well, bitch, I put all the

22  money in there, and I've [never] seen a damn

23  dollar of it back."

1          What business did he put it back

2    into?

3          A.    I don't know.

4          Q.    What was he -- why was he telling

5    you all about that if you don't have any idea

6    what he was talking about?

7          A.    Because that's between him and

8    Jeremy.  Just venting.

9          Q.    It doesn't sound like it is.  He

10   wasn't calling Jeremy from jail, he was

11   calling you.

12         A.    Yeah.  But just venting so --

13         Q.    When you were putting -- you put

14   money on his book, on Jimmy's book, right?

15         A.    Right.

16         Q.    Where did you get the money from?

17         A.    C-Squared.

18         Q.    From C-Squared?

19         A.    Yes.

20         Q.    Okay.  Where else?

21         A.    That's it.

22         Q.    Okay.  Did you get any from his --

23   did you have any of his credit cards?

1      A.    I didn't.

2      Q.    Okay.  On page 5, it says, "Every

3  week you write that 15 to old boy."  Who is

4  "old boy" on page 5?

5      A.    Chris.

6      Q.    Fifteen thousand?

7      A.    No, 1500.

8      Q.    To "old boy" is Chris?

9      A.    Yes.

10     Q.    So every week you're supposed to

11 write 15 to "old boy," right?

12     A.    That's his paycheck, yes.

13     Q.    Okay.  And right above that, it

14 says there's -- you say there's 48 in there.

15 Forty-eight thousand in where?

16     A.    C-Squared account.

17     Q.    And then it says "Get three and

18 give to Greg."  Do you see that?  And you

19 said, "Okay"?

20     A.    Oh, okay.  No.  No.

21     Q.    It wasn't C-Squared?

22     A.    That wasn't C-Squared.

23     Q.    Where was it?

1    A.    That was Renaissance Builders.

2    Q.    So he's telling you what to do

3  with your money in Renaissance Builders?

4    A.    Yes.

5    Q.    He's telling you to give it to

6  Greg, 3000?

7    A.    Yes.

8    Q.    For what?

9    A.    I think that was for bills.

10    Q.    How does he know what bills there

11  are when he's in jail?

12    A.    The same bills every month.

13    Q.    How does he know what the bills

14  are, the same exact bills every month?

15    A.    Yes.

16    Q.    I want you to show Plaintiff's

17  Exhibit 23, August 21st.  Do you see that?

18  That's a conversation between you and Mr.

19  Bulger that took place August 21st at 12:59?

20    A.    Yes.

21         MR. BENSINGER:  Is it okay if Greg

22  sits?

23         MR. STOTSER:  I don't care.

1           (Whereupon, Greg Schmitt entered
2             the deposition room.)
3      Q.    (BY MR. STOTSER) Okay.  In that --
4  look at page 7.  Page 7 says, "I will get
5  everybody to sign the house back over to me
6  and then I will go to the bank and borrow
7  money against it.  And I will probably buy
8  another cabin..."
9           So his idea was to take the -- for
10 you guys to give him back the property?
11     A.    Yes.
12     Q.    Okay.  And when was he going to --
13 you were going -- when were you going to deed
14 it back to him?
15     A.    I don't know.
16     Q.    Whenever he asked you to; is that
17 correct?
18     A.    I don't know when that would be.
19     Q.    But whenever he asked you to, that
20 was his plan, and you were going to do that?
21     A.    Yes.
22     Q.    Okay.
23     A.    Yes.

1          MR. STOTSER:  Let me take five

2    minutes.  Do you want to take a five-minute

3    break, and maybe we'll be almost done?

4          MR. BENSINGER:  Okay.

5          MR. STOTSER:  Let me sit in here,

6    if you don't mind, for five minutes.

7          MR. BENSINGER:  Sure.  Sure.

8          MR. STOTSER:  That way I can just

9    look and talk to them.

10          (Recess.)

11          MR. STOTSER:  We're going to close

12    out.  We have nothing further for Mr. Adams.

13          THUS CONCLUDED THE DEPOSITION OF

14          RICKY DARRELL ADAMS AT 3:55 P.M.

15

16

17

18

19

20

21

22

23

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA    )

4    JEFFERSON COUNTY    )

5           I hereby certify that the above and

6    foregoing proceeding was taken down by me by

7    stenographic means, and that the questions

8    and answers therein were produced in

9    transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a true

12   and correct transcript of the proceedings

13   occurring on said date at said time.

14           I further certify that I am neither of

15   counsel nor of kin to the parties to the

16   action; nor am I in anywise interested in the

17   result of said cause.

18

19           _____

20              SALLIE NESMITH GUNTER

21           CERTIFIED COURT REPORTER

22              ABCR LICENSE #37

23              EXPIRES 9/30/2022