1       IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5   IN RE:                )

6   JAMES D. BULGER,      )    CASE NO. 21-31333

7          Debtor.        )       CHAPTER 7

8

9

10          DEPOSITION:  JAMES GREGORY SCHMITT

11

12            DATE:  NOVEMBER 18, 2021

13

14

15

16

17  BEFORE:

18  Sallie NeSmith Gunter

19  Certified Court Reporter

20  Alabama Board of Court Reporting

21  License #37

22

23

1 S T I P U L A T I O N S

2    IT IS STIPULATED AND AGREED by

3 and between the parties through their

4 respective counsel that the deposition of

5 JAMES GREGORY SCHMITT may be taken on

6 November 18, 2021, before Sallie NeSmith

7 Gunter, Certified Court Reporter of the State

8 of Alabama, Alabama Board of Court Reporting

9 (ABCR) License Number 37, Commissioner and

10 Notary Public, at the law offices of Memory,

11 Memory & Causby, LLP, 469 South McDonough

12 Street, Montgomery, Alabama.

13    IT IS FURTHER STIPULATED AND AGREED

14 that the signature to and the reading of the

15 deposition by the witness is waived, the

16 deposition to have the same force and effect

17 as if full compliance had been had with all

18 laws and rules of court relating to the

19 taking of depositions.

20    IT IS FURTHER STIPULATED AND AGREED

21 that it shall not be necessary for any

22 objections to be made by counsel to any

23 questions except as to form or leading

1   questions, and that counsel for the parties

2   may make objections and assign grounds at the

3   time of trial or at the time said deposition

4   is offered in evidence or prior thereto.

5        IT IS FURTHER STIPULATED AND AGREED

6   that the filing of the deposition by the

7   court reporter is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | **Appearing for the Creditors Pike Road** |
| 3 | **Investments and John William Kitchens:** |
| 4 | MASSEY STOTSER & NICHOLS, P.C. |
| 5 | By:  Mr. Garrick L. Stotser, Esq. |
| 6 | By:  Mr. Scott Patrick Hooker, Esq. |
| 7 | 1780 Gadsden Highway |
| 8 | Trussville, Alabama 35235-3106 |
| 9 | rstotser@msnattorneys.com |
| 10 | shooker@msnattorneys.com |
| 11 | MEMORY MEMORY & CAUSBY, LLP |
| 12 | By:  William Wesley Causby, Esq. |
| 13 | P.O. Box 4054 |
| 14 | Montgomery, Alabama  36103 |
| 15 | wcausby@memorylegal.com |
| 16 | **Appearing for the Debtor:** |
| 17 | CHRISTIAN & SMALL, LLP |
| 18 | By:  Mr. Bill D. Bensinger, Esq. |
| 19 | 1800 Financial Center |
| 20 | 505 20th Street, North |
| 21 | Birmingham, Alabama  35203 |
| 22 | bdbensinger@csattorneys.com |
| 23 | Before: |

1  Sallie NeSmith Gunter,

2  Alabama Certified Court Reporter

3  ABCR License #37

4  Also Present:

5  Billy Kitchens

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1               I N D E X

2

3  WITNESS:  JAMES GREGORY SCHMITT

4  EXAMINATION

5  By Mr. Stotser                          7

6  EXHIBITS

7  (For purposes of clarification, as used
    referring to exhibits marked herein,
8  "Plaintiff" refers to Creditors Pike Road
    Investments and John William Kitchens)

9

10  Plaintiff's Exhibit 28              26
    Regions Bank Records of James Gregory Smith
11  Account # 0271321098

12  Certificate of Court Reporter       81

13

14

15

16

17

18

19

20

21

22

23

1           I, Sallie NeSmith Gunter, a Certified

2    Court Reporter of the State of Alabama,

3    Alabama Board of Court Reporting (ABCR)

4    License Number 37, acting as Commissioner,

5    certify that on this date there came before

6    me at the law offices of Memory, Memory &

7    Causby, LLP, 269 South McDonough Street,

8    Montgomery, Alabama, on November 18, 2021,

9    beginning at or about 4:00 P.M.,

10   JAMES GREGORY SCHMITT, witness in the above

11   cause, for oral examination, whereupon, the

12   following proceedings were had:

13                THE COURT REPORTER:  Usual

14   stipulations again, gentlemen?

15                MR. BENSINGER:  That's fine.

16                MR. STOTSER:  Yes, ma'am.

17                THE COURT REPORTER:  All right.

18   Would you raise your right hand, please, sir,

19   to be sworn?

20

21

22

23

1          **JAMES GREGORY SCHMITT**,

2   being first duly sworn, was examined and

3   testified as follows:

4                    **EXAMINATION**

5   **BY MR. STOTSER:**

6        Q.    Would you state your name, please,

7   for the record?

8        A.    James Gregory Schmitt.

9        Q.    Mr. Schmitt, have you ever had

10  your deposition taken before?

11       A.    No.

12       Q.    Okay.  I'm going to -- your

13  attorney has probably advised you about this.

14  Mr. Bensinger is your attorney, correct?

15       A.    Yes.

16       Q.    Okay.  When did you retain him?

17       A.    August?

18       Q.    He's not going to answer your

19  question.  You've got to get the best you

20  can.

21             When were you -- when did you

22  retain his services?

23       A.    The first of August.  I don't know

1    the -- I don't know the exact date.

2         Q.    So the beginning of August.  Was

3    it before or after Mr. Bulger went to jail?

4         A.    After.

5         Q.    How long after, assuming I think

6    it was the 5th?

7         A.    Yes.

8         Q.    After that?

9         A.    Yes.

10        Q.    Okay.  Do you have any idea, now

11   that I've mentioned that, how much after

12   that?

13        A.    I don't know the -- no.

14        Q.    Where do you -- where are you

15   employed?

16        A.    I am a part of a venue, the event

17   venue, Fortuitous event venue.  I own it with

18   two other people.

19        Q.    Who do you own that with?

20        A.    Jeremy Richards and Ricky Adams.

21        Q.    How long have you owned that

22   entity?

23        A.    A little over a year.

1      Q.    Is that the event venue that does

2    Airbnb?

3      A.    Yes.

4      Q.    Okay.  When was the first time you

5    had anybody use the Airbnb in the last year?

6      A.    June, I believe.  I can't remember

7    the exact date.

8      Q.    Around June, this summer around

9    June --

10     A.    Yes.

11     Q.    -- of 2021?  And the Airbnb is

12   located where?

13     A.    2211 -- do you want the address?

14     Q.    Yes, sir.

15     A.    2211 U.S. Highway 31, North,

16   Deatsville, Alabama.

17     Q.    Who owns that property?

18     A.    I do.

19     Q.    You own the Deatsville property?

20     A.    With two others.

21     Q.    Who do you own --

22     A.    Jimmy James Bulger, LLC, owns it.

23     Q.    And who are the members of Jimmy

1    James Bulger, LLC?

2        A.    Myself, Jeremy Richards, and Ricky

3    Adams.

4        Q.    And when did you buy that?

5        A.    It was a little over a year ago.

6        Q.    Okay.  What did you pay for that?

7        A.    I can't remember the exact.

8        Q.    Give me your best judgment.

9        A.    Jimmy -- Jimmy gave it -- me an

10   apartment when he built it, gave me an

11   apartment because I gave him -- I loaned him

12   money.

13       Q.    Okay.  You did a loan to him and

14   just --

15       A.    My 401(k), inheritance, and that's

16   part of the payback.

17       Q.    Okay.  You loaned him 401(k), and

18   you loaned him some of your inheritance?

19       A.    Yes.

20       Q.    And then he gave you an apartment?

21       A.    Apartment, and I -- yes.  I had my

22   say in how it was built.

23       Q.    Okay.  And how much of a loan did

1    you give him?

2         A.    It was -- I'm not sure of the

3    exact.  That was so long ago.  That was ten

4    years ago.

5         Q.    Ten years ago you loaned him

6    money?

7         A.    Yes.

8         Q.    Give me your best estimate how

9    much money you loaned him ten years ago.

10        A.    It was -- it was probably close to

11   200,000.

12        Q.    How did you have $200,000 ten

13   years ago?

14        A.    When I quit my job.

15        Q.    What job did you quit?

16        A.    Walmart, 2009.

17        Q.    How long did you work for Walmart?

18        A.    Twenty-four and a half years.

19        Q.    So you worked for Walmart for 24

20   and a half years.  What was your last job

21   with Walmart?

22        A.    With -- with --

23        Q.    Walmart, what was your last

1    position there that you held?

2        A.    In the transportation office, I

3    worked in the dispatch office.

4        Q.    Okay.  You were a dispatcher?

5        A.    I was a driver coordinator.

6        Q.    Driver coordinator.  And then when

7    you retired, you had saved that, or you had

8    that in a 401(k), or what?

9        A.    It was a retirement and then my

10   dad's inheritance.

11       Q.    And that came --

12       A.    My dad passed away.

13       Q.    And that came up to $200,000?

14       A.    Around that, yes.

15       Q.    And you loaned him that ten years

16   ago?

17       A.    Yes.

18       Q.    Okay.  And how much did he pay you

19   back?

20       A.    That was his way of paying me

21   back, to give me the apartment and

22   different -- and -- and to the house.

23       Q.    Do you have a copy of the

1   promissory note where you loaned him the
2   money?
3       A.   I don't know where it's at.  I
4   could probably find it.
5       Q.   Okay.  Would you look for that and
6   give that to your attorney?
7       A.   Sure.
8       Q.   And then so I would be able to
9   see -- tell me what bank account you got the
10  money out of that you gave him.  Where did
11  that come from?  What account did that come
12  out of?
13      A.   Well, it was a check that Walmart
14  gave me.  It was Compass Bank, I think.
15      Q.   Okay.  So where do you bank right
16  now?
17      A.   Regions.
18      Q.   You bank at Regions now?
19      A.   Yes.
20      Q.   Where did you bank then when
21  you --
22      A.   Compass.
23      Q.   -- gave him the money?  At

1  Compass.  So your testimony is that we'll

2  find a $200,000 check that came out to you?

3       A.    No.   No.   It will be -- it won't

4  be 200,000.  A lot of it was in cash, I got

5  it in cash.

6       Q.    So there would be cash withdrawals

7  from the Compass account that would make up

8  some of the $200,000 which you gave him?

9       A.    No.  I cashed -- I cashed it out

10 and had cash with me.  And then that's the

11 way I did, I did cash.

12      Q.    You cashed out what?

13      A.    My retirement from Walmart.

14      Q.    And you -- you're telling me that

15 you cashed out your retirement from Walmart,

16 you got all that money in cash, and you gave

17 it to him?

18      A.    Yes.  Most of it, yes.

19      Q.    Okay.  And you realize you're

20 under oath today?

21      A.    Yes, I know.  I'm telling the

22 truth.

23      Q.    Okay.  And you gave him $200,000,

1    and how many years was it before he paid you

2    anything?

3         A.    He's -- he's always helped me out.

4    I don't know exactly.  But when he built this

5    house, that apartment was assigned to me.

6    That is mine.  I've got the deed to it.

7         Q.    You have a deed to an apartment?

8         A.    Yes.

9         Q.    Okay.

10        A.    Deed to the house.  I'm a third-

11   owner of the house.

12        Q.    Who did the closing?

13        A.    It was -- I don't know.

14        Q.    How many closings have you been

15   involved in in the last three years, real

16   estate closings?

17        A.    I don't know.

18        Q.    More than one?

19        A.    No.

20        Q.    Well, then you don't remember

21   where you closed the loan?

22        A.    I don't know.

23        Q.    You know you closed the loan -- do

1  you know who Monica Mann is?

2        A.    Yes.  I forgot about that.  Yeah.

3        Q.    That's where you closed the loan,

4  wasn't it?

5        A.    Yes, I did close one there in

6  August.

7        Q.    Okay.  Do you file your taxes

8  every year?

9        A.    Yes.

10       Q.    Okay.  Did you file your last

11  taxes for 2020?

12       A.    Yes.

13       Q.    Okay.  How much did you claim as

14  income?

15       A.    I can't remember.

16       Q.    Give me your best estimate.

17       A.    I don't remember.

18       Q.    Well, you've got to have an

19  estimate what money you were making.

20       A.    I do not know.

21       Q.    Who did your -- who did your

22  taxes?

23       A.    National Tax Experts do it.

1    They've got me -- I had some problems.

2          Q.    What problems did you have?

3          A.    Tax problems.

4          Q.    What -- I don't -- we all have tax

5    problems.  What kind of problems did you have

6    with taxes?

7          A.    With the IRS.

8          Q.    From not paying taxes?

9          A.    Yes.  But they've got me

10   straightened out.

11         Q.    Okay.  What money have you made in

12   2021 from any source?

13         A.    The only money I make, we're just

14   starting that venue.

15         Q.    Fortuitous?

16         A.    Fortuitous.  We're just starting

17   it, so it's not really making anything.  But

18   I go to -- I go to Jimmy Bulger and ask him

19   for money when I need it.

20         Q.    How much money have you gotten

21   from Jimmy Bulger in this year when you

22   needed it?

23         A.    A few thousand, I guess.  I'm not

1    sure.

2         Q.    And you just get money when you

3    need it?

4         A.    Yes, just when I need it.

5         Q.    Would that be the same for 2019

6    and 2020?

7         A.    Yes.

8         Q.    How much money would you have

9    gotten from him in 2020?

10        A.    Probably close to -- I don't know.

11   I don't know the exact.

12        Q.    Well, I'm not asking -- I know you

13   don't know exact.  Give me your best

14   estimate.

15        A.    Thirty-five thousand.

16        Q.    Okay.  In 2019, how much money

17   would you have gotten from Mr. Bulger?

18        A.    About the same.

19        Q.    Would you have gotten it by cash,

20   check, or what?

21        A.    Cash.

22        Q.    So each time he would have given

23   you 35,000 in cash?

1       A.    He deals with cash, yes.

2       Q.    How much cash in the last three

3 years have you seen or known that he has had?

4 How much money in cash have you known or seen

5 that he's had?

6       A.    A lot.  I don't know.  I don't

7 know.

8       Q.    What's "a lot"?

9       A.    I don't know the exact.  I do not

10 know.

11      Q.    And I know you're not going to

12 know dollar for dollar.  I'm asking you for

13 your best idea about how much money he has in

14 cash.

15      A.    I do not know.

16      Q.    How much money has he told you

17 he's had in cash in the last three years?

18      A.    I do not know.

19      Q.    Has he said he's lost or had any

20 money that has been taken or stolen?

21      A.    I do not know.  We do not discuss

22 business like that.

23      Q.    Your testimony under oath is you

1    don't discuss business with Mr. Bulger?

2         A.    No.

3         Q.    Okay.  So if these jailhouse -- do

4    you remember talking to Mr. Bulger while he

5    was in jail?

6         A.    Yes.

7         Q.    Did you discuss business while he

8    was in jail?

9         A.    We discussed different things.

10         Q.    Did you discuss business dealings

11    while he was in jail?

12         A.    No.

13         Q.    You did not.  So when I have your

14    recorded statements where you're talking

15    about business, are you lying to me about

16    that?

17         A.    No, I am not lying.

18         Q.    Okay.  So when I show you these

19    recordings where you had conversations with

20    him in jail about businesses, you're telling

21    me that that's not true?

22         A.    I discussed money with him, yes.

23         Q.    You just told me you don't discuss

1  things like that with him.  I'm trying to get

2  the truth.  Did you discuss -- have you

3  discussed money with him?

4       A.   Yes, I've discussed money with

5  him.

6       Q.   It would be easier if you told me

7  the truth the first time, sir.  So how much

8  money did he tell you he's had in cash over

9  the years?

10       A.   I do not know.

11       Q.   Has he given you any idea whether

12  he's had any cash, lost any cash, or spent

13  any cash on anything in the last three years?

14       A.   I do not know.

15       Q.   You have no idea?

16       A.   Do not know.

17       Q.   He's never told he's lost a bunch

18  of money?

19       A.   I do not know.

20       Q.   He's never told you he's had a lot

21  of money?

22       A.   I do not know.

23       Q.   When is the last time you talked

1  to Mr. Bulger?

2  　　　A.　　Today.

3  　　　Q.　　Okay.  What did he tell you about

4  your testimony today?

5  　　　A.　　We didn't really discuss it.  He

6  just said just to answer the questions.

7  　　　Q.　　He didn't talk to you about it.

8  How long did you talk to him?

9  　　　A.　　A few minutes in passing, and that

10 was it.

11 　　　Q.　　He came back to where you were

12 located and talked to you about it?

13 　　　A.　　Yes.

14 　　　Q.　　What -- did he say anything

15 specifically at all about your testimony

16 today?

17 　　　A.　　No.

18 　　　Q.　　Nothing?

19 　　　A.　　No.

20 　　　Q.　　Okay.

21 　　　A.　　He just said answer the questions.

22 　　　Q.　　Who pays for your utilities at

23 your address?

1          A.     We do.

2          Q.     Who's "we"?

3          A.     I go to Jimmy Bulger, and he gives

4    me the money.  I tell him what we need for

5    the utilities and insurance, and I pay them.

6    I pay all the bills.

7          Q.     He gives you the money, and then

8    you pay the bills?

9          A.     Yes.

10         Q.     Okay.  So you're the bill payer

11   for the house?

12         A.     Yes.

13         Q.     Okay.  Are you the bill payer for

14   the personal -- his personal property, like

15   cars, anything else he owes?

16         A.     Yes, I do pay that.

17         Q.     Do you also pay for Ricky's?

18         A.     No.

19         Q.     You don't pay anything for Ricky?

20         A.     No.

21         Q.     Who pays for Ricky's utilities?

22         A.     I do not know.  You'll have to ask

23   him.

1      Q.     I did.  He didn't know.  He said

2  you did.

3      A.     I pay the whole power bill and

4  water bill and everything, and that pays for

5  his.

6      Q.     So then you pay -- so then you

7  do --

8      A.     I pay the whole thing.

9      Q.     So you do -- so Jimmy gives you

10 the money to pay the utilities, insurance,

11 and other costs associated with the house?

12     A.     Yes.

13     Q.     And then you pay them?

14     A.     Yes.

15     Q.     Does he pay you in cash?

16     A.     Yes.

17     Q.     And then you put it in your

18 account?

19     A.     Put it in the WoodForest account.

20     Q.     WoodForest account.  Do you ever

21 put it in your Regions account?

22     A.     No.

23            (Off-the-record discussion.)

1          (Plaintiff's Exhibit 28 was marked

2           for identification.  A copy is

3           attached.)

4      Q.    (BY MR. STOTSER) Okay.  And you

5  were asked to bring certain documents today,

6  and your attorney supplied these documents

7  related to your personal or business

8  interests.

9      A.    Yeah, I recall that.

10     Q.    You've got to answer my questions.

11     A.    Yes.

12     Q.    And that's a copy of what you

13  brought pursuant to the subpoena, correct?

14     A.    Yes.

15     Q.    And that's all the accounts that

16  you own or you have an interest in?

17     A.    That's -- that one, and that's it,

18  I think.

19     Q.    I thought you just said Wood --

20  Wood something.

21     A.    WoodForest, I'm not on WoodForest.

22     Q.    I thought you just said you had an

23  account there.

1       A.      I just make the deposits in there

2   and auto-pays, they auto-pay.  I am not on

3   the account.

4       Q.      What other things do you pay for

5   other than the utilities and the --

6       A.      House insurance.

7       Q.      House insurance.  Do you pay the

8   car payments?

9       A.      Yes.

10      Q.      For everybody?

11      A.      No, just Mr. Bulger's.

12      Q.      Mr. Bulger gives you money to pay

13  his car?

14      A.      Yes.

15      Q.      In cash?

16      A.      Yes.

17      Q.      And then you pay for it?

18      A.      (Nodding.)

19      Q.      Do you deposit it?

20      A.      I go to the bank, and I pay it for

21  him.

22      Q.      You just pay it?

23      A.      Yes, pay it directly to them.

1    Q.    Okay.  Okay.  And then what do you

2  pay out of the Regions -- this Regions

3  account?

4    A.    That's my personal.

5    Q.    Okay.  What other businesses other

6  than Fortuitous do you own, any?

7    A.    I'm on Magnolia Real Estate.

8    Q.    With who?

9    A.    With Ricky Adams and Ginger

10  MacLeod.

11    Q.    Magnolia Real Estate I or II?

12    A.    II.

13    Q.    You know there was a predecessor,

14  Magnolia Real Estate I, right?

15    A.    Yes.

16    Q.    You were in court the last time we

17  talked about that in circuit court, weren't

18  you?

19    A.    Yes.

20    Q.    Okay.  And who owned that, Mr.

21  Bulger?

22    A.    He was on it, but that's been

23  closed down.

1    Q.    So he owned Magnolia Real Estate
2    I, then it got closed out, then it got opened
3    Magnolia Real Estate II --
4    A.    Right.
5    Q.    -- in yours and Ginger's and
6    Ricky's name?
7    A.    Correct.
8    Q.    Any other businesses which you own
9    or have an interest in?
10    A.    No.
11    Q.    What assets are in Magnolia Real
12    Estate II?
13    A.    Nothing yet.  It's just started
14    out.
15    Q.    Okay.
16    A.    There's no bank account, no
17    nothing for that.
18    Q.    No bank account?
19    A.    No, not for that one.
20    Q.    Okay.  And then your Regions
21    account is just for your personal purchases,
22    right?
23    A.    Yes, it's my personal one.

1     Q.   Look at the first one, 7/23, one,

2 two, three, four Secretary of States.  What

3 are those four entires for Secretary of State

4 for?

5     A.   Yeah.  That was -- they asked me

6 to -- that was when Mr. Bulger got arrested.

7 They asked me --

8     Q.   He wasn't arrested 7/23, sir.

9     A.   They --

10     Q.   He was arrested in August, and

11 that was before he was arrested.  So tell me

12 what that -- those were for.

13     A.   I got it mixed up.  Okay.  Those

14 were closings.

15     Q.   Those aren't real estate closings.

16 Those are Secretary of State fees.  What were

17 they for?

18     A.   I don't remember.

19     Q.   It came out of your -- you said

20 everything that came out of your personal

21 check was for you personally.  You told me

22 the two entities you own.  What were those

23 for?  There are four entries there.

1          A.    I don't remember what they are,
2    honestly.
3          Q.    Okay.  And I'm looking through
4    this for the first time too, so I'm trying to
5    get your best -- on 9/7, card purchase,
6    Autauga County.  That's for money put on his
7    jail -- his book, right?
8          A.    9/7, yes.
9          Q.    Okay.  That would be for his jail.
10   Then there's a Capital One online payment
11   James Schmitt, $30.07.
12         A.    That's mine.
13         Q.    That's your Capital One?
14         A.    Yes.  I have a small Capital One.
15         Q.    Why does it say online payment,
16   James G. Schmitt?  Is Capital One --
17         A.    They auto-pay.
18         Q.    Explain to me how that works.  Why
19   does it have his name on it?
20         A.    It has my name on it.
21         Q.    Oh, I'm sorry.
22         A.    That's my name.
23         Q.    Okay.  It's your Capital One?

1    A.    Yes.

2    Q.    I apologize.  And then you paid

3 $200 for internet?

4    A.    Yes.  I paid the -- I paid the

5 internet that --

6    Q.    Is that for the whole --

7    A.    The whole house, that's just for

8 the whole house.

9    Q.    Is that like something you would

10 get from Jimmy, and then you would pay it,

11 you just happened to pay it on your personal?

12    A.    Yes.

13    Q.    Okay.  And then you paid it again

14 in September.  Is that something he gives you

15 the money to pay the internet, and sometimes

16 you pay it through your personal and

17 sometimes you pay it through something else?

18    A.    Yes.  I pay it through there,

19 because we were having a problem with -- I

20 don't know what the problem was.  They

21 wouldn't pay it, so I paid it through mine.

22 I keep my bills paid.

23    Q.    Now, 9/21, you paid one, two,

1   three, four power bills.  What were those?

2       A.    Alabama Power?

3       Q.    Yeah, four times.

4       A.    Yes.

5       Q.    For what?

6       A.    That was the Alabama Power that --

7   he used to own -- that was the Alabama Power.

8   He used to own rental properties in

9   Montgomery.  Those are the final payoffs.

10      Q.    Okay.

11      A.    Alabama Power.

12      Q.    So those are for the last month?

13      A.    Yes.  I paid them, and I paid

14  the --  yes.

15      Q.    What rental properties did he own

16  that you paid the power bills on?  Give me

17  just whatever the basic address is.  You may

18  not know the number.

19      A.    They've been sold is all I know.

20      Q.    Well, I know they were sold.  The

21  last payment you said was the 21st of

22  September, so I'm assuming they were sold

23  within 30 days prior to that.

1          A.    I can't remember all the

2     addresses.

3          Q.    Give me some of them.

4          A.    He has a bunch of them.

5          Q.    Just give me some of them.

6          A.    But they've all been sold.

7          Q.    I know.  I'm just asking you what

8     they were.

9          A.    Oh, man.  April Street.

10         Q.    Okay.  April Street.  What else?

11         A.    My memory is not as good as it

12    used to be.

13         Q.    I understand.  Neither is mine.

14    Pocahontas?

15         A.    Yes, that was one of them.

16         Q.    J-A-P-O-N-I-C-A?

17         A.    Yes.

18         Q.    Okay.  Were those some too?  So

19    they were sold in August, and the last bill

20    came out in September?

21         A.    Yes.  I closed them down.

22         Q.    Okay.  You closed them down.  Who

23    did -- who did those get sold to?

1    A.    I do not know.  I didn't have any
2  part of that.
3    Q.    You paid the bills, though, right?
4    A.    Yes, I just paid the utilities.
5    Q.    What's the TCB MGW/Montgomery?  Is
6  that -- that's a utility charge too, one for
7  water, I guess those are water?
8    A.    Water, yes, it's Montgomery Water.
9    Q.    On the same location?
10    A.    Montgomery Water.
11    Q.    Okay.  So what you did is you paid
12  the last bills out after these were sold?
13    A.    Right.
14    Q.    Okay.  So what happened is -- did
15  you pay them for some months before too the
16  same way, like you would pay for those out of
17  your personal account?  Jimmy would give you
18  the money, and you'd pay them?
19    A.    Yes.
20    Q.    Okay.  And you'd pay them out,
21  these accounts, and then this was the last
22  one that was paid?
23    A.    That one, yes.

1     Q.    How did Jimmy get paid for

2 these -- for the sale of these properties?

3     A.    I do not know.

4     Q.    Well, you know he got $3000 a

5 month in cash for something, didn't you?

6     A.    Yes.

7     Q.    What did he get $3000 a month in

8 cash for?

9     A.    That was for houses he sold.

10     Q.    I thought you just told me you

11 didn't know anything --

12     A.    I don't know any -- I -- that's

13 all I know.  I don't know the people or

14 anything or any of the business.

15     Q.    How much -- how much money has he

16 got -- does he get $3000 a month now?

17     A.    I do not know if he still gets it.

18 I do not know.

19     Q.    You've gotten some of it out of

20 the -- out of the mailbox, haven't you?

21     A.    One time, yes.

22     Q.    Okay.  What did you do with that

23 money?

1          A.    Paid bills.

2          Q.    What -- Traveluro Hotel, 9/21,

3    what hotel?  Where did you go, Mexico?

4          A.    I don't know.  I'll have to look

5    at it.

6          Q.    Hotel bill, $1139?

7                MR. BENSINGER:  It's right here

8    (indicating).

9          A.    I let him use my card.  I do not

10   know what that is.

11         Q.    You let Jimmy use your card?

12         A.    I do not know what that is.

13         Q.    Isn't that about when Jimmy and

14   Ricky went to Mexico?  That was about when he

15   got out and went to Mexico, right?

16         A.    I guess.  I do not know.  I've

17   never --

18         Q.    Well, you have an idea where he

19   went.

20         A.    I do not know.

21         Q.    You have no idea where he went?

22         A.    I don't know.

23         Q.    You just gave him your card and --

1   A.   They didn't take it with them.

2   Q.   They didn't take what with them?

3   A.   The card.

4   Q.   They just used it to buy the

5   hotel?  Did you go down there with them to

6   Mexico?

7   A.   No.  I've never been.

8   Q.   Okay.  Ricky -- to your knowledge,

9   Ricky and Jimmy went down to Mexico to check

10  on the ATV company?

11  A.   I don't know for sure what they

12  did.

13  Q.   What -- sir --

14  A.   I don't, don't, don't, don't.

15  Q.   How many conversations have you

16  had with him about the Mexico business that

17  he had?

18  A.   I do not know anything about his

19  businesses -- that business.

20  Q.   You're saying that under oath?

21  A.   I do not.

22  Q.   You're saying that under oath, you

23  don't know anything about it?  He's never

1   told you about it, he's never mentioned it?

2        A.    He's mentioned some business down

3   there, but I do not know.  I've never been.

4        Q.    What has he said about the

5   business that he's mentioned down there?

6        A.    It's an ATV, like you said,

7   business is all I know of.

8        Q.    Okay.

9        A.    But I do not -- I don't ask him

10  questions about that.

11       Q.    He just gives you -- you just let

12  him have your card and go ahead and put $1100

13  on your card, that's typical?

14       A.    He gives me the cash.  I put it on

15  there, and he does that.

16       Q.    So the way you work -- and then

17  Delta Airlines, one, two -- wait, there's

18  three.  Who went with them?

19       A.    I do not know that, I really

20  don't.

21       Q.    You just gave him your card, and

22  he put six -- 617.15 times three on there on

23  the 17th, right?

1          A.     If that's what it says.

2          Q.     I'm sorry, I can't even read,

3     817.15, and he gave you the cash and then did

4     that, right?

5          A.     Yes.

6          Q.     Okay.  Chrysler Capital, what's

7     that for?

8          A.     It's a truck payment.

9          Q.     Whose truck?

10          A.     One of the -- it's a Dodge truck.

11     It's -- Jimmy owns it, I guess.

12          Q.     Is that one that he -- the same

13     thing, he would give you the cash for it, and

14     you would make the payment?

15          A.     Uh-huh.

16          Q.     You have to say yes.  You have to

17     say yes, not uh-huh.

18          A.     Oh, yeah.

19          Q.     I'm sorry, she can't get uh-huh or

20     uh-huh.

21          A.     Oh.

22          Q.     So I'm just trying to help her

23     out.  I've given her a hard enough time

1    today.

2            Verizon Wireless, that's the

3    Verizon bill at the house, right?

4        A.    Yes.

5        Q.    326.74, you paid -- the same

6    thing, he pays you, you pay for it?

7        A.    Yes.

8        Q.    He gives you money in cash.  Wow,

9    you had one, two, three, four, five, six,

10   seven, eight Secretary of States on July

11   23rd.  Were those for your businesses or

12   other businesses?

13       A.    No, not mine.

14       Q.    How often does he use your card,

15   whenever he asks you to?  Does he sort of

16   just take your card and give you cash?

17       A.    No, he does not take my card.

18       Q.    Does he just ask you, and you give

19   it to him, and then he gives you cash?

20       A.    Yes, he just gives me cash.

21       Q.    And that's been the same way you

22   guys have operated for the last -- when you

23   got 35,000 in '20 and 35,000 in '19?

1          A.     Cash.

2          Q.     Cash.  Okay.  Other than the

3     Fortuitous that you said has been open for

4     one year, but you haven't made any money out

5     of it?

6          A.     No, we have not.

7          Q.     So basically for the year, do you

8     have -- have you had any other employment for

9     the last year other than the Fortuitous?

10         A.     The rental properties, before he

11    sold that, I did get a check off that because

12    I helped with the rental properties.

13         Q.     Were those the four or five you

14    just mentioned?

15         A.     Yes.

16         Q.     Okay.  Do you do any building

17    yourself?

18         A.     Buildings?

19         Q.     Do you do any construction work?

20         A.     No.

21         Q.     Or building?

22         A.     I do not know anything, no.

23         Q.     Okay.  Are you more the back-

1    office guy?

2        A.    Yes.

3        Q.    Okay.  Do you pay for the company

4    bills or the business bills or the personal

5    bills or what, or both?

6        A.    Personal.

7        Q.    Well, some of them were business,

8    that's why I was asking.

9        A.    Well, some were business, yes.

10       Q.    Okay.  What businesses do you know

11   that Mr. Bulger owns presently or has an

12   interest in right now?

13       A.    None that I know of, not one that

14   I know of.

15       Q.    Do you know any of them he's

16   transferred to anybody else in the last 12

17   months?

18       A.    Transferred?

19       Q.    Yeah.

20       A.    Yeah, the Fortuitous.

21       Q.    Okay.  He transferred that one to

22   you guys?

23       A.    Right, and deeded us those

1  apartments, yes.

2         Q.    Okay.  What else?

3         A.    Nothing else I know of that I'm

4  involved in.

5         Q.    What property are you holding for

6  him?

7         A.    Just the Jimmy James Bulger, LLC,

8  the house.

9         Q.    Okay.  That's the only property

10 you're holding?

11        A.    And that -- all that land that's

12 up there.  It's all in that.

13        Q.    You're holding that for him but

14 nothing else?

15        A.    Nothing else.

16        Q.    Okay.  Did he own a cabin up in

17 Tennessee?

18        A.    Yes.

19        Q.    Does he still own it?

20        A.    No.

21        Q.    Were you involved in the sale of

22 it?

23        A.    No.

1    Q.    Did he own anything in Georgia or
2  any entity in Georgia?
3    A.    No.
4    Q.    Weren't you a part of one of the
5  LLCs he had in Georgia?
6    A.    That was years ago.  That was 12
7  years ago probably.
8    Q.    So you did, so you've owned
9  property with him for --
10   A.    No property.
11   Q.    Businesses with him?
12   A.    It was not property.
13   Q.    What other businesses have you
14  owned with him?
15   A.    That's the only thing.
16   Q.    Do you have any bank accounts with
17  him?
18   A.    No.
19   Q.    Who owns the -- in that Deatsville
20  area --
21   A.    What?
22   Q.    In the Deatsville house, there's a
23  lot of personal property, like antique

1   clocks.  Do you know about those?

2          A.     Uh-huh.

3          Q.     Okay.  And those are Mr. Bulger's?

4          A.     Yes.

5          Q.     And he owns other antiques there,

6   right, chairs, different other antiques

7   there, right?

8          A.     Yes.  A lot of it is just -- just

9   what was in there, what we've got in there,

10  yeah.

11         Q.     Okay.  But he was the owner of

12  that.  He owns chairs, and there's a lot in

13  the garage there, right?

14         A.     Yes.

15         Q.     Okay.  And he wanted -- he's going

16  to --

17         A.     A lot of junk in there mainly.

18         Q.     Okay.  And then there's a -- but

19  there's a lot of property while he was in

20  jail he told you guys to move around in order

21  to make the Airbnb more saleable, liveable,

22  or whatever?

23         A.     Decorating.  He knows how to

1  decorate and stuff like that.  I do not.

2       Q.   Okay.  I want to show you what has

3  been marked in a previous deposition as

4  Plaintiff's Exhibit 8.  It's a telephone

5  conference from jail, Autauga County Jail,

6  between you and Mr. Bulger August 8th, 2021,

7  at 9:54.

8       A.   Okay.

9       Q.   Okay.  Look at page 2 of that.

10  See he says, "Whenever the money hits the

11  account, tell Ricky to pull out nine and give

12  Bill five," and you said, "I will check on it

13  in a few minutes."

14            Where did the money, the $9000,

15  come from?

16       A.   Ricky got it.

17       Q.   No.  It says, "I will check on

18  it."  It doesn't say -- I see where it says

19  Ricky is pulling it out.  But "I will check

20  on it."  Where were you checking?

21       A.   Checked on it with Ricky.

22       Q.   From what account was it supposed

23  to be in?

1      A.    I do not know where he got it

2  from.

3      Q.    Did he take that money out, nine

4  out?

5      A.    I guess.  I do not know.

6      Q.    So you're telling me under oath

7  that you have no idea what he was talking

8  about when he said, "Whenever that money hits

9  the account, tell Ricky to pull out nine"?

10     A.    I don't know which account.  I

11  just told Ricky, and Ricky --

12     Q.    Which --

13     A.    -- knew what that --

14     Q.    Name the different accounts that

15  it could have been in.  Where did the $9000

16  come from?

17     A.    I do not know.

18     Q.    So he just told you in an

19  interview right after he went in jail, "When

20  that money hits the account, tell Ricky to

21  pull out nine," and your testimony is I have

22  no idea where that money was coming from?

23     A.    I don't.

1       Q.      Do you know --

2       A.      We were distraught when he went in

3   there.  He was rail -- okay.

4       Q.      He was what?

5       A.      Railroaded.

6       Q.      As a result of what?  He was --

7   you talked to him many of these -- you talked

8   to him in many of these things about how you

9   were glad that it got out of Autauga County

10  and into federal court, right?  Is that

11  correct?

12      A.      Yes.

13      Q.      Okay.  And you said that because

14  you and he both thought that he wasn't

15  getting a fair shake in the courts?

16      A.      Yes.

17      Q.      And you were glad it got out of

18  there?

19      A.      Yes.

20      Q.      You guys both talked very

21  unfavorably as to whether the judge was not

22  doing you right there?

23      A.      Yes.

1      Q.    And so you thought the bankruptcy
2    court would be a better forum for you --
3    right, for him?
4      A.    Yes.
5      Q.    Okay.  Now, he said on page 3,
6    we're in a better position, and I'll let you
7    know about it, on page 3, toward the bottom.
8    "We are in a better position."  He told you
9    after he got out the better position and
10   about this plan that he had.  Tell me what he
11   told you after he got out of jail was the
12   plan.
13     A.    He was always talking about plans,
14   just dreams, hopes and dreams.
15     Q.    Okay.  Well, what did he --
16     A.    That was it.
17     Q.    He told you a lot of those that he
18   was going to tell you when he got out.  What
19   did -- what did he --
20     A.    He just said he was going to talk
21   to me about it.
22     Q.    But he did after he got out,
23   didn't he?

1      A.    It was just hopes and dreams and

2  whatever he had planned.

3      Q.    What kind of hopes and dreams did

4  he have planned?

5      A.    I do not know.

6      Q.    He talked -- he told you 40 times

7  in these conversations, as soon as he got

8  out, he was going to tell you the whole plan.

9  Did he tell you a plan when he got out?

10      A.    That was just talk, I mean, he

11  would just --

12      Q.    Well, I know it was talk.

13      A.    I don't know.

14      Q.    Tell me what you said to him and

15  what he said to you about these plans after

16  he got out of jail.  Whether it was talk or

17  it happened, what did he say?

18      A.    Just a plan for the big picture.

19  I do not know.

20      Q.    What was the plan?

21      A.    I do not know.

22      Q.    You were a part of the plan?

23      A.    No, I'm not.

1      Q.   You're not a part the plan?  You

2 and Ricky and Jimmy -- Jimmy, you, and Ricky

3 are not a part of the plan; is that your

4 testimony?

5      A.   I do not know.

6      Q.   You do know, sir.  Are you part of

7 the plan with him or not?

8      A.   I do not know.

9      Q.   You're saying that under oath?

10 You know you're sworn to tell the truth; do

11 you know that?

12     A.   Yes.

13     Q.   Okay.  Are you telling me the

14 truth?

15     A.   Yes.

16     Q.   You do not know whether you three

17 have a plan?

18     A.   I am not in -- I don't have a

19 plan.

20     Q.   Does he have a plan of which

21 you're involved?

22     A.   If he does, he -- I don't know it.

23     Q.   So you're --

1          A.     I do not know the whole thing.

2          Q.     I didn't say you know the whole

3     thing.  I said do you know part of it?

4     What's the plan?

5          A.     I do not know it.

6          Q.     You're just not going to tell me?

7               MR. BENSINGER:  Object to the

8     form.

9          A.     (No response.)

10          Q.     Okay.  Then on page 5, make sure

11    you to explain to him to get out $9000 in

12    cash and you say are all the bills paid.

13    What bills are there supposed to be paid?

14          A.     The utilities.

15          Q.     Household stuff?

16          A.     Household stuff I just talked to

17    you about.

18          Q.     Okay.  I show you Plaintiff's

19    Exhibit 9.  That's a conversation you had

20    with Mr. Bulger August the 9th at 1:53.  Who

21    paid for his book, like the money?  I saw two

22    payments coming from you.  Did you pay other

23    payments for his book?

1   A. His book?

2   Q. Whatever it's called in jail,

3 where he puts money on the book to buy things

4 and make calls.

5   A. I did, I put -- yes.

6   Q. Did you pay it out of -- what

7 account did you pay it out of?

8   A. Mine mostly.

9   Q. Okay.  If "mostly," then that

10 means that it was paid through somebody else

11 too.  Who else paid for it?

12   A. WoodForest.

13   Q. WoodForest?

14   A. Yes.

15   Q. But that's one that I asked you to

16 bring today that you didn't bring, correct?

17 You said that that was one of your accounts?

18   A. I'm not on the account, that

19 account.

20   Q. Who's on that account?

21   A. James Bulger.  I can make

22 deposits, and that's it.

23   Q. How did you get money out to pay

1    on his book from WoodForest if you could not

2    do anything but make deposits?

3          A.    You can do it online.

4          Q.    Well, then you did take out money

5    online out of that account?

6          A.    Online.

7          Q.    So you're telling me --

8          A.    To put on his books.

9          Q.    Excuse me?

10         A.    To put on his books.

11         Q.    So you're telling me that you were

12   authorized to make withdrawals out of that

13   account to put on his books?

14         A.    Yes.

15         Q.    Have you made withdrawals from

16   that account for anything else?

17         A.    I don't remember.

18         Q.    You don't remember if you made any

19   other?

20         A.    I don't remember.

21         Q.    You don't remember or you're just

22   not telling me?

23         A.    I don't remember.  I can't

1   remember everything.

2         Q.    Can you remember anything?

3               MR. BENSINGER:  Object to the

4   form.

5         Q.    You know, at some point you're

6   going to be in another week before a federal

7   judge saying the exact same things; do you

8   know that?

9         A.    Yes.  I'm telling you the truth.

10        Q.    Okay.  Because it's not me.

11  You're making the oath to this federal court,

12  and you're swearing to tell the truth under

13  penalty of perjury.  You know that, right?

14        A.    Yes.

15        Q.    On page 4, it says, "You have" --

16  you say, "You have two houses with permits,"

17  and Jimmy said, "Okay."  And you said, "Two

18  small ones."  And then you said -- Jimmy

19  said, "Just transfer them.  Just get them

20  moved."

21              What -- what two houses are you

22  talking about with permits?

23        A.    I do not remember.

1        Q.    "You have two houses with
2    permits," you brought that up to him, and
3    you're telling me under oath you don't
4    remember what they were?
5        A.    I do not remember.
6        Q.    "Just transfer them."  Did you
7    transfer them and not remember?
8        A.    I do not remember.
9        Q.    Then it says you're supposed to
10   sign on three and a half acres.  Do you
11   remember that?
12       A.    Yes.
13       Q.    Did you sign on three and a half
14   acres?
15       A.    Yes.
16       Q.    Whose name did you sign in?
17       A.    Mine.
18       Q.    Mine.  How did you come up with
19   the idea to buy three and a half acres?
20       A.    Mine and Ricky Adams bought the
21   three and a half acres.
22       Q.    Individually?
23       A.    Together.

1      Q.    Both of you as individuals --

2      A.    Yes.

3      Q.    -- bought it?  So it is in your

4 name and in his name individually?

5      A.    Yes.

6      Q.    Okay.  What did you pay for it?

7      A.    Forty thousand.

8      Q.    Forty thousand.  Where did you get

9 the money to pay for it?

10     A.    I had it saved up.

11     Q.    Saved up in what account?

12     A.    I don't put it in an account.  I

13 just had the cash, and I paid cash first

14 payment, and another one is due in -- in

15 December.

16     Q.    Did you pay -- the cash payment,

17 is that something that Mr. Bulger gave you to

18 pay from the cash, like the other stuff?

19     A.    No.

20     Q.    So where did you get this cash?

21     A.    He has no involvement in that.

22     Q.    Where did you get this cash?

23     A.    It was mine.  I've just -- I saved

1    it up.

2         Q.    Since when?

3         A.    This year, or I don't know exactly

4    how long it takes.

5         Q.    You didn't make any money on

6    anything else other than the money Mr. Bulger

7    gave you, that was just your testimony a

8    little while ago.

9         A.    I sold my truck, my pickup truck,

10   when he was in jail.

11        Q.    You sold your truck after you

12   closed on this property, sir.

13        A.    Yes.

14        Q.    So how did you get -- how did you

15   get the money before?

16        A.    I saved that up.

17        Q.    You saved it up from money that

18   Mr. Bulger had given you from time to time

19   before, correct?  It's true, right?

20        A.    I just have money.

21        Q.    Okay.  So your testimony before

22   about where you got the money, you don't want

23   to add to that testimony about where you got

1    any other money, right?

2        A.    (Nodding.)

3            THE COURT REPORTER:  I'm sorry,

4    you're going to have to say it.

5        A.    No.  I'm sorry.

6        Q.    You're supposed -- you also were

7    supposed to sign on six acres, right, is what

8    it says?

9        A.    But I did not.

10        Q.    Why didn't you?

11        A.    The deal didn't go through.  I

12    didn't do it.  I didn't want to.

13        Q.    He talked about you on page 5 and

14    6, he talked about buying another house close

15    to the Church of Christ.  Do you remember

16    that?

17            MR. BENSINGER:  I'm sorry, Rick,

18    real quick, identify that for the record,

19    just to keep it clear.

20            MR. STOTSER:  Oh, I apologize.

21            MR. BENSINGER:  Which exhibit

22    number?

23            MR. STOTSER:  Look at the front

1  right there, very front page.

2          MR. HOOKER:  I think it's 13.

3          MR. STOTSER:  Yeah, 13.

4          MR. BENSINGER:  13.  I'm sorry, I

5  just wanted to make sure the record was

6  clear.

7      Q.    (BY MR. STOTSER) Thank you.  On

8  page 5, he talked to you about buying another

9  house that was shaped like a barn.  Do you

10  see that?

11      A.    Yes.

12      Q.    You went and looked at it, right?

13      A.    Yes.

14      Q.    What was your conversations that

15  you had about buying that house?

16      A.    It was just to -- to move in

17  temporarily.

18      Q.    Whose house?

19      A.    It was just -- just -- that's all

20  he did.  I looked at it.

21      Q.    Whose house was that supposed to

22  be?

23      A.    I don't know.  I just went -- I

1  just drove past it.

2      Q.    Do you remember him on page 11

3  talking to you about the fact that if the

4  case got settled, he was going to get his

5  attorney to write a letter saying the filing

6  of the bankruptcy was a clerical error?

7      A.    Yes.

8      Q.    It was a mistake.  What else did

9  he tell you about that?

10     A.    That's all.

11     Q.    Plaintiff's 14, he -- on page 4

12 and on different places during the jail

13 conversations you had, he asked you to learn

14 all about the deeds and the mortgages from

15 Debbie, right?

16     A.    Yes.

17     Q.    What deeds and mortgages was he

18 talking about?

19     A.    Everything that's in the filing

20 cabinets.

21     Q.    Okay.

22     A.    I don't know specifics, but I've

23 been working with Debbie Hudson.

1      Q.    Okay.  You've been working with

2  her trying to find out all the assets and all

3  the deeds and mortgages, correct?

4      A.    I'm just learning the book -- the

5  books and everything she does, that's all, so

6  I can be a backup for her.

7      Q.    Okay.

8      A.    That's all.

9      Q.    Well, actually, it says you'll be

10 able -- when she's gone, you'll be able to

11 know what to do, right?  So what -- what

12 deeds and mortgages are there that you've

13 looked at?

14     A.    I do not know every one of them.

15     Q.    What -- I mean, I want to know any

16 of them.

17     A.    I don't know.

18     Q.    So you're telling me there's deeds

19 and mortgages that you're looking over

20 that -- that you're doing to try to take over

21 the business from her like he asked you to,

22 right?  It's just what you testified to.

23              MR. BENSINGER:  Object to the

1  form.

2      Q.    Didn't you just say you were

3  working to take over from her when she's gone

4  these deeds and mortgages?

5      A.    When she's on vacation.

6      Q.    And take over.  Okay.

7      A.    Then I can help out.

8      Q.    Okay.

9      A.    That's all I do.

10     Q.    What deeds and mortgages are

11 outstanding now that you know of?

12     A.    Just the ones that are -- The

13 Venue and all that.  I don't know.  I don't

14 know.

15     Q.    Well, you're the one that's

16 working with Debbie, I'm not.

17     A.    Yes.

18     Q.    And you've been working with her

19 for that least two months or three months,

20 based on this August 13th taped conversation.

21 So in three months, what deeds and mortgages

22 on properties have you learned about?

23     A.    I do not know.

1    Q.    When you sold your truck -- on

2  Plaintiff's 17, you sold your truck for

3  $12,000.  What did you do with that money?

4    A.    Paid the bills.

5    Q.    What bills?

6    A.    All the bills at the house.  I

7  stretched it out.

8    Q.    You paid Mr. Bulger's bills?

9    A.    I paid all the house utilities,

10  insurance, whatever to keep afloat.

11    Q.    And would he pay you back that in

12  cash?

13    A.    No.  I sold it, so I could --

14    Q.    No, I know that.  I'm saying, did

15  he pay you back in cash, like he normally did

16  on those?

17    A.    For what?

18    Q.    For the money that you put into

19  the -- did he pay you back in cash, or did he

20  pay you back a check for the money you put in

21  that?

22    A.    No.

23    Q.    He hasn't paid you back?

1       A.      I sold my truck so we could pay
2    the bills, so we could --
3       Q.      How did you --
4       A.      So I could survive.
5       Q.      How did you get here today?
6       A.      Do what?
7       Q.      How did you drive here today?
8       A.      I can't hear you.
9       Q.      How did you drive to -- how did
10   you drive here today?
11      A.      My -- I have a Lexus.
12      Q.      In whose name?
13      A.      An SUV.
14      Q.      Whose name is that in?
15      A.      That is mine.
16      Q.      Okay.  And did you -- and that's
17   been in your name also?
18      A.      Yes.
19      Q.      When did you buy that?
20      A.      Probably three, four years ago.
21   I'm not sure.
22      Q.      Did you pay cash?
23      A.      Yes.

1   Q. What year is it?

2   A. 2003.

3   Q. Plaintiff's Exhibit 19, the bottom

4 of page 2, are you on that account at

5 Hancock?

6   A. No.

7   Q. Who's on the Hancock account?

8   A. I do not know anything about it.

9   Q. You don't know anything about it?

10   A. No, I do not.

11   Q. The draw went into BBVA. Do you

12 see that, page 3, halfway down, the middle,

13 "The draw, which one did it go into?"

14 Answer, "BBVA."

15     MR. BENSINGER: Hang on, Rick.

16     MR. STOTSER: I'm sorry, page 3.

17     MR. BENSINGER: Page 3. I just

18 want to make sure that we're all there.

19     MS. STOTSER: Look at the bottom

20 right here. I'm looking right here. It's

21 also right there (indicating).

22     MR. BENSINGER: Okay. We're on

23 19, right?

```
 1              MR. STOTSER:  I think so.

 2              MR. HOOKER:  That's our tab

 3   number.  Actually, you --

 4              MR. STOTSER:  Am I on the wrong

 5   one?  Am I showing you the wrong one?

 6              MR. HOOKER:  Yeah, move to 17,

 7   right here (indicating).

 8              MR. BENSINGER:  We were looking at

 9   19.

10              MR. STOTSER:  I'm trying to get

11   you the right one.  I apologize.

12              MR. HOOKER:  This exhibit number,

13   I'm referring to the tab number.

14              MR. STOTSER:  I'm sorry.

15              MR. HOOKER:  No, this is the right

16   one.  Look at the date.

17              MR. STOTSER:  Let's go to 19,

18   yeah, there you go.

19              MR. BENSINGER:  And what page are

20   we on?

21              MR. STOTSER:  Let's go to page 6.

22              MR. BENSINGER:  It's there

23   (indicating).
```

1    Q.    (BY MR. STOTSER) This -- see page

2    6?

3    A.    Yes.

4    Q.    Okay.  Were you involved in the

5    sale of that South Perry Street house?

6    A.    No.

7    Q.    Do you know anything about it?

8    A.    No.

9    Q.    Do you know who Mark Pierce is?

10    A.    A realtor.

11    Q.    Did you get the lawsuit when it

12    did come to you at the door?

13    A.    It was just a notice on the

14    mailbox from the sheriff.

15    Q.    Okay.  Let's go back to

16    Plaintiff's 18.  I think I'll get the right

17    one now.  Now look and make sure we're on the

18    right page.  Page 2, does it talk -- is that

19    the right one?  Does it talk about Hancock?

20         MR. BENSINGER:  Yes, sir, it does.

21    Q.    Okay.  And you said you don't

22    know -- on page 3, you don't know anything

23    about Hancock?

1          A.    No, I do not.

2          Q.    Then it says on the next page,

3    "The draw, which one did it go into?" and you

4    said "BBVA"?

5          A.    It's what I was assuming.  I do

6    not know.

7          Q.    You didn't say "I don't know."

8    You said it went into BBVA, and it said, "You

9    are on it, right?"  And the answer is "Yes."

10   What's the BBVA account?

11         A.    A Renaissance Builders, as far as

12   I know.

13         Q.    I thought you told me you didn't

14   have account?

15         A.    I don't.

16         Q.    Well, you're telling him you have

17   one and it went into that account, and he --

18         A.    I'm not on that account.

19         Q.    Do you see when he asks, "You are

20   on it, right?" and your answer was "Yes"?  Do

21   you see that on page 3?

22         A.    Yes.

23         Q.    Are you on it?

1   A. No.

2   Q. You're not on the BBVA account?

3   A. No, not the -- not the

4 Renaissance.

5   Q. What was the draw for?

6   A. I do not know.

7   Q. So he's asking you --

8   A. I don't know.

9   Q. He's asking you about a draw?

10   A. I don't know where the draw came

11 from.  I do not know.

12   Q. Okay.  So the question was asked,

13 "Te draw, which one did it go into?"  Your

14 answer was what?

15   A. "BBVA."

16   Q. His answer -- question, "Okay.

17 All right.  You are on it, right?"  What's

18 your answer?  What's your answer?

19   A. "Yes."

20   Q. So now you're telling me you're

21 not on it?

22   A. I am not on that BBA account --

23 BBVA.

1    MR. STOTSER:  That's the one I

2 just looked at.  Is the other one 20?

3    MR. HOOKER:  21 should be the next

4 one.

5    (Off-the-record discussion.)

6    Q.    (BY MR. STOTSER) Plaintiff's 22,

7 on page 5 and 6, they're talking about a

8 camper.  Do you remember somebody coming by

9 to look at the camper?

10    A.    Yes.

11    Q.    Who was that?

12    A.    I don't know the name of the

13 couple that came by, but I showed it to them.

14    Q.    They came by to buy the camper?

15    A.    Yes.

16    Q.    And it was -- Jimmy directed you

17 to --

18    A.    Yes.

19    Q.    -- to show them the camper?  And

20 Jimmy told you what he wanted for the camper?

21    A.    Yes.

22    Q.    And did they also look at the

23 horse trailer?

1      A.    No, they did not want to.

2      Q.    Okay.  But they looked at the

3 camper?

4      A.    Yes.

5      Q.    How much did -- how much -- did he

6 tell you that he wanted ten to 12,000 for the

7 camper?

8      A.    Yes.

9      Q.    Did you sell the camper to them?

10     A.    No.

11     Q.    Why not?

12     A.    They didn't like it.  They didn't

13 want it.

14     Q.    I show you Plaintiff's 24.  On

15 page 6, it said, "Ricky gave you that nine."

16 Do you see that, like right here, this far

17 down the page (indicating)?

18          MR. BENSINGER:  Okay.  Here

19 (indicating).

20     Q.    And "Ricky gave you that other?"

21          "What did you say?"

22          "Ricky gave you that nine?"

23          "Yes.  Yes, he did."

1          Where did Ricky get the nine to

2    give you?

3          A.    I do not know.

4          Q.    Okay.  On the next page it said

5    that "...We have to learn that app because I

6    don't want no [one] to be able to get nothing

7    over on us anymore."  And then it said --

8    Jimmy said at the bottom of the page, "I

9    really don't know what it is, but there's a

10   way to track it because we get 50/50 on it.

11   You know, he gets half and I get half."

12          Who are the two people that get

13   half?

14          A.    Talking about The Venue.

15          Q.    That each -- both -- that Jimmy

16   gets half and then the rest of the group gets

17   half?

18          A.    No.  Jimmy does not have any

19   interest in that at all.

20          Q.    "You know, he gets half and I get

21   half," do you see that?  Who is "I," Jimmy

22   Bulger?

23          A.    No, he does not.

1    Q.    Did you tell him no, you do not?

2  You said, "Right."  The next page, you said

3  "Right."  You didn't say no, you said

4  "Right," right?

5    A.    He's talking about the app on The

6  Venue.

7    Q.    Right.  And each one of you

8  gets -- he gets 50 percent?

9    A.    He does not get a dime.

10    Q.    That's not what he said.  He said,

11  "You know, he gets half and I get half," and

12  then you said, "Right."  Why did you say,

13  "Right"?

14    A.    Just agreeing with him.

15    Q.    Why didn't you say no, you don't

16  get it?  And later on he says, "Because

17  everything has to go in trust...When I get

18  out, I can put everything back in my name

19  because that restraining order is off of me."

20         What was he supposed to put back

21  in his name?

22    A.    I do not know.

23    Q.    What are you holding for him?

1          A.    I am not holding nothing.

2          Q.    What is anybody else, to your

3    knowledge, holding for him?

4          A.    Nothing that I know of.

5                (Off-the-record discussion.)

6          Q.    (BY MR. STOTSER) Plaintiff's 25,

7    He says on page 5, I'm going to get a loan

8    against the house and I'll buy another cabin

9    in the mountains.  What loan was he going to

10    get against the house?

11          A.    He was just talking.

12          Q.    Just talk?

13          A.    Just talk, that's all it was is

14    talk.

15          Q.    What house was it?

16          A.    It was just talking against [sic]

17    the house, but he has no interest in the

18    house.

19          Q.    So he's going to get a loan on a

20    house that he doesn't have any interest in?

21          A.    He was just talking.  He was

22    distraught.  I was letting him talk.  And I

23    did --

1      Q.    He actually said that that was the

2   best thing that ever happened was that he

3   went in jail.  You were on conversations

4   where he said he was happy he went to jail,

5   that it saved his life, that he got to rest

6   and his head was clear.  He didn't sound

7   distraught to me.  Was he distraught or was

8   he -- he said it was great.  Was he lying?

9      A.    He was very sick.  We were all

10  very worried about him.

11     Q.    Didn't he tell you --

12     A.    He had been sick for a long time.

13     Q.    Didn't he tell that he's glad he

14  was in jail, or words to that effect, that he

15  was happy because it made him be able to

16  think clearly and rest?  You remember that,

17  don't you?

18     A.    Yes.

19     Q.    Okay.  So was he distraught or was

20  he clear-headed?

21     A.    He was distraught.  He was just --

22  I was just letting him talk.

23     Q.    And he was so distraught, on page

1  6, he said, hey, these phones are recorded so

2  I don't want to say too much, right?  What

3  was he hiding, what has he told you since he

4  got out?

5      A.    Nothing.

6      Q.    Does Lonnie Marshall work for him?

7      A.    No.

8      Q.    Has Lonnie Marshall worked for him

9  in the last six months?

10     A.    Yes.

11     Q.    What did he do?

12     A.    Collected rent.

13     Q.    On what house, the properties that

14 we've talked about?

15     A.    Yes.  And they're all sold, so he

16 doesn't --

17     Q.    Well, while he was in jail, the

18 properties were already sold, and he was

19 still getting money.  Why was Lonnie still

20 getting money after the properties were sold,

21 if that's all he did for him?

22     A.    I do not know.  That's between him

23 and Lonnie.

1    Q.    How would he get the money?

2    A.    I do not talk to Lonnie.

3    Q.    Lonnie is the one you don't get

4    along with, right?

5    A.    I do not talk to Lonnie.

6    Q.    You blocked him from your phone,

7    right?

8    A.    I do not talk to Lonnie.

9    Q.    Well, answer my question.  Did you

10   block him from your phone?

11   A.    Yes.

12   Q.    Okay.  Do you have any

13   understanding or knowledge about his auto --

14   the automotive business that he owns?

15   A.    His what?

16   Q.    715 Madison Avenue, that

17   automotive business.

18   A.    I have no interest in that.

19   Q.    I didn't say that.  Do you know

20   anything about that business?

21   A.    No, I do not.

22   Q.    Have you ever gotten paid from it?

23   A.    No.

1          Q.     Has Ricky, to your knowledge?

2          A.     Has what?

3          Q.     Ricky gotten paid on it?

4          A.     He works there, as far as I know.

5          Q.     Okay.  Where does Jimmy get all

6    the money that he's been paying to you in

7    cash?  Where does he get that money from?

8          A.     I do not know.  He's always

9    working doing something.

10          Q.     Always paying you in cash too?

11          A.     Yes.

12               MR. STOTSER:  Okay.  Let me take

13    five minutes.

14               (Recess.)

15               MR. STOTSER:  We're done for

16    tonight.  No further questions.  Thank you.

17               THE WITNESS:  Thank you.

18          THUS CONCLUDED THE DEPOSITION OF

19          JAMES GREGORY SCHMITT AT 5:40 P.M.

20

21

22

23

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA    )

4    JEFFERSON COUNTY    )

5         I hereby certify that the above and

6    foregoing proceeding was taken down by me by

7    stenographic means, and that the questions

8    and answers therein were produced in

9    transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a true

12   and correct transcript of the proceedings

13   occurring on said date at said time.

14         I further certify that I am neither of

15   counsel nor of kin to the parties to the

16   action; nor am I in anywise interested in the

17   result of said cause.

18

19         _____

20              SALLIE NESMITH GUNTER

21           CERTIFIED COURT REPORTER

22              ABCR LICENSE #37

23              EXPIRES 9/30/2022